1  JULIE SCHUMER, SBN 82814
   Attorney at Law
2  PMB 120, 120 Village Square
   Orinda, Ca. 94563
3  (925) 254-3650

4  Attorney for Petitioner
   DAVID MICHAEL LEON

5

6

7

8                    UNITED STATES DISTRICT COURT

9          FOR THE NORTHERN DISTRICT OF CALIFORNIA

10  DAVID MICHAEL LEON,              ) Case No. _____
                                     )
11          Petitioner,              )
                                     )
12          vs.                      )
                                     )
13  JAMES A. YATES, Warden,          )
    Pleasant Valley State Prison;    )
14  JAMES E. TILTON,                 )
    Director California             )
15  Department of Corrections,       )
                                     )
16          Respondents.             )
    _____)

17

18          **PETITION FOR WRIT OF HABEAS CORPUS**

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

**PAGE**

3    PETITION FOR WRIT OF HABEAS CORPUS                              1

4    INTRODUCTORY ALLEGATIONS AND PROCEDURAL BACKGROUND    1

5    STANDARD OF REVIEW                                             36

6    CLAIMS FOR RELIEF                                              37

7         I.    PETITIONER'S SIX AND FOURTEENTH AMENDMENT
               RIGHTS TO DUE PROCESS WERE VIOLATED BY THE 17
8              YEAR PRE-ACCUSATION DELAY.                           37

9         II.    PETITIONER'S SIXTH AND FOURTEENTH
               AMENDMENT GUARANTEES OF DUE PROCESS
10             AND THE RIGHT TO PRESENT A DEFENSE WERE
               VIOLATED BY THE EXCLUSION OF THIRD PARTY
11             CULPABILITY EVIDENCE.                                45

12        III.   PETITIONER WAS DEPRIVED OF HIS SIXTH
               AMENDMENT RIGHT TO JURY TRIAL
13             AND FOURTEENTH AMENDMENT RIGHT TO DUE
               PROCESS BY THE TRIAL COURT'S ERRONEOUS
14             DISMISSAL OF A JUROR DURING DELIBERATIONS.          52

15        IV.    PETITIONER WAS DEPRIVED OF HIS SIXTH AMENDMENT
               RIGHT TO THE EFFECTIVE ASSISTANCE OF APPELLATE
16             COUNSEL.                                             65

17   CONCLUSION AND PRAYER FOR RELIEF                              80

18   VERIFICATION                                                  81

19

**TABLE OF AUTHORITIES**

20

**FEDERAL AUTHORITIES**

21

     Andrade v. Lockyer (2003)                                     36
22   538 U.S. 63

23   Barker v. Wingo (1972)                                        42
     407 U.S. 514
24
     Brecht v. Abrahamson (1993)                          49, 50, 65
25   507 U.S. 619

26

27

David Michael Leon v. James A. Yates, et al.
28   Petition for Writ of Habeas Corpus          -i-

Chambers v. Mississippi (1973)                                    45
410 U.S. 284

Chapman v. California (1967)                                  49, 65
368 U.S. 18

Chia v. Cambra (9th Cir. 2004)                               47, 48
360 F.3d 997

DePetris v. Kuykendall (9th Cir. 2001)                       36, 49
239 F.3d 1057

Evitts v. Lucey (1985)                                           65
469 U.S. 387

Himes v. Thompson (9th Cir. 2003)                               36
336 F.3d 848

Holmes v. South Carolina (2006)                                 45
547 U.S.319

Houston v. Roe (9th Cir. 1999)                                  36
177 F.3d 901

Joubert v. Hopkins (9th Cir. 1996)                              63
75 F.3d 1232

Kent v. United States (1966)                                    40
383 U.S. 541

Miller v. Stagner (9th Cir. 1985)                               52
757 F.2d 988

Parle v. Runnels (9th Cir. 2007)                                37
___F.3d___, 2007 WL 2936652

Perez v. Marshall (9th Cir. 1997)                               58
119 F.3d 1422

Sanders v. Lamarque (9th Cir. 2004)                      57, 62, 63, 64
357 F.3d 943

Sanders v. Ratelle (9th cir. 1994)                              75
21 F.3d 1446

Shackleford v. Hubbard (9th Cir. 2000)                          57
234 F.3d 1072

David Michael Leon v. James A. Yates, et al.
Petition for Writ of Habeas Corpus                    -ii-

1   Smith v. Robbins (2000)                                    65, 66
    528 U.S. 259
2
    Strickland v. Washington (1984)                            65, 78
3   466 U.S. 668

4   United States v. Barken (9th Cir. 2005)                    39, 40
    412 F.3d 1131
5
    United States v. Doe (19th Cir. 1998)                          40
6   149 F.3d 945

7   United States v. Hall (7th Cir. 1996)                      71, 74
    93 F.3d 1337
8
    United States v. Hall (C.D. I.. 1997)                      71, 73
9   974 F.Supp. 1198

10  United States v. Lovasco (1977)                                39
    431 U.S. 783
11
    United States v. Manning (9th Cir. 1995)                       40
12  56 F.3d 1188

13  United States v. Rosales (1st Cir. 1994)                       78
    19 F.3d 763
14
    United States v. Marion (1971)                             39, 40
15  404 U.S. 307

16  United States v. Shay (1st Cir. 1995)                          71
    57 F.3d 126
17
    United States v. Sherlock (9th Cir. 1989)                      39
18  962 F.2d 1349

19  Van Tran v. Lindsey (2003)                                 36, 37
    212 F.3d 1143
20
    Wiggins v. Smith (2003)                                        75
21  539 U.S. 510

22  Williams v. Florida (1970)                                     52
    399 U.S. 78
23
    Williams v. Taylor (2000)                                      36
24  529 U.S. 362

25

26

27

Williamson v. United States (1994)                                    48
512 U.S. 594

**STATE CASES**

Barnett v. Rosenthal (2006)                                          72
40 Cal.4th 33

Boyer v. State (2002)                                                71
825 So.2d 418

Greyhound Lines, Inc. v. County of Santa Clara (1986)                71
187 Cal.App.3d 480

Jones v. Superior Court (1970)                                       45
3 Cal.3d 734

Kansas v. Cobb (Kan.Ct.App.2002)                                     69
43 P.3d 855

Miller v. State (Ind. 2002)                                      71, 73
770 N.E.2d 763

Nabors v. Worker's Compensation Appeals Board (2006)             72, 75
140 Cal.App.4th 217

New Jersey v. Free (2002)                                            69
798 A.2d 83

Penney v. Superior Court (1972)                                      45
28 Cal.App.3d 941

People v. Barnwell (2007)                                            58
41 Cal.4th 1038

People v. Boysen (2007)                                       39, 43, 44
152 Cal.App.4th 1409

People v. Chi KoWong (1976)                                          40
18 Cal.3d 698

People v. Cleveland (2001)                                           57
25 Cal.4th 466

People v. Cudjo (1993)                                            48, 49
6 Cal.4th 585

People v. Fauber (1992)                                                   59
2 Cal.4th 792

People v. Feagin (1995)                                               58, 60
34 Cal.App.4th 1427

People v. Feggans 91967)                                              66, 72
67 Cal.2d 444

People v. Franklin (1976)                                                59
56 Cal.App.3d 18

People v. Jackson (1985)                                                 64
168 Cal.App.3d 700

People v. Johnson (1981)                                                 66
123 Cal.App.3d 106

People v. Keenan (1988)                                                  57
46 Cal.3d 478

People v. Page (1991)                                                    70
2 Cal.App.4th 161

People v. Pellegrino (1978)                                              45
86 Cal.App.3d 776

People v. Ramos (2004)                                               70, 73
121 Cal.App.4th 1194

People v. Reilly (1988)                                                  72
196 Cal.App.3d 1127

People v. Son (2000)                                             69, 73, 74
79 Cal.App.4th 224

People v. Thomas (1990)                                         58, 59, 60
218 Cal.App.3d 1477

Scott v. Texas (Tex.App.2005)                                           73
165 S.W.3d 27

State v. Conn.  (Ct. 1976)                                              71
370 A.2d 1002

State v. Davis (2000)                                                    69
32 S.W.2d 603

1

## OTHER AUTHORITIES

2
28 U.S.C. 2254(d)(1)                                                  36
Fifth Amendment, U.S. Const.                                      39, 45
3
Sixth Amendment, U.S. Const.                                  46, 52, 65
Fourteenth Amendment, U.S. Const.                         39, 45, 52,63
4
Appeals and Writs in Criminal Cases (2d Ed.)                        72
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

## PETITION FOR WRIT OF HABEAS CORPUS

DAVID MICHAEL LEON ("Petitioner"), through counsel, hereby

petitions this Court, pursuant to 28 U.S.C. §2254, in this petition for the issuance

of a writ of habeas corpus, vacating his conviction and sentence of 27 years to life

for a violation of Penal Code section 187, first degree murder plus personal use of

a weapon.  Petitioner alleges as follows:

## INTRODUCTORY ALLEGATIONS AND PROCEDURAL BACKGROUND

### Jurisdiction and Current Case Status

1.  Petitioner is presently unlawfully confined, restrained of his

liberty and in the custody of James A. Yates, Warden of Pleasant Valley State

Prison in Coalinga, California, and by James E. Tilton, Secretary of the California

Department of Corrections.

2.  Petitioner is so confined pursuant to the judgment of the Superior

Court of Santa Clara County, State of California, in Case No. CC093326, rendered

May 23, 2003.

3.  Petitioner's conviction of murder and 27 years to life state prison

sentence are in violation of the Fifth, Sixth and Fourteenth Amendments to the

United States Constitution.  This Court has jurisdiction pursuant to the United

States Constitution's Article I, section 9, clause 2 and 28 U.S.C. §§2241 and 2254.

Venue is proper in the Northern District because Petitioner was convicted within

it.  (28 U.S.C. §2241(d).)

4.  All issues raised in this Petition have been raised before all state

tribunals in which the issues could be heard, to the exhaustion of Petitioner's state

remedies.  Petitioner has not previously sought relief arising out of the matter from

this Court or any other federal court.

David Michael Leon v. James A. Yates, et al., Petition for Writ of Habeas Corpus

-1-

1

**The Record**

2          5.  Petitioner is submitting concurrently with this Petition the state

3  court opinion in his direct appeal H026042 dated February 24, 2006, the denial of

4  review by the California Supreme Court on May 24, 2006, the Court of Appeal's

5  opinion of February 7, 2007 following Petitioner's appeal of his restitution fines,

6  the superior court's opinion denying his state habeas based on ineffective

7  assistance of appellate counsel dated April 18, 2007 and the denial of review of

8  said claim by the California Supreme Court on October 10, 2007.  (Exhibits A, B,

9  C, D, and E, respectively.)

10                              **Procedural History**

11          6.  Petitioner was charged with a violation of Penal Code section 187

12 (murder) in an information filed October 19, 2001 by the District Attorney of

13 Alameda County.  It was further alleged he had personally used a weapon. (Penal

14 Code section 12022.5(a)(1).)  Said murder was alleged to have occurred November

15 30, 1983.  (4 CT 821-823.)  Petitioner entered a plea of not guilty.  Petitioner was

16 at that time and at all times subsequent represented by counsel.

17          7.  Petitioner was subsequently found guilty as charged and the use

18 allegation was found true.  (7 CT 1670.)

19          8.  On May 23, 2003, the trial court denied Petitioner probation and

20 sentenced him to state prison for 27 years to life.  (7 CT 1819-1820.)

21          9.  Petitioner's conviction was affirmed on direct appeal by the Sixth

22 District in Case No. H026042 on February 24, 2006.  Restitution fines were

23 reversed and the matter was remanded to the Superior Court for a new hearing as

24 to said fines.  A copy of the opinion is attached hereto as Exhibit A.  On May 30,

25 2006, the California Supreme Court denied his Petition for Review.  A copy of the

26 order denying review is attached hereto as Exhibit B. On June 20, 2006, the trial

27

28

David Michael Leon v. James A. Yates, et al., Petition for Writ of Habeas Corpus

1   court reimposed the fines from which order Petitioner appealed.  On February 7,

2   2007, the Sixth District Court of Appeal reduced the restitution fine and struck the

3   parole revocation fine.  A copy of the Court' opinion is attached hereto as Exhibit

4   C.  Petitioner filed a petition for writ of habeas corpus in the Santa Clara County

5   Superior Court on March 7, 2007 alleging ineffective assistance of appellate

6   counsel.  The Superior Court denied said petition in a written order filed April 18,

7   2007,  a copy of which is attached hereto as Exhibit D.  Petitioner refiled the

8   petition in the Sixth District Court of Appeal on May 11, 2007.  It was denied on

9   July 16, 2007.  Petitioner filed a Petition for Review based on this denial on July

10  25, 2007, which petition was denied on October 10, 2007.  A copy of the order

11  denying review is attached hereto as Exhibit E.

12          10.  All of the claims made herein have been exhausted in the highest

13  California state court.  Petitioner has filed no other federal petition for writ of

14  habeas corpus challenging the instant conviction.

15          11.  The State court decision was contrary to, or involved an

16  unreasonable application of clearly established federal law as determined by the

17  Supreme Court of the United Sates.  Title 28 U.S.C. Section 2254, therefore,

18  imposes no obstacle to relief.

19                      **Summary of Facts Presented at Trial**

20      **A.      The Prosecution's case in chief.**

21      The discovery of the body of Marlon Bass and the crime scene investigation

22          On November 30, 1983, Deborah Gerkin, age 16, attended Del Mar

23  High School. She had made plans with Marlon Bass and other friends to leave

24  school and get high at lunch. (7 RT 888-889). Marlon did not show up. (7 RT 890).

25          On November 30 1983, Annie and Palmer Bass and their two sons,

26

27  David Michael Leon v. James A. Yates, et al., Petition for Writ of Habeas Corpus

28                                  –3–

1   Marcus and Marlon[1] lived at 2568 Custer Drive in San Jose. (6 RT 562-563;

2   589-590). Marlon was 20 years old. (6 RT 563). He had graduated Del Mar High

3   School. (6 RT 564). He drove a 1968 Mustang. (6 RT 564-565).  During

4   November, 1983, the Bass's received a lot of hang up calls.  (6 RT 640).

5        Mr. and Mrs. Bass arrived home from work at about 5:30 p.m. (6 RT

6   571; 592).  The door to their residence was ajar and there was glass on the ground.

7   (6 RT 571, 574; 593).  Marlon was laying on the floor in the hall with a bat in his

8   hand. (6 RT 575-576, 581-582; 593-594, 596).  Mr. Bass attempted to revive

9   Marlon and the bat rolled out of Marlon's hand.  6 RT 576; 594, 599). According

10  to Mr. Bass, Marlon was stiff. (6 RT 594).

11       Nothing had been disturbed in the residence except a desk was out of

12  place in Marlon's bedroom. (6 RT 577-578; 603- 604).  However, the desk drawer

13  where Marlon usually kept his money was locked. (6 RT 607-608; 650). Two cans

14  and a towel were under Marlon's desk. (6 RT 636-637; 755-756).  A $2 bill was

15  found on the floor in Marlon's bedroom but no other money was present.  6 RT

16  582; 609).  Mr. Bass did not find money in Marlon's room after the police left. (6

17  RT 582, 609).

18       Before the police arrived, Mr. Bass checked a safe Marlon had

19  underneath his room and moved it into the garage. About a week later, Mr. Bass

20  took the safe to a locksmith and it was empty. (6 RT 601-602, 623).

21       The night before he found Marlon dead, Mr. Bass had checked

22  Marlon's room and found drugs. (6 RT 623-625; 648-649).  Initially he testified he

23  did not remember doing this.  6 RT 623).  Mr. Bass removed two large buckets of

24  _____

25  [1]        Because of the testimony of family members, the
            victim will be referred to at times as Marlon to avoid
26          confusion.

27

28  David Michael Leon v. James A. Yates, et al., Petition for Writ of Habeas Corpus

                                      – 4 –

1    marijuana and locked them in the trunk of a black car he had parked in the garage.

2    (6 RT 626; 649, Exhibits A, B, C).  Mr. Bass had spoken to Marlon regarding his

3    drug dealing and constantly having friends over. (6 RT 638-639).  Mr. Bass told

4    the police he had found $4200 in Marlon's desk drawer on the Sunday before

5    Marlon died. (6 RT 651). On Monday, there was no money. (6 RT 652).  Mr. Bass

6    had seen up to $10,000 previously in Marlon's room. (6 RT 653).

7            At the beginning of the investigation, Sgt. Brockman told Mr. Bass

8    that his son was shot with possibly a .22 caliber weapon but he had not

9    substantiated that yet with lab analysis.  (6 RT 653).  Brockman cautioned Mr.

10   Bass about revealing any information about the case.  (6 RT 658).

11           On the day he died, Marlon's car was parked around the corner

12   facing the wrong way and nosed into the curb. (6 RT 654).  A neighbor, Pamala

13   Anderson, who lived at 2564 Tioga Way on November 30, 1983, saw Marlon park

14   a green Mustang on the wrong side of the street in front of her house in the mid to

15   late morning.  (8 RT 880). He took a baseball bat out of the car and walked away.

16   (8 RT 872-875, 878).  He was wearing a red or blue work shirt. (8 RT 876).  He

17   walked south toward Custer. (8 RT 878).

18           Marlon Bass suffered five gunshot wounds and a small abrasion to

19   his right forearm. (7 RT 679-681; 769).  The cause of death was gunshot wounds

20   to the chest and neck. (7 RT 695).  From the state of the body and clothing, it

21   appeared death occurred before 2:00 p.m. from shots fired from further than three

22   feet away. (7 RT 678, 694; 806-808).  Death in the morning of November 30, 1983

23   was consistent with the degree of rigor mortis and lividity observed.  (7 RT 679).]

24   Five bullets were recovered during the autopsy.  (7 RT 681, 724). The bullets were

25   Remington .22 caliber gold coat hollow point bullets and were most likely fired

26   from a .22 caliber Rohm, RG Industry, Liberty Arms, Burgo, Arminus, or

27

David Michael Leon v. James A. Yates, et al., Petition for Writ of Habeas Corpus

28                                    –5–

1  Mossberg revolver. (7 RT 778-779).  Seven dollars were in the wallet in Marlon's

2  pants pocket. (7 RT 733-734).

3         According to the Medical Examiner, it appeared likely Bass was

4  facing and approaching his assailant when he was first shot and the remaining

5  shots were inflicted as he was attempting to flee and eventually fell. (RT

6  690-694).[2]  In arriving at this opinion it appeared the Medical Examiner assumed

7  that shooter remained stationary.  (7 RT 693).

8         San Jose Police Officer Willam Santos examined the crime scene.  (7

9  RT 700-701). A glass panel nearest the latch on the Bass' front door was broken. (7

10  RT 708).  There were bullet strikes in the walls of the residence near where

11  Marlon's body was found.  (7 RT 716-717).  A bullet was recovered from the wall.

12  (7 RT 723).  No bullet casings were found.  (7 RT 725).  A $2 bill was recovered

13  from the floor in the garage and a $2 bill was recovered from the night stand in

14  Marlon's bedroom. (7 RT 732-733, 734; 762).  Marijuana in two plastic bucket was

15  found in a the trunk of a car in the garage. (7 RT 735-737, 767).

16         A gray button, from the right sleeve of Marlon's shirt, was recovered

17  close to Marlon's leg. (7 RT 752-754; 769).  Other items found at the scene

18  included a Taco Bell cup, nunchukas, baggies with marijuana and white powder, a

19  tan cloth bag with gold strings with a glass rod, and a balance scale. (7 RT

20  758-762).

21         Officer Santos agreed that moving things around at the crime scene

22  can contaminate it and that that could affect the conclusions drawn.  (7 RT 741-

23  744).

24  _____

25    [2]      According to defense expert Dr. John Thornton,
            Marlon Bass was shot by someone inside his bedroom.
26            (RT 1955).

27

David Michael Leon v. James A. Yates, et al., Petition for Writ of Habeas Corpus

28                                    –6–

1        The ensuing investigation.

2        Many of Marlon's friends were interviewed about their contacts with

3   Marlon and their whereabouts on the day of the offense.

4        David Brewster knew Marlon Bass from junior high and high school.

5   (8 RT 815- 816).  Marlon sold marijuana - and drove a green Mustang. (8 RT 817).

6   He sold the drugs from Doerr Park, the 7-Eleven or a friend's house 90% of the

7   time.  The rest of the time he sold from his residence.  (8 RT 817).  Brewster saw

8   Petitioner around the neighborhood and at Marlon's house once. (8 RT 818).

9   Marlon did not have enemies or debts.  (8 RT 818).  Marlon kept his drugs in a

10  bucket or a small wooden jewelry box in his room.  He kept pre weighed drugs in a

11  wooden drawer by his bed.  (8 RT 819, 828-829).  He kept his money locked in his

12  desk drawer. (8 RT 819).  Every once in a while, Marlon carried money in a wad.

13  (8 RT 821).  According to Brewster, besides himself, only a few others knew

14  where Marlon kept his drugs and money although he was open with his drug

15  dealing. (8 RT 837-838).  Brewster told police the opposite, that many people

16  knew Marlon's habits.  (8 RT 836).  He did not let too many people into his room.

17  (8 RT 835).  Marlon had a baseball bat which he kept in his bedroom and

18  sometimes in the trunk of his car. (8 RT 822).

19        Brewster went to a movie with Marlon the night before his death. (8

20  RT 822).  They were drinking and might have smoked a joint before going to the

21  movie. (8 RT 832-833).  Marlon did not have a falling out with Petitioner. (8 RT

22  847).

23        Brewster told officers Marlon picked up a couple of pounds of

24  marijuana from Jeff Purrington on Monday, November 28, 2003. (8 RT 848-849.)

25  Marlon had $1300 to $1400 left after buying the marijuana. (8 RT 849-850).  On

26  Tuesday night, Brewster saw Marlon with between $1000 and $1500 in his locked

27

28
    David Michael Leon v. James A. Yates, et al., Petition for Writ of Habeas Corpus
                                        –7–

1   desk drawer. (8 RT 850, 853-854).  Brewster said Marlon was pretty open in his

2   drug dealing and everyone he dealt with knew where his money and drugs were

3   kept. (8 RT 851).  Brewster said Marlon got some of the drugs from "Tony." (8 RT

4   852).

5          Jeffrey Purrington was with Marlon Bass at the Bass residence two

6   days before Marlon's death. (8 RT 857).  Marlon gave Purrington $2000 to

7   purchase marijuana. (8 RT 857). It appeared Marlon had about $2000 left over. (8

8   RT 857-858).  Marlon kept his money in the center drawer of his desk which was

9   locked. (RT 858, 869, Exhibit No. 30).  He did not see money stored in any other

10  place.  (8 RT 858).  Purrington delivered the marijuana later that same day. (8 RT

11  859).  Marlon was nervous that day. (8 RT 860). Purrington told the police Marlon

12  was under the influence of cocaine. (8 RT 861).

13         According to Purrington, Marlon was open and bragged about selling

14  drugs.  (8 RT 866).  Purrington knew many of Marlon's customers. (8  RT 868).

15  However, Marlon also dealt with a lot of people Purrington did not know. (8 RT

16  869).  Purrington had never seen Petitioner and Marlon together.  (8 RT 865).

17         Brothers Daniel and Samuel Barnett attended junior high school with

18  Petitioner and Marlon Bass. (9 RT 979-980; 1011).  Daniel was closer to Petitioner

19  and Samuel was closer to Marlon Bass. (9 RT 981; 1011-1012).  Daniel had gone

20  to Petitioner's house one day when Petitioner was waiting for Marlon. (9 RT 982).

21  Petitioner said he was "so pissed off at that fucking nigger.  I could just kill him."

22  (9 RT 982).]  At the Preliminary Hearing Daniel testified that Petitioner had said,

23  "that fucking nigger, I'll kick his ass."  (9 RT 989).  Daniel could not say what day

24  or month he heard the statement, it could have been one to two years before the

25  killing.  (9 RT 991).  At the Preliminary Hearing he said it was within six months.

26  (9 RT 993).  Petitioner disappeared after the murder and Daniel did not know

27

David Michael Leon v. James A. Yates, et al., Petition for Writ of Habeas Corpus

28                                  -8-

1   where he was for two or three years. (9 RT 983).

2          As much as a year and a half prior to the murder, Petitioner showed a

3   gun to Daniel Barnett. (9 RT 984-985).  Daniel never saw Petitioner with a gun on

4   any other occasion.  (9 RT 1003).  In 2000, Daniel told Detective Vizzusi he never

5   saw Petitioner with a gun but was pretty sure Petitioner's family had a gun in their

6   house.  (9 RT 1001).

7          Samuel Barnett had purchased marijuana from Marlon Bass and

8   knew he dealt drugs out of his bedroom.  (9 RT 1012).  According to Samuel,

9   Marlon "sometimes" kept his desk drawer locked.  (9 RT 1026).

10          Before Marlon was murdered, Marlon complained about a falling out

11  with Petitioner and said he might need to "kick his ass." (9 RT 1013).  The day

12  after Marlon died Petitioner called Samuel to ask him to purchase some marijuana.

13  (9 RT 1013).  Petitioner wanted $550 for a quarter pound.  (9 RT 1014).  Samuel

14  was shocked because he thought Petitioner was a small time dealer. (9 RT

15  1014-1015).  Samuel asked Petitioner if he knew that Marlon had been killed.

16  Petitioner responded that it had nothing to do with the transaction. (9 RT 1017).

17  Samuel told Petitioner never to call him again because he was uncomfortable that

18  Petitioner might have had something to do with Marlon's death. (9 RT 1017).

19  Samuel had been convicted of felony violation of a protective order and corporal

20  injury on a spouse. (9 RT 1017-1018).

21          Shortly after Marlon's death, Samuel told the police Marlon was mad

22  at someone who ripped him off and it was either Jeffrey Caplan or Petitioner and

23  most likely it was Caplan. (9 RT 1028-1029).  Marlon caught Jeff Caplan ripping

24  off drugs from his house. (9 RT 1032).  Marlon believed a man in a hooded

25  sweatshirt was casing his house a few days before he died. (9 RT 1032-1033).

26  Samuel saw the man in the hooded sweatshirt walk by. (9 RT 1033).  Marlon

27

28
David Michael Leon v. James A. Yates, et al., Petition for Writ of Habeas Corpus
                                    –9–

1   yelled at the guy and the guy said he was waiting for his girlfriend. (9 RT 1034).

2   The guy then fled. (9 RT 1034).  Marlon did not mention Petitioner as being the

3   stalker. (9 RT 1037).

4            Troy Tibbils started Mar Vista High School with Petitioner but then

5   transferred to another school. (12 RT 424-1425).  Petitioner started hanging out

6   with Bernard Wesley and the Smith brothers. (12 RT 1425-1426).  Petitioner

7   bought marijuana from Marlon Bass. (12 RT 1427).  Petitioner told Tibbils that

8   Marlon had money and drugs all over his room. (12 RT 1432).  Petitioner had been

9   attacked by David and Marvin Smith and told Tibbils to stay away from them. (12

10   RT 1473).  Petitioner owned a BB gun. (12 RT 1474).

11            Tibbils related that Petitioner was in a car accident in 1983 and

12   received a monetary settlement. (12 RT 1475).  Petitioner received $2500 and

13   some amount for medical.  He also fixed his car and sold it. (12 RT 1477).  Tibbils

14   was never involved in a burglary and did not know Petitioner to be involved. (12

15   RT 1477-1478).  Sometimes, Petitioner would make large purchases of marijuana

16   and resell it. (12 RT 1483).

17            On the day Marlon was killed, Tibbils and Ron Delgado were with

18   Petitioner at Petitioner's residence at about 10:00 a.m. (12 RT 1429).  They were

19   going to buy marijuana. (12 RT 1430).  Petitioner said he could not get marijuana

20   that day because Marlon was in school and he could get it later. (12 RT 1433,

21   1440, 1446).  Tibbils went back to school and returned to Petitioner's residence

22   around 12:30 or 1 p.m. and picked up the marijuana. (12 RT 1441-1442). He did

23   not notice any difference in Petitioner's demeanor. (12 RT 1470). Although

24   Tibbils testified at trial that believed he made this purchase the day of the

25   homicide, he had nothing to back this up. (12 RT 1448).  By contrast, in 2000, he

26   told Detective Vizzusi that he wasn't sure that he was with Petitioner the day of

27

28   David Michael Leon v. James A. Yates, et al., Petition for Writ of Habeas Corpus
                                           -10-

1   the killing. (12 RT 1454).

2          Four to five days later, Tibbil's father saw an article in the newspaper

3   and asked him whether he knew Marlon Bass.  Tibbils immediately telephoned

4   Petitioner. (12 443). Tibbils had testified previously that Petitioner said he had met

5   Marlon at the 7-Eleven that morning to get drugs.  Petitioner told Tibbils he had

6   seen Bernard Wesley near Marlon's residence on Curtner. (12 RT 1443-1445).

7   Tibbils was unable to recall if he told Nicole DiFlavio, a mutual friend, that he had

8   asked Petitioner if he was involved. (12 RT 1458, 1460).  Tibbils did not believe

9   Petitioner was involved. (12 RT 1461).

10          After the killing Tibbils saw less of Petitioner.  When Petitioner told

11  him he was going to New Mexico, Tibbils was surprised.  (12 RT 1462-1463).

12  Tibbils could not recall how long after the killing Petitioner left but at the

13  preliminary hearing he stated it was six months. (12 RT 1464).  Tibbils told

14  Detective Vissuzi in 2000 that when Petitioner left town he owed people money.

15  (12 RT 1481).

16          Detective Vizzusi interviewed Troy Tibbils on May 10, 2002. (13 RT

17  1527-1528).  Tibbils felt the killing was the same day he bought marijuana from

18  Petitioner.  (12 RT 1528).  Tibbils talked to Petitioner and Petitioner said he met

19  Marlon at the 7-Eleven and purchased marijuana from him.  Petitioner said after

20  Marlon left he saw Bernard Wesley driving down the street and stop at a house on

21  Curtner.  (12 RT 1528).]  Petitioner said Wesley was acting real suspicious. (12 RT

22  1528-1529).  Tibbils said he had gotten a traffic ticket that day.  By the time of

23  trial records of that ticket were destroyed.  (12 RT 1529).  There was no indication

24  Tibbils had been interviewed prior to 2002.  (12 RT 1530).  Detective Vizzusi

25  testified that had he been interviewed earlier, there would have been better success

26  in tracking down the ticket.  (12 RT 1531).

27

David Michael Leon v. James A. Yates, et al., Petition for Writ of Habeas Corpus

28                              -11-

1    Petitioner and Nicole DiFlavio were good friends and used

2  marijuana and cocaine together in 1983.  DiFlavio also was friendly with Marlon

3  Bass. (12 RT 1485-1486). According to DiFlavio, Petitioner was envious of

4  Marlon. (12 RT 1509 ).  Tibbils told her Petitioner got marijuana from Marlon on

5  the morning of the murder. (12 RT 1496, 1498). According to DiFlavio, Petitioner

6  was very concerned about money. (12 RT 1490).  After Marlon's death, Petitioner

7  had a little more money and seemed to have more drugs which caused DiFlavio to

8  become suspicious. (12 RT 1490).  Admittedly, DiFlavio did not know if Petitioner

9  was working. (12 RT 1501).

10    Petitioner left town shortly after Marlon's death without saying he

11  was leaving. (12 RT 1488).  On cross-examination, DiFlavio said he left between

12  one to six months after Marlon's death.  (12 RT 1504).  A month or two after

13  Petitioner left, he called DiFlavio from New Mexico or Arizona. (12 RT 1494).

14  Petitioner never said he killed Marlon.  (12 RT 1502).

15    <u>Petitioner's statements about the Marlon Bass homicide</u>

16    Danette Edelberg, formerly known as Danette Arbuckle, was

17  Petitioner's girlfriend for three or four years in high school.[3]  (13 RT 1550-1552).

18  Danette talked to Petitioner almost every day. (13 RT 1558).  Petitioner was

19  physically abusive to her and was very jealous and possessive. (13 RT 1555-1556).

20  Danette knew Marlon Bass from school but did not associate with him and did not

21  know if Petitioner did. (13 RT 1556).  It was common knowledge that Marlon was

---

23    [3]    Danette Arbuckle had a petty theft conviction in 1984.
24    (13 RT 1578).  The witnesses at trial referred to her as
    Danette Arbuckle and Danette Edelberg.  She also used
25    the married name Danette Rodriguez for a period of
    time.  To avoid confusion, Danette will be used
26    throughout this pleading.

27

<u>David Michael Leon</u> v. <u>James A. Yates</u>, et al., Petition for Writ of Habeas Corpus
28                                             -12-

1  involved in drugs. (13 RT 1674). According to Danette, Petitioner had large sums

2  of money before and after Marlon's death. (13 RT 1674).

3              Petitioner acted as if the murder investigation regarding Bass was a

4  joke. (13 RT 1557).  Petitioner went to visit his father in San Diego sometime after

5  the murder.  (13 RT 1557).  Danette told Inspector Brockman Petitioner told her he

6  was moving to San Diego to be with his dad because his dad wanted him out of the

7  environment and said she took him to the airport when he departed. (13 RT

8  1591-1592).[4]  When he returned, the relationship and the physical abuse resumed.

9  (13 RT 1560-1561).

10             On March 12, 1984, Petitioner and Danette had an argument.

11  Petitioner became abusive and Danette went to a doctor and made a police report.

12  (13 RT 1562). The argument ensued when they were discussing the Bass

13  investigation.  According to Danette, Petitioner admitted the murder.  He said he

14  went to the Bass home to steal money and drugs which were in Marlon Bass's desk

15  drawer.  He said he was in the bedroom when he heard a noise and Marlon was in

16  the hall with a baseball bat.  They had words, Petitioner became frightened and he

17  shot Marlon. (13 RT 1563-1566).  Petitioner demonstrated how he had held the

18  gun. (13 RT 1567).  Petitioner stood up and put hands out in front of him as though

19  he were holding a gun and said he had shot Marlon.  (13 RT 1567).  When Danette

20  started crying, Petitioner said he was just kidding. ((RT 1568).  She tried to leave

21  but he locked the door.  He told her to get on her knees and he started kicking her.

22  She crawled to the door. (13 RT 1569).  She got outside, got in her car and left.

23  (13 RT 1569, 14 RT 1744).  That was the end of the relationship.  (13 RT 1570).

24  Danette didn't tell the police about his statements at the time she initially made the

25  _____

26        [4]        Danielle admitted that she lied to the police during the
                course of the murder investigation.  (13 RT 1581).

27

28  David Michael Leon v. James A. Yates, et al., Petition for Writ of Habeas Corpus
                              -13-

1    police report because she was scared. (13 RT 1571).][5]

2              According to Danette, she told Inspector William Brockman about

3    Petitioner's statements and about his reenactment of the offense sometime after the

4    reenactment.[6]  She talked to Brockman six times between November 30, 1983 and

5    February 10, 1984. (13 RT 1597; 14 RT 1745-1746).  Danette told Brockman

6    Petitioner had a pellet gun but no other gun, (9 RT 1680).  On March 12, 1984, she

7    spoke to Detective Vizzusi but she did not tell him about the reenactment. (13 RT

8    1603-1605).  When she spoke to Sgt. Brockman on February 10 and February13,

9    1984, there had been no reenactment. (13 RT 1628).  On March 13, 1984, she told

10   police she felt 100% certain that Petitioner did not kill Marlon.  (13 RT 1630).

11   She never saw Petitioner with a gun.  (13 RT 1679).

12              On June 9 and June 11, 1986, Danette was interviewed by Annette

13   Rodriguez, a DA investigator, about the domestic violence charges she had

14   reported against Petitioner in 1984. (13 RT 1572; 1733).[7]  Danette told Rodriguez

15   Petitioner had acted out the murder of Marlon Bass then said he was kidding. (13

16   RT 1574; 14 RT 1735).  DAI Rodriguez contacted Inspector Brockman.  However,

17

18       [5]    The report indicated Danette said she was slapped in

19   the face, punched in the ribs, told to get on her knees
     and then she crawled out of the house. The report

20   stated Petitioner kicked Danette in the buttocks. (14

21   RT 1743).  Danette ran to her car and got inside while
     Petitioner was punching the windows. (14 RT 1744).

22

23       [6]    She told another officer that as she drove, Petitioner
     followed her home.   (13 RT 1603). On that occasion

24   she did not mention the reenactment or Petitioner's
     alleged admission.  (13 RT 1605).

25

26       [7]    At the Preliminary Hearing Danette did not recall this
     conversation. (13 RT 1574).

27

David Michael Leon v. James A. Yates, et al., Petition for Writ of Habeas Corpus

28                                   -14-

1   no one followed up with Danette until she talked to Detective Vizzusi in 2000. (13

2   RT 1574; 14 RT 1736).  The only other person Danette told about the reenactment

3   was her best friend Danielle but she did not give her the details. (13 RT 1575,

4   1577).  She never told her brother, Shelby Arbuckle, until years later.  (13 RT

5   1575).

6           In 2000, Danette told Detective Vizzusi that the reenactment was in

7   the midst of the murder investigation and could have taken place between

8   December, 1983 and March, 1984. (13 RT 1626).  At the Preliminary Hearing, she

9   testified it could have been a year after the crime.  (13 RT 1637).  The portion of

10  Vizzusi's interview with Danette where he asked her about the reenactment was

11  not on tape.    (17 RT 2069).[8]

12          In 2002, Danette met with Sgt. Brockman for lunch at the suggestion

13  of the prosecutor who wanted them to remember the details of the reenactment. (13

14  RT 1572; 14 RT 1746).  The lunch was not documented. (13 RT 1665).  Danette

15  told Brockman she had told him about the Petitioner's reenactment of the Marlon

16  Bass murder when he interviewed her in 1984.  Brockman had no memory of

17  being told about the reenactment and had she done so he would have remembered.

18  (14 RT 1746).  If Danette had talked to him about the facts of the case before

19  February 10, 1984, he would have written a report. (14 RT 1757).  Brockman had

20  no recorded contacts with Danette prior to February 10, 1984.  (14 RT 1758).

21          Brockman was contacted by DAI Rodriguez in 1986 and she told

22

23          [8]     Vizzusi noted that with some interviews in the case the
24                  tape was turned on at some point into the interview.
                    (17 RT 2075).  Vizzusi noted that Danielle (infra)
25                  described the reenactment as showing the shooting to
                    be execution style whereas Danette stated Petitioner
26                  put his right arm out. (17 RT 2079).

27
    David Michael Leon v. James A. Yates, et al., Petition for Writ of Habeas Corpus
28                                      -15-

1    him about the reenactment.  He was delighted to receive the information and made

2    arrangements to interview Danette.  He then decided to refer the matter to the

3    homicide unit instead. (14 RT 1747).  He prepared some questions for Danette and

4    talked to Mo Reyes in the homicide unit. (14 RT 1748).

5              Danielle Fournier was a childhood friend of Danette's. [Exhibits

6    Vol. 10:1361 (14 RT 1712).]  Danette told her Petitioner had committed the

7    murder of Marlon Bass and had reenacted the actual murder. (14 RT 1719).

8    According to Danette, Petitioner made her kneel down and put a gun to her head

9    and said he was going to do to her what he had done to Marlon.  (14 RT 1719).

10   Danette said Marlon was shot. (14 RT 1719).  Danette told Fournier Petitioner said

11   he was kidding. (14 RT 1726).

12             Danielle claimed Danette had called her and she went to pick

13   Danette up at Petitioner's house right after the alleged reenactment but agreed she

14   could have picked her up from someplace else. (14 RT 1721).  Danette appeared

15   afraid. (14 RT 1723).  Danielle thought this was a week after Marlon's death.  (14

16   RT 1724).

17             Shelby Arbuckle is Danette Edelberg's younger brother. (8 RT 899;

18   1553).  Petitioner was his sister's boyfriend when Shelby was 12 to about 15 years

19   old. [Exhibits Vol. 4:548 (8 RT 900). Petitioner was abusive to him and they used

20   drugs together. (8 RT 900).  Petitioner started Shelby selling joints of marijuana

21   when Shelby was in the sixth grade. (8 RT 902).  Shelby started selling marijuana

22   in the seventh grade to kids at his junior high school. (8 RT 903).

23             Petitioner talked to Shelby about doing burglaries in the Doeer Park

24   neighborhood. (8 RT 904).  He described casing houses and discussed the ones he

25   planned to hit. (8 RT 905).  Petitioner never said he was going to hit the Bass

26   residence. (8 RT 906).  He did say a person should never burglarize a house where

27

28   David Michael Leon v. James A. Yates, et al., Petition for Writ of Habeas Corpus
                                        -16-

1  the owner or occupier was a police officer.[9]  (8 RT 945).  Troy Tibbils, Ronny

2  Cortez and Darryl Ramos were also involved in burglaries when Petitioner was

3  involved. (8 RT 944).  Shelby was not involved with Petitioner in burglaries but he

4  was a lookout in burglaries involving other people. (8 RT 944).  Petitioner

5  mentioned having a gun one or two months before Marlon Bass died but Shelby

6  did not see it. (8 RT 906-907).  On cross-examination, Shelby thought Petitioner

7  mentioned the gun a lot longer before that.  (9 RT 967).

8            The day after Marlon Bass's death, Shelby heard a rumor about it.

9  Shelby told the rumor to Danette and Petitioner. (8 RT 908).  Petitioner laughed

10  and said Marlon had not been stabbed; he had been shot. (8 RT 909).  Petitioner

11  said someone had broken into the Bass residence, that the perpetrator was in

12  Marlon's bedroom and was surprised by Marlon Bass.  Petitioner said Marlon was

13  shot once or twice in the heart. (8 RT 909).  Shelby's memory was foggy about

14  that part.  (9 RT 965).  According to Shelby, at the time of the statements, there

15  had been nothing in the newspaper or news about the murder. (8 RT 911). Later,

16  Shelby saw a newspaper article about the murder which in his opinion was

17  consistent with what Petitioner had told him. (8 RT 911).  Shelby did not notice

18  any thing unusual in Petitioner's demeanor after the killing. (8 RT 946).]

19            According to Shelby, a month to three months later, Petitioner

20  admitted his involvement in the murder.  (8 RT 913).  He said he had hired two

21  Black men to do the burglary for him and the police were looking in the wrong

22  direction.  He said the men were big and had played for the San Francisco 49ers.

23  He and the men he had hired were going to split the money and drugs they took

24  from the Bass residence. (8 RT 913). Petitioner was confident and cocky.  (8 RT

25

26        [9]      Marlon Bass's father Palmer Bass was a police officer.
                  (6 RT 592).

27

28  David Michael Leon v. James A. Yates, et al., Petition for Writ of Habeas Corpus
                                      -17-

914).]  In another conversation, Petitioner said there was a drawer full of drugs and money.  He said the perpetrator was going to wait for Marlon to leave.  Then he was going to go into the back door of the house.  He would then go directly to Marlon's room where he knew there was a drawer full of money and a separate drawer full of drugs.  (8 RT 915-917).  He said the perpetrator was caught by surprise when Marlon sneaked up with a baseball bat. (8 RT 917).  The perpetrator shot Marlon, who was in the hallway, twice. (8 RT 917- 918).

According to Shelby, Petitioner was strapped for money before the murder. (8 RT 920).  After the murder, Petitioner started buying gifts for Danette and his mother.  (8 RT 921).  Petitioner also had cocaine and a triple beam scale.  (8 RT 921-922).  Petitioner left town for about four months. (8 RT 922-924).  He said he left because the police were bothering him and investigating him for the Bass murder. (8 RT 925).  Petitioner never said he killed Bass.  (8 RT 943).

Shelby had only recently disclosed all this information to Detective Vizzusi in 2002. (8 RT 927).

Mary Keasling was Petitioner's girlfriend starting on December 27, 1990 until December 1994. (11 RT 1346-1347). The relationship ended because Petitioner left Alamogordo, New Mexico. (11 RT 1348).

One night in 1991 when Keasling had been drinking, Petitioner told her he was a suspect in a murder that happened when he was seventeen years old. (11 RT 1350).  He knew the victim who was a drug dealer and had been a friend. (11 RT 1351).  Although she told officers Petitioner told her the victim had been shot, Keasling was unable to recall the topic at trial. (11 RT 1353, 1357).  She was unable to recall if a statement was made about the victim being Black. (11 RT 1354).  Petitioner said no weapon had been found.  (11 RT 1355).  He did not say anything regarding fingerprints. (11 RT 1355).  Petitioner said he had been to the

David Michael Leon v. James A. Yates, et al., Petition for Writ of Habeas Corpus

1   guy's house that day to pick up drugs and had left before it happened. (11 RT

2   1357).  He said he saw someone else approach the victim's house as he left.

3   Keasling recalled the name of the person was Ed, Eddie, Fred or Freddie or Jack or

4   Jackie. (11 RT 1357).  Petitioner never said he killed Bass.  That would have

5   caused her concern.   (12 RT 1370).]

6           According to Keasling, when she was interviewed by the officers in

7   2000 about what Petitioner had told, she had been drinking and they were rude to

8   her. (11 RT 1358).  Officers told her she was going to jail for being an accessory to

9   murder. (12 RT 1386).  Keasling felt they were trying to get her to make certain

10  incriminating statements about Petitioner such as that he committed the crime in

11  self-defense.  (12 RT 1373-1374).  She felt threatened and felt the officers could

12  make trouble in her life.  (12 RT 1382).  She kept telling them Petitioner never

13  mentioned self-defense, all he said was the victim had been murdered.   (12 RT

14  1382).  The officers played her a snippet of a tape of Petitioner's father saying

15  Petitioner had said it was self-defense and told her self-defense could potentially

16  help Petitioner.  (12 RT 1389-1390).  Keasling would not lie under oath for

17  Petitioner.  (12 RT 1374).

18          Keasling's interview was tape recorded and the tape was played for

19  the jury. (21 RT 2398-2399).  The officers said that if she knew about a crime and

20  did not tell about it she could be prosecuted as an accessory. (6 CT 1427.)

21  According to Keasling, Petitioner told her there had been a murder but he did not

22  know anything about it. (6 CT 1429.)  They were drinking when it was discussed.

23  (CT 1429, 1439.)  The officers asked Keasling if self defense was involved and

24  told her Petitioner's father had said it was self defense. (6 CT 1430-1431, 1435,

25  1440, 1445-1446.)  She said Petitioner had beaten her but he wouldn't kill a cat

26  even when she begged him because it was injured.  According to Keasling,

27

28

1    Petitioner was incapable of committing a murder. (6 CT 1430, 1498.)  Keasling

2    insisted she did not know anything and he never mentioned self defense. She

3    insisted Petitioner had caused her much pain and she would never lie for him. (6

4    CT 1432, 1436-1438, 1440, 1443-1448, 1458-1461, 1463, 1468-1469, 1472, 1475-

5    1477, 1486-1487, 1503-1504.)  The officers threatened to get the FBI involved and

6    to arrest her for conspiracy. (6 CT 1478.)  She persisted in saying she knew

7    nothing. (6 CT 1479, 1483.)  The officers threatened to arrest her and she told

8    them to go ahead because she didn't know anything. (6 CT 1502-1504.)  She said

9    she did not like being threatened in her own home. (6 CT 1504.)

10          Keasling told the officers all Petitioner said was he had been under

11    suspicion for murder when he was 17 or 18, the victim was a friend, was shot, was

12    Black and a drug dealer and he had been to the victim's house the day before or the

13    day after it happened. (6 CT 1434, 1436, 1448-1449, 1451.)  He said no

14    fingerprints or weapon was found. (6 CT 1449.)

15          David Michael Leon is Petitioner's father. (14 RT 1766).  Mr. Leon

16    did not recall Petitioner visiting him in San Diego unexpectedly in late 1983 or

17    early 1984  but he did recall Petitioner being in New Mexico in July of 1984.  (14

18    RT 1771-1772).   Petitioner stayed with him in San Diego from one to three weeks

19    at times when he visited.  At that time Mr. Leon lived with a woman who was not

20    keen on his children visiting him. (14 RT 1772).  Petitioner lived in Alamogordo in

21    the 1990s. (14 RT 1774). Mr. Leon admitted he told officers his son had first

22    mentioned the homicide in 1982 when he was living in San Diego. (15 RT 1882).]

23          The police came to Mr. Leon's house in New Mexico in 2000 to

24    discuss Petitioner's alleged involvement in the Bass homicide.  (14 RT 1779).  He

25    was home alone.  (14 RT 1828).]  Mr. Leon was not expecting them and the

26    interview lasted nearly an hour and a half.  (14 RT 1792).  He was nervous.  (14

27

28    <u>David Michael Leon</u> v. <u>James A. Yates</u>, et al., Petition for Writ of Habeas Corpus

                                          -20-

1   RT 1792).  At the beginning of the interview, he told the police he all he knew was

2   that Petitioner had told him he had been a suspect. (14 RT 1783, 1832).  He could

3   not recall when Petitioner told him this but he (Mr. Leon) was not concerned at the

4   time.  (14 RT 1788-1789).

5           Mr. Leon lied to the police  in stating that Petitioner told him he had

6   killed Bass in self-defense. (14 RT 1767, 1799, 1800).  Petitioner did not tell him

7   this.    (14 RT 1800, 16 RT 1889). He did this to help Petitioner and regretted

8   having done so.  (14 RT 1864). He felt threatened in the middle of the interview.

9   The officers didn't seem satisfied with the answers he was providing. (14 RT

10  1795-1796). They threatened him with prosecution for accessory to murder. (14

11  RT  1795-1796).  Mr. Leon was concerned about this.  (14 RT 1859).  Mr. Leon

12  believed that if he would corroborate that it was in self defense he would be

13  helping his son. (14 RT 1802-1803).  The police gave him this impression.  (14 RT

14  1802).  He felt if he agreed on the self-defense issue it would be the end of the

15  interview.   (15 RT 1860).  He felt the police pressured him to say something that

16  wasn't true.  (14 RT 1797).  Toward the end of the interview he made up answers.

17  (14 RT 1798).  During the interview, the police played him a snippet of a tape of

18  Petitioner's 2000 interview with the police wherein he said, "My father, I told him.

19  . ." (15 RT 1888, 17 RT 2033 ).

20          Mr. Leon had been drinking alcohol before the officers arrived. (14

21  RT 1827-1828).  He was into his second six pack of beer.  (14 RT 1828).  He told

22  the officers he had a problem with drinking and sometimes Petitioner talked to him

23  when he had been drinking. (14 RT 1837).  Detective Vizzusi opined that Mr.

24  Leon did not show objective symptoms of intoxication.  (16 RT 1958).

25          Mr. Leon's statements to the officers were recorded and played for

26  the jury. (16 RT 1963).

27

David Michael Leon v. James A. Yates, et al., Petition for Writ of Habeas Corpus

28                                          -21-

1         Mr. Leon told the officers Petitioner might have mentioned a friend

2    of his being murdered in 1983. (6 CT 1283, 1290).  Mr. Leon said Petitioner might

3    have mentioned he was a suspect in the case but Mr. Leon often called Petitioner

4    when Mr. Leon had been drinking. (6 CT 1287, 1307, 1317). Early on in the

5    interview, the officers told Mr. Leon that if he was untruthful he might be charged

6    with something and if he had knowledge and concealed it he might be an

7    accessory, a theme which was repeated. (6 CT 1288-1289, 1306). The officers also

8    told Mr. Leon he might help by corroborating what Petitioner had said. (6 CT

9    1289, 1296).  Mr. Leon denied knowing anything about the crime but

10   acknowledged several times Petitioner mentioned he was a suspect. (6 CT 1297,

11   1298, 1301, 1304, 1320).  The officers again told Mr. Leon he could be prosecuted

12   and implied Petitioner had said it was "self defense." (6 CT 1306-1307).  Shortly

13   thereafter, Mr. Leon said Petitioner had said it was self defense.  Mr. Leon said

14   Petitioner had not elaborated and did not mention a gun. (6 CT 1308, 1309-1310,

15   1315).  The officers told Mr. Leon the crime scene corroborated the self defense

16   claim. (6 CT 1315).  When asked, Mr. Leon agreed Petitioner might have said

17   something about a baseball bat. (6 CT 1316, 1324).  He said he was probably

18   drinking the night Petitioner talked to him. (6 CT 1323, 1329).

19        Petitioner was interviewed by the police on March 16, 2000. (6 CT

20   1332).]  His statements were recorded and played for the jury. (17 RT 2037).

21        Petitioner met Marlon Bass at a party then started selling drugs for

22   him.  Eventually, Petitioner branched out and conducted his own sales.  Petitioner

23   had been to Marlon's house. (17 CT 1339-1342). Marlon would have sales lined up

24   on the street and would throw his money in a big drawer.  He did not allow people

25   into his house.  However, Petitioner was allowed in.  (17 CT 1343).  Petitioner told

26   some of his friends about all the money. (17 CT 1344).  Bernard Wesley started

27

28   David Michael Leon v. James A. Yates, et al., Petition for Writ of Habeas Corpus
                                        -22-

1  hanging around. (17 CT 1344). Wesley had stolen some drugs from Petitioner. (17

2  CT 1344-1345).]

3          Petitioner first said he did not remember seeing Marlon Bass on the

4  day he died. (17 CT 1333).]  Later, Petitioner said he thought he stopped by to see

5  Marlon on that day but did not think he went into the Bass residence.   (17 CT

6  1346 ).]  When Petitioner was in the neighborhood in his car, he saw Bernard

7  Wesley and somebody with Wesley on Leigh Avenue. (17 CT 1346-1347, 1352).]

8  Wesley was moving very fast.  (18 RT 2152).]  Petitioner also had someone with

9  him in the car but he did not recall who it was.  He named a number of his friends

10 as possibilities. (17 CT 1349, 1354-1356).]  He had told the police about this when

11 interviewed shortly after the killing.  (17 CT 1353).]  He was aware then that he

12 was being looked at for the crime.  (6 CT 1382-1383).

13          When asked, Petitioner said Marlon had been shot with a .22 caliber

14 gun by someone who entered his house for dope or money while he was gone.

15 Somebody, such as a police officer,  told Petitioner this or he read it in a

16 newspaper.  (6 CT 1377-1378).[10]  He was told that someone went into Marlon's

17 house for dope or money.  Marlon had left and come back for some reason.

18 According to Petitioner, Marlon carried a souvenir bat under the seat in his car.

19 (CT 1378-379).  Petitioner did not know if Marlon had a gun. (CT 1379-1380).

20          Petitioner was probably working at Great Western Bank during this

21 time period.  (6 CT 1358).

22          Danette was Petitioner's girlfriend at the time. (6 CT 1355).  Danette

23 asked him if he was involved in the murder and he told her he was not. (6 CT

24 _____

25      [10]    According to Detective Vissuzi the caliber of the

26          weapon used was never publicly divulged.  (18 RT

27          2157).

28 David Michael Leon v. James A. Yates, et al., Petition for Writ of Habeas Corpus
                                   -23-

1 | 1392).  If Danette had said otherwise, she was lying. (6 CT 1392).

2              Petitioner knew the Smith brothers. (6 CT 1361).  Petitioner denied

3  telling anyone he had been involved in Marlon's murder even as a joke or in anger.

4  (6 CT 1370-1371). Petitioner said he was truthful when he was interviewed almost

5  20 years prior and said he hadn't seen Marlon for two weeks before Marlon's death.

6  (6 CT 1373).  However, Petitioner remembered owing Marlon some money and

7  having to repay him. (6 CT 1373).  He left town after Marlon's death because of

8  drugs and because he was being investigated. (6 CT 1380-1384).  He went to stay

9  with his father in Murietta Hot Springs and then to New Mexico to stay with his

10 grandmother. (6 CT 1384-1386).   Some of his friends thought he had done it

11 because of the way the police were acting. (6 CT 1391).

12              Petitioner adamantly denied killing Marlon Bass. (6 CT 1395, 1397).

13 Petitioner denied telling anyone he was involved. (6 CT 1397-1398).  During the

14 interview, the officers told Petitioner that they believe they could prove he was

15 involved and that it would make a big difference if it were a cold-blooded murder

16 versus self-defense.  (6 CT 1394).  Petitioner denied being involved.  (6 CT 1395).

17

18 Petitioner' s statements to Bernard Wesley and Wesley's activities on
   November 30 1983

19

20              At the time in question Bernard Wesley knew Petitioner and Marlon.
   (9 RT 1043-1044).

21

22              According to Bernard Wesley, prior to Marlon Bass's death,

23 Petitioner told him that Marlon had good drugs. (9  RT 1046).  Petitioner said

24 Marlon had at least $10,000 and they should steal money and drugs from him. (10
   RT 1047).  Petitioner said Marlon kept the money in a dresser drawer.(9 RT

25

26

27

28 David Michael Leon v. James A. Yates, et al., Petition for Writ of Habeas Corpus
                                    -24-

1    1047).][11]   He said it would be easy to break a window and reach his hand inside.

2    (9 RT 1048).  He said he knew Marlon's parent's schedule and it would be easy for

3    him to get Marlon away from the house.(9 RT 1049). Petitioner said he would

4    meet Marlon at the nearby 7-Eleven for a drug deal then double back to his

5    house.(9 RT 1049).  He said he would wear a ninja outfit which would conceal his

6    face.(9 RT 1050-1051).  He said he would need a gun in case Marlon went back.(9

7    RT 1051). Petitioner asked Wesley to participate. (9 RT 1052).  According to

8    Wesley, Petitioner's sister Dede was present during part of the conversation which

9    took place in Petitioner's room. (9 RT 1053).  Wesley also discussed the plot with

10   Greg Chatman and the Smith brothers.[12] (10 RT 1140, 1154, 1176, 11 RT 1288).

11          Wesley saw a crime stopper program about the Marlon Bass

12   homicide and heard about it through the streets. (9 RT 1056-1057).[13]  He and a co-

13   worker Tim Pantiga joked about the murder. (RT 1057).  He thought this

14    happened after there was something in the paper about the killing.  (9 RT 1057).

15   Tim and Wesley often took work breaks together during which Tim read the

16   newspaper. When Tim read him an article about the killing, Bernard did not tell

17   him, "Those are my boys."  (9 RT 1091, 1098).  He denied telling Tim that he

18   (Bernard) committed the murder or that the police were looking for him in

19   _____

20          [11]      Wesley had been in Marlon's room before.  (9 RT
21                   1045, 1117).  He also had his phone number. (10 RT
22                   1131).

23          [12]      Gregory Chatman knew Bernard Wesley in 1983.
                     Wesley did not tell him that he had ever been told
24                   about a plan to burglarize the home of Marlon Bass by
                     Petitioner. (18 RT 2161).
25

26          [13]      He claimed to have seen the program after his initial
                     interviews with the police.  10 RT 1229.
27

28   David Michael Leon v. James A. Yates, et al., Petition for Writ of Habeas Corpus
                                      -25-

1    connection with the case.  (9 RT 1058, 1098).  His friends teased him that the

2    police were after him. (RT 1058). Wesley was angry with Petitioner for identifying

3    him to the police as a suspect.  (10 RT 1144, 1177).

4          Wesley first talked to the police by phone on December 12, 1983.

5    He said he had seen a large amount of drugs in Marlon's desk drawer. (10 RT

6    1200).  The purpose of his call was to report Petitioner's plan.  (10 RT 1201).  He

7    went to the police station on December 20, 1983 and tried to tell the police

8    everything he knew. (10 RT 1203).  He claimed to have gotten nervous and tired

9    so his intention was thwarted.  (10 RT 1208).  He denied telling the police that he

10   had the conversation with Petitioner about the plan while they were watching the

11   fights and was impeached with a contrary statement.  (10 RT 1204-1205).  He

12   recalled telling the police he visited with Petitioner's sister that day and Petitioner

13   was not home.  (10 RT 1206).  During that interview, Wesley stated that the Smith

14   brothers (infra) were the only ones who would have the intestinal fortitude to go

15   into Marlon's house with a gun.  (18 RT 2123).  Detective Vizzusi did not recall

16   that in that interview Wesley said that the Smith brothers had wasted Marlon like

17   they threatened to waste him.  (18 RT 2122).

18         Wesley first told the police that on the day Marlon Bass died, Wesley

19   was with a neighborhood friend named Renee. (9 RT 1061, 1073-1074, 10 RT

20   1256-1258).  He also told the police he heard he was a prime suspect because he

21   had heard Petitioner was naming him because Wesley had been in the area (9 RT

22   1133).  When the police asked Wesley if he had driven down Curtner and stopped

23   when he saw a couple he knew, his memory of where he had been was jogged.  He

24   had stopped to talk to the people; but, it turned out he did not know them so he

25

26

27

David Michael Leon v. James A. Yates, et al., Petition for Writ of Habeas Corpus

28                                          -26-

1   apologized.[14] (9 RT 1061-1062, 1069- 1071, 1074, 10 RT 1264).  Wesley was

2   driving a new Camaro Z28 painted white with multiple colored stripes. (9 RT

3   1082).  The car was white, orange and black.  (9 RT 1082). He denied keeping a

4   roach clip in his car in 1983 and 1984. (11 RT 1289).  He told the police he drove

5   by Marlon's house. (12 RT 1285-1286).  Before driving on Curtner, Wesley had

6   been at Eastridge Mall buying an opal necklace and a pair of earrings for his

7   girlfriend, Marianne Digiovanni. (9 RT 1062, 1265-1266).  He bought the gift on

8   credit.  He previously testified he paid cash. (9 RT 1063). He no longer had a

9   receipt for this purchase.  10 RT 1265).  He thought he left the mall at 10:30 a.m.

10  but it could have been 11:30 a.m. (9 RT 1071). He was on his way to Marianne's

11  job when he saw Petitioner kneeling down at a phone booth at a 7-Eleven. (9 RT

12  _____

13          [14]       Crystal Custodia lived at 1953 Curtner Avenue in San
                       Jose in November of 1983. (12 RT 1511).  The
14                     7-Eleven was on the opposite side of Curtner.  (12 RT
15                     1512).  In late 1983, a person in a "cool car"
                       approached her and a friend named Bruce as they were
16                     standing in her front yard. (12 RT 1513-1514).  She
                       could not remember anything about him.   (12 RT
17                     1513).  He said he thought they were someone else.
                       (12 RT 1514). The person got out of his vehicle.  (12
18                     RT 1516).  She did not remember the time of day this
19                     occurred or the day of the week.  (12 RT 1514).

20
                       Inspector Joe Brockman interviewed Crystal Custodia on
21                     December 23, 1983.  (12 RT 1520). She reported that she and
                       her boyfriend were sitting in front of her house near a bus stop
22                     when a Black male, average build, driving a white Camaro or
                       Firebird with an orange pinstripe pulled past the house,
23                     honked and backed up.  (12 RT 1521-1522).  He approached
24                     them, then said he thought they were someone else and
                       departed. (12 RT 1522).  She said it was a Monday or a
25                     Wednesday three to four weeks prior in the late afternoon
26                     between two and three p.m.  (12 RT 1522-1523).

27
    David Michael Leon v. James A. Yates, et al., Petition for Writ of Habeas Corpus
28                                         -27-

1   1064-1065)[15] They made eye contact. Petitioner looked like he was throwing up. (9

2   RT 1066). Wesley went to Marianne's job and gave her the jewelry.[16]   (9 RT

3   1072).

4           Wesley knew David and Marvin Smith.  9 RT 1075).  Wesley had

5   seen Petitioner with David and Marvin Smith. (RT 1076).  Wesley had taken some

6   drugs from Petitioner before the murder of Marlon Bass. (RT 1076).  Petitioner

7   unsuccessfully tried to get payment from him and enlisted the assistance of the

8   Smith brothers, who were physically large. (9 RT 1076, 1078-1079). David and

9   Marvin Smith and Petitioner threatened to beat him up and take his car for a

10  joyride. (RT 1077).  Before Marlon's death, Wesley was at Petitioner's house when

11  the Smith brothers confronted him about taking Petitioner's cocaine. (RT 1139).

12  Bernard denied he was mad at Petitioner because of this.  (10 RT 1171).  At one

13  point the Smith brothers  asked his help to "take off" Petitioner.  (10 RT 1162).

14  ――――――――――――

15      [15]    Marianne's job was near Camden Ave. and Hwy. 17.
            From the Eastridge Mall Wesley took Curtner all the
16          way to her job.   (9 RT 1064).

17      [16]    Marianne Brown, formerly known as Marianne
18          Digiovanni, was Wesley's girlfriend in 1983. Wesley
            gave her an aquamarine ring at the beginning of 1983.
19          (12 RT 1539, 1547).  He might have given her an opal
            necklace during her lunch break.  He sometimes visited
20          her at her job at lunchtime.  The job was not far from
21          Camden Ave. and Hwy 17.  (12 RT 1540).  He was not
            the type to give several items of jewelry at one time.
22          (12 RT 1543).  Brown vaguely remembered Wesley's
23          involvement in a drug rip off. (RT 1542-1543).  At that
            time Wesley used and sold drugs.   (12 RT 1541). She
24          told a defense investigator she was not certain that
25          Bernard Wesley gave the ring to her for her birthday or
26          Christmas but he was not the type of person to give her
            a ring out of the blue.

27

28  <u>David Michael Leon</u> v. <u>James A. Yates</u>, et al., Petition for Writ of Habeas Corpus
                                    -28-

1          Wesley called the police on December 27, 1983 and reported he had

2   seen David Smith walking on Bascom at 3:30 p.m. and that he looked different

3   than when he had last seen him, now sporting a new hairstyle and expensive coat.

4   (10 RT 1209).  During this call, Wesley did not initially mention having seen

5   Petitioner on Curtner.  (11 RT 1278).

6          Wesley did not remember telling the police that he did not think

7   Petitioner was involved in Marlon's murder.  (10 RT 1185).  He denied that he

8   rode on a bus with the Smith brothers at some time after the murder.  (10 RT

9   1186).

10         David and Marvin Smith are twin brothers.[17]  (11 RT 1291; 1298,

11  1302).  David frequented a deli on Bascom Avenue where Petitioner worked. (11

12  RT 1291; 12 RT 1474).  Marvin knew Petitioner but denied having a relationship

13  with him. (11 RT 1303). Neither Smith brother knew Marlon Bass or Bernard

14  Wesley. (11 RT 1292; 1301, 1303, 1309).  Neither brother was able to recall

15  Petitioner asking him to collect a drug debt from anyone. (11 RT 1293, 1303).

16  However, in 1984 they might have told the police that Petitioner had used them to

17  collect a drug debt. (11 RT 1292; 1303-1304).  Petitioner never asked them to rip

18  off some drug dealers and they never told that to police officers. (11 RT 1292-

19  1294; 1305). Nor did Petitioner tell them he was planning such a thing. (11 RT

20  1305). David never told Det. Vizzusi that Petitioner kept saying he wanted to

21  rip-off somebody and he wanted to get their drugs nor that Petitioner offered to

22

23       [17]     In 1990, David Smith was convicted of misdemeanor

24               destroying or concealing documentary evidence (Pen.
                 Code § 135) and Marvin Smith suffered a

25               misdemeanor conviction of false identification to a

26               police officer in 1985 (Pen. Code § 148.9).  (22 RT
                 2473).

27

28  David Michael Leon v. James A. Yates, et al., Petition for Writ of Habeas Corpus
                                      -29-

1   pay him to do so. (11 RT 1294).  Petitioner asked him and his brother to help at the

2   store with a beer theft. (RT 1296-1297).  David denied having a falling out with

3   Petitioner.  (11 RT 1297).  After the police talked to David, Petitioner disappeared.

4   (11 RT 1296-1297).  David had never seen Petitioner with a gun. (11 RT 1299).

5          Former Officer John Kracht interviewed David and Marvin Smith on

6   February 6, 1984. (11 RT 1312).  David said he and his brother backed up

7   Petitioner when he collected a drug debt from Bernard Wesley. (11 RT 1314-

8   1315).  He also said Petitioner wanted them to rip off some drug dealers and he

9   said he would pay them. (11 RT 1315).  Martin Smith was interviewed on

10  February 4 and confirmed what his brother had told Officer Kracht.  According to

11  Marvin, Petitioner did not name the dealer and he said he was going to set it up.

12  (11 RT 1316-1317).  Petitioner said he knew the drug dealer and the dealer did not

13  have a gun. (11 RT 1319).  David said he had not seen Petitioner for six to seven

14  months prior to February 6, 1984. (11 RT 1321).

15         Detective Gilbert Vizzusi interviewed David and Marvin Smith on

16  February 11, 2000. (11 RT 1327).  They confirmed the statements they had made

17  in 1984 were true and accurate. (11 RT 1328).  David recalled that Petitioner had

18  asked him to participate in a robbery of a drug dealer. (11 RT 1329). At the time of

19  these interviews Vizzusi had not completely excluded the Smith brothers as

20  suspects.  (11 RT 1331). Vizzusi told Marvin that his name had come up because

21  Petitioner had pointed the finger at him and his brother.   (11 RT 1337). At the

22  time he interviewed the Smiths, Vizzusi also knew that Wesley had also made a

23  statement identifying them as possibly being involved. (11 RT 1342).

24              **B.  The defense case.**

25         Bernard Wesley and Timothy Pantiga were coworkers in late 1983

26  and early 1984 and they took breaks together.  (18 RT 2223-2225). They would

27

28  <u>David Michael Leon</u> v. <u>James A. Yates</u>, et al., Petition for Writ of Habeas Corpus

1   smoke marijuana and read the newspaper. (18 RT 2225-2226). Wesley, who

2   normally did not take an interest in the newspaper, was checking it for a few days

3   looking for an article regarding a murder and a "Black kid" killed in a home

4   invasion. (18 RT 2226). After he found the article, Wesley said "those were his

5   boys." (18 RT 2227-2228).  Pantiga told Wesley there was no statute of limitations

6   on murder. (18 RT 2228). Later, when Pantiga visited Wesley at his residence to

7   purchase marijuana, Wesley said the police wanted to talk to him about the

8   murder.  Pantiga told Wesley if he had nothing to worry about he should talk to the

9   police. (18 RT 2229). Wesley admitted the killing.  He quickly said he was joking

10  and he didn't do it. (18 RT 2229).[18]  Wesley appeared nervous like something was

11  bugging him. (18 RT 2230). Wesley never said Petitioner asked him to commit a

12  burglary of Marlon Bass.   (18 RT 2232).

13          According to Pantiga, Wesley had a roach clip with a feather in his

14  car. (18 RT 2232) Wesley borrowed Marianne Mai's car occasionally. (18 RT

15  2232).

16          Marianne Mai was the girlfriend of Bernard Wesley in the early 80's

17  for two or three years. (18 RT 2236-2237).  According to Mai, Wesley drove a

18  white and red Camaro and carried a red roach clip with red feathers on it in the car.

19  (RT 2237-2238).  The clip matched the car. (18 RT 2238).

20          According to Dr. John Thornton, a forensic scientist, the crime scene

21  processing in this case was rather casual. (16 RT 1926-1927, 1935). It was

22  important to protect the crime scene to avoid contamination. (16 RT 1933). The

23  crime scene was not limited to the immediate area where the body was found.  16

24  RT 1935).

25  _____

26          [18]     Pantiga told a district attorney's investigator that he did
                not take this admission seriously.  (18 RT 2233.)

27

28  David Michael Leon v. James A. Yates, et al., Petition for Writ of Habeas Corpus
                                    -31-

1    The front door area of the Bass residence where the glass was broken

2  and the bat should have been processed for fingerprints. (16 RT 1936-1938).  The

3  missing button and the injury to the victim's arm could be consistent with a

4  struggle. (16 RT 1939-1940).  There was no damage to the desk drawer, indicating

5  it was not forced open. (16 RT 1942).  A towel and a red feather were found in the

6  victim's bedroom. (16 RT 1945).  Dr. Thornton could not rule out the possibility of

7  more than one perpetrator.  (16 RT 1941).  The evidence at the scene did not reveal

8  much of a story.  Nothing established the sequence of events.  (16 RT 1947).

9  Because there was only one bullet remaining in the wall with the others in Marlon,

10 the positions of the shooter and Marlon could not be determined.  (16 RT 1946).

11   In 1982, there had been a petty theft at the Bass residence and two

12 theft related crimes on the same street.  (18 RT 2165).  Ken Auda was a suspect in

13 the crime based on rumors he had been committing burglaries in the area. (RT

14 2166).  However, Detective Vizzusi never interviewed Auda.  (18 RT 2168).

15 Vizzusi never attempted to interview Blaine Buscher or Kirk Woods who were

16 mentioned in the investigation.  (18 RT 2169-2170).

17   Petitioner was seen at the Arbuckle residence on January 24, 1984.

18 (18 RT 2191).

19   Geoffrey Caplan lived around the corner from Marlon Bass in 1983.

20 (18 RT 2240). Caplan broke into the Bass residence five times through a bathroom

21 window to take drugs. (18 RT 2241-2242). According to Caplan, Marlon kept

22 drugs and some money, but not his big money, in a small wooden box.  He also

23 kept money in a metal box. (18 RT 2242- 2243).

24   Marlon caught Caplan stealing about a year before the murder. (18

25 RT 2248). This caused their friendship to end. (18 RT 2249).  About a week before

26 Marlon died, Caplan and Marlon got into a scuffle. (18 RT 2244). In 1983,

27

28

1   Caplan's father owned a .22 caliber rifle. (18 RT 2244).  According to Caplan, he

2   was with Eddie King on the day of the murder. (18 RT 2252).

3            Caplan was unaware of a falling out between Petitioner and Marlon

4   Bass prior to Marlon's death. (20 RT 2312).

5            Kenneth Pitts interviewed Caplan on July 2, 1985.  (18 RT 2257).

6   Caplan told him Marlon bass kept his money and drugs in a small handmade

7   wooden box.  (18 RT 2257).

8            According to defense investigator Robert Bortnick, Shelby Arbuckle

9   said he had a conversation with Petitioner about Marlon's death between 24 to 72

10  hours after the death.  His sister Danette was present. (20 RT 2286). Shelby said at

11  some point Danette had told him about the reenactment. (20 RT 2287).

12           A pay owe sheet recovered from Marlon Bass's bedroom reflected a

13  person named Dave L. owed $40. (20 RT 2338-2339).

14           In an interview with Danette Edelberg on February 10, 1984,

15  Inspector Brockman told her Bass attacked the perpetrator who was in the

16  bedroom with a baseball bat. (20 RT 2321-2322).[19]  He possibly told her Marlon's

17  connection  had cut him off because his drugs were not good and he was getting

18  them elsewhere.  20 RT 2323).  Brockman possibly disclosed the caliber of the

19  bullets to Palmer Bass. (20 RT 2340). During an interview of Anthony James, a

20  drug dealer who knew Marlon through the drug trade, on December 22, 1983, the

21  involvement of a .22 weapon was mentioned.  (20 RT 2342-.2343).

22           Petitioner telephoned Detective Brockman at 2:09 on December 2,

23  1983.  He told Brockman he had seen Bernard Wesley near Marlon Bass's

24  _____

25      [19]      In his conversations with Danette, Brockman discussed
26               with her that Petitioner worked as a bank teller and that
                 he was earning good money. (20 RT 2328-2329).
27

28  David Michael Leon v. James A. Yates, et al., Petition for Writ of Habeas Corpus
                                        -33-

1   residence on November 30, 1983. (20 RT 2314, 2316). Wesley stopped, backed

2   up and left in a big rush. (21 RT 2388). Petitioner told Inspector Brockman that

3   he and Marlon Bass had been friends for 4 ½ years and he saw him at least five

4   times a week. (20 RT 2354). He said he knew Marlon did not have a gun and he

5   saw $15,000 in Marlon's money drawer once several months before the murder.

6   (20 RT 2354). He said he stopped seeing Marlon two weeks before the murder and

7   he did not go to Marlon's funeral. (20 RT 2354). Petitioner mentioned working at

8   Great Western Bank as the reason he did not see Marlon for two weeks. (20 RT

9   2359-2360).[20] Petitioner said he had no grudges against Bernard Wesley. (20 RT

10  2355). He said he did not think Wesley killed Marlon Bass. (20 RT 2356).[21]

11          Bernard Wesley called Brockman on December 12, 1983. Bernard

12  Wesley told him two "Black guys," David and Martin, beat up Petitioner twice,

13  once when they ripped off cocaine and again when he damaged their front door.

14  (RT 2325). They intimidated him into telling them about drug dealers so they

15  could rip him off. (20 RT 2326). Wesley also said that he had had a conversation

16  with Petitioner three weeks earlier where Petitioner mentioned how much money

17  Marlon had and he (Petitioner) was impressed. Wesley inferred from that that

18  Petitioner wanted to rip off Marlon. (20 RT 2326).

19          Petitioner had a phone interview with Brockman on December 20,

20

21          [20]   Brockman did not recall following up on Petitioner's
22                 statement about working at Great Western.    (20 RT
23                 2331).

24          [21]   Petitioner called Brockman on February 8, 1984, upset
25                 because Danette had called him, hysterical, asking if
                   she should talk to the police. Petitioner was upset bout
26                 being investigated and said he was calling from San
                   Diego. (20 RT 2351.)
27

28  David Michael Leon v. James A. Yates, et al., Petition for Writ of Habeas Corpus

                                    -34-

1   1983.  (21 RT 2385).  Petitioner said he owed Marlon $20 or $30 at the time of his

2   death.  He told Brockman he had seen money in Marlon's money drawer and that

3   on the day of Marlon's death, he saw Wesley cruising on Curtner.  (21 RT 2388).

4   Wesley stopped, backed up and left the area in a rush. (21 RT 2388). Wesley was

5   interested in the subject of Marlon's money drawer. (21 RT 2388).

6                    **C.     The prosecution's rebuttal.**

7                    Eight fingerprints were collected from Marvin Bass's bedroom or the

8   door to the bedroom by Officer Bill Santos. (22 RT 2475).  Santos was unable to

9   recall dusting the entry for fingerprints. (22 RT 2477). There was no record of the

10  removal of any prints from the latch of the front door.  (22 RT 2488). Santos

11  collected a towel and a red fiber from Marvin's bedroom. (22 RT 2478). The crime

12  lab described the fiber as a feather. (22 RT 2481).

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
David Michael Leon v. James A. Yates, et al., Petition for Writ of Habeas Corpus

1

**STANDARD OF REVIEW**

2          Under the Antiterrorism and Effective Death Penalty Act of 1996, a

3    state prisoner can be granted federal habeas relief only when the state court

4    decision was "contrary to, or involved an unreasonable application of, clearly

5    established Federal law, as determined by the Supreme Court of the United States."

6    (28 U.S.C. 2254(d)(1); Williams v. Taylor 529 U.S. 362 (2000); DePetris v.

7    Kuykendall 239 F.3d 1057, 1061 (9th Cir. 2001).

8          "Clearly established federal law, as determined by the Supreme

9    Court of the United States" means the holdings, not dicta of the Supreme Court as

10   of the time of the state court decision.  (Van Tran v. Lindsey 212 F.3d 1143, 1154

11   (9th Cir. 2000), overruled on other grounds Andrade v. Lockyer, 538 U.S. 63, 75-

12   77 (2003).)  The "Supreme Court need not have addressed a factually identical

13   case [;] §2254(d) only requires that the Supreme Court clearly determine the law."

14   (Houston v. Roe 177 F.3d 901, 905 (9th Cir. 1999.)  While state court decisions

15   will no longer be overturned in the habeas context because they conflict with

16   circuit caselaw, circuit decisions are still "persuasive authority for purposes of

17   determining whether a particular state court decision is an 'unreasonable

18   application' of Supreme Court law, and may help us determine what law is 'clearly

19   established.'  (Id., at p. 1154; Himes v. Thompson , 336 F.3d 848, 853 (9th Cir.

20   2003).)

21          As observed in Van Tran, supra, 212 F.3d at p. 1150:

22          "A state court's decision can be 'contrary
            to' federal law either 1)if it fails to apply
23          the correct controlling authority, or 2) if it
            applies the controlling authority to a case
24          involving facts 'materially indistinguishable'
            from those in a controlling case, but
25          nonetheless reaches a different result.  A
            state court's decision can involve an
26          'unreasonable application' of federal law if

27

David Michael Leon v. James A. Yates, et al., Petition for Writ of Habeas Corpus

28                                        -36-

1    it either 1) correctly identifies the
     governing rule but then applies it to a new set
2    of facts in a way that is objectively
     unreasonable, or 2) extends or fails to extend
3    a clearly established legal principle to a new
     context in a way that is objectively
4    unreasonable."  Also see <u>Parle</u> v. <u>Runnells</u>
     ___F.3d___, 2007 WL 2936652, *2-*3 (9th Cir. 2007).
5
     The <u>Van Tran</u> court continued:
6
7        "[W]hen analyzing a claim that there has
         been an unreasonable application of federal
         law, we must first consider whether the
8        state court erred; only after we have made
         that determination may we then consider
9        whether any error involved an unreasonable
         application of controlling law within the
10       meaning of §2254(d).  (<u>Id</u>., at 1155.)  We will
         find an 'unreasonable application' only when
11       our independent review of the legal question
         'leaves us with a "firm conviction" that one
12       answer, the one rejected by the [state]
         court, was correct, and the other, the
13       application of the federal law that the
         [state] court adopted, was erroneous, in other
14       words that clear error occurred." (<u>Id</u>., at pp.
         1153-1154.)
15

16
                    **CLAIMS FOR RELIEF**
17
         **I.  PETITIONER'S FIFTH AND FOURTEENTH AMENDMENT**
18           **RIGHTS TO DUE PROCESS WERE VIOLATED BY THE 17**
             **YEAR PRE-ACCUSATION DELAY.**
19
             **Facts supporting this claim.**
20
             1.  There was a 17 year delay between the time Bass was killed and
21
     Petitioner was accused of his murder.  Bass was killed November 30, 1983,
22
     Petitioner not charged until April 28, 2000.  Prior to trial Petitioner sought
23
     dismissal of the case on the basis of prejudicial delay in charging him, arguing the
24
     delay violated his federal and state due process right to a fair trial.  (5 CT 1025-
25
     1035; 1160-1165.)
26

27
     <u>David Michael Leon</u> v. <u>James A. Yates</u>, et al., Petition for Writ of Habeas Corpus
28                                    −37−

1    　　　　Trial counsel argued Petitioner was prejudiced by the long delay

2    because he lost the right to have the case tried in juvenile court where, had he been

3    found guilty, his maximum sentence was far less severe, the memories of

4    witnesses were lost or faded; his own memory had failed which negatively

5    impacted his ability to defend himself and he could no longer produce material

6    evidence and witnesses. (5 CT 1030-1035.)  The trial court conducted an

7    evidentiary hearing and determined it would rule on the matter after trial.  (3 RT

8    310, 412, 4 RT 488.)  During argument on the motion following trial, defense

9    counsel argued that lost physical evidence from the scene included the failure to

10   fingerprint the baseball bat and glass and latch at the front door was prejudicial.

11   (22 RT 2494-2497.)  He also argued that Sgt. Pitts, who was one of the original

12   investigating officers, had lost any memory of the case.  (2 RT 2497, 18 RT 2260-

13   2261.)  He argued that Sgt. Brockman failed to recall discussing Petitioner's

14   alleged reeanactment of the crime with Danette in 1984, the traffic ticket Troy

15   Tibbils had received on the day of a drug deal between Petitioner and Marlon was

16   unavailable, documentation of Bernard Wesley's purchase of jewelry on the day of

17   the offense was no longer available, a witness who had seen Bernard Wesley near

18   the Bass house on the day of the crime no longer had a memory of the event,

19   Marlon's father could not recall with any precision when he removed drugs from

20   Marlon's bedroom, Petitioner could not recall his own activities that day, his

21   employment records were no longer available and Mitch Helms, from whom

22   Petitioner had purchased drugs, was missing by the time of trial.  (22 RT 2498-

23   2499, 2502-2504.)  Tapes of interviews with witnesses as well as of a telephone

24   conversation between police and Petitioner in 1989 were missing by the time of

25   trial and records of Danette's 1984 domestic violence action against Petitioner

26   were unavailable also.  (22 RT 2505-2507, 2508.)  The Smith brothers' memory

27

28

1   was now impaired and they could no longer be cross-examined as to what they told

2   police in February, 1984.  (22 RT 2500.)  Crystal Custodia's memory was

3   impaired..  (22 RT 2503.)

4            The trial court denied the motion finding that Petitioner failed to

5   demonstrate prejudice from the delay.  (22 RT 2516.)

6            2.  The Fifth and Fourteenth Amendments protect an accused from

7   pre-accusation delay that results in the denial of a fair trial.  (United States v.

8   Marion (1971) 404 U.S. 307, 324 (1971).  In United States v. Barken 412 F.3d

9   1131 (9th Cir. 2005), the reviewing court set forth the law applicable to a claim of

10  preaccusation delay under the federal constitution:

11          "The well-settled test for determining whether a defendant's
            due process rights have been violated is in two parts.
12          First, 'a defendant must prove that he suffered actual,
            non-speculative prejudice from the delay,' meaning
13          proof that demonstrates exactly how the loss of evidence
            or witnesses was prejudicial.  (Citations omitted.)  The
14          defendant's burden to show actual prejudice is heavy and
            is rarely met.  (Id.)  The second part of the test applies only if
15          the defendant has demonstrated actual prejudice.  United States
            Manning, 56 F.3d 1188, 1194 (9th Cir. 1995).  In the second
16          part, the delay is weighed against the reasons for it, and
            the defendant must show that the delay '"offends those
17          fundamental conceptions of justice which lie at the base of our
            civil and political institutions."'  (Citations omitted.)  (Also see
18          United States v. Sherlock, 962 F.2d 1349, 1352 (9th Cir. 1989);
            United States v. Doe, 149 F.3d 945, 948 (9th Cir. 1998).)
19
20  To the same effect are United States v. Lovasco 431 U.S. 783, 790 (1977) and

21  United States v. Marion, supra,  404 U.S. at pp. 324-325.[22]

22  _____

23          [22]    Although Marion and Lovaso both noted the
                    prosecutorial concession that deliberate delay to
24                  disadvantage a defendant would constitute a denial of
                    due process, these cases do not hold that such is
25                  required in order to obtain a dismissal on the basis of
                    preaccusation delay.  (People v. Boysen , 152
26                  Cal.App.4th 1409, 1422 (2007).)  The Boysen court

27  _____
    David Michael Leon v. James A. Yates, et al., Petition for Writ of Habeas Corpus
28                                  –39–

1        3.  In the instant case, Petitioner was prejudiced in a variety of ways

2   by the 17 year delay in charging him.

3        Petitioner lost the ability to have the case adjudicated in juvenile

4   court and was thereby subject to far more severe, adult sanctions for the crime.

5   (People v. Chi Ko Wong , 18 Cal.3d 698, 718 (1976).)  As observed by the United

6   States Supreme Court, "to transfer a child from the statutory structure of the

7   juvenile court to the criminal process . . .is, indeed, a 'critically important'

8   proceeding."  (Kent v. United States, 383 U.S. 541, 560 (1966).)

9        Further, significant evidence and witnesses were lost by the time of

10  trial.  The original 911 call and dispatch tapes were missing.  (5 CT 1162.)  These

11  tapes would have helped pinpoint the time of the report and aided the jury in

12  determining whether Mr. Bass had removed the drugs from Marlon's room after he

13  discovered the murder of his son as the defense alleged or whether he did so the

14  night before, as Mr. Bass testified.  Such evidence would have been critical to

15  proving whether or not the crime occurred during the commission of a burglary

16  and whether or not Petitioner was the perpetrator.  The prosecution presented

17  evidence that Petitioner appeared to have more drugs and money after Marlon's

18  death, the implication being he stole these from Marlon.  Establishing with

19

20  _____

21        observed:

22        "It is one thing to conclude, as those cases do, that delay for tactical
          advantage constitutes a violation of due process, it is another
23        to conclude delay for tactical advantage must be shown before
          a due process violation may be found to exist.  We observe
24        in this regard that Marion and Lovasco are entirely consistent
          with California's balancing test."  (152 Cal.App.4th at p. 1422.)  The
25        Ninth Circuit employs the balancing test as well.  (Barken, supra;
          United States v. Manning 56 F.3d 1188, 1193 (9th Cir. 1995).)
26

27  David Michael Leon v. James A. Yates, et al., Petition for Writ of Habeas Corpus
28                                    -40-

1    certainty that Mr. Bass removed the drugs the night <u>before</u> would have negated

2    that Petitioner's increased wealth was due to his commission of the crime.

3              It was undisputed that tapes of interviews of the Smith brothers were

4    missing.  (5 CT 1164.)  This evidence was critical because there was a critical and

5    question as to whether they were involved in the commission of the offense based

6    on Wesley's testimony.  (22 RT 2547-2552.)    Further, the trial court found the

7    Smith brothers had been deliberately evasive and not credible at trial.  (22 RT

8    2499.)  The tapes would have assisted the defense in arguing their lack of

9    credibility and the jury in determining their credibility.  The loss of physical

10   evidence at the scene, specifically the failure to fingerprint the baseball bat and

11   glass and latch at the front door was prejudicial.  (22 RT 2494-2497.)  There was

12   no physical evidence otherwise connecting Petitioner to the scene.  Fingerprint

13   evidence tying someone else there would have been powerful exonerating

14   evidence.

15             A traffic ticket that Troy Tibbils claimed he received on the day of a

16   drug transaction between Petitioner and Marlon was lost by the time of trial.  The

17   loss of the ticket prevented Petitioner from proving that the drug transaction did

18   not occur on the day of Marlon's death, a critical point since Tibbils was the only

19   witness to link Petitioner to Marlon on that day.  (22 RT 2502.)

20             Documentation proving Wesley's purchase of jewelry for his

21   girlfriend on the day of the killing was unavailable by the time of trial.  (10 RT

22   1267-1268, 22 RT 2503.)  Wesley was clearly a suspect during the investigation.

23   He knew Marlon and was seen in the area of Marlon's house on the day of the

24   crime.  Further, he had made incriminating statements to a co-worker about the

25   crime and had initially lied as to his whereabouts on the day it occurred.

26   Documentation of a jewelry purchase would either have solidified his alibi or

27

<u>David Michael Leon</u> v. <u>James A. Yates</u>, et al., Petition for Writ of Habeas Corpus

28                                          -41-

1    further implicated him as the perpetrator.  This was critical where Petitioner denied

2    committing the offense and Wesley was seen near the Bass house near in time to

3    Marlon's death.

4              Records pertaining to Danette Edelberg's 1984 domestic violence

5    action against Petitioner were unavailable.  These records were critical because

6    Danette asserted that the incident arose out of a discussion of the Bass killing.  Her

7    1984 rendition of what occurred at that time would have either constituted

8    powerful corroborating evidence or severely impeached her trial testimony as to

9    what took place.   Petitioner's employment records were unavailable also which

10   would have assisted the defense in establishing his whereabouts on the day of the

11   crime and provided him with a point of reference for that time period.

12             Other witnesses were lost who would have helped Petitioner buttress

13   his defense that someone else committed the crime.  Clearly, prejudice can result

14   from the death of a witness.  (Barker v. Wingo 407 U.S. 514, 532 (1972).)  Darryl

15   Littlejohn, who was owed $987 by Marlon and had said, "Let's go over and get the

16   Black guy" was dead by the time of trial.  (2 RT 155-156; 5 CT 1164, see II,

17   below.)  Littlejohn had also talked about a .22 gun.  (2 RT 157.)  According to the

18   defense, Ricky Ventimiglia, a percipient witness to Littlejohn's threat about

19   Marlon Bass, was missing by the time of trial.  (5 CT 1164.)  Mitch Helms, who

20   also had sold drugs to Petitioner, was missing at the time of trial.  (22 RT 2504, 10

21   RT 1155.)  Given that Petitioner claimed he was not the perpetrator, showing there

22   were others who might have committed the offense was critical defense evidence.

23             A number of witnesses had lost memories.  Sgt. Pitts, one of the

24   original investigating officers, had lost any recollection of the case by the time of

25   trial.  (22 RT 2497, 18 RT 2260.)  Sgt. Brockman, originally in charge of the

26   investigation, failed to recall a critical discussion with Danette Edelberg about

27

28   David Michael Leon v. James A. Yates, et al., Petition for Writ of Habeas Corpus
                                          -42-

1  Petitioner's alleged reenactment of the crime to her in 1984.  (22 RT 2498-2499.)

2  Crystal Custodia, who saw Wesley near the Bass residence on the day of the

3  offense, had a failure of recall.  (22 RT 2503.)  Marlon's father could not recall

4  with any precision when he removed drugs from Marlon's bedroom, the

5  significance of which is discussed above.  (22 RT 2503.)  Petitioner himself could

6  not recall or corroborate his own doings on the day of the crime.  (3 RT 2503.)

7          5.  Most recently, a California reviewing court, applying the

8  balancing test mandated by the United States Supreme Court found that a 24 year

9  delay in charging the defendant with his parent's murder was prejudicial when

10  balanced by the justification for the delay, requiring dismissal of the charges.

11  (People v. Boysen 152 Cal.App.4th 1409 (2007).)  The court noted that the passage

12  of time "fades memories, sees the death of important witnesses and often results in

13  the loss of physical evidence," all of which occurred in that case.  (Id., at p. 1425.)

14  The same is no less true in the case at bar, as has been described above.  In

15  Boysen, the court determined that the most important evidence lost was "that

16  dealing with a possible alibi defense."  (Id., at p. 1425.)  Two potential alibi

17  witnesses had died.  One had supposedly heard a shot the night of the murders and

18  was the first on the scene to observe the victims.  The reviewing court concluded:

19          "Not only did her death deny the defense the statement about
            hearing a shot the night of the murders, it denied the
20          defense the ability to develop additional evidence
            concerning what she heard and the particular
21          circumstances under which she heard it.  The police
            investigation of Naples [the dead witness] was not
22          extensive."  (Id., at p. 1425.)

23  A second witness, deceased at the time of trial, had told police she heard a small

24  car's engine at a particular time on the night of the killings.  The court found her

25  death meant that the defense could not interview her concerning the engine sound

26  or her observations as the first person on the scene.  (Id., at p. 1426.)  The court

27

David Michael Leon v. James A. Yates, et al., Petition for Writ of Habeas Corpus

28                                          -43-

1    also found prejudice from the defense's inability to investigate potential third party

2    culpability evidence, explaining, "While some suggestions of third party

3    culpability evidence in 1980 and 1981 were mere speculation, e.g., the possibility

4    they were killed by drug traffickers, other evidence was more credible and might

5    have been meaningfully investigated by the defense." (Id., at pp. 1426-1427.)

6    Another potential witness relating to third party culpability had died.  As to this

7    witness, the court stated, "The inability because of the passage of time to explore

8    Hobbs's possible involvement in the murder of Elsie and Robert was prejudicial to

9    the defense." (Id., at p. 1427.)  Notably, the defense made no specific showing of

10   what any such exploration or investigation would have revealed.  Finally, the

11   reviewing court cited the trial court's additional finding of prejudice, "The trial

12   court also concluded that the failure of the police in 1980 to fully investigate the

13   murders, document the crime scene, conduct forensic tests and retain important

14   physical evidence, e.g., an open brief case found at the scene, all made

15   investigation of the crime and the development of a defense in 2004 very

16   difficult." (Id., at p. 1427.)

17        Boysen is significant for the instant case for it sanctions a finding of

18   prejudice without the defense showing absolutely that the lost evidence impacted

19   his defense.  In other words, the Boysen court allows a margin of speculation as to

20   what the defense could have done by way of investigation had the evidence been

21   available.  It found prejudice where the defendant's ability to develop third party

22   culpability evidence was impacted without requiring a concrete showing that such

23   evidence could absolutely be produced.  Thus, to the extent that the California

24   Court of Appeal herein denied Petitioner's claim based on the fact that certain of

25   his assertions of prejudice were speculative, such finding is contrary to Boysen,

26   which applied the balancing test of the U.S. Supreme Court.

27

28   David Michael Leon v. James A. Yates, et al., Petition for Writ of Habeas Corpus
                                    – 4 4 –

1    6.  The prosecution presented no reasonable justification for the 17

2  year delay.  The need to conduct additional investigation may provide such

3  justification.  (Jones v. Superior Court, 3 Cal.3d 734, 740-741 (1970).)  However,

4  negligence in gathering evidence or assembling a case for presentation to the

5  district attorney or a district attorney's incompetence in evaluating a case for

6  possible prosecution will not justify a long delay which deprives a defendant of his

7  due process right to a fair trial.  (Penney v. Superior Court, 28 Cal.App.3d 941,

8  953 (1972).)  As stated in People v. Pellegrino, 86 Cal.App.3d 776, 781, (1978)

9  "'[the] People cannot simply place gathered evidence of insubstantial crimes on

10  the 'back burner' hoping that it will someday simmer into something more

11  prosecutable. . ."   In this case, the prosecution had their most critical evidence

12  shortly after the crime was committed.  Here, the prosecution offered no

13  explanation to counter defense representations regarding the various stops and

14  starts in the investigation and years of no activity in the case.  The trial court at the

15  hearing of Petitioner's motion to dismiss noted, "I know somebody dropped the

16  ball," (5 RT 427), a charge with which the prosecutor agreed.  (23 RT 2682.)

17    In sum, Petitioner's Fifth and Fourteenth Amendment rights to due

18  process were violated by the substantial delay in charging him.

19  **II.  PETITIONER'S SIXTH AND FOURTEENTH
     AMENDMENT GUARANTEES OF DUE PROCESS AND THE
20   RIGHT TO PRESENT A DEFENSE WERE VIOLATED BY
     THE EXCLUSION OF THIRD PARTY CULPABILITY
21   EVIDENCE.**

22    1.  The  Sixth and Fourteenth Amendments afford a criminal

23  defendant the right to due process, a fair trial and the right to present a defense.

24  (Chambers v. Mississippi, 410 U.S. 284, 294 (1973); Holmes v. South Carolina,

25  547 U.S. 319, 324 (2006).)

26    **Facts supporting this claim**

27

David Michael Leon v. James A. Yates, et al., Petition for Writ of Habeas Corpus

28                    -45-

1           2.  Petitioner adopts and reincorporates all the facts and other matters

2  set forth elsewhere in this petition.

3           3.  The trial court allowed third party culpability evidence pertaining

4  to Geoffrey Caplan, but excluded such evidence as to Blaine Buscher..  (2 RT 159-

5  160; 17 RT 1983-2014.)

6           With respect to Buscher, Petitioner presented an offer of proof that a

7  William Wall had spoken to the police in 1984 and told them that at a poker party,

8  he said to Buscher, "You killed the nigger," referring to Marlon.  Buscher nodded

9  his head up and down in agreement.  Buscher was interviewed by police and

10  denied involvement.  (5 CT 1058, 2 RT 145.)  Petitioner also proffered that

11  Buscher  acknowledged knowing Marlon and another witness said Buscher owned

12  a small handgun.  (2 RT 149.)  The prosecution proffered that Wall did not know if

13  Buscher understood his reference to be to Marlon's murder and when interviewed

14  by police, Buscher denied ever adopting anyone's suggestion at the card game that

15  he was responsible.  (2 RT 145-6, 17 RT 1994-1995.)  The prosecutor pointed out

16  that Wall's initial statement, to which Buscher nodded, was ambiguous because

17  they were playing cards with another African American, Billy Baptiste, and Wall's

18  statement was made at 4:30 or 5:00 a.m. after a long night of drinking.  (2 RT 145-

19  149, 17 RT 1994-1995, 4 CT 973-974.)  The trial court excluded the evidence on

20  the basis that the admission was tenuous and vague given the context of an all

21  night drinking and card party and Buscher and Wall's subsequent denials that

22  Buscher made an admission.  (2 RT 154, 160, 17 RT 1993.)

23           Defense counsel also sought to present the testimony of Kirk Hill,

24  Laura Basolo, Shannon Murphy and Mark Delaney in an attempt to link Buscher to

25  the crime scene.  The evening before the murder, at about 7:00 p.m., Hill saw a

26  white male in a green Army fatigue jacket approach the Bass residence and yell at

27

28  <u>David Michael Leon</u> v. <u>James A. Yates</u>, et al., Petition for Writ of Habeas Corpus

1   Marlon. (17 RT 1988-1989.) He did not know the man. (17 RT 1989.) Laura

2   Basolo was in the Bass neighborhood at 11:00 a.m. on the day of the murder. She

3   placed a leaflet on the Bass front door and saw nothing wrong with the front

4   window. When she left the area, she saw a male, around 6 feet tall, wearing a

5   green Army fatigue jacket at the Bass front door. (17 RT 1987.) On the evening

6   of the murder, Shannon Murphy, who lived near the Bass's, saw a man in a green

7   Army fatigue jacket, who appeared to be under the influence of something or

8   bothered by something. (17 RT 1991-1996.) Delaney had information that

9   Buscher was known to wear an Army field jacket at the time of the murder. (17

10  RT 1992.) Petitioner argued that the man seen by Hill, Basolo and Murphy could

11  have been Buscher, thus their testimony would circumstantially connect him to

12  Marlon's house before, around the time of and after the murder, thus providing

13  evidence that he did the crime, not Petitioner. (17 RT 1991-1992.) The trial court

14  declined to allow all of this evidence to be admitted on the basis that it was not

15  relevant and not sufficient to qualify as third party culpability evidence in that it

16  was too tenuous and vague. (17 RT 1998.)

17         4.  In <u>Chia</u> v. <u>Cambra</u> 360 F.3d 997 (9th Cir. 2004), the Ninth Circuit

18  explained:

19         "It is clearly established federal law, as determined by the
           Supreme Court, that when a hearsay statement bears persuasive
20         assurances of trustworthiness and is critical to the defense, the
           exclusion of that statement may rise to the level of a due process
21         violation.  <u>Chambers</u>, 410 U.S. at 302, 93 S.Ct. 1038. . .

22         '[T]he Constitution guarantees criminal defendants a 'meaningful
           opportunity to present a complete defense.'" (Citation omitted.)
23         . . . .

24         In a habeas proceeding, we have traditionally applied a
           balancing test to determine whether the exclusion of evidence
25         in the trial court violated a petitioner's due process rights,
           weighing the importance of the evidence against the
26         state's interest in exclusion. (Citation omitted.)  In balancing

27  
    <u>David Michael Leon</u> v. <u>James A. Yates</u>, et al., Petition for Writ of Habeas Corpus
28                                          −47−

1    these interests, we must, on the one hand, afford 'due weight
     to the substantial state interest in preserving orderly trials,
2    in judicial efficiency, and in excluding unreliable . . .
     evidence.' (Citation omitted.)  On the other hand, we must
3    stand vigilant guard over the principle '[t]he right to present
     a defense is fundamental' in our system of constitutional
4    jurisprudence. (Citation omitted.). . .In light of these competing
     interests, federal habeas courts must 'determine what weight
5    the various interests carry when placed on the scales,' (Citation
     omitted) and ultimately determine whether the decision of the
6    state court to exclude the evidence in question was reasonable
     or unreasonable.. . .In assessing the interests at issue in this case,
7    we invoke the five part balancing test formulated in Miller.  These
     factors include: (1) the probative value of the excluded evidence
8    on the central issue; (2) its reliability; (3) whether it is capable of
     evaluation by the trier of fact; (4) whether it is the sole
9    evidence on the issue or merely cumulative; and (5) whether
     it constitutes a major part of the attempted defense.'  Miller
10   757 F.2d at 994."

11        5.  Application of the balancing test as described in Chia compels the

12   conclusion that the trial court unreasonably excluded third party evidence in the

13   case at bar.  The probative value of the excluded evidence was great in terms of

14   Petitioner's denial of culpability.  "Self-inculpatory statements have long been

15   recognized as bearing a strong indicia of reliability."  ( Chia, supra, 360 F.3d at p.

16   1004-1005, citing Williamson v. United States, 512 U.S. 594, 599 (1994)

17   ["[R]easonable people, even reasonable people who are not especially honest, tend

18   not to make self-inculpatory statements unless they believe them to be true."].)

19   Here, a named person, Buscher, who knew Marlon,  made an incriminating

20   admission about the killing.  The fact that Buscher denied having done so, that

21   Wall did not think he intended to accept responsibility for the killing, and the

22   admission took place in the context of an all night drinking and card playing party

23   was not a principled basis upon which to exclude it and did not detract from its

24   reliability.  In People v. Cudjo, 6 Cal.4th 585 (1993), the California Supreme Court

25   found the exclusion of a third party's confession to be error.  The defendant's

26   brother confessed to a cell mate that he had in fact committed the murder for

27

28   David Michael Leon v. James A. Yates, et al., Petition for Writ of Habeas Corpus
                                    -48-

1  which the defendant was on trial.  The court excluded the testimony on the basis

2  that it was unreliable hearsay, and its probative value was outweighed by its

3  prejudice.  (Id., at pp. 605-606.)  The state high court found error in such exclusion

4  because doubts about the credibility of the witness should be left to the jury and

5  the evidence had substantial probative value, and the evidence need only be

6  capable of raising a reasonable doubt of guilt.  (Id., pp. 609-610.)  The evidence

7  excluded here is comparable to that erroneously excluded in Cudjo.  There, the

8  third party confessed to the crime, here he made an inculpatory admission and

9  other erroneously excluded evidence circumstantially placing him in the area

10  during the relevant time period buttressed that admission.  Per Cudjo, it was not up

11  to the trial court to refuse it based on credibility concerns.

12          6.    The refusal of the trial court to admit the third party culpability

13  evidence described above violated Petitioner's Sixth and Fourteenth Amendment

14  rights to due process and to present a defense under any standard this Court might

15  find applicable, mandating reversal.  E.g., Respondent cannot prove that the

16  constitutional error was harmless beyond a reasonable doubt per Chapman v.

17  California (1967) 386 U.S. 18, 24.  Alternatively, the error had a substantial and

18  injurious effect on the jury's verdict, requiring reversal.  (Brecht v. Abrahamson

19  507 U.S. 619, 623 (1993).)  The inquiry is not merely whether there was enough

20  evidence to support the verdict, but whether the error itself had substantial

21  influence.  (Id., at p. 637.)  Here, the excluded evidence went to the centrality of

22  the case, the heart of Petitioner's defense that he was not the perpetrator.  (Cf.

23  DePetris v. Kuykendall 239 F.3d 1057, 1065 (9th Cir. 2001) [erroneous exclusion

24  of defense testimony about victim's handwritten journal could not be deemed

25  harmless because "preclusion of this highly probative evidence went to the crux of

26  the case, and the harm caused by its exclusion was not cured by the receipt of other

27

28  David Michael Leon v. James A. Yates, et al., Petition for Writ of Habeas Corpus
                                    -49-

1   evidence that was significantly less compelling."].)  In addition, upon critical

2   analysis it is clear that the strength of the evidence of  Petitioner's guilt was not

3   overwhelming, a factor that <u>Brecht</u> teaches may be considered in determining

4   whether or not a jury was substantially influenced.  (<u>Brecht</u>, <u>supra</u>, 507 U.S. at p.

5   639.)  Michael Leon's statement concerning Petitioner's alleged admission to him

6   that he committed the crime in self-defense was weakened by the fact that he had

7   been drinking just before he talked to the police and the defense asserted the

8   statement was coerced.

9   Edelberg's testimony regarding Petitioner's admissions/reenactment was not

10  strong evidence of his guilt.  Her testimony was rife with inconsistencies as to

11  when the reenactment took place, how Petitioner reenacted the crime, and when

12  Edelberg informed law enforcement of it.  Further, she admitted lying to the

13  police.  Her testimony conflicted with that of her friend, Danielle Fournier as to

14  how Petitioner reenacted the crime and whether or not Danielle picked Edelberg

15  up or she left his house in her own car.  Both Danette and her brother had a reason

16  to be biased against Petitioner because of his alleged physical and emotional abuse

17  of them.  Danette and Shelby's testimony differed as to whether or not Danette told

18  Shelby about the alleged reenactment.  Further, Shelby never disclosed Petitioner's

19  supposed admissions until shortly before his testimony.  As for Bernard Wesley,

20  his testimony was filled with contradictory statements and was inconsistent with

21  other witnesses.  In addition, he had been a suspect in the case as he was seen near

22  the Bass residence on the day of the crime and thus had a bias toward

23  incriminating Petitioner.  He gave the police inconsistent alibis and his girlfriend

24  did not corroborate his story of giving her jewelry on the day in question.  He

25  admitted the crime to a co-worker although he claimed to be joking.  Even the

26  prosecution admitted that Wesley was not a good witness.  (22 RT 2545.)  The

27

<u>David Michael Leon</u> v. <u>James A. Yates</u>, et al., Petition for Writ of Habeas Corpus

28                              –50–

1  Smith brothers, who in 1984 told police that Petitioner had asked their help in

2  collecting a drug debt were obvious liars and indeed, the trial court found them not

3  credible.  (22 RT 2499.)  They claimed to have no relationship with Petitioner and

4  claimed not to know Bernard Wesley despite the fact that Wesley identified them

5  as possibly involved and they had backed Petitioner up when he collected a drug

6  debt from Wesley.

7          Other evidence relied upon by the People to establish Petitioner's

8  guilt was equivocal.  No physical evidence connected him to the crime.  No one

9  saw him at the Bass house on the day of the crime.  His former girlfriend Mary

10  Keasling did not incriminate him.  The case against him rested entirely on the

11  statements of various witnesses made years after the fact.  Although the

12  prosecution pointed to the fact that Petitioner appeared to have money after the

13  crime, there was evidence that he was employed at the time, plus had received

14  funds from the sale of his car and an insurance settlement.  Although there was

15  evidence that he had been seen with a gun, as it turned out, this was not at the time

16  of the killing and moreover was not shown to be the type of weapon used to kill

17  Bass.  The prosecution relied on the fact that Petitioner appeared to know facts

18  about the killing that had not been released to the public.  The defense presented

19  evidence that such facts had not been kept secret.  The prosecution argued that

20  Petitioner's allegedly abrupt departure from the San Jose area was evidence of his

21  guilt.  Yet the defense presented evidence that said departure was planned as

22  Petitioner had to obtain advance permission from the court to change the location

23  of his then probation.

24          In sum, the wrongful exclusion of third party culpability evidence

25  requires reversal.

26

27

David Michael Leon v. James A. Yates, et al., Petition for Writ of Habeas Corpus

28                                                    -51-

1

2

3

**III.  PETITIONER WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO JURY TRIAL AND FOURTEENTH AMENDMENT RIGHT TO DUE PROCESS DUE TO THE TRIAL COURT'S ERRONEOUS DISMISSAL OF A JUROR DURING DELIBERATIONS.**

4

5

6

7

8

9

10

11

12

13

14

15

      1.  Petitioner had a Sixth Amendment right to jury trial and a Fourteenth Amendment right to due process and a fair trial.  A defendant's Sixth Amendment right to a fair trial is violated when the "essential feature" of the jury is not preserved.  (<u>Williams</u> v. <u>Florida</u> 399 U.S. 78, 100 (1970.)  California Penal Code section 1089 allows removal of a juror from service before or after submission of the case if the juror becomes ill, dies, or upon other "good cause."  The constitutionality of said statute has been upheld.  (<u>Miller</u> v. <u>Stagner</u>, 757 F.2d 988, 995 and fn. 3 (9th Cir. 1985).)  Petitioner contends that the trial court's removal of Juror 6 during deliberations and substitution of an alternate over strong defense objection was in violation of his Sixth and Fourteenth Amendment rights.  The Sixth Amendment right at issue encompasses the improper removal of a juror.  (<u>Id</u>., at p. 995.)

16

17

      2.  Petitioner adopts and reincorporates all the facts and other matters set forth elsewhere in this petition.

18

19

20

21

22

23

24

25

26

      3.  During voir dire every juror was asked about "good" and "bad" experiences with the police.  (1 ART 88-89, 123, 135, 148, 159, 164, 177.)  They were asked if they knew anyone who had been criminally accused.  (1 ART 96-97.)  There were questions about police lying (1 ART 89-94), and each juror was asked if there was any reason they might be biased or not fair.  (1 ART 25, 28, 30, 32, 33, 34-38, 76-77, 83, 113, 128-129, 177, 189.)  Juror 6 was not part of the 12 prospective jurors in the box  at that time.  (2 ART 174.)   Juror 6 was called for questioning partway through the second day of voir dire.  (2 ART 174.)  He indicated he had a first cousin who was a policeman.  (2 ART 174.)  That

27

28

<u>David Michael Leon</u> v. <u>James A. Yates</u>, et al., Petition for Writ of Habeas Corpus

1    relationship would not make it difficult for him to be fair.  When asked if the crime

2    of murder with gun use had "ever touched your life" so that his impartiality would

3    be in question, he said no.  (2 ART 175.)   He could not think of any reason why he

4    could not be fair.  The prosecutor asked him, "When I asked the earlier question

5    about particularly good or bad experiences with law enforcement, about the

6    victim's background, dealing drugs, and the other questions about being able to

7    weigh the evidence at the end of trial, any questions that were outstanding, is there

8    anything that came to mind?"  (2 ART 177.)  Juror 6 said no, and when the

9    prosecutor followed up with, "Nothing at all?"again said no.  (2 ART 177.)

10           During deliberations, seven jurors sent a note to the court stating that

11   Juror 6 was biased against police officers, thought all the witnesses had lied and

12   had mentioned an incident where a young friend of his had been shot.  The note

13   further stated that "We feel he may have misrepresented himself during jury

14   selection" and asked for the court's advice.  (24 RT 2722-2723.)  The court

15   informed both counsel of the note and obtained briefing from both parties as to a

16   proposed course of action.  (24 RT 2723, 7 CT 1641-1657.)  Over defense

17   objection, the court determined it would conduct an investigation because of the

18   possibility that "personal experience" had not been disclosed.  (24 RT 2725, 2730.)

19           The court informed Juror 6 of the contents of the other jurors' note.

20   (24 RT 2731.)  The court asked Juror 6 if his answer was still "No problem" to the

21   question he had been asked in voir dire, "When I asked the earlier questions about

22   particularly good or bad experiences with law enforcement, about the victim's

23   background, dealing drugs and the other questions about being able to weigh the

24   evidence at the end of the trial."  (24 RT 2733.)  He denied that he had during

25   deliberations expressed a negative bias toward police officers and that he had

26   personal experience with violence and guns.  (24 RT 2731.)  He stated, "I

27

David Michael Leon v. James A. Yates, et al., Petition for Writ of Habeas Corpus

28                                            -53-

1   expressed that I felt that the investigators didn't do a good enough job to prove it,

2   to prove to me beyond a reasonable doubt." (24 RT 2731.) Juror 6 denied any

3   negative experience with the police in the past. (24 RT 2732.)

4            The court interviewed the other jurors. Juror 1 said Juror 6 was an

5   angry man and the other jurors did not know the police like he did. He had seen a

6   friend shot in the stomach when he was 13. (24 RT 2734.) The other jurors did

7   not grow up in the same neighborhood as he did and the police were trained to

8   mislead or lie. Juror 6 was not refusing to deliberate. (24 RT 2734, 2736.) Juror 2

9   refused to sign the note because he/she did not think things were going badly but

10  he/she was disturbed about Juror 6's reference to the shooting when he was 13

11  because he/she did not think that came out during voir dire. (24 RT 2737.) Juror 3

12  said, "[Juror 6] basically said they are all trained to lie and he's had some bad

13  experiences with a friend being shot in the stomach. . .I just feel like he brought

14  this bias with him into this trial and he should never have been a juror." (24 RT

15  2738.) Juror 4 said, "[Juror 6]' made a couple of inferences about you don't

16  understand. You haven't seen the things I've seen throughout my lifetime. You

17  haven't seen the way the police act. . .he said as far as I'm concerned all police are

18  trained liars." (24 RT 2739.) Juror 5 said Juror 6 said he "didn't believe anything

19  that police said and "he didn't believe any of the witnesses." Juror 6 also said "he

20  had a lot of experience with police" and "none of the jurors were going to change

21  his mind." (24 RT 2740.) Juror 5 felt Juror 6 was biased. (24 RT 2740.) Juror 7

22  denied that Juror 6 said anything negative about police officers in the jury room.

23  Juror 6 had mentioned his problems with police to Juror 7 and the foreman while

24  they were outside on a break. (24 RT 2741.) Juror 8 said Juror 6 had said he was

25  raised in a tough part of San Jose where there were shootings and stabbings. (24

26  RT 2742.) He/she believed Juror 6 was "in the process of reasoning." (24 RT

27

28  David Michael Leon v. James A. Yates, et al., Petition for Writ of Habeas Corpus
                                        -54-

1    2743.)  Juror 9 said that Juror 6 had said the police were dishonest and liars and,

2    "you can't believe anything that anyone tells you."  Juror 6 answered yes when

3    asked if he had had bad experiences in the past.  (24 RT 2743.)  Juror 10 did not

4    see any problems with how Juror 6 had conducted himself.  (24 RT 2745.)  Juror

5    11 said Juror 6 said that all police are liars, he grew up with them in his

6    neighborhood, that one of his friends had been shot in the stomach and he had

7    problems with guns.  (24 RT 2745.)  This juror opined that Juror 6 was not

8    working with them at all.  (24 RT 2746.)  Juror 12 said Juror 6 was "very negative

9    on the law enforcement" and mentioned when he was younger one of his friends

10   had been shot.  He did not actually say a police officer had done it.  (24 RT 2747.)

11            The court then questioned Juror 6 again.  (24 RT 2747.)  Juror 6

12   denied making any statement about a young friend being shot in the stomach.  (24

13   RT 2748.)  He admitted stating that the other jurors had not been raised in his type

14   of neighborhood.  He was trying to explain that police can make mistakes and lie.

15   (24 RT 2748.)  He opined the other jurors were angry with him because he was not

16   coming to an immediate conclusion and one juror was supposed to go on vacation

17   that week and another had to go to a wedding.  He felt "it was already eleven to

18   one and I was the only one."  (24 RT 2749.)  He acknowledged that he had been to

19   court several times on criminal matters but this had not caused him to become

20   hostile toward police because, "I felt anything I did in the past was my mistake and

21   whatever consequences that happened to me was because of what I did."  (24 RT

22   2749-2750.)

23            The court expressed concern about the narrow issue of  whether

24   Juror 6 had been truthful when he said he could be fair and impartial.  (24 RT

25   2754.)  The prosecutor noted that had the juror not concealed his criminal record

26   and negative bias toward police he could have excluded for cause and he should be

27

28

David Michael Leon v. James A. Yates, et al., Petition for Writ of Habeas Corpus

1   now. (24 RT 2757.)  Defense counsel reiterated his strong objection to any

2   decision to remove Juror 6. (24 RT 2757.)  The court dismissed the juror, finding

3   he had committed misconduct by lack of truthfulness during voir dire, concealing

4   his bias at that time.  The court found he lacked credibility and disbelieved his

5   denial that he had not seen a 13 year old friend shot, stating other jurors would not

6   make that up. The court also found there was a demonstrable reality that Juror 6

7   had lied under oath and was not truthful regarding his bias against police officers.

8   (24 RT 2759-2760.)  Before ruling the court marked as an exhibit Juror 6's

9   criminal history reflecting 29 bookings and ordered it sealed and not unsealed

10  unless by the Court of Appeal. (24 RT 2759.)  The court also marked as an exhibit

11  the transcript of the voir dire of Juror 6, which was also ordered sealed. (24 RT

12  2761.)

13          Trial counsel raised the issue of Juror 6's dismissal in a motion for

14  new trial. (7 CT 1711-1723.)  He attached a declaration from Juror 6. (7 CT

15  1776-1780.)  In said declaration, Juror 6 again denied recounting to other jurors

16  the shooting of a 13 year old although he may have made passing reference to the

17  fact that there had been shootings by police officers. (7 CT 1778-1779.)  He

18  acknowledged that he had had many contacts with the police in the past, but any

19  negative experiences he had had with them were well in the past.  Whatever had

20  happened to him in the past was his mistake and because of his youth. He further

21  stated he did not believe he lied during voir dire and he was not biased.  His

22  statements in the jury room were "with regard to the case that I heard, not with any

23  bias." (7 CT 1780.)

24          The trial court ruled Juror 6's declaration was hearsay and stated he

25  had not been credible at the time of the hearing nor in the declaration. (26 RT

26  2794-2795.)  The court denied the new trial motion. (26 RT 2811.)

27

28                                                  -56-

1          4.  The Court of Appeal, the last reasoned decision on the matter,

2   found that the testimony of the other jurors supported the trial court's finding that

3   Juror 6 lacked credibility, had lied during voir dire about not having a negative

4   police bias that would impede his ability to be fair and impartial, and lied again to

5   the court about not making certain statements during deliberations.  (Exhibit A, p.

6   34.)[23]   The California Court rejected Petitioner's contention that Juror 6's

7   statements merely reflected his personal experience and found that "his statement

8   that he thought all police were dishonest and trained to lie reflects actual bias and

9   an inability to be fair and impartial that is sufficient by itself to support a

10  discharge."  (Exhibit A, p. 34.)   "Because on habeas review a trial court's findings

11  regarding juror fitness are entitled to special deference, review is for manifest

12  error."  (Perez v. Marshall, 119 F.3d 1422, 1426 (9th Cir. 1997).)  As stated in

13  Sanders v. Lamarque, 357 F.3d 943, 948 (9th Cir. 2004), "the state court's factual

14  findings are entitled to a presumption of correctness unless the petitioner can prove

15  otherwise by clear and convincing evidence."

16          5.  Under Penal Code section 1089, a court may remove a juror for

17  good cause if it finds a "demonstrable reality" that the juror is unable to perform

18  his duty, i.e. deliberate fairly.  (People v. Cleveland, 25 Cal.4th 466, 474 (2001).)

19  If the trial court finds that the juror harbors an actual bias which was concealed on

20  voir dire, there will be good cause to remove the juror.  (People v. Keenan, 46

21  Cal.3d 478, 532 (1988).)  "Specifically, a bias against law enforcement officers

22  that renders a juror unable to fairly weigh police testimony is grounds for the

23

24  _____

        [23]       As the last reasoned decision on the matter, it is this
25              opinion that must be reviewed by this Court.
                (Shackleford v. Hubbard, 234 F.3d 1072, 1079, n. 2
26              (9th Cir. 2000).)

27

28  David Michael Leon v. James A. Yates, et al., Petition for Writ of Habeas Corpus
                                         -57-

1   juror's replacement." (People v. Barnwell, 41 Cal.4th 1038, 1051 (2007), citing

2   People v. Thomas, 218 Cal.App.3d 1477, 1485 (1990) and People v. Feagin, 34

3   Cal.App.4th 1427, 1437 (1995).) Barnwell counsels that:

4           "A distinction must be made, of course, between a juror who
            cannot fairly deliberate because of bias and one who, in good
5           faith, disagrees with the others and holds his or her ground. 'The
            circumstance that a juror does not deliberate well or relies upon
6           faulty logic or analysis does not constitute a refusal to deliberate and
            is not ground for discharge.. . .A juror who has participated in
7           deliberations for a reasonable period of time may not be
            discharged for refusing to deliberate, simply because the juror
8           expresses the belief that further discussion will not alter his or
            her views.' (Citation omitted.)"
9
            "Removing a juror is, of course, a serious matter, implicating
10          the constitutional protections defendant invokes. While a trial
            court has broad discretion to remove a juror for cause, it should
11          exercise that discretion with great care." (Barnwell, 41 Cal.4th at p.
            1052-1053.)
12
13          6.  The trial court's finding, adopted by the California Court of

14   Appeal that Juror 6's comments that police were dishonest, that he had grown up in

15   a tough neighborhood and one of his friends had been shot in the stomach

16   constituted actual and impermissible bias against law enforcement that would

17   render him unable to be fair and impartial was not supported by clear and

18   convincing evidence.

19          First, several jurors had expressed the belief that Juror 6 had

20   negative bias against the police, one recalled that Juror 6 thought all police officers

21   were liars while two indicated he had commented that police officers are trained to

22   lie. Some thought Juror 6 had strong opinions but was deliberating properly. (24

23   RT 2734, 2738, 2739, 2743, 2743, 2745.) A comment that police were trained to

24   lie was within the bounds of the evidence presented at trial. Detective Vissuzi

25   testified that officers received training in lying to witnesses. In trial counsel's

26   motion for new trial, he stated:

27
    David Michael Leon v. James A. Yates, et al., Petition for Writ of Habeas Corpus
28                                    -58-

1

2

3

4

5

> "Vissuzi employed a number of tactics to persuade witnesses
> to say certain things, including misrepresenting himself (as a
> parole officer) and splicing specific portions of David Leon's
> previous statement to the police out of context onto tapes and then
> specifically stating to witnesses that they meant something
> other than the meaning that was given to them by the
> defendant.  One extreme example of this was the use of
> such a tape-splicing method with the defendant's father,
> Mr. Michael Leon." (7 CT 1721.)

6    Given that only one juror remembered that Juror 6 had said all police officers are

7    liars, and given Detective Vissuzi's admission that police receive training in lying

8    to witnesses, coupled with what occurred in this case as quoted from defense

9    counsel's new trial motion, there was insufficient evidence to support a finding of

10   actual bias against all police officers, regardless of the circumstances, which would

11   amount to actual and disqualifying bias.  (People v. Thomas, supra, 218

12   Cal.App.3d 1482-1483.)

13           Second, Juror 6 was permitted to bring his personal experience to

14   bear in reaching a decision.  (People v. Fauber, 2 Cal.4th 792, 838-839 (1992);

15   People v. Franklin, 56 Cal.App.3d 18 (1976).)  In Franklin, during deliberations a

16   juror revealed she wanted to disqualify herself because she had once been drugged

17   at a party and had "run amuck" for three days with lapses in memory, an

18   experience akin to the defense testimony related to diminished capacity.  (Id., at p.

19   24-25.)  She felt she could not be fair and impartial.  However, upon further

20   questioning by the court and counsel, she stated she could shut out of her mind her

21   own personal experiences.  The reviewing court upheld the trial court's

22   determination to retain her as a juror:

23

24

25

26

> "From the record it appears that Mrs. Allen's comments clearly
> do not reach the required standard of an inability to perform the
> functions of a juror.  She appeared intelligently sensitive to the
> effect that her personal experience would have on the case, and
> indicated her desire to serve and render a fair decision.  With
> such statements on the record, the court's discretion was
> extremely diminished to justify the disqualification of Mrs.

27

28

1    Allen under sections 1089 and 1120." (Id., at p. 26.)

2    Here, Juror 6 was clear that he denied a negative police bias and admitted that his

3    extensive police contacts did not cause him to be biased because they were his own

4    fault, not that of law enforcement.  (24 RT 2749-2750.)  As in Franklin, in making

5    the comments to other jurors during deliberations, Juror 6 was simply relating his

6    personal experience to the matter at hand.

7    Third, the record did not demonstrate any such bias as a

8    demonstrable reality.  Petitioner acknowledges two California Court of Appeal

9    decisions which have held that a juror's bias against police is good cause to

10    discharge him or her and that the trial court may properly rely on the accounts of

11    other jurors to corroborate that bias in the face of the offending juror's claim that

12    he harbors no such bias.  (People v. Thomas, supra, 218 Cal.App.3d at pp. 1484-

13    1485; People v. Feagin, supra, 34 Cal.App.4th at pp. 1434-1437.)  However,

14    neither of these cases expressly involved a situation where the vote was 11 to 1 for

15    guilt with the allegedly biased juror being the holdout juror and consequently the

16    conclusion that there was actual bias justifying discharge did not take into account

17    that factor and how it might have influenced the other jurors in making the

18    accusations they made against Juror 6.  In the instant matter, as summarized above,

19    it was clear that Juror 6 was the lone holdout.  When questioned by the court, Juror

20    6 said it was already 11 to 1 with him being the one, and other jurors were irritated

21    with him because he was not coming to an immediate decision and two of them

22    had social and vacation plans that they did not want interrupted.  (24 RT 2749-

23    2750.)  The trial court did not accord proper significance to this factor nor did it so

24    much as question any jurors in this vein to substantiate Juror 6's claim. In earlier

25    questioning, Juror 6 had indicated his feeling came from the specific investigation

26    in this case and it would not prevent him from being fair and impartial.  (24 RT

27

28    David Michael Leon v. James A. Yates, et al., Petition for Writ of Habeas Corpus

        -60-

1  2731-2733.)  He also maintained that his many arrests did not engender this

2  feeling, that his past was his mistake and whatever consequences he suffered were

3  because of what he himself did.  (24 RT 2749-2750.)    The trial court failed to

4  afford proper weight to these statements in light of the fact that Juror 6 was the

5  lone holdout with other jurors angry at him.

6           7.  Juror 6 did not intentionally conceal a negative bias toward law

7  enforcement during voir dire which would support his discharge.  During voir dire,

8  Juror 6 revealed he had a cousin in law enforcement, but this would not impact his

9  ability to be fair.  He could think of no reason why he couldn't be fair.  (2 ART

10  174-175.)  He felt "strongly" about holding the prosecution to their burden of

11  proof beyond a reasonable doubt "because it's their job to prove."  (2 ART 176.)

12  When asked by the prosecutor, "When I asked the earlier questions about

13  particularly good or bad experiences with law enforcement, about the victim's

14  background, dealing drugs, and the other questions about being able to weigh the

15  evidence at the end of trial, any questions that were outstanding, is there anything

16  that came to mind?", Juror 6 said no.  (2 ART 177.)  Taking away the garbled

17  syntax of the question which was compound and vague, the prosecutor was

18  essentially asking the juror if he had had any bad experiences with police.  While

19  he had suffered numerous arrests, Juror 6 said no.  He subsequently explained this

20  answer, when questioned during deliberations, by stating that, essentially, he had

21  gotten what he deserved.  Notably, although during the process of determining

22  whether or not to discharge Juror 6 the trial court had before it the record of the

23  juror's numerous arrests, the court did not ask him a single question about them to

24  determine if there were circumstances about them that would have caused him to

25  harbor negative feelings about the police.

26           The trial court found Juror 6 lacked credibility when he stated during

27

28  <u>David Michael Leon</u> v. <u>James A. Yates</u>, et al., Petition for Writ of Habeas Corpus

1  voir dire he could be fair and impartial based on his denial that he had witnessed a

2  thirteen year old friend being shot, something reported by certain of the other

3  jurors. (24 RT 2759, 2748.)  However, the trial court's decision in this regard, and

4  thus the California reviewing court's, was not supported by clear and convincing

5  evidence that Juror 6 lied about this, thus providing a basis for rejecting his

6  credibility.  When Juror 6 denied having made any statements about at age 13

7  seeing a friend shot, the trial court stated, "ten people told me that." (24 RT 2748.)

8  In fact, that was not the case.  Juror 1 testified that Juror 6 said he saw a friend shot

9  in the stomach when he was 13. (24 RT 2734.)  Juror 2 said Juror 6 saw his first

10 shooting when he was 13 years old. (24 RT 2737.)  Juror 3 said Juror 6 claimed a

11 friend had been shot in the stomach. (24 RT 2738.)   Juror 8 said Juror 6 said he

12 was raised in a rough part of town where there where shootings and stabbings. (24

13 RT 2742.) Juror 12 stated that Juror 6 had said that one of his friends had been

14 shot. (24 RT 2747.)  Thus, only two juror, not ten, claimed that Juror 6 had said

15 something about a friend being shot in the stomach, and only one juror claimed

16 that it was a thirteen year old that had been shot.  Per Juror 12, Juror 6 did not say

17 that a police officer had done the shooting.

18         At worst, Juror 6 was not completely forthcoming during voir dire.

19 Sanders v. Lamarque 357 F.3d 943 (9th Cir. 2004) is instructive as to whether or

20 not this compelled his dismissal.  Sanders involved the removal of the lone holdout

21 juror after the jury foreperson sent the trial court a note complaining that Juror 4

22 was not following the court's instruction not to be influenced by "mere sentiment,

23 conjecture, sympathy, passion, prejudice, public opinion or public feeling."  The

24 court questioned each juror individually and it became clear that the vote was 11 to

25 1 with Juror 4 being the one.  Juror 4 testified she had been deliberating, felt

26 "deeply" that she was fair and objective, that she had requested the jury analyze

27

28 David Michael Leon v. James A. Yates, et al., Petition for Writ of Habeas Corpus
                                          -62-

1   the testimony witness by witness but she felt pressured.  The court determined she

2   need not be removed for failure to deliberate or bias.  (Id., at p. 946.)

3            During the hearing, an issue arose as to whether or not Juror 4 had

4   been truthful during voir dire.  She had disclosed her grandnephew had been the

5   victim of a possibly gang related murder but had not revealed that she had lived 25

6   years ago in an area about 20 blocks from where the current crime took place, even

7   though she had not been back in years, and that her sons had associated with gangs

8   when they were teens (they were now 40 and 34 years old).  (Id., at p. 947.)  The

9   trial court ordered her removed because "she did fail to disclose. . .that her sons

10  claimed gang affiliation and she lived in a neighborhood where apparently there

11  was. . .gang activity going on."  (Id., at p. 947.)

12            The Ninth Circuit reversed the conviction, stating:

13            "When establishing juror bias, 'a party must first demonstrate
              that a juror failed to answer honestly a material question
14            on voir dire, and then further show that a correct response would
              have provided a valid basis for a challenge for cause.  The
15            motives concealing information may vary, but only those
              reasons that affect a juror's impartiality can truly be said to
16            affect the fairness of a trial.'(Citation omitted.)" (Id., at p. 948.)

17  Significantly, the court determined the nature of the questions was critical to a

18  determination of whether there was a failure to disclose:

19            "The trial court's conclusion that 'she did fail to disclose. . .
              that her sons claimed gang affiliation, and she lived in a
20            neighborhood where apparently there was. . .gang activity going on'
              is simply and objectively incorrect.  Juror 4 answered
21            questions about her sons' activities in detail and did not, in fact,
              live 'in a neighborhood in some proximity to the crime scene, but
22            that was not the question posed to her.  As explained by the
              district court, not only was Juror 4's interpretation of the
23            questions on voir dire reasonable, but an independent review
              of the record demonstrates that, by all measures, it was the
24            correct one.  All of the questions posed by the trial court
              relating to familiarity with the neighborhood were couched in
25            the present tense.  Whereas the trial court elected to inquire whether
              jurors expressly had present and past encounters with
26            particular experiences such as visiting a jail, being a victim of

27

28  David Michael Leon v. James A. Yates, et al., Petition for Writ of Habeas Corpus
                                    -63-

1    crime, being accused of a crime, the knowledge of the
2    neighborhood expressly was conditioned on the juror's
     present-day residence, work, or other reason that brought her into
     that neighborhood on a regular basis.
3
4    Likewise, all of the questions relating to gangs were specific
     questions about gang membership, academic expertise about gangs,
     and whether anyone presently lives or works in an area with a
5    known gang presence. These questions expressly asked about
     discrete and particular contacts with gangs and are not open-ended
6    queries into all possible contacts with gangs or gang members.
     In light of this record, any claim of implied bias becomes
7    untenable." (Id., at p. 949.)

8  On this basis the Ninth Circuit upheld the district court's determination that there

9  was clear and convincing evidence that the state trial court made an objectively

10 unreasonable determination of the relevant facts.

11        Here, as noted above, the question at issue was extremely vague,

12 broad and compound. The juror answered truthfully, as he apparently did not

13 perceive his prior arrests to be particularly good or bad. Similarly, in People v.

14 Jackson, 168 Cal.App.3d 700 (1985), a case involving possession of marijuana for

15 sale, a broad catch-all question was posed during voir dire to the effect did anyone

16 have anything in their background to disclose, a skeleton in the closet type issue.

17 (Id., at p. 702.) Not until deliberations did a juror disclose that his nephew had died

18 from drug related reasons many years prior to trial. On appeal, the defense

19 claimed the juror should have been discharged. The reviewing court disagreed,

20 concluding that the question had been inartfully framed. The juror had informed

21 the court that his decision would not be affected, which the reviewing court

22 determined supported a finding that the juror was not biased. (Id., at p. 705-706.)

23 The same factors obtain in the case at bar.

24        8. The erroneous dismissal of Juror 6 violated Petitioner's Sixth and

25 Fourteenth Amendment rights to due process and fair trial under any standard of

26 review this Court might find applicable, mandating reversal. E.g., Respondent

27
28

David Michael Leon v. James A. Yates, et al., Petition for Writ of Habeas Corpus
                                          -64-

1  cannot prove that the constitutional error at issue was harmless beyond a

2  reasonable doubt per <u>Chapman</u> v. <u>California</u>, <u>supra</u> (see <u>Joubert</u> v. <u>Hopkins</u> 75

3  F.3d 1232, 1245 (8th Cir. 1996) [in federal habeas review of state court error,

4  <u>Chapman</u> is applied to constitutional errors when underlying state court opinion

5  failed to apply <u>Chapman</u> analysis in the first instance]; see p. 34 of California

6  Court of Appeal opinion dated 2/24/06, Exhibit A) and the wrongful dismissal had

7  a substantial and injurious effect on the jury's verdict requiring reversal.  (<u>Brecht</u>

8  v. <u>Abrahamson</u>, <u>supra</u>.  Juror 6 was the lone holdout.  Petitioner was convicted

9  shortly after an alternate was substituted.  From that we glean that had there been

10 no substitution, Petitioner's jury would have hung.

11     **IV.  PETITIONER WAS DEPRIVED OF HIS SIXTH AMENDMENT
          RIGHT TO THE EFFECTIVE ASSISTANCE OF APPELLATE
12        COUNSEL.**

13         1.  Petitioner had a Sixth Amendment right to effective counsel on

14 appeal.  (<u>Evitts</u> v. <u>Lucey</u>, 469 U.S. 387 (1985).) In order to find counsel was

15 ineffective, the test set forth in <u>Strickland</u> v. <u>Washington,</u> 466 U.S. 668, 687-8

16 (1984) requires a showing that counsel's performance fell below an objective

17 standard of reasonableness and that, but for counsel's error, a different result

18 would have been reached.  The <u>Strickland</u> test applies to appellate counsel.  (<u>Smith</u>

19 v. <u>Robbins</u>, 528 U.S. 259, 285 (2000).)  To establish constitutionally deficient

20 representation on appeal, the defendant must show that (1) the act or omission in

21 question was objectively unreasonable, and (2) there is a reasonable probability

22 that but for counsel's error, the defendant would have prevailed on appeal.  (<u>Id</u>., at

23 p. 285.)

24         2.  Petitioner adopts and reincorporates all the facts and other maters

25 set forth elsewhere in this petition.

26         3.  Appellate counsel had a duty to present a brief to the reviewing

27 <u>David Michael Leon</u> v. <u>James A. Yates</u>, et al., Petition for Writ of Habeas Corpus

28                                  –65–

1   court that among other things, sets forth all arguable issues, meaning one that is

2   not frivolous.  (Smith v. Robbins, supra, 528 U.S. at p. 282.) As explained in

3   People v. Johnson, 123 Cal.App.3d 106, 109, 112 (1981):

4              ". . .an arguable issue consists of two elements.  First, the issue
               must be one which, in counsel's professional opinion, is
5              meritorious.  That is not to say that the contention must
               necessarily achieve success.  Rather, it must have a
6              reasonable potential for success.  Second, if successful,
               the issue must be such that, if resolved favorably to
7              the Petitioner, the result will either be a reversal or a
               modification of the judgment."

8
    Further, "counsel serves both the court and his client by advocating changes in the
9
    law if argument can be made supporting change."  (People v. Feggans, 67 Cal.2d
10
    444, 447-448 (1967).)
11
12           4.  Appellate counsel was ineffective in failing to raise on direct

13  appeal the issue of the trial court's refusal to allow the defense to present the

14  testimony of Dr. Ofshe or Dr. Leo, experts on the subject of police coerced

15  statements by witnesses.

16           5.  At Petitioner's trial, defense counsel made repeated attempts to

17  induce the court to allow him to present the testimony of an expert, Dr. Richard

18  Ofshe.  The purpose of the testimony was to show that the statement Petitioner's

19  father gave to the police in which he admitted that Petitioner had informed him the

20  murder was committed in self-defense was coerced as a result of police tactics.

21  Petitioner unsuccessfully sought to exclude the statement of his father on this basis.

22  (4 CT 984-985.)  When Dr. Ofshe proved to be unavailable, defense counsel sought

23  permission to present the same type of testimony through Dr. Ofshe's colleague,

24  Dr. Richard Leo.  (5 CT 1172-1174.)  Defense counsel argued that the purpose of

25  Dr. Ofshe's testimony was not to establish the credibility of a witness but rather to

26  show the subtle and not obvious ways a statement can be coerced.  Defense counsel

27
    David Michael Leon v. James A. Yates, et al., Petition for Writ of Habeas Corpus
28                                  -66-

1   argued:

2              "We submit that the statement by Mr. Leon [Petitioner's father]
               was the product of police coercion, specifically putting Mr. Leon
3              in a position where he was coerced into stating that his son
               said to him that 'it was self-defense.' The evidence will show
4              that Mr. Leon stated numerous times that his son did not tell
               him anything about the murder other than he had been a suspect.
5              It was only when the police make statements to Mr. Leon that if he
               told them that his son said it was in self-defense they could go
6              to the District Attorney and see that his son was freed from
               custody. The police also went on to tell the father that they had
7              been to the crime scene and that the crime scene corroborated
               that self-defense was a viable conclusion. All they needed to
8              hear was corroboration. The police even went the extent of
               playing a tape for the father using an excerpt lifted from the
9              defendant's earlier statement to the police and implying that
               from this snippet that his son said he killed Marlon Bass in
10             self-defense. This was not only untrue but furnished the basis
               for the father to believe that the police were telling him the
11             truth. The police also threatened the father that if he did not
               tell him what they want to hear he would be 'charged with
12             something' and that he could be 'an accessory' to the murder.
               It was only after the police preyed upon him for approximately
13             one hour that he finally corroborated what he believes they told
               him existed, e.g. that they have been to the crime scene and if
14             he just told the police his son mentioned that it was in self-defense
               it will result in his son's 'life' and 'his son's freedom.' 'Now is the
15             time to get it out so we can go to the DA before he is even
               charged and tell the DA that this is what he told us. . .' All of these
16             ploys can be demonstrated to produce unreliable and coerced
               responses. This is especially true where Mr. Leon who had consumed
17             approximately two six packs of beer at the time. This
               coerced statement goes to the very core of the prosecution's case.
18             There is a substantial nexus between the way the interview was
               conducted and the statement that was finally elicited from Mr.
19             Leon's father. The prosecution's attempt to mask this as a
               credibility question is an attempt to obfuscate the evidence."
20             (5 CT 1088-1089.)

21             After listening to the tape of Michael Leon's statement, the trial court

22  ruled that "you [meaning defense counsel] do not need an expert to tell me that this

23  tape was a statement by someone who was coerced or not coerced." (3 RT 281.)

24  The court made a finding that Mr. Leon's statement was voluntary without hint of

25  coercion and whatever tactics were used by the police were permissible under

26  California law. The court then excluded expert testimony as it would not assist the

27

28  David Michael Leon v. James A. Yates, et al., Petition for Writ of Habeas Corpus
                                          -67-

1  jury "because there's something of common experience that juries have in

2  regarding the credibility of people under the circumstances under which they are

3  given." (3 RT 283, 287.)

4         Petitioner sought reconsideration of this ruling. (3 RT 377.)

5  Defense counsel cited various cases to the court and acknowledged that the trial

6  court had found Mr. Leon's statement voluntary but objected to the trial court's

7  blanket exclusion of expert testimony to educate the jury as to general principles

8  concerning police interrogation. Defense counsel noted that the techniques could

9  not be readily recognized by jurors, jurors did not know that police were necessarily

10 specifically trained in how to interrogate witnesses, that these techniques were

11 designed to cause someone to make a statement against their self-interest, and that

12 it was counter intuitive for a juror to believe a person would make a false statement

13 and come to court to testify that it was false. (3 RT 384-385.) Counsel restated the

14 coercive tactics inherent in the police handling of Mr. Leon. (3 RT 386-387.)

15        The trial court ruled that the issue was not false confession but rather

16 of the credibility of a witness and "expert witnesses are not necessary to assist the

17 trier of fact in determining credibility." (3 RT 393.) The court noted on cross-

18 examination of Michael Leon, counsel could elicit various factors and argue to the

19 jury about what value and weight they should accord his statement. (3 RT 393.)

20 The court denied Petitioner's request to reconsider its earlier ruling. (3 RT 394.)

21        Petitioner raised the issue again unsuccessfully in a motion for new

22 trial. (7 CT 1727-1728.)[24]

23

24              [24]       Dr. Leo was essentially a substitute for
25                         Dr. Ofshe whose schedule apparently did
26                         not permit him to be a witness at the time
                           counsel needed him. (2 RT 195.)
27

28 David Michael Leon v. James A. Yates, et al., Petition for Writ of Habeas Corpus
                                    -68-

1          6.  Counsel on direct appeal should have briefed the issue of the trial

2    court's exclusion of the above-described testimony.

3          Here, as outlined above, defense counsel sought to present the

4    testimony of Drs. Ofshe or Leo to attest to the factors that would cause Michael

5    Leon to make a false statement to the police, a statement which was incredibly

6    damaging to Petitioner and a key component of the evidentiary puzzle against him.

7    As set forth above, defense counsel was clear that the testimony would be in the

8    form of general education of the jury as to police interrogation techniques,

9    interview training and why a person would make a false statement to the police, and

10   would not cross into the arena of commentary on witness credibility.

11         At the time appellate counsel filed the opening brief, there was one

12   published California decision disallowing the testimony of Dr. Ofshe.  This was

13   People v. Son, 79 Cal.App.4th 224, 240-241 (2000), a decision from the Fourth

14   District Court of Appeal.  In that case:

15              "Son asserted Ofshe could testify about police tactics in
                wearing down suspects into making false admissions.  The court
16              declined to admit Ofshe's testimony.  The court stated such
                expert testimony was unnecessary in light of Son's testimony
17              that he had confessed falsely due to Detective Gallivan's
                asserted offer of not more than one year in custody.  The
18              court also stated there was no evidence that police engaged in
                tactics wearing down Son into making false admissions."
19              (Id., at p. 241.)

20   The court found the exclusion of Dr. Ofshe's testimony as irrelevant was proper

21   due to the lack of evidence of coercive tactics coupled with the defendant's

22   admission that he confessed only because of the promise of not more than one year

23   in custody.  (Id., at p. 241.)  At that time, there were cases from other jurisdictions

24   also disallowing Dr. Ofshe's testimony on false confessions.  (See e.g., Kansas v.

25   Cobb, 43 P.3d 855 (Kan.Ct.App.2002); State v. Davis,  32 S.W.3d 603 (2000); New

26

27

David Michael Leon v. James A. Yates, et al., Petition for Writ of Habeas Corpus

28                                        -69-

1   Jersey v. Free, 798 A.2d 83 (2002).)[25]

2           On the other hand, at the time Petitioner's opening brief was filed

3   there was a published California case as well as cases from other jurisdictions

4   authorizing the admission of the type of evidence sought to be admitted here, in

5   some cases specifically the testimony of Dr. Ofshe.  The California case was People

6   v. Page, 2 Cal.App.4th 161 (1991).  In that case the defendant sought the

7   admissibility of expert testimony in three categories as follows:

8               "(1) the general psychological factors which might lead to
                an unreliable confession, along with descriptions of the
9               supporting experiments; (2) the particular evidence in Page's
                taped statements which indicated that those psychological
10              factors were present in this case; and (3) the reliability of Page's
                confession given the overall method of interrogation."  (Id., at
11              p. 183, emphasis in original.)

12  The trial court allowed evidence in category one but not two and three.  The

13  reviewing court upheld these restrictions:

14              ". . .Professor Aronson outlined the factors which might
                influence a person to give a false statement or confession during
15              an interrogation.  Having been educated concerning those
                factors, the jurors were as qualified as the professor to determine
16              if those factors played a role in Page's confession, and whether,
                given those factors, the confession was false."  (Id., at p. 189.)

17
    In our case, trial counsel limited his request to category one.  (7 CT 1727-1728,
18

19  _____

20      [25]        A more recent case disallowing the testimony of Dr.
                Leo is People v. Ramos, 121 Cal.App.4th 1194 (2004),
21              a decision from the California Court of Appeal, Second
                District.  The reviewing court found no abuse of
22              discretion in the exclusion of Dr. Leo's testimony on
                police interrogation techniques and false confessions
23              because the defense extensively cross-examined the
                officer on the interrogation techniques he used in the
24              interview of Ramos and other witnesses and called
                witnesses who attested to the officer threatening them
25              and attempting to coerce statements from them.

26

27
    David Michael Leon v. James A. Yates, et al., Petition for Writ of Habeas Corpus
28                                  -70-

1  3 RT 384-385.)  Page is thus authority for defense counsel's request.

2          Other cases authorizing the admission of Dr. Ofshe's testimony

3  specifically or testimony like it  include United States v. Shay, 57 F.3d 126, 133 (1st

4  Cir. 1995) [error to exclude psychiatric testimony that the defendant suffered from a

5  mental disorder that caused him to make false statements against his interest];

6  United States v. Hall, 93 F.3d 1337 (7th Cir. 1996)[reversible error in refusing to

7  hold a full Daubert hearing before excluding Dr. Ofshe's testimony regarding false

8  confessions and the indicia recognized as present when that is likely to occur];

9  United States v. Hall, 974 F. Supp. 1198 (C.D. Ill. 1997) [Dr. Ofshe found to be a

10  qualified expert who could testify "that false confessions do exist, that they are

11  associated with the use of certain police interrogation techniques, and that certain of

12  those techniques were used in Hall's interrogation; Dr. Ofshe could not explicitly

13  testify about matters of causation, specifically whether the interrogation methods

14  used in this case caused Hall to falsely confess]; Boyer v. State, 825 So.2d 418

15  (2002) [reversible error due to exclusion of Dr. Ofshe's testimony as to "a

16  phenomenon that causes innocent people to confess to a criminal offense; police

17  techniques that secure false confessions under certain circumstances; and his

18  explanation of the parameters within which one can evaluate a confession to

19  determine its veracity]; Miller v. State, 770 N.E.2d 763 (Ind. 2002) [exclusion of

20  Dr. Ofshe's expert testimony to assist jury in understanding psychology of

21  interrogation of mentally retarded persons deprived defendant of opportunity to

22  present a defense, requiring reversal]; State v. Conn., 370 A.2d 1002 (Ct. 1976)

23  [testimony of psychologist admissible to assist jury in considering weight and

24  credibility of confession].

25          In short, at the time appellate counsel was handling Petitioner's direct

26  appeal, there was one California appellate court case supporting the admission of

27

28

1    the type of expert testimony sought herein, and one specifically declining to admit

2    Dr. Ofshe's testimony as well as caselaw from the federal courts and other states

3    authorizing its admission and finding reversible error when it was excluded.  Under

4    such circumstances, appellate counsel Romero was ineffective in failing to raise

5    this issue.   First, there was no California Supreme Court case squarely holding

6    such evidence inadmissible, thus appellate counsel was free to argue that the <u>Son</u>

7    case, the only negative published decision at that time, was ill-reasoned and should

8    not be followed or to distinguish it factually from the instant case.  Further, the

9    Sixth District Court of Appeal was not bound by a decision of the Fourth District,

10   the district that decided <u>Son</u>.  (<u>Nabors</u> v. <u>Worker's Compensation Appeals Board</u>,

11   140 Cal.App.4th 217, 226 (2006); <u>Greyhound Lines, Inc</u>. v. <u>County of Santa Clara</u>,

12   187 Cal.App.3d 480, 485 (1986).)  Second, counsel had a plethora of favorable

13   authority from other states as well as federal appellate courts upon which to base an

14   argument that it was error to exclude the expert testimony in question.  While not

15   binding on the California state reviewing court, the decisions of other state and

16   federal courts are persuasive.  (<u>Barnett</u> v. <u>Rosenthal</u>, 40 Cal.4th 33, 58 (2006);

17   <u>People</u> v. <u>Reilly</u>,196 Cal.App.3d 1127, 1135 (1988) [in considering the general

18   acceptance of a new scientific technique, "a court should examine relevant

19   decisions from other jurisdictions on the question of consensus"].)  Further,

20   appellate counsel had an obligation to advance the law in the face of contrary

21   authority per <u>Feggans</u>, <u>supra</u>, as described in  <u>Appeals and Writs in Criminal Cases</u>

22   (2d Ed., Section 1D.42, p. 201).

23        In the case at bar, appellate counsel could have made a compelling

24   argument that the trial court's exclusion of Dr. Ofshe or Leo's testimony was

25   reversible error.  The only negative California authority at the relevant time, <u>Son</u>,

26   was readily distinguishable as in that case, the defendant gave a specific reason as

27

28   <u>David Michael Leon</u> v. <u>James A. Yates</u>, et al., Petition for Writ of Habeas Corpus
                                    −72−

1  to why he falsely confessed.  Thus there was no reason for Dr. Ofshe in that case to

2  describe police tactics that result in false confessions.  (Son, supra, 79 Cal.App.4th

3  224, 241.)  That is not the case here.  Both Dr. Ofshe and Dr. Leo had been found

4  to be experts in the relevant subject area in other published decisions.  (Hall, supra,

5  974 F.Supp. 1198.)  Dr. Leo has since implicitly been so found.  (Scott v. Texas,

6  165 S. W.3d 27 (Tex.App. 2005); Ramos, supra [no objection in either case that Dr.

7  Leo was not an expert in the field about which the defense sought his testimony].)

8  The scope of expert testimony Petitioner sought to have admitted was in line with

9  what the Page court had approved some years earlier.  The court's expressed reason

10  for excluding the expert testimony in this case, that such testimony was not

11  necessary to help the jury resolve the issue of witness credibility was not well taken

12  inasmuch as, as more fully set forth in the preceding subsection, defense counsel

13  specifically indicated he would not be asking his expert to render an opinion on the

14  credibility of the particular false statement by Michael Leon but rather would allow

15  the jury to draw their own conclusion in that regard.  Further, the trial court could

16  have admitted the testimony then sustained individualized objections to any

17  testimony that appeared to cross the line into improper opinion as to witness

18  credibility.  (State v. Miller, supra, 770 N.E.2d at p. 774.)  Indeed, defense counsel

19  was prepared to limit his expert in the manner approved by the court in United

20  States v. Hall, supra, 974 F.Supp. at p. 1205 ["It is beyond Dr. Ofshe's knowledge

21  as a social psychologist to assess the weight of the evidence and the credibility of

22  witnesses."].  Further, appellate counsel could have argued that the fact that the

23  court decided it did not need expert testimony to assist it in its determination that

24  Michael Leon's statement was voluntary was similarly not a principled basis to

25  exclude the proffered expert testimony.  As stated in Miller v. State, supra,  "The

26  trial court's threshold determination of sufficient voluntariness for admissibility of

27

28

1  the videotape did not preclude the defendant's challenge to its weight and

2  credibility at trial."  (770 N.E.2d at p. 773.)  Also see <u>Hall</u>, <u>supra</u>, 93 F.3d at p.

3  1344.)

4           Further, appellate counsel could have made an equally compelling

5  argument that the refusal to allow the requested expert testimony was prejudicial

6  error warranting reversal.  Michael Leon's alleged statement that Petitioner

7  essentially admitted the crime to him, stating it had been committed in self-defense

8  was one of the centerpieces of the prosecution's case, right alongside Danette

9  Edelberg's claim that Petitioner had not only admitted to her that he committed the

10 murder but reenacted it as well to her.  Indeed, the prosecutor argued the

11 importance of Michael Leon's statement in the scheme of the case during his

12 opening argument to the jury.  (22 RT 2563-2564.)  Petitioner's defense depended

13 upon his ability to demonstrate the unreliability of his father's highly incriminating

14 statement to the police.   Counsel's cross-examination of Mr. Leon was no

15 substitute for the requested expert testimony, for if it were, such testimony would

16 never be admitted on the theory that the defense could always elicit coercive factors

17 on cross-examination.  Cases allowing such expert testimony implicitly demonstrate

18 that cross-examination of the witness making the statement or the police officer

19 taking it is not an adequate substitute.

20          During the state habeas proceedings, appellate counsel Lynda Romero

21 provided a declaration as to why she did not raise this issue..  In said declaration

22 (attached hereto as Exhibit F ), she states she had familiarity with the issue from

23 two prior cases and had actually raised it on appeal in one case.  In evaluating the

24 issue, she reviewed several cases, which included <u>People</u> v. <u>Son</u>, <u>supra</u>, the case

25 upon which the People relied in arguing against the admission of the expert

26 testimony and two Evidence Code sections.  She also listened to the tape of Michael

27

28

<u>David Michael Leon</u> v. <u>James A. Yates</u>, et al., Petition for Writ of Habeas Corpus

-74-

1   Leon's interview with police which she opined did not show that any coercive

2   tactics were used.  She also felt that establishing prejudice from the exclusion of the

3   requested testimony would be problematic and that the fact that the testimony in

4   question was that of a witness as opposed to a defendant impacted the viability of

5   the issue.  She vaguely recalls discussing the issue with trial counsel.

6           Petitioner contends that Ms. Romero's explanation for her failure to

7   raise this issue is unavailing. First, although she claims familiarity with the issue, it

8   is clear that her research was inadequate as she failed to review the <u>Page</u> case from

9   California that would have supported the admission of the expert testimony in this

10  case as well as the numerous authorities from other jurisdictions cited above in

11  existence at the time Petitioner's direct appeal was pending which would have

12  supported it as well and which in some instances found reversible error in its

13  exclusion.  To analogize to IAC in the trial counsel context, Ms Romero made a

14  tactical choice based on an inadequate investigation.  As such her choice is not

15  entitled to the deference of this court:

16          "'Strategic choices made after thorough investigation of
            law and facts relevant to plausible options are virtually
17          unchallengeable; and strategic choices made after less
            than complete investigation are reasonable precisely
18          to the extent that reasonable professional judgements support
            the limitations on investigation.  In other words, counsel has a
19          duty to make reasonable investigations or to make a reasonable
            decision that makes particular investigations unnecessary."
20          (<u>Wiggins</u> v. <u>Smith</u> (2003) 539 U.S. 510, 123 S.Ct. 2527, 2535;
            also see <u>Sanders</u> v. <u>Ratelle</u> (9th Cir. 1994) 21 F.3d 1446, 1456.)
21
            Second, the case she had personally handled on appeal which
22
    involved an unfavorable and unpublished disposition of this same issue, <u>People</u> v.
23
    <u>Hall,</u> 78 Cal.App.4th 232 (2000) was from the Fourth District.  The Sixth District
24
    appellate court, which reviewed Petitioner's appeal, was not bound to follow <u>Hall</u> if
25
    the relevant portion of the case had been published.  (<u>Nabors</u> v. <u>Worker's</u>
26

27
    <u>David Michael Leon</u> v. <u>James A. Yates</u>, et al., Petition for Writ of Habeas Corpus
28                              -75-

1   Compensation Appeals Board, supra, 140 Cal.App. 4th at p. 226.)

2          Third, Ms. Romero's negative judgement of the issue based on her

3   own review of the tape of Michael Leon's police interview does not warrant

4   excluding the issue from Petitioner's direct appeal.  She was not qualified to judge

5   whether or not coercive tactics were used in extracting the statement from Mr.

6   Leon.  As more fully set forth above, the whole point of the proffered testimony, as

7   argued by defense counsel, was that such techniques were subtle and not

8   necessarily apparent to untrained eyes.

9          Fourth, Ms. Romero's conclusion that the issue was not worthy of

10  arguing because the coerced statement testimony was that of a witness as opposed

11  to a defendant is similarly not well taken.  While it is true that the applicable cases

12  happens to involve statements by defendants, nothing in those cases indicates they

13  do not apply to witness statements as well.

14         Attached hereto as Exhibit G is the declaration of Sam Polverino,

15  Petitioner's trial counsel, a veteran of many homicide trials and a certified specialist

16  in criminal law, provided during the state habeas proceedings.  Mr. Polverino's

17  assessment of the issue is that it was a critical one because of the importance of

18  Michael Leon's testimony to the prosecution's case and that its exclusion deprived

19  Petitioner of his right to a fair trial.  Further, Mr. Polverino recalls discussing this

20  issue with appellate counsel and so informing her of this opinion.

21         7. Ms. Romero's assessment that the error in excluding the expert

22  testimony was harmless is unavailing.  She indicated in her declaration (Exhibit F)

23  that Petitioner's father's statements were not the most damaging evidence of guilt,

24  and that even if his statements had been excluded, there was other more damaging

25  evidence of guilt sufficient to sustain the conviction.  She points to the testimony of

26  Danette Edelberg and her brother, Shelby Arbuckle, as to Petitioner's admission of

27

28  David Michael Leon v. James A. Yates, et al., Petition for Writ of Habeas Corpus
                                    -76-

1  guilt and his reenactment of the crime which she characterizes as the strongest

2  evidence of guilt.  She also points to Bernard Wesley's testimony as to Petitioner's

3  admissions concerning the crime and Danette Edelberg's testimony as to

4  Petitioner's admission he was with Marlon Bass on the day of the murder.  She also

5  opines that Michael Leon's testimony that he had been drinking before the police

6  interviewed him provided an alternative attack on his statements to the police and

7  gave the jury a basis to reject said statements.

8          Appellate counsel's argument as to lack of prejudice is unpersuasive.

9  Petitioner has in Claim II above, paragraph 6, addressed in detail and with

10 particularity how the evidence of guilt against him was not strong, when critically

11 analyzed.   Petitioner incorporates that discussion here.

12          Defense trial counsel argued that Michael Leon had been drinking at

13 the time he was interviewed by the police and that the statements were "a product

14 of how police get the information they want when they want to build a case against

15 somebody."  (22 RT 2629-2630.)  It will be recalled that Michael Leon testified that

16 he felt pressured and threatened.  (15 RT 1832, 1851.)  Counsel continued:

17          "And the way the police operate is that there is this, they provide
           inducements and they provide threats.  You could be an
18          accessory.  All of these sorts of threats that are addressed to
           somebody.  At the same time they are providing inducements;
19          this could help your son, just tell us what was told to you.  It
           was self-defense, just tell us. . .
20
           What you have is their [sic] is a gradual inducements of threats
21          and inducements.  And inducements and threats.  Sometimes it
           works with respect to Mr. Leon, sometimes it doesn't."
22          (22 RT 2630.)

23 Defense counsel's argument rang hollow without any expert testimony to support it,

24 leaving the jury free to reject it as lacking in evidentiary support.  The absence of

25 Dr. Leo or Ofshe thus cast a long shadow over this case.  Without the necessary

26 expert testimony, counsel's argument concerning the coerced nature of Michael

27

28   David Michael Leon v. James A. Yates, et al., Petition for Writ of Habeas Corpus
                                    -77-

1 Leon's statement to police  was doomed to failure. As caselaw has observed, jurors

2 tend to ascribe great importance to expert testimony by a qualified expert as it has

3 an aura of special reliability and trustworthiness.  (United States v. Rosales 19 F.3d

4 763, 766 (1ˢᵗ Cir. 1994.).)

5         Based on the foregoing, Petitioner contends that he was deprived of

6 the effective assistance of appellate counsel due to her failure to raise  on direct

7 appeal the issue of the trial court's exclusion of expert testimony concerning police

8 coerced statements.  As demonstrated above, the issue had a reasonable potential

9 for success.  Not only did counsel have favorable authority on which to rely but she

10 could have shown the prejudice to Petitioner's case of the exclusion of the

11 requested testimony.  Her failure to raise the issue "undermines confidence in the

12 outcome."  (Strickland v. Washington, supra.)

13         8.  The state court's decision on this issue was an unreasonable

14 application of Strickland, warranting habeas relief.  The only reasoned state court

15 decision on this point was the Superior Court's order denying relief on April 18,

16 2007, attached hereto as Exhibit D.  The court determined the issue in question was

17 arguable but appellate counsel's failure to raise it was harmless.

18         The Superior Court points to the California Court of Appeal's

19 summation of Michael Leon's statement including that Mr. Leon testified that he

20 had lied to the police as evidence that the jury should not take his statements to the

21 police at face value, and thus a lack of prejudice as to the exclusion of the expert

22 testimony.  (Exhibit D, p. 3.)    However, the jury would likely view such testimony

23 as self-serving, given that it came out of the mouth of Petitioner's father, a man the

24 jury was equally likely to view as having a strong motive to help his son.

25 Obviously, an expert was required to provide a more impartial view as to why the

26 jury should not take Mr. Leon's statements at face value.  As previously observed,

27

1  it is axiomatic that jurors give great importance to expert testimony by a qualified

2  witness.

3          The Superior Court also points to the California Court of Appeal's

4  description of the alleged strength of the evidence against Petitioner, specifically

5  that incriminating evidence came from Petitioner himself, that Daniel Barnett

6  testified that Petitioner threatened Marlon, that Shelby Arbuckle testified that

7  Petitioner knew many details about the crime and professed to have hired someone

8  to commit the burglary, that Danette Edelberg testified that Petitioner admitted the

9  crime to her, that defendant told his father he had acted in self-defense, that

10 Bernard Wesley testified that Petitioner approached him to commit the burglary,

11 and that various witnesses testified that Petitioner seemed to have money after the

12 murder.  (Exhibit D, p. 3.)  As noted above, this evidence breaks down on careful

13 analysis and thus is not overwhelming in favor of Petitioner's guilt.  For example,

14 Shelby Arbuckle had good reason to be biased against Petitioner because of

15 Petitioner's alleged abuse of him and kept quiet about Petitioner's admissions for

16 years until shortly before his testimony.  As for Daniel Barnett's trial testimony that

17 Petitioner supposedly threatened to kill Marlon, he had testified differently at the

18 Preliminary Hearing, i.e. that Petitioner threatened to kick his ass, which statement

19 could have been made one to two years before the murder.  (9 RT 989, 991.)  In the

20 preceding section, Petitioner has pointed out the numerous weaknesses,

21 inconsistencies and lies by Danette which show that her testimony was not as strong

22 as this Court stated in its earlier opinion in this case.  The same holds true as to

23 Bernard Wesley and Petitioner incorporates those comments rather than repeat them

24 here.  In terms of Petitioner appearing to have money after the crime, it bears

25 repetition that he was employed at the time and had recently received an insurance

26 settlement plus sold his car.

27

28

David Michael Leon v. James A. Yates, et al., Petition for Writ of Habeas Corpus
                                        -79-

1    In sum, the reasons given by the Superior Court for denying

2  Petitioner's Petition do not withstand reasoned analysis and reversal is required.

3    **CONCLUSION AND PRAYER FOR RELIEF**

4  _____Wherefore, Petitioner respectfully prays that this Court:

5    1.  Order Respondent to answer this petition by specifically admitting

6  or denying each allegation and claim herein and provide a copy of the state record

7  herein;

8    2.  Grant Petitioner leave to file a traverse, or reply, or additional

9  points and authorities, following the filing of Respondent's answer;

10    3.  Grant Petitioner a reasonable opportunity to supplement or further

11  amend his petition to include claims, facts and evidence which becomes apparent

12  from future investigation, discovery or other event, and to fully develop the facts

13  and law related to the claims set forth herein;

14    4.  Order such hearings as may be necessary;

15    5.  After full consideration of the issues raised, issue a writ of habeas

16  corpus relieving Petitioner from the judgment of conviction and sentence imposed

17  in Santa Clara County No. C1C093326, the underlying matter; and

18    6.  Grant such other and further relief as is just and appropriate.

19  Dated: 11/8/07    Respectfully submitted,

20

21

22    _____

      JULIE SCHUMER, Attorney

23    For Petitioner DAVID MICHAEL LEON

24

25

26

27
    David Michael Leon v. James A. Yates, et al., Petition for Writ of Habeas Corpus

28    -80-

1

**<u>VERIFICATION</u>**

2          I, JULIE SCHUMER declare:

3          1.  I am attorney admitted to practice before the courts of the State of

4  California and am admitted to practice before this court.  I maintain my office in

5  Contra Costa County, California.  I represent David Michael Leon, the Petitioner

6  herein.  He is presently confined and restrained of his liberty at Pleasant Valley

7  State Prison in Coalinga, California.

8          2.  I have personally reviewed all of the records on file in the

9  California court pertaining to this matter.  All the facts stated in the Petition are

10  supported by citations to the record and exhibits.

11          3.  I am authorized to file this petition for writ of habeas corpus on

12  Petitioner's behalf.  Because Petitioner is incarcerated in a different county than the

13  one in which my law office is located, and because he is not in a position to make

14  the necessary verification himself, I make this verification on his behalf.

15          I declare under penalty of perjury that the foregoing is true and

16  correct.  Executed on November 8, 2007 at Lamy, New Mexico.

17

18                                  _____
                                    JULIE SCHUMER
19

20

21

22

23

24

25

26

27

<u>David Michael Leon</u> v. <u>James A. Yates</u>, et al., Petition for Writ of Habeas Corpus

28                                  -81-

1

## CERTIFICATE OF SERVICE

2          I declare that my business address is in Contra Costa County. Said
address is PMB 120, 120 Village Square, Orinda, CA 94563.  I am over the age of
3  18 years and not a party to this action.  On November 8, 2007, I served the
foregoing

4

**PETITION FOR WRIT OF HABEAS CORPUS AND EXHIBITS IN**
5  **SUPPORT OF PETITION**

6  on all parties in this cause by placing a true and correct copy thereof enclosed in a
sealed envelope with first class postage fully prepaid in the United States mail at
7  Santa Fe, New Mexico, addressed as follows:

8  Office of the Attorney General
455 Golden Gate Ave., Suite 11000
9  San Francisco, CA 94102

10

11          I declare under penalty of perjury that the foregoing is true and

12  correct.

13          Executed November 8, 2007 at Lamy, New Mexico.

14

15                    _____
JULIE SCHUMER

16

17

18

19

20

21

22

23

24

25

26

27
David Michael Leon v. James A. Yates, et al., Petition for Writ of Habeas Corpus
28                              -82-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

David Michael Leon v. James A. Yates, et al., Petition for Writ of Habeas Corpus