1   JULIE SCHUMER, SBN 82814
    Attorney at Law
2   PMB 120, 120 Village Square
    Orinda, Ca. 94563
3   (925) 254-3650

4   Attorney for Petitioner
    DAVID MICHAEL LEON

5

6

7

8               UNITED STATES DISTRICT COURT

9         FOR THE NORTHERN DISTRICT OF CALIFORNIA

10  DAVID MICHAEL LEON,              ) Case No. _____

11          Petitioner,              )
                                     )
12          vs.                      )
                                     )
13  JAMES A. YATES, Warden,          )
    Pleasant Valley State Prison;    )
14  JAMES E. TILTON,                 )
    Director California             )
15  Department of Corrections,       )
                                     )
16          Respondents.             )
    _____ )
17

18              **EXHIBITS IN SUPPORT OF**

19        **PETITION FOR WRIT OF HABEAS CORPUS**

20

21

22

23

24

25

26

27
    Leon v. Yates, Exhibits in support of
28  Petition for Writ of Habeas Corpus

1

## INDEX OF EXHIBITS

2
                                                                          **PAGE**

3

EXHIBIT A
4         California Court of Appeal opinion in People v David Leon,
          H026042, dated February 24, 2006                               1-37
5

EXHIBIT B
6         California Supreme Court order denying review in
          People v David Leon, dated May 24, 2006                        38
7

EXHIBIT C
8         California Court of Appeal opinion in People v David Leon,
          H026042, dated February 7, 2007                                39-43
9

EXHIBIT D
10        California Superior Court' denial of Petitioner's state habeas
          action in CC093326, dated April 18, 2007                       44-47
11

EXHIBIT E
12        California Supreme Court order denying review in Petitioner's
          state habeas action, dated October 10, 2007                    48
13

EXHIBIT F
14        Declaration of Lynda Romero, Esq. contained in Petitioner's
          state habeas action                                            49-50
15

EXHIBIT G
16        Declaration of Sam Polverino, Esq., contained in Petitioner's
          state habeas action                                            51-52
17

18

19

20

21

22

23

24

25

26

27
          Leon v. Yates, Exhibits in support of
28        Petition for Writ of Habeas Corpus          -i-



1000 0
COPY

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 977(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 977(b). This opinion has not been certified for publication or ordered published for purposes of rule 977.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SIXTH APPELLATE DISTRICT

Court of Appeal - Sixth App. Dist.

**FILED**

FEB 2 4 2006

MICHAEL J. YERLY, Clerk

By _____ DEPUTY

|  |  |
|---|---|
| THE PEOPLE, | H026042 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. CC093326) |
| v. | |
| DAVID MICHAEL LEON, | |
| Defendant and Appellant. | |

### STATEMENT OF THE CASE

In 1983, Marlon Bass was shot to death. In 2001, defendant David Michael Leon was charged with Bass's murder, and in 2002, a jury convicted him of first degree murder and found that he personally used a firearm. He was sentenced to a term of 25 years to life plus two years for using a firearm. On appeal from the judgment, defendant claims the 17-year delay in charging him denied him a fair trial. He further claims the trial court erred in excluding evidence that someone else killed Marlon and abused its discretion in removing a juror during deliberations. Last, he claims the imposition of restitution and parole revocation fines violates the constitutional ban on ex post facto laws.

We agree that the fines are unconstitutional, reverse the judgment, and remand the matter for a new restitution fine hearing.

**EXHIBIT** A

## FACTS

On November 30, 1983, around 5:30 p.m., Lieutenant Palmer Bass, a police officer at the San Francisco Airport, and his wife Annie returned home and found their front door ajar. The glass panel nearest the door latch was broken. They entered and soon discovered the body of their 20-year-old son Marlon in the hallway just outside his bedroom. He had a small bat in his hand.[1] The autopsy and forensic analysis revealed that around 2:00 p.m. that day, someone shot Marlon with a.22 caliber gun five times from at least three feet away. When the first shot was fired, Marlon was in the hallway, facing the shooter, who was in the bedroom; the remaining shots were fired after Marlon had turned and started to flee.

At trial, Mr. Bass testified that knew his son sold marijuana. Days before the murder, he saw around $4200 in Marlon's desk. The night before the murder, he found and removed two buckets of marijuana from Marlon's room and locked them in a car.

Daniel Barnett, defendant's friend from high school, testified that defendant once showed him a gun. Over a year later, Daniel was with defendant waiting for Marlon, and defendant said, ". . . I'm so pissed off at that fucking nigger, I could just kill him." The statement stuck in Daniel's mind because Marlon was killed not long after defendant said it.

Marlon's close friend David Brewster testified that Marlon often sold marijuana from a nearby 7-Eleven. He and Marlon's customers knew that Marlon stored drugs in his dresser drawer, a wooden box, or buckets and kept money in his desk drawer. During the investigation, Brewster told police that two days before the murder, Marlon bought two pounds of marijuana from Jeff Perrington. Afterward, Brewster noticed that Marlon still had around $1500 in his desk drawer.

---

[1] Pamala Anderson, a neighbor, testified that sometime between 9:00 a.m. and noon that day, Marlon parked his car in front of her house going the wrong way. He then got out carrying a bat and walked away.

Jeff Perrington testified that two days before the murder, Marlon paid $2000 for two pounds marijuana and still had what appeared to be about $2000 left in his desk drawer.

Troy Tibbils testified that one day around 10:00 a.m. he went to defendant's house to buy some marijuana. Defendant, who acted as a middleman for Tibbils, said he would get the marijuana from Marlon and told Tibbils to come back later. Tibbils returned that afternoon and picked up the marijuana. Tibbils thought this happened on the day of the murder but said he did not know for sure.[2] Several days after the murder, Tibbils called defendant. Defendant said he had met Marlon at a 7-Eleven store and had also seen Bernard Wesley near Marlon's house.

Shelby Arbuckle testified that around the time of the murder, defendant was his sister Danette's boyfriend. Defendant told Shelby he had a gun and often talked about committing burglaries in the neighborhood when the residents were gone or asleep. Shelby thought Troy Tibbils, Ronny Cortez, and Darryl Ramos were involved with defendant in committing burglaries.

The day after the murder, Shelby told Danette and defendant that Marlon had been stabbed. Defendant laughed and said Marlon had not been stabbed. He told Shelby that Marlon had surprised a burglar in his bedroom, and the burglar shot him in the heart. According to Shelby, defendant appeared uncharacteristically timid, meek, and evasive. Shelby later saw a newspaper article that was consistent with defendant's version of the killing. He found it odd and then frightening that defendant knew so much about the murder apparently before the details had become public. Shelby further said that after the murder, defendant, who had previously been "cash strapped," suddenly had lots of money, a new, expensive scale, and a large amount of cocaine. Defendant also left town.

---

[2]  At the preliminary hearing, Tibbils was similarly uncertain about the day.

3

0 0000

He later told Shelby that the "heat was on," and the police were bothering and investigating him.[3]

Months after the murder, defendant told Shelby that he had hired two big African-American professional football players to burglarize Marlon's home. According to Shelby, defendant was "[c]onfident, cocky" and said the police were looking in the wrong direction. Some weeks later, defendant told Shelby that the burglars wanted the drugs and money that Marlon kept in a drawer in his room. Defendant explained that the burglars had waited for Marlon to leave the house. They entered and went straight to the drawer in Marlon's room. However, Marlon surprised them with a baseball bat, and they shot him. Shelby did not believe defendant had hired two men to commit the burglary but again wondered how defendant knew so many details.

Samuel Barnett, Daniel's brother and Marlon's friend, testified that sometime before the murder, Marlon and defendant had a falling out, and Marlon said he "might need to kick [defendant's] ass." The day after the murder, defendant, who was a small time dealer, called Samuel and said he wanted to buy over $500 worth of marijuana. Samuel was shocked and suspicious because he had never dealt with defendant in this way before. Samuel asked if defendant knew about Marlon's death, and defendant asked what that had to do with his request. Samuel was uncomfortable and told him never to call again. In his interview with police, Samuel reported that Marlon had been angry because someone had stolen from him. Marlon suspected defendant or Geoff Caplan, who previously had stolen drugs from him.

---

[3] Defendant's good friend Nicole DeFlavio similarly testified that before the killing, defendant's financial resources were limited, and he made little money as a middleman drug dealer for Marlon. However, he had a strong desire to be rich. He was envious of Marlon. After the killing, defendant suddenly had more money and larger amounts of drugs. This seemed unusual and made her suspicious and uneasy.

Bernard Wesley knew both Marlon and defendant. He testified that defendant bought "damn good" drugs from Marlon near a 7-Eleven. Defendant once told him that he had seen drugs and at least $10,000 in Marlon's dresser drawer. Defendant suggested that they steal Marlon's money and drugs. Defendant said he knew Marlon's parents' schedule and could lure Marlon out to the 7-Eleven for a drug transaction, making it easy to break a window and gain entry. Defendant said he would need a gun in case Marlon unexpectedly returned home. He said he would wear a ninja-type outfit to conceal his face. Wesley testified that when he refused to participate, defendant said he would ask David and Marvin Smith to help him. Wesley explained that the Smith brothers were very large football players. He said that once, on behalf of defendant, the Smith brothers had threatened to beat him up if he did not pay defendant for some drugs. Wesley testified that the Smith brothers later talked to him about defendant's plan, but he warned them not to "mess" with Marlon.

Over a week after the murder, Wesley called the police. He thought he had become a suspect because he heard that defendant had been accusing him of the murder. When asked what he had been doing the day of the murder, Wesley said he was not sure what day that was and thought he had been with a friend named Renee. However, when police asked if he had been driving on Curtner Avenue, he remembered that that morning, he had gone to a jewelry store in the Eastridge Mall to buy some jewelry for his girlfriend Marianne. He left there sometime between 10:30 and 11:15 a.m. and drove on Curtner to meet Marianne on her lunch break. While on Curtner, he saw a couple at a bus stop and thought he knew the man. However, when he pulled over, he realized he was mistaken, apologized, and drove away.[4] Wesley also said that farther down Curtner, he saw defendant at a 7-Eleven near a phone booth. Defendant was kneeling down and looked

---

[4] Crystal Custodia testified that she and her boyfriend were near a bus stop and a 7-Eleven that day, and a man pulled over but then realized he did not know them and left. She told police that the encounter occurred in the afternoon.

sick. It also seemed as if he were trying to conceal himself. Wesley continued on to meet Marianne.[5]

David and Marvin Smith were interviewed by the police in 1984. Both indicated that they had once helped defendant collect a debt from Wesley. According to David, defendant had also offered to pay them to help him steal from other drug dealers. The Smith brothers were interviewed again in 2000. At that time, David remembered his previous statements; Marvin could not but said he had told the truth. At trial, David denied both making the statements attributed to him during the 1984 interview and confirming them in 2000. He testified that defendant never asked him to steal from drug dealers, and he had no recollection of ever talking to Wesley. He said that defendant once had asked for help preventing people from stealing beer from a store where he worked. At trial, Marvin could not recall ever saying he had helped collect a debt from Wesley. Marvin also denied that defendant had ever talked about stealing from drug dealers.

Police interviewed defendant's father Michael Leon in 2000. He said that around 1984, defendant mentioned that a friend had been killed and some suspicion had focused on him. According to Mr. Leon, defendant was scared, and although he did not talk about the incident, he mention something about a baseball bat and that "it was self defense." At trial, Mr. Leon said that he lied to the police about the bat and self-defense because that is what the police wanted to hear, and he thought he was helping his son.

Danette Arbuckle Edelberg, defendant's high school girlfriend, testified that he was possessive, verbally abusive, and physically violent. After the murder, he became nervous whenever the murder came up and would change the subject, calling the investigation a joke. He then left town for a while. When he returned, they would argue,

---

[5] Marianne Brown testified that when she was seeing Wesley, he sometimes visited her at lunchtime. She also said that he gave her jewelry and might have given her a present during lunchtime in November 1983.

and he resumed abusing her. When she said she wanted to end their relationship, he became violent.

Edelberg said that the police interviewed her six times between November 30, 1983, and February 10, 1984. She testified that on March 12, 1984, she and defendant argued again about the investigation. She said that at that time, he admitted killing Marlon and reenacted what had happened. He explained that he went to Marlon's house to steal money and drugs from Marlon's desk drawer. While inside, he heard a noise and then saw Marlon in the hallway with a baseball bat. They exchanged some words, and defendant got scared and shot him. After hearing defendant's story, Edelberg began to cry. Defendant got angry and said he was only kidding. Edelberg was not consoled and tried to leave. However, defendant attacked her. She escaped to her friend Danielle Fournier's home and told her that defendant had killed Marlon.[6] Later, Edelberg saw a doctor for her injuries. She also reported defendant's physical attack to the police but did not mention his admission. Ultimately, however, Edelberg reported the admission to authorities.[7]

_____

[6] Fournier testified that Edelberg arrived upset and told her that defendant had reenacted the murder.

[7] There is a conflict in the evidence concerning when Edelberg first reported the admission. As noted, she testified that she spoke to police several times between November 1983 and February 1984. She also said that some weeks after the March 1984 domestic violence incident, she told Detective Sergeant Brockman of the San Jose Police Department, the lead investigator, about defendant's admission. Detective Brockman testified that Edelberg was mistaken. He explained that he would have included such obviously important information in a report if she had divulged it to him. He further testified that he later transferred from the homicide unit to the vice intelligence unit. He said he first learned about Edelberg's statement from an investigator from the district attorney's office, who had questioned Edelberg in 1986 about the March 12, 1984 domestic violence incident. It is undisputed that in 1986, Edelberg told the investigator that defendant had acted out the murder but had also said he was only kidding. Edelberg agreed that the investigator's report was the first documentation of defendant's admission.

Police interviewed defendant in 2000. He said that he sold drugs for Marlon but also had his own suppliers and customers. He said he had been inside Marlon's house and knew where Marlon kept his money. Defendant said that somehow, Wesley also knew this information. Defendant did not remember and did not think he bought drugs from Marlon on the day of the murder, saying that at that time he had not seen him for two weeks. However, defendant also said that he spoke to Marlon on the day of the murder and drove by his house. He said he owed Marlon some money and may have gone over to pay him. At that time, he noticed that Wesley and some other people were in the area. Defendant said that later he drove back to Marlon's home, but the road was blocked off. He found out that Marlon had been shot in the neck by a burglar, who was stealing Marlon's money and drugs. Defendant denied killing Marlon and denied telling anyone that he was involved. He said that Edelberg was lying.

Mary Keasling was defendant's girlfriend from December 1990 to December 1991. She testified that they were drinking one night, and he told her that he had been a suspect in a murder when he was 17 years old. He said that he had gone to the victim's house that day to pick up drugs but left before the killing. He told her that at that time, he saw someone he knew walking in the area near Marlon's house.

*The Defense*

Doctor John Thornton testified as an expert in forensic crime-scene reconstruction. He reviewed diagrams of the crime scene; notes concerning how the crime scene was processed; the evidence log from the police department; various pieces of evidence, including fingerprint cards, a baseball bat, a towel, shards of broken glass, and the bullets that were recovered. He opined that the police had processed the crime scene in a "casual" way and "did not address issues that would be conspicuously applicable to the

---

In ruling on defendant's motion to dismiss, the trial court implicitly resolved the factual dispute, finding that before 1986, when Edelberg reported defendant's admission, there was insufficient evidence to charge defendant.

application of this crime." In particular, he criticized police for failing to test the baseball bat, the shards of broken glass, and the door latch for fingerprints and not looking for shoe prints. He speculated that the burglar could have used the bat to break the glass, leaving his fingerprints on the bat, and then reached inside to open the door, leaving prints on the latch. The burglar also could have stepped on and tracked glass dust, leaving shoe prints. Doctor Thornton also suggested that a shirt button found near Marlon and an abrasion on his arm could mean that Marlon struggled with the burglar. He could not conclusively dismiss the possibility that more than one intruder was involved.

Timothy Pantiga testified that he and Wesley worked together in 1983. He remembered that Wesley used to regularly check the newspaper for an article about Marlon's killing, and when it appeared, he showed Pantiga, saying "those were his boys." On another occasion, Pantiga was with Wesley, and Wesley said he committed the crime but immediately said he was only joking. Although Wesley seemed nervous or bothered, Pantiga did not take his admission seriously because Wesley had a tendency to brag, and Pantiga thought he was joking.

Geoff Caplan testified that in 1983, he lived around the corner from Marlon, and they grew up together as best friends. He occasionally bought drugs from him and had on five occasions sneaked into Marlon's room to steal marijuana. Marlon caught him once and thereafter refused to talk to him. A week before Marlon's death, Caplan and Marlon had a scuffle. Caplan admitted that his father had a .22 caliber rifle.

Sergeant Gilbert Vizzusi of the San Jose Police Department testified that during the investigation, there were rumors that a person named Ken Auda had been committing crimes in the area. However, Sergeant Vizzusi did not interview him. Blaine Buscher was another name mentioned during the initial investigation, but he too was not interviewed.

## PRE-COMPLAINT DELAY

Defendant contends that the trial court erred in denying his motion to dismiss the prosecution due to the 17-year delay in filing the charges against him.[8]

"Delay in prosecution that occurs before the accused is arrested or the complaint is filed may constitute a denial of the right to a fair trial and to due process of law under the state and federal Constitutions." (*People v. Catlin* (2001) 26 Cal.4th 81, 107.) " 'It is not improbable that under certain circumstances an accused may be deprived of due process of law, if the lapse of time between the alleged commission of the offense and the filing of the accusation makes it difficult or impossible for the accused to prepare his defense.' " (*People v. Archerd, supra,* 3 Cal.3d at p. 640, quoting *People v. Wilson* (1966) 239 Cal.App.2d 358, 365.)

In ruling on a claim of pre-complaint delay, the trial court balances any prejudice from the delay against the justification for it and determines whether the defendant was denied a fair trial. (*People v. Catlin, supra,* 26 Cal.4th at p. 107; *Scherling v. Superior Court* (1978) 22 Cal.3d 493, 505.) The court does not presume prejudice. Instead, the defendant must affirmatively demonstrate that the delay resulted in actual prejudice. (*People v. Morris* (1988) 46 Cal.3d 1, 37, disapproved on other grounds in *In re Sassounian* (1995) 9 Cal.4th 535, 543-544, fn. 5.) Actual prejudice may arise from "loss of material witnesses due to lapse of time [citation] or loss of evidence because of fading memory attributable to the delay. [Citation.]" (*People v. Morris, supra,* 46 Cal.3d at p. 37.) However, lost evidence must be significant given the facts of the case. (See *People v. Catlin, supra,* 26 Cal.4th at p. 109.) Whether a defendant has shown actual prejudice is a factual question for the trial court, and its finding will be upheld on appeal if supported

---

[8] Defendant made a motion to dismiss before trial. The court deferred ruling on the motion until after trial. (See *People v. Archerd* (1970) 3 Cal.3d 615, 641 [approving such a deferral].)

by substantial evidence. (*People v. Hill* (1984) 37 Cal.3d 491, 499; *People v. Abraham* (1986) 185 Cal.App.3d 1221, 1226-1227.)

Here, the trial court found that defendant failed to demonstrate actual prejudice. Accordingly, we shall review defendant's claims of prejudice to see whether he demonstrated actual prejudice as a matter of law. (See *Scherling v. Superior Court*, *supra*, 22 Cal.3d at p. 506 ["We cannot say as a matter of law that the trial court erred in concluding defendant was not prejudiced by the delay"].)

### Right to Juvenile Adjudication

Defendant first claims that as a result of the delay, he lost "the right to have his matter litigated in juvenile court where if was found guilty he would be subject to a much less severe sentence."[9]

Defendant cites no pertinent authority for the proposition that a claim of actual prejudice may be based on the inability to have charges adjudicated in juvenile court. As noted, the controlling issue is whether the loss of evidence and witnesses due to a delay prevented the defendant from getting a fair *trial*. (See *Scherling v. Superior Court*, *supra*, 22 Cal.3d at p. 507 ["The ultimate inquiry in determining a claim based upon due process is whether the defendant will be denied a fair trial"].) In any event, the People correctly note that defendant did not have the *right* to an adjudication of the murder charge in juvenile court. Rather, he was entitled only to a fitness hearing. (See former Welf. & Inst. Code, § 707, subds. (b) and (c); stats. 1982, ch. 1282, §§ 4 & 4.5, pp. 4747-4751.) In that regard, we note that, where, as here, the charge is murder, the court presumes that the minor is unfit for juvenile court. That presumption can be overcome only if the minor demonstrates that the offense was mitigated or his participation was less significant or attenuated—i.e., that the minor's participation in the offense was not as

---

[9] Marlon was killed on November 30, 1983, one week before defendant turned 18 years old.

grave or serious as the charge itself would lead a court to believe. (*Ibid.*; *People v. Superior Court (Jones)* (1998) 18 Cal.4th 667, 680-683, 685.)

Here, defendant had a fitness hearing and was found unfit.[10]  The record does not suggest that there were mitigating circumstances concerning the murder or that defendant's participation was insignificant or attenuated.  Moreover, as noted, he was almost 18 when the crime was committed.  Under the circumstance, the record does not suggest that the court abused its discretion in finding defendant unfit or that pre-complaint delay caused the court to find him unfit.

### Lost or Unavailable Evidence and Witnesses

Defendant claims that as a result of the delay, the following evidence was lost or unavailable:  (1) the original 911 dispatch tape; (2) tapes of the interviews with Marvin and David Smith in 2000; (3) fingerprints from the baseball bat, glass shards, and the door latch; (4) a traffic ticket that Tibbils got on the day of the drug transaction between defendant and Marlon; (5) a police report of an interview with Tibbils shortly after the murder; (6) documentation concerning Wesley's purchase of jewelry; (7) defendant's employment records; (8) tape recordings of interviews and conversations with witnesses; and (9) records concerning Edelberg's 1984 domestic violence action against defendant. Defendant also claims that potential witnesses Darryl Littlejohn, Ricky Ventimiglia, and Mitch Helms were dead or otherwise unavailable.  He further claims that Sergeant Kenneth Pitts, Detective Brockman, Crystal Custodia, and Mr. Bass were unable to recall important events and circumstances. We individually analyze each alleged source of prejudice.

---

[10]  Although the transcript of the hearing is not included in the record on appeal, the hearing and finding of unfitness were referred to during trial, and defendant does not claim that he did not get a fitness hearing.

*The 911 Tape*

Defendant claims the tape would have shown exactly when the police were called and also helped the jury determine whether Mr. Bass removed the buckets of marijuana from Marlon's bedroom before or after the murder. Showing that they were removed before the murder would have helped him rebut the prosecution's theory that defendant derived his sudden wealth from the drugs he stole.

Defendant does not explain why the exact time of the 911 call is significant. In any event, other evidence established the time with sufficient exactitude. Officer Caren Hare of the San Jose Police Department explained that the 911 operator dispatches patrol officers within "[a] few minutes" of a call. In this case, she received the dispatcher's call at 5:11 p.m. Detective Brockman testified that he received a dispatch shortly after 5:00 p.m. Moreover, evidence of Mr. Bass' interview with police immediately after the murder as well as his and Mrs. Bass' testimony similarly revealed that the call was made around 5:00 p.m.

Defendant also does not explain how the tape could have shed light on whether Mr. Bass removed Marlon's marijuana before *or after* the murder. There is no evidence that Mr. Bass or anyone else might have mentioned when he removed the marijuana to the 911 dispatcher. In any event, there was no factual dispute concerning when he did. At trial, Mr. Bass initially denied that he found any marijuana the night before the murder. However, after having his memory refreshed, he remembered that he found and removed it the night *before* the murder. Defense counsel emphasized that fact during his closing statement, arguing that defendant's sudden wealth could not have come from stealing Marlon's marijuana or money because they had been removed from Marlon's room before the burglary.[11]

---

[11] For this reason, we reject defendant's claim of prejudice arising from Mr. Bass' faded memory, that is, his alleged inability "to recall with precision when he removed the drugs from Marlon's bedroom." On that issue, Mr. Bass' memory was refreshed.

In short, the 911 tape would have been cumulative of other evidence, and its unavailability was harmless.

### The Smith Brothers' Interview Tapes

Defendant claims that tapes of the interviews with the Smith brothers were material because "the prosecution specifically discussed the Smith brothers during closing argument and there was a critical question of whether they were involved in the commission of the murder based on Bernard Wesley's testimony." He further argues that the tapes would have been helpful in determining the Smith brothers' credibility at trial.

The record reveals that the defense had transcripts of the tapes and used them to cross-examine the officer who interviewed both brothers. Moreover, the defense had a police report of the 1984 interview with David Smith and a report and transcript of the 1984 interview with Marvin Smith. Again, the tapes were cumulative, and their unavailability harmless.

### Fingerprint Evidence

Defendant reiterates his forensic expert Doctor Thornton's criticism of the initial investigation: The police failed to fingerprint the baseball bat, the shards of broken window glass, or door latch. Defendant claims prejudice because fingerprint evidence "tying someone else to the scene would have been powerful exonerating evidence."

This claim is based on Doctor Thornton's assumption that the objects were not tested for prints. Doctor Thornton based his assumption on the fact that there were no fingerprint cards for them. However, he conceded that he did not know and could not tell whether tests had been performed but yielded no prints. He did not consult with the officer who initially tested the crime scene. That person, Officer William Santos of the San Jose Police Department, testified that the lack of fingerprint cards does not mean that areas and objects were not processed. When prints are not found, documentation is not generated, and no record is kept of such negative results. Although Officer Santos had no recollection of testing the point of entry, he opined that it would have been something

14

that he ordinarily would have done because it was "obviously involved in the crime scene scenario."

Defendant's claim also assumes that potentially exonerating prints—i.e., those of some third person—were left on the various objects. Concerning the likelihood of fingerprints on the glass shards, Doctor Thornton doubted that the burglar used a hand to break the glass, let alone fingers. He opined instead that the burglar probably used the baseball bat. However, multiple witnesses testified and defendant told police that Marlon possessed a bat. Moreover, his neighbor saw him carrying it shortly before the murder, and he was still clutching it the when his parents found him. Furthermore, forensic analysis established that Marlon was shot from a distance, and there was little, if any, evidence of a hand-to-hand struggle, during which the burglar might have touched the bat.

Last, the record does not establish that the lack of fingerprint evidence was caused by the delay. As noted, the trial court found that there was insufficient evidence to charge defendant before Edelberg revealed his admission to her in 1986, two years after the murder. However, Doctor Thornton testified that fingerprints are not always left when one touches an object, and whether a print is left in the first place and how long it remains depends on a number of variables, including the nature of the surface, the oils on the skin, and other environmental factors. For example, he explained that prints left on paper may last indefinitely; but prints left on nonporous surfaces "may last for weeks or months, if protected against the sunlight and air . . . ."

Under the circumstances, the alleged failure to test for the fingerprints that may or may not have been on the various objects and remained there until 1986 combined with the assumption that tests would have revealed the fingerprints of someone other than Marlon or defendant makes defendant's claim that he lost potentially material evidence too speculative to show that the delay caused actual prejudice. (See *Scherling v. Superior*

*Court, supra,* 22 Cal.3d at p. 506 [lost evidence of only "speculative value"]; see also *People v. Roybal* (1998) 19 Cal.4th 481, 513 [alleged prejudice is "largely speculative"].)

***Tibbils's Traffic Ticket***

Defendant argues that Tibbils's testimony that defendant got marijuana from Marlon on the day of the murder was the only evidence linking Marlon and defendant together that day. According to defendant, Tibbils also said he received a traffic ticket that day. Defendant claims that if he had had the ticket and if it revealed that it had been issued on a different day, then he could have proved that the marijuana deal did not occur on the day of the murder and therefore that he and Marlon had not been together.

Tibbils did not fix the date of the marijuana deal with certainty. Although initially he thought it occurred on the day of the murder, he later conceded that he was not sure of the day and could not say he had ever been sure. Likewise, Tibbils was not sure when he got the ticket. He told Sergeant Vizzusi that when he spoke with defendant after the murder, he "felt" that the marijuana deal and murder occurred on the same day, noting that defendant told him that he had seen Wesley acting suspiciously. Sergeant Vizzusi then asked Tibbils how else he might connect the drug transaction and the murder to the same day. Tibbils said he "thought" he had gotten a traffic ticket around the time of the murder and opined that it could have been on the same day as the transaction, but he was not sure. Later, at the preliminary hearing, Tibbils recalled this exchange with Sergeant Vizzusi and explained that he traveled to and from defendant's house a lot and "got a ticket one day, and whether it lined up to be the day or not, I couldn't—I was unaware." His trial testimony mirrored his testimony at the preliminary hearing.

Given Tibbils's admitted uncertainty concerning (1) whether the marijuana transaction and murder occurred on the same day and (2) whether he got the traffic ticket on the same day, we find that any tendency the ticket had to show that defendant and Marlon were not together the day of the murder was speculative, even if the ticket was issued on a different day. Furthermore, and contrary to defendant's claim, Tibbils's

16

testimony was not the only evidence linking him to Marlon on the day of the murder. Defendant told the police that he spoke to Marlon the day of the murder and drove by his house, and he told Keasling that he went to Marlon's house that day to pick up some drugs. Under the circumstances, defendant has not shown that the unavailability of the traffic ticket was prejudicial as a matter of law.

*Report of the Tibbils's Interview*

Tibbils testified that he spoke to police over the phone shortly after the murder. Defendant claims prejudice from the loss of the police report of that interview. However, defendant provides no evidence that a report was ever generated. Nor does defendant explain what he would have been able to prove with such a report. In this regard, we note that Tibbils remembered and was questioned about the interview. He testified that during that period of time, he did not cooperate with the police and refused to go to the police station. He said the interview was brief, and he provided no information about going to defendant's house for drugs the day of the murder or talking to defendant about it a few days later. Under the circumstances, defendant cannot establish actual prejudice from the alleged loss of a police report that may not have ever existed.

*Documentation of Wesley's Jewelry Purchase*

Assuming that Wesley might not have bought jewelry on the day of the murder, defendant argues that the unavailability of documentation concerning the purchase prevented him from challenging Wesley's alibi concerning his whereabouts and bolstering the evidence implicating Wesley.

Defendant presented no evidence to support his assumption that the documentation might show a different date of purchase. Thus, the explanation concerning what he might have been able to prove is speculative. Defendant's claim of actual prejudice is further undermined by the fact that (1) Crystal Custodia corroborated Wesley's testimony that he stopped on Curtner near the 7-Eleven on his way to meet his girlfriend during her lunch break; (2) defendant said he saw Wesley near the 7-Eleven around that time; and

17

(3) Wesley's former girlfriend testified at that he would meet her at lunchtime on occasion and might have given her a piece of jewelry during her lunch break. Under the circumstances, defendant fails to show that the loss of whatever documentation there might have been was prejudicial as a matter of law.

### *Defendant's Employment Records*

Defendant argues that his employment records would have helped him prove where he was the day of the murder and provided "a point of reference for the time period." He argues that his own faded memory of events during that time aggravated the prejudice from the loss of records.

During his interview with Sergeant Vizzusi in 1983, one month after the murder, defendant said he was a trainee at a Great Western Bank. He also said that he did *not* work on the day of the murder. Defendant presented no evidence that his memory in 1983 had faded or was otherwise impaired. Defendant also spoke to police in 1984, 1989, and 2000, and his statements were documented in police reports and transcripts. During his interview in 2000, defendant recalled that he worked at a bank around the time of the murder. Defendant did not testify at trial. Under the circumstances, he cannot show that the lack of employment records and his allegedly faded memory before trial prevented him from being able to prove *at trial* that he might have been working at the bank on the day of the murder. Accordingly, he fails to demonstrate actual prejudice.

### *Records of Edelberg's Domestic Violence Complaint*

Edelberg testified that what triggered the domestic violence incident on March 12, 1984, was her reaction to defendant's admission that he killed Marlon. Defendant claims the unavailability of records documenting her complaint was prejudicial because "[h]er rendition of what occurred at the time it did occur would have either constituted powerful corroborating evidence or served to severely impeach her trial rendition."

As the People point out, defendant had the police report generated when Edelberg first complained to the police. At that time, she did not mention defendant's admission. As a result, defense counsel used the report to impeach Edelberg and suggest that she had fabricated his admission. Defendant does not now identify what, if any, additional records may have been generated that were later lost or unavailable. Again, he simply assumes the existence of such records. Under the circumstances, defendant fails to demonstrate that the alleged unavailability of records impaired his ability to undermine Edelberg's recorded statements and testimony about defendant's admission or caused some other sort of actual prejudice.

### Unavailability of Darryl Littlejohn and Ricky Ventimiglia

Darryl Littlejohn died before trial. Defendant asserts that there was evidence that Darryl "was owed $987 by Marlon Bass"; he once "said, 'Let's go over and get the Black guy,' " referring to Marlon; and he also "talked about a .22 gun." Defendant further notes that Ricky Ventimiglia apparently overheard Darryl make the comment but was unavailable to testify. Defendant argues that the unavailability of these two witnesses impaired his ability to show third-party culpability for the murder and thus raise a reasonable doubt about his own guilt.

There is evidence that Darryl uttered the statement attributed to him. However, the record does not suggest that Marlon owed him money. Rather, it reveals that Darryl's brother Darren owed Marlon the money. The record also reveals that it was Darren who talked about getting a gun for protection. Furthermore, Darren and Geoff Caplan overheard Darryl make his comment, and Kevin Camara later overheard Ventimiglia and Caplan talking about Darryl's comment.

Given the availability of other witnesses to testify about Darryl's comment, Darren's debt, and Darren's interest in a gun, we do not find that the unavailability of Darryl and Ventimiglia caused actual prejudice. This is especially so because the court

ruled prior to trial and again during trial that the evidence implicating Darryl was inadmissible for the purpose of showing possible third-party culpability.

### Unavailability of Mitch Helms

Defendant asserts that "Mitch Helms, who also sold drugs to appellant, was missing at the time of trial." However, other than noting Helms's unavailability, defendant does not explain what Helms's testimony could have helped him prove. Thus, defendant fails to show actual prejudice.

### Sergeant Pitts's Faded Memory

Defendant asserts that Sergeant Pitts, who was involved in the initial investigation, was unable to recall any particulars about the case. The record reveals that Sergeant Pitts was called to testify about his interview with Geoff Caplan after the murder. He did not recall much, but defense counsel had the police report that Sergeant Pitts prepared after the interview. The report supported defendant's effort to show that Caplan, who had previously burglarized Marlon's house, committed the murder. Under the circumstances, defendant fails to show that Sergeant Pitts's inability to recall the interview was prejudicial.

### Detective Brockman's Faded Memory

Defendant notes that Detective Brockman had no recollection of whether Edelberg reported defendant's admission to him in early 1984. As noted, however, it was unclear whether Edelberg did so, and the court implicitly found that she did not. (See *ante*, fn. 7.) In any event, it is undisputed that Edelberg reported defendant's admission in 1986, and she testified about it at trial. Defense counsel impeached her with the fact that although she immediately reported defendant's physical abuse, she did not mention his admission. Under the circumstances, we fail to see how Detective Brockman's inability to remember for sure whether Edelberg told him about defendant's admission in 1984 caused actual prejudice.

0 0021

*Crystal Custodia's Faded Memory*

Defendant asserts that Custodia, who testified that Wesley pulled over at the bus stop on the day of the murder, "had a failure of recall." However, defendant does not explain what she could not recall, its significance, and the resulting prejudice. The record reflects that she could not remember any descriptive details about the man who stopped. However, she was able to describe the type of car he was driving, and her description closely matched Wesley's car. Moreover, the defense had a copy of the police report containing her statement to police in 1983, which was used to refresh her recollection. In her statement, she described the man who stopped and his vehicle in more detail. Last, Wesley admitted that he pulled over to the curb to talk to some people that day, and defendant said that he had seen him in the area that day. Again, the record does not establish any prejudice from Custodia's inability to recall details about Wesley.

*Case Law*

In support of his claims of actual prejudice, defendant cites *People v. Hartman* (1985) 170 Cal.App.3d 572 (*Hartman*) and *Fowler v. Superior Court* (1984) 162 Cal.App.3d 215.

In *Hartman,* the victim was found dead in his office with a head wound. The doctor who performed the initial autopsy concluded that the victim died of natural causes. Although he could not determine the exact cause, he noted a high level of occlusion in the coronary artery and opined that the victim had died of a heart attack. He dismissed the head wound as insignificant because there was no sign of hemorrhage or skull fracture. (*Hartman, supra,* 170 Cal.App.3d at pp. 574-575.) One year later, the victim's widow had the body exhumed, and after another autopsy, a second doctor concluded that someone had killed the victim. He too could not identify the cause but opined that the victim had been strangled. He disagreed with the first doctor's analysis because he found a much lower level of occlusion. He submitted his report to two other doctors. However, both of them agreed with the first doctor's analysis and conclusion. A fifth doctor then

21

reviewed the case. He agreed that the victim had been killed but rejected the second doctor's view that the cause was strangulation and instead suggested that the victim suffered ventricular fibrillation during a struggle. A sixth doctor found the evidence of fibrillation inconclusive but agreed with the second doctor that the victim had a normal level of occlusion. (*Id.* at pp. 576-577.)

Over the next few years, the victim's wife sought to have the case reopened. Seven years after the death, the district attorney filed murder charges against the defendant, and he was convicted of second degree murder. Thereafter, the trial court denied his motion to dismiss due to pre-complaint delay. (*Hartman, supra,* 170 Cal.App.3d at pp. 577-578.) On appeal, court concluded that the delay had denied the defendant a fair trial and reversed the judgment. In finding that the defendant had demonstrated actual prejudice, the court noted that the first doctor had died before charges were filed. Thus, he was unavailable to explain his findings and conclusion that the victim had died of natural causes or rebut testimony implying that he had been negligent. One of the two subsequent doctors who agreed with the first doctor had also died and thus was unavailable to explain why he had concurred. (*Id.* at pp. 579-580.) Next, the court noted that the victim's brain was lost after the first autopsy. The second doctor expressed concern that he could not examine it because the victim had suffered a head injury. In this regard, a police investigator also testified that "a complete examination of the brain is a critical factor in determining whether the death was the result of a beating." (*Id.* at p. 580.) The victim's heart also disappeared after the second autopsy, making it impossible to resolve inconsistencies in the doctors' findings about occlusion and fibrillation. Photographs of the second autopsy were missing, and performing a third autopsy was ruled out because the body had decomposed too much. Last, the court observed that although the defendant could have introduced alibi witnesses concerning his whereabouts at the probable time of death, the witnesses would

have been difficult to locate and would have had trouble remembering the details of one night seven years earlier. (*Ibid.*)

*Hartman, supra,* 170 Cal.App.3d 572, is distinguishable from this case. The lost evidence and witnesses in *Hartman* had unique, if not, exclusive probative potential concerning whether the victim died of natural causes or at the hands of someone else. Thus, the lost evidence involved a matter of fundamental significance: whether a crime occurred in the first place. Here, defendant has scoured the record and compiled a long list of anything and anybody that was either lost or unavailable. However, the items and witnesses, individually or collectively, do not represent prejudicial impact remotely equivalent to that in *Hartman*. As noted, some of the unavailable evidence may never have existed, and most of it and the missing witnesses were (1) cumulative of other evidence, (2) involved issues that were undisputed or insignificant, or (3) related to matters that adequately could have be explored with available witnesses, evidence, police reports, and transcripts.

In *Fowler v. Superior Court, supra,* 162 Cal.App.3d 215, police received an anonymous report of a burglary at the defendant's house. They hid outside until defendant emerged and then announced their presence. The defendant ran and was later arrested. Prior to trial, he moved to dismiss the charges of possession of drugs and a firearm on due process grounds. In support of his motion, he noted that the police had destroyed the tape of the dispatcher's conversation with the anonymous caller about the burglary. The defendant testified in detail about a conspiracy against him by certain Los Angeles police officers, who previously had arrested him and later threatened to retaliate against him because he had succeeded in getting the charges dismissed. A police psychologist testified that phony telephone tips are not uncommon, and the defendant also presented the declarations of 15 neighbors, all of whom denied responsibility for the anonymous telephone call. The defendant argued that loss of the tape prevented him from proving that the call was made by a police officer. (*Id.* at pp. 217-218.) The trial

23

court denied the motion, finding that the defendant had not demonstrated actual prejudice. However, the appellate court found that the defendant had plausibly explained what he might have been able to prove with the tape therefore had shown actual prejudice. The court issued a writ of mandate directing the trial court to rehear the motion and balance the prejudice against any justification for the delay. (*Id.* at pp. 220, 222.)

*Fowler v. Superior Court, supra,* 162 Cal.App.3d 215, acknowledges that when evidence is lost, it may be impossible to show that it would have been favorable to the defense. However, *Fowler* teaches that a defendant can nevertheless establish actual prejudice if the evidence would have been uniquely relevant in resolving a factual dispute concerning a material issue and the defendant makes a showing that supports a plausible explanation for exactly what the lost evidence might have allowed him or her to prove. Thus in *Fowler,* the defendant presented relevant evidence indicating that a police officer might have made the anonymous call as part of a retaliatory conspiracy. The missing tape had unique, highly probative value concerning who made the call. Thus, it was entirely plausible that with the tape, the defendant could have proved that a police officer made the call.

*Fowler* is also distinguishable. Here, none of the lost or unavailable evidence was as uniquely relevant and probative concerning a disputed material issue as the lost dispatch tape in *Fowler*. Nor did defendant make a comparable showing sufficient to establish plausible explanations of what the lost or unavailable evidence might have enabled him to prove. Rather, defendant's explanations were sometimes general and vague and often based on faulty or factually unsupported assumptions and speculation.

*Conclusion*

The record supports the trial court's finding that defendant failed to demonstrate actual prejudice, and we do not find that he established actual prejudice as a matter of law. Under the circumstances, we need not determine whether the delay was justified,

particularly since there was no evidence that the delay in prosecution was for the purpose of weakening the defense. (See *Scherling v. Superior Court, supra*, 22 Cal.3d at pp. 506-507.)

We note, however, that the trial court did further find that even if there were some prejudice from the delay, it was not sufficient to deny defendant a fair trial. The court's conclusion is not unreasonable.

The record reveals that in 1986, after learning about Edelberg's statement to the district attorney's investigator—i.e., that defendant had admitted and reenacted the killing but had said he was only kidding—Detective Brockman forwarded it to the homicide unit. However, by that time, the investigation had lapsed, and the case was considered cold. Apparently, the new information was given low priority compared with more current ongoing investigation, especially because the information from Edelberg was that defendant had only been joking. Thereafter, the case languished apparently due to the press of subsequent cases and investigations and the low priority given this case after two years of extensive but fruitless investigation. Then, in 2000, Sergeant Vizzusi reexamined the file and reinterviewed Edelberg. In light of additional evidence incriminating defendant, the case was revived, and ultimately the charges were filed.

Generally, " ' [t]he People cannot simply place gathered evidence of insubstantial crimes on the "back burner" hoping that it will some day simmer into something more prosecutable . . . .' " (*People v. Pellegrino* (1978) 86 Cal.App.3d 776, 781; accord, *Hartman, supra*, 170 Cal.App.3d at p. 582.) In hindsight, the record does not reveal any insurmountable reason why the revival of the case in 2000 could have occurred back in 1986, when Edelberg's statement came to light. However, that the investigation could have been revived sooner does not necessarily establish that the police were negligent in failing to do so or that the apparent justification for the delay—the press of more current cases—at least between 1986 and 2000, is invalid and unreasonable.

25

There is no strict rule establishing how much of a pre-complaint delay invariably constitutes a denial of due process. Each case is unique and must be resolved by balancing the public interest and the rights of the defendant in light of its fact and circumstances. (See *People v. Wright* (1969) 2 Cal.App.3d 732, 736.) Where, as here, the delay did not cause prejudice of any material significance, a minimal justification will counterbalance it. Furthermore, the balancing must also include consideration of the seriousness of the alleged crimes and the public interest in resolving them. (See *Penney v. Superior Court* (1972) 28 Cal.App.3d 941, 953-954, implicitly disapproved on another ground in *People v. Hannon* (1977) 19 Cal.3d. 588, 610-611, fn. 12.) Murder is a serious crime, for which there is no statute of limitations, and therefore it is one for which society has a strong interest in seeing the perpetrator brought to justice.

On balance, we do not find that any marginal prejudice from the delay necessarily outweighed the explanation and compels reversal as a matter of law. Rather, having reviewed the record, which, as the trial court observed, included 81 tapes and almost 200 pages of police reports, we do not find that defendant's ability to meet and challenge the prosecution's case, rebut its evidence, and impeach its witnesses or his ability to defend himself were so impaired that he was denied a fair trial.

### EXCLUSION OF EVIDENCE OF THIRD-PARTY CULPABILITY

Defendant contends that the trial court erred in excluding evidence that Blaine Buscher or Darryl Littlejohn killed Marlon.[12]

" 'To be admissible, the third-party evidence need not show "substantial proof of a probability" that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt. At the same time, we do not require that any evidence, however remote, must be admitted to show a third party's possible

---

[12] The court allowed the defendant to introduce evidence that implicated Wesley and Caplan.

culpability. . . . [E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime.' [Citation.]  We emphasized that 'courts should simply treat third-party culpability evidence like any other evidence:  if relevant it is admissible [citation] unless its probative value is substantially outweighed by the risk of undue delay, prejudice, or confusion [citation.]'  [Citation.]  A trial court's discretionary ruling under Evidence Code section 352 will not be disturbed on appeal absent an abuse of discretion.  [Citation.]"  *(People v. Lewis* (2001) 26 Cal.4th 334, 372, fn. omitted; *People v. Bradford* (1997) 15 Cal.4th 1229, 1325; *People v. Hall* (1986) 41 Cal.3d 826, 832-833.)

"[J]udicial discretion is . . . 'the sound judgment of the court, to be exercised according to the rules of law.' [Citation.]  . . . [T]he term judicial discretion 'implies absence of arbitrary determination, capricious disposition or whimsical thinking.' [Citation.]  Moreover, discretion is abused whenever the court exceeds the bounds of reason, all of the circumstances being considered. [Citations.]"  *(People v. Giminez* (1975) 14 Cal.3d 68, 72.)

*Blaine Buscher*

Defendant sought to introduce the testimony of William Wall that Buscher admitted killing Marlon.  He also sought to introduce the testimony of Kirk Hill, Laura Basolo, Shannon Murphy, and Mark Delaney as circumstantial evidence linking Buscher to the murder.

In his offer of proof, defendant asserted that in early 1984, several people, including Wall, Buscher, and an African-American man named Billy Baptiste, were at an all-night card party.  Around 4:30 or 5:00 a.m., Wall leaned over to Buscher and whispered, "you killed the nigger[,]" referring to Marlon.  According to Wall, Buscher slowly nodded once.

27

The record further reveals that sometime later, Wall called police with a tip about narcotics trafficking. He also mentioned the incident at the card party. Later, however, Wall denied knowing whether Buscher had known that his comment at the party referred to Marlon's murder. Wall also did not believe that Buscher had intended to accept responsibility for the murder. The police also questioned Buscher. He admitted being at the card party and said he knew Marlon from playing basketball together. However, he denied involvement in the murder.

Kirk Hill told police that around 7:30 p.m. the night before the murder, he, a friend, and Marlon were outside Marlon's house when an unkempt white man, wearing a green army jacket, drove up in a Mustang, got out, walked up to Hill and said, "you are not Buscher." The man, whom Marlon apparently did not know, then started yelling at Marlon. Laura Basolo said that around 11:00 a.m. the day of the murder, she saw a man in a green army jacket ringing the doorbell at Marlon's house. Shannon Murphy, who lived about three-quarters of a mile from Marlon, said that on the night of the murder, a shabby, unshaven man in a green army jacket, who seemed to be under the influence of something, came to his house. Mark Delaney said that around the time of the murder, Buscher used to wear a green army jacket.

In seeking to introduce this evidence, defendant argued that the man seen by Hill, Basolo, and Murphy could have been Buscher, and thus their testimony would circumstantially connect Buscher to Marlon's house before, around the time of, and after the murder. According to defendant, this evidence plus Buscher's silent nod at the card party was strong evidence of third-party culpability.

In excluding the evidence, the court noted that Wall's proposed testimony involved hearsay. Moreover, given the late-night, card-party context; ambiguity concerning the nature, meaning, and intent of Buscher's response to Wall's whispered comment; and the subsequent denials by Wall and Buscher that Buscher intended to admit killing Marlon, the court found the evidence of Buscher's alleged admission to be

too unreliable, tentative, tenuous, and vague to connect him to commission of the murder. The court similarly found that Hill's, Basolo's, and Murphy's observations of an unidentified man in a green army jacket were too "every day" to establish such a connection.

The People argue that in essence the court found that the proposed evidence of Buscher's alleged admission was too vague and ambiguous concerning Buscher's understanding of Wall's reference to Marlon, the meaning of Buscher's response, and Wall's subjective impression of it to establish the necessary foundation to admit Wall's testimony under the hearsay exception for adoptive admissions. (See Evid. Code, § 1221;[13] cf. *People v. Vindiola* (1979) 96 Cal.App.3d 370, 382-383, disapproved on another ground in *People v. Carter* (2003) 30 Cal.4th 1166, 1197-1199.) We agree. The court could reasonably find that given Wall's proposed testimony in the context it was made, no reasonable person could find that Buscher knowingly intended his one slow nod to be an admission that he murdered Marlon. "[E]xclusion of evidence that produces only speculative inferences is not an abuse of discretion." (*People v. Babbitt* (1988) 45 Cal.3d 660, 684, 681-682.)

Given the inconsistencies among the descriptions of the man in the green army jacket and Hill's indication that the man was not Buscher, the court reasonably could also conclude that the three observations and evidence that Buscher was known to wear an army jacket were insufficient to link him to the scene of the crime around the time it happened. Moreover, even if the evidence had some tendency to do so, it was nevertheless insufficient to connect Buscher to perpetration of the crime because it only showed that Buscher had the opportunity to commit it. (See *People v. Hall, supra*, 41

---

[13] Evidence Code section 1221 provides, "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth."

Cal.3d at p. 833 [evidence of mere opportunity to commit crime not enough to admit to show third-party culpability].)

*Darryl Littlejohn*[14]

Defendant sought to introduce evidence that (1) Darryl Littlejohn owed Marlon $957; (2) Darryl once said, "let's go over and get the black guy"; and (3) Darryl had talked to Wall about a gun.

The court observed that part of the evidence was hearsay, and together it was too speculative to connect Darryl to commission of the murder.[15]

Again, we find no abuse of discretion. As noted, the record indicates that it was *Darren*, not Darryl, who owed Marlon money; and it was also Darren who talked to Wall about a gun. Moreover, the evidence revealed only a possible motive, a threat, and an opportunity to commit the crime. As such it was inadmissible without additional evidence, more direct evidence connecting Darryl to commission of the crime. (*People v. Hall, supra,* 41 Cal.3d at p. 832.)

Last, we conclude that any error in excluding the evidence was harmless. First, there was strong evidence incriminating defendant, and much of it came from defendant himself. Daniel Barnett testified that defendant threatened Marlon. Shelby Arbuckle testified that defendant knew many details about the crime and had said he hired others to commit the burglary. Edelberg testified that defendant admitted killing Marlon. Marlon's father's testified that defendant said he had acted in self-defense. Wesley

---

[14] As noted, Darryl Littlejohn died before trial.

[15] Among other things, the court stated that "when you go down to . . . Buscher, Littlejohn, clearly from reading the Supreme Court cases these are all issues of, I think [he said], he might have said, she might have heard, he might have heard that I think is evidence that the courts have always sustained to be excluded as too tentative, too speculative, and not meeting the criteria of a connection, if you will."

testified that defendant approached him to commit the burglary.  Furthermore, various witnesses' testified about defendant suddenly having money after the murder.

Next, we note that the proposed evidence concerning Buscher and Darryl did not directly undermine any of this testimony or impeach the witnesses who provided it.

Last, we observe that the court admitted evidence of third-party culpability concerning Wesley and Caplan that was less vague and ambiguous more incriminating than the evidence concerning Buscher and Darryl Littlejohn.  However, that evidence failed to undermine the evidence against defendant and raise a reasonable doubt concerning his guilt.  Under the circumstances, we do not consider it reasonably probable the jury would have reached a different verdict had the far less certain and compelling evidence concerning Buscher and Darryl Littlejohn been admitted.[16] (See *People v. Cudjo, supra*, 6 Cal.4th at p. 611; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

## DISMISSAL OF JUROR

Defendant contends the trial court abused its discretion in dismissing a juror during deliberations.

---

[16]  Defendant asserts that the erroneous exclusion of evidence concerning third-party culpability violated his federal constitutional right to present a defense, and therefore such an error compels reversal unless the reviewing court can find it harmless beyond a reasonable doubt. (See *Chapman v. California* (1967) 386 U.S. 18, 24.) However, in *People v. Cudjo* (1993) 6 Cal.4th 585, 611, the court explained that " '[a]s a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's [constitutional] right to present a defense. Courts retain . . . a traditional and intrinsic power to exercise discretion to control the admission of evidence in the interests of orderly procedure and the avoidance of prejudice. [Citations.] . . . [T]his principle applies perforce to evidence of third-party culpability . . . .' [Citation.] [¶] It follows, for the most part, that the mere erroneous exercise of discretion under such 'normal' rules does not implicate the federal Constitution.  Even in capital cases, we have consistently assumed that when a trial court misapplies Evidence Code section 352 to exclude defense evidence, *including third-party-culpability evidence*, the applicable standard of prejudice is that for state law error, as set forth in *People v. Watson*,[ *supra*, 46 Cal.2d at page 836] (error harmless if it does not appear reasonably probable verdict was affected). [Citations.]." (Italics added.)

31

## Background

During jury voir dire, the court and counsel questioned prospective jurors about their view of the police and their feelings toward the credibility and trustworthiness of police officers as witnesses. They also asked prospective jurors whether they had had any positive or negative experiences with the police that might make them biased or prejudiced or impair their ability to deliberate and be fair and impartial. Juror No. 6 did not indicate that he thought police were untrustworthy; he denied having good or bad experiences that might render him biased; and he assured the court he could be fair and impartial.

Later, during jury deliberations, the court received a note signed by seven jurors. They expressed concern that Juror No. 6 was unwilling to examine the evidence. They further asserted, "This juror has expressed negative bias based on his personal experience. This experience has caused him to disregard all police testimony. He has had personal experience with violence, guns and corrupt police and has informed us that we are naïve about the police. [¶] In addition, he believes all of the witnesses were lying and has thus disregarded their testimony. Based on his comments and behavior, it appears to us that he does not understand, respect or accept our legal system. [¶] We feel that he may have misrepresented himself . . . during jury selection. We would appreciate your advise or additional jury instructions in this matter."

In response, the court spoke with Juror No. 6. He denied the accusations in the note and said he had no bias against the police. He explained that he told the other jurors that he thought the police investigation had been inadequate and had not convinced him that defendant was guilty beyond a reasonable doubt. The court asked whether he had had any bad experiences of violence or corruption involving the police or been treated unfairly by them or harbored personal animosity toward them. Juror No. 6 said no and reiterated that he could be fair.

The court then spoke with the other jurors.  Several jurors reported that Juror No. 6 told them that he had experience with the police because he grew up in a rough area of San Jose and once saw the police shoot a friend of his in the stomach.  He also told them that the police are dishonest and trained to lie.  One juror said that Juror No. 6 expressed problems with law enforcement; and another characterized him as "very biased.  Another juror reported that during a break, Juror No. 6 said he had had his own personal problems with the police.  One juror, however, did not take Juror No. 6's comments as an indication that he was biased.

After hearing this testimony, the court obtained Juror No. 6's criminal history and then spoke to him again.  Juror No. 6 denied saying he had seen the police shoot a friend but admitted saying he had grown up in a rough neighborhood.  When asked about his criminal record, Juror No. 6 admitted that he had made mistakes in the past.  However, he reiterated that he had had no negative experiences of the police and harbored no animosity toward them.

Given Juror No. 6's initial responses during voir dire and the testimony from him and other jurors, the court removed him and seated an alternate.  The court did not base its decision on a finding that Juror No. 6 had failed and refused to deliberate.  Rather, the court found that he lacked credibility, had violated the court's admonition not to discuss the case during breaks, and had falsely denied making certain statements during deliberations.  The court ultimately found a "demonstrable reality" that Juror No. 6 had lied under oath during voir in saying that he could be unbiased, fair, and impartial.[17]

---

[17] After the jury found defendant guilty, he filed a motion for new trial, claiming the court erred in removing Juror No. 6.  In denying the motion, the court reiterated that its ruling was not based on the failure to deliberate but on the lack of credibility.

*Discussion*

Under Penal Code section 1089, a court may remove a juror for good cause if it finds a "demonstrable reality" that the juror is unable to perform his or her duty.[18] (*People v. Cleveland* (2001) 25 Cal.4th 466, 474.) A finding that a juror harbors an actual bias and concealed it during voir dire constitutes good cause to remove that juror. (*Id.* at p. 478; *People v. Keenan* (1988) 46 Cal.3d 478, 532; e.g., *People v. Thomas* (1990) 218 Cal.App.3d 1477, 1482-1485; *People v. Feagin* (1995) 34 Cal.App.4th 1427, 1437.)

On appeal, we review a decision to remove a juror for abuse of discretion: If there is any substantial evidence to support the decision, we will uphold it. (*People v. Samuels* (2005) 36 Cal.4th 96, 131-132.)

Here, the testimony of other jurors supports the court's findings that Juror No. 6 lacked credibility, had lied during voir dire about not having negative experiences of the police and a bias that would prevent him from being fair and impartial, and later lied again to the court about not making certain statements during deliberations.

Defendant argues that the statements attributed to Juror No. 6 merely reflect his personal experience, which jurors are allowed to bring to bear during deliberations. However, his statement that he thought all police were dishonest and trained to lie reflects actual bias and an inability to be fair and impartial that is sufficient by itself to support a discharge. This is especially so because Juror No. 6 concealed his views concerning police during voir dire. Moreover, the trial court was not obliged to believe

---

[18] Penal Code section 1089 provides in pertinent part, "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, or if a juror requests a discharge and good cause appears therefor, the court may order the juror to be discharged and draw the name of an alternate, who shall then take a place in the jury box, and be subject to the same rules and regulations as though the alternate juror had been selected as one of the original jurors."

either his denial about making the statements attributed to him or his assurance that he

harbored no hard feelings toward police.  Last, we find defendant's reliance on *People v.*

*San Nicolas* (2004) 34 Cal.4th 614, *People v. Kelly* (1986) 185 Cal.App.3d 118, *People v.*

*Jackson* (1985) 168 Cal.App.3d 700, and *Sanders v. Lamarque* (9th Cir. 2004) 357 F.3d

943 to be misplaced.  Those cases are distinguishable and do not convince us that the

court here abused its discretion.

### IMPOSITION OF FINES UNDER PENAL CODE SECTIONS 1202.4 AND 1202.45[19]

Defendant contends that the imposition of a $5,400.00 restitution fine under

section 1202.4 and a matching parole revocation fine under section 1202.45 violated the

constitutional ban on ex post laws because neither statute was in effect when he murdered

Marlon.  (See *People v. Callejas* (2000) 85 Cal.App.4th 667, 676-678; *People v. Barker*

(1986) 182 Cal.App.3d 921, 942; *People v. McCaskey* (1985) 170 Cal.App.3d 411, 418.)

The People agree that the fines must be stricken.  However, the People point out

that when defendant committed his offense, restitution fines were governed by former

Government Code section 13967, which authorized the imposition of fines on persons

convicted of violent crimes resulting in the injury or death of another person.  (See

*People v. McCaskey, supra,* 170 Cal.App.3d at p. 414; see former Gov. Code, § 13967,

stats. 1981, ch. 166, § 3, p. 967.)  Accordingly, the People argue that the matter should be

remanded for a restitution hearing in accordance with former Government Code section

13967.[20]

---

[19] All further statutory references are to the Penal Code unless otherwise specified.

[20] When defendant committed the crime, there was no statute equivalent to section
1202.45 authorizing a parole revocation fine.  Consequently, the People concede that
remand is inappropriate for imposition of a parole revocation fine.

We agree that a remand is proper and appropriate. (See, e.g., *People v. Barker, supra,* 182 Cal.App.3d at p. 944 [remand for hearing]; *People v. McCaskey, supra,* 170 Cal.App.3d at p. 419 [same].)

Citing *People v. Downing* (1985) 174 Cal.App.3d 667, defendant suggests that a remand is inappropriate. In *Downing,* the court struck a fine imposed under former Government Code section 13967 and did not remand for a new hearing because the defendant had committed a *non-violent* offense. (*Id.* at pp. 670-671.) Here, however, defendant was convicted of a violent offense, which qualified him for a restitution fine under the former statute.

## DISPOSITION

The judgment is reversed, and the matter remanded to the trial court for a restitution fine hearing in accordance with former Government Code section 13967.

_____
                    RUSHING, P.J.


WE CONCUR:




_____
        PREMO, J.




_____
        ELIA, J.




*People v. Leon*
H026042

0  0038

Court of Appeal, Sixth Appellate District - No. H026042
**S142159**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

THE PEOPLE, Plaintiff and Respondent,

v.

DAVID MICHAEL LEON, Defendant and Appellant.

SUPREME COURT
F I L E D

MAY 2 4 2006

Frederick K. Ohlrich Clerk

DEPUTY

Petition for review DENIED.

GEORGE
───────────────────
Chief Justice

EXHIBIT 𝐵

0    0039

COPY



**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

Court of Appeal - Sixth App. Dist.

**FILED**

FEB - 7 2007

MICHAEL J. YERLY, Clerk

DEPUTY

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DAVID MICHAEL LEON,<br><br>    Defendant and Appellant. | H030578<br>(Santa Clara County<br>Super. Ct. No. CC093326) |

    Defendant David Michael Leon was convicted of first degree murder. On a previous appeal we remanded for correction of errors in the imposition of certain fines. On this appeal defendant contends that the trial court again erred on remand. Respondent concedes the error. The only issue is whether we can direct a correction of one of the fines without further ado, or whether the nature of the error requires further proceedings below. We have concluded that further proceedings would serve no purpose. Accordingly we will direct the trial court to strike one fine and reduce the other to a specified amount.

## BACKGROUND

    In our previous decision, of which defendant has requested and we have granted judicial notice, we summarized the events and proceedings leading to defendant's conviction of the 1983 murder of Marlon Bass. (*People v. Leon* (Feb. 24, 2006,

**EXHIBIT** C

H026042) [nonpub. opn.].)  In that appeal we rejected various challenges to the conviction itself, but sustained defendant's challenges to the imposition of certain fines. The court had imposed a $5,400.00 restitution fine under Penal Code section 1202.4 and a parole revocation fine of like amount under Penal Code section 1202.45.  Defendant contended that these fines violated the constitutional prohibition against ex post facto punishments.  (*People v. Leon, supra,* at p. 35 [nonpub. opn.].)  We accepted defendant's contention that he could not be fined under those statutes, but also accepted respondent's contention that defendant could be fined under former Government Code section 13967, which in 1983 authorized fines on persons convicted of violent crimes resulting in the injury or death of another person.  (*People v. Leon, supra,* at p. 35 [nonpub. opn.].)  We acknowledged that there was then no equivalent to a parole revocation fine, and that any remand could not embrace the re-imposition of such a fine.  (*People v. Leon, supra,* at p. 35, fn. 20 [nonpub. opn.].)  However, we reversed and remanded "for a restitution fine hearing in accordance with former Government Code section 13967."  (*People v. Leon, supra,* at p. 36 [nonpub. opn.].)

On remand, the court scheduled a restitution hearing, apparently for June 28, 2006. A court officer inquired of the sentencing judge whether defendant should be "transported back from state prison for the purpose of conducting a Restitution Fine Hearing."  The record contains no reply to this inquiry, but on June 20 the court conducted a hearing at which it recited, "There is no appearance by defense counsel or the prosecution.  [¶]  Defense counsel was contacted, indicated that he waived his client's appearance.  He did not want Mr. Leon brought back for this sentencing and agreed that the 200 minimum is the appropriate remedy."  Accordingly, the court—acknowledging that there was no evidence of defendant's ability to pay—imposed a restitution fine of $200, which it considered the statutory minimum at the time of the offense.  The court also struck the fine previously imposed "pursuant to 1205.45 [*sic*]," but then imposed a $200 fine in its stead as well.  The amended abstract of judgment thus recites that

defendant is fined "$200 per PC 1202.4(b) forthwith per PC 2085.5," and "$200 per PC 1202.45 suspended unless parole is revoked."

Defendant filed this timely appeal from the judgment as so modified.

## DISCUSSION

Defendant contends that the imposition of fines in his absence "violated his federal and state constitutional and statutory rights to be present." He contends that the error was structural and thus mandates reversal without a showing of prejudice; alternatively, he contends, the error cannot be found harmless beyond a reasonable doubt. He asserts that defense counsel rendered ineffective assistance in two respects: first, by waiving defendant's presence at the hearing, and second, by erroneously conceding that the minimum fine at the time of the offense was $200, when in fact it was $10.

We find it unnecessary to sift through the constitutional issues because no matter how they are resolved, there is only one suitable appellate remedy: a remand with explicit instructions to strike both fines and to impose a single fine of $10. This is because, as respondent concedes, that was the minimum fine that could be imposed under the version of Government Code section 13967 in effect in 1983, when the murder occurred. (See *People v. McCaskey* (1985) 170 Cal.App.3d 411, 414, 418.) Ten dollars is thus the amount in which the fine should have been imposed when the prosecution declined to contest the matter. (See *People v. Vieira* (2005) 35 Cal.4th 264, 405-306.)

As respondent also concedes, and as our previous opinion made quite clear, there was no statutory basis for imposition of a parole revocation fine at the time of the offense, and therefore no such fine can or should be imposed. (*People v. Leon, supra*, at p. 35, fn. 20 [nonpub. opn.].)

In view of these well taken concessions, the issues raised by defendant concerning the applicable rule of reversible error appear academic. By any standard the error warrants reversal, and the correct disposition is to reverse with instructions to modify the judgment to impose a single restitution fine of $10. We will therefore so direct.

0 0042

## DISPOSITION

The judgment is reversed and remanded for the sole purpose of striking both the restitution fine and the parole revocation fine, and imposing a single restitution fine in the amount of $10.

0 0043

_____

                          RUSHING, P.J.

WE CONCUR:

_____

         PREMO, J.

_____

         ELIA, J.

*People v. Leon*
**H030578**

0 0044

**FILED**

APR 1 8 2007

KIRI TORRE
Chief Executive Officer
Superior Court of CA County of Santa Clara
BY _____ DEPUTY

## SUPERIOR COURT OF CALIFORNIA

## COUNTY OF SANTA CLARA

|                          |   |                    |
|--------------------------|---|--------------------|
| In re                    | ) | No.: CC093326      |
|                          | ) |                    |
|     DAVID MICHAEL LEON,   | ) | <u>ORDER</u>       |
|                          | ) |                    |
| On Habeas Corpus         | ) |                    |
|                          | ) |                    |

DAVID MICHAEL LEON, hereinafter Petitioner, has submitted to the Superior Court a habeas petition in which he asserts his appellate attorney provided ineffective assistance of counsel by not arguing the trial court erred in excluding the expert testimony of Dr. Ofshe and Dr. Leo.

While the point now pressed certainly was arguable, it was not a winning argument for counsel to present on appeal. Thus it appears that appellate counsel had to make strategic choices regarding this and the other potential issues to be brought on appeal. Counsel had to balance the likelihood of prevailing on a point, the likely result

**EXHIBIT D**

1  of winning a point (would it make a difference or be harmless error)

2  and the fact that a shotgun approach (i.e. raising every possible

3  issue) conveys to the court the impression that none of the

4  individual arguments are particularly strong and also runs the risk

5  that the court will not focus on the points that counsel believes

6  deserve the most attention and have the most merit.  The risk that

7  the appellate court would devote a substantial portion of their

8  opinion to the weakest defense argument, and inadvertently give short

9  shrift to the argument that should have prevailed, is why appellate

10 counsel often foregoes their weakest, but still viable, points.

11 Choices have to be made and an appellate counsel's tactical approach,

12 just as a trial counsel's, should not be second guessed if it was a

13 reasonable under the circumstances.

14

15     With the above background in mind, in this case the analysis of

16 the two prongs of ineffective assistance of counsel somewhat

17 collapses into the single inquiry of whether prevailing on the expert

18 testimony issue would have made a difference.  Had Petitioner

19 prevailed on the question of Dr. Ofshe's or Dr. Leo's testimony, but

20 the Sixth District would have found the error harmless, then there

21 was neither prejudice nor deficient performance because counsel

22 correctly analyzed the situation and made a sound tactical decision.

23

24     From this Court's review it appears that the claimed error, if

25 it was error, would have been found harmless.  The Sixth District

26 summed up the evidence at issue as follows:

27     Police interviewed defendant's father Michael Leon in
       2000. He said that around 1984, defendant mentioned that

28

1  a friend had been killed and some suspicion had focused
on him.  According to Mr. Leon, defendant was scared,
2  and although he did not talk about the incident, he
mention something about a baseball bat and that "it was
3  self defense."  At trial, Mr. Leon said that he lied to
the police about the bat and self-defense because that
4  is what the police wanted to hear, and he thought he was
helping his son. (Page 6.)

5

6      It appears from this summation that the point was already made

7  to the jury that Petitioner's father's statements to the police

8  should not be taken at face value.  While the expert testimony would

9  have made the point more convincing, the excluded expert testimony

10  only went to the weight of the issue.  Because this is not a

11  situation of the jury being precluded from considering an argument in

12  its entirety it is difficult to find prejudice.

13

14      More importantly, in rejecting another claim of error, the Sixth

15  District stated:

16      Last, we conclude that any error in excluding the
evidence was harmless. First, there was strong evidence
17  incriminating defendant, and much of it came from
defendant himself. Daniel Barnett testified that
18  defendant threatened Marlon. Shelby Arbuckle testified
that defendant knew many details about the crime and had
19  said he hired others to commit the burglary. Edelberg
testified that defendant admitted killing Marlon.
20  Marlon's father's testified that defendant said he had
acted in self-defense. Wesley testified that defendant
21  approached him to commit the burglary. Furthermore,
various witnesses' testified about defendant suddenly
22  having money after the murder.  (Page 30.)

23

24      This is exactly what would have been said (of course without the

25  "Marlon's father ..." sentence) had counsel made the argument now

26  presented and had counsel persuaded the court to accept it.  Because

27  the expert testimony would not have been conclusive, and there was

28

1  too much other evidence, prevailing on this point would not have made

2  a difference in the outcome of the appeal.  (Note also that there

3  would have been no cumulative error argument because the Sixth

4  District provided the above harmless error analysis as an alternative

5  after finding no error on a third party culpability issue.)

6

7         For the above reasons, the petition is respectfully DENIED.

8

9

10

11  DATED:  _*18 April*_ , 2007              

12                                    PAUL BERNAL
                                      JUDGE OF THE SUPERIOR

13

14  cc:  Petitioner
         District Attorney

15       Research(3-7A)
         CJIC

16

17

18

19

20

21

22

23

24

25

26

27

28

4

Court of Appeal, Sixth Appellate District - No. H031537
**S154766**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re DAVID MICHAEL LEON on Habeas Corpus

The petition for review is denied.

SUPREME COURT
FILED

OCT 1 0 2007

Frederick K. Ohlrich Clerk

Deputy

GEORGE

Chief Justice

EXHIBIT E

.0 0049

## DECLARATION OF LYND A . ROMERO

I am certified to practice law in the state of California and declare, under penalty of perjury, the following to be true:

1.   I was appointed to represent David Leon before the Court of Appeal, Sixth District in H026042.

2.   At the conclusion of the appeal, I provided the transcripts and parts of my file including letters from Mr. Leon, briefs and my potential issues list with notations to Mr. Leon.

3.   At her request, I provided the remainder of my file to attorney Julie Schumer on August 18, 2006.

4.   I have not been provided any materials to refresh my recollection from Ms. Shumer or Mr. Leon.

5.   In a letter dated January 10, 2007, Ms. Shumer asked me to provide my reasons for not including an issue regarding the exclusion of defense proffered testimony of "either Dr. Ofshe or Dr. Leo concerning coercive techniques by police" in obtaining the statement of Mr. Leon's father as an issue on appeal.

6.   My reasons for not including the issue are as follows:

a.   I was familiar with expert testimony regarding false confessions/coercive tactics from two prior cases in which such an expert had testified.  Although every case is different, I believe I understood the scope and significance of the potential testimony.

b.   From my explanation provided to SDAP regarding "unbriefed issues" at the time the opening brief was filed, I reviewed the following authorities:  People v. McDonald (1984) 37 Cal.3d 351, 373; People v. Cole (1956) 47 Cal.2d 99; 105; People v. Wright (1985) 39 Cal.3d 576, 584-585; People v. Alcala (1992) 4 Cal.4th 743; People v. Johnson (1993) 19 Cal.App.4th 778; Evid. Code, § 720, subd. (a) and Evid. Code, § 801.  Further, I had raised an issue concerning the limitation on such testimony in one prior case.  Although that issue was not published and involved limitation of testimony as opposed to exclusion, the court squarely rejected the issue.  The case is People v. Hall (2000) 78 Cal.App.4th 232.  However, the discussion of the issue is not published.  In addition, an issue regarding the exclusion of Dr. Ofshe's testimony had been rejected in People v. Son (2000) 79 Cal.App.4th 224.  Of course, the fact that the testimony was excluded regarding testimony of a witness as opposed to attacking directly a defendant's confession impacts the evaluation of the issue as well.

c.   I also listened to the tape of the statements of appellant's father.  As best as I can

EXHIBIT   D    EXHIBIT   F

recall, it was my assessment that the tape did not substantiate a claim of coercive tactics employed by the police in the interview.

d.    I also have a very vague recollection of speaking with the trial attorney about the issue.

e.    As to every issue an assessment must be made regarding not just whether an argument regarding error can be made but also, and perhaps more importantly, whether any argument on prejudice can be made. In my assessment, prejudice was a major problem. Appellant's father's statements were not the most damaging evidence of guilt in the case and even had his statements been excluded, there was other more damaging evidence of guilt sufficient to sustain the conviction. I recall that Danette Arbuckle and her brother quoted direct statements and a re-enactment from appellant which, constituted the strongest evidence of guilt. Bernard Wesley also quoted direct statements by appellant admitting involvement in the crime. Appellant's former girlfriend also repeated statements made by appellant about being with the victim on the day of the murder. In addition, I believe appellant's father testified he was often drinking alcohol when he spoke to appellant and was drinking before the interview by the police which constitutes an alternative attack on his statements to the police about appellant's admissions and provided the jury with a basis to reject appellant's father's statements. Thus, any error would have been harmless.

7.    In a letter dated January 25, 2007, Ms. Shumer asked whether research led me to People v. Page (1991) 2Cal.App.4th 161, Boyer v. State (2002) 825 So.2d 418, United States v. Hall (7th Cir. 1996) 93 F.3d 1337, United States v. Hall (C.D. Ill 1997) 974 F.Supp 1198 and Untied States v. Shay (1st Cir. 1995) 57 F.3d 126. In a letter dated February 5, 2007, I informed Ms. Shumer I do not recall the cases. Thus, I cannot attest to whether or not I reviewed these cases during my research on the case or at any other time.

Dated:    2/5/07                                                    Lynda A. Romero

0 0051

SAM J. [ATTORNEY AT LAW]
POLVERINO

TWO N. SECOND ST., STE. 295
SAN JOSE CALIFORNIA 95113
Ph.  408.295.3330
Fax  408.295.9830

**ATTORNEY FOR**

DECLARATION OF SAM J. POLVERINO, TRIAL COUNSEL

I, SAM J. POLVERINO, declare:

That I am the attorney for the defendant in the above-entitled action.

1.     I am an attorney at law, duly licensed to practice in the state of California.  I have

been a criminal defense attorney since November of 1979 and am a certified specialist in

criminal law.  I have handled many homicide trials and represented David Leon, Petitioner, who

was accused and convicted of the murder of Marlon Bass, in trial court proceedings in his case.

2.     One of the key pieces of evidence against Petitioner was a statement his father,

Michael Leon, gave to the police in an interview.  Toward the end of that interview Mr. Leon

finally stated that Petitioner had told him he had committed the crime in self-defense, a highly

incriminating statement.  Mr. Leon made that statement after Detective Vizzusi played a snippet

of the tape for him that sounded as though Petitioner had admitted to the officers committing the

crime in self defense.  The clear intent of Detective Vizzusi was to lead Mr. Leon to believe that

Petitioner had in fact made that statement.  I requested that the court allow me to present the

testimony of an expert, either Dr. Ofshe or Dr. Leo as to the techniques used by the police to

coerce that statement from Michael Leon.  I advised the court that I wanted the expert to present

general testimony, without relating it to the specifics of this case, as to how police interrogate

witnesses and defendants and the subtle ways in which their statements can be coerced.  I made

EXHIBIT E
1

EXHIBIT G

0 0052

1   several such requests in writing and argued the matter orally on the record on numerous

2   occasions as has been outlined in the instant petition.

3        3.     In my opinion, the trial court's refusal to allow me to present such testimony was

4   error which deprived Petitioner of his right to a fair trial. The proposed expert testimony was

5   that significant in the scheme of the case. Mr. Leon's statement was amoung the most damaging

6   of any of the evidence presented against Petitioner and the exclusion of the requested expert

7   testimony took the teeth out of my strongest attack on the statement, which was that *it had been*

8   subtly coerced by the officers interviewing Michael Leon. Further, my recollection is that I

9   discussed this issue with appellate counsel, Lynda Romero and gave her my opinion that the trial

10   court's refusal to allow the expert testimony was a critical issue in the case.

11

12

13       I declare under penalty of perjury that the foregoing is true and correct. Executed on

14

15   February *22*, 2007, at San Jose, California.

16

17

18             SAM J. POLVERINO

19

20

21

22

23

24

25

26

27

28                          2

TWO N. SECOND ST., STE. 295
SAN JOSE CALIFORNIA 95113
408.295.3330

SAM J.
POLVERINO
ATTORNEY AT LAW