1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  GREGORY A. OTT
   Deputy Attorney General
5  JEFFREY M. LAURENCE
   Deputy Attorney General
6  State Bar No. 183595
    455 Golden Gate Avenue, Suite 11000
7   San Francisco, CA 94102-3664
    Telephone: (415) 703-5897
8   Fax: (415) 703-1234
    Email: Jeff.Laurence@doj.ca.gov
9  Attorneys for Respondent

10              IN THE UNITED STATES DISTRICT COURT

11          FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                   SAN FRANCISCO DIVISION

13

| | |
|---|---|
| **DAVID MICHAEL LEON,** | C 07-5719 CRB |
| Petitioner, | |
| v. | |
| **JAMES A. YATES, Warden,** | |
| Respondent. | |

**POINTS AND AUTHORITIES IN SUPPORT OF ANSWER**

1

# TABLE OF CONTENTS

2 | | Page

3 | STATEMENT OF THE CASE | 1

4 | STATEMENT OF FACTS | 2

5 |     Overview | 2

6 |     The Murder Of Marlon Bass | 2

7 |     Events Leading Up To The Murder | 4

8 |     Petitioner's Actions Before And After The Murder | 6

9 |     Petitioner's Initial Interview And Sudden Departure | 10

10 |     Petitioner's Confession To Danette | 11

11 |     Petitioner's 2000 Interview | 14

12 |     Defense Case | 16

13 | STANDARD OF REVIEW UNDER THE AEDPA | 17

14 | ARGUMENT | 18

15 | I.   PETITIONER CANNOT DEMONSTRATE THE STATE COURT'S REJECTION OF HIS DUE PROCESS CLAIM BASED ON PRE-ACCUSATION DELAY WAS CONTRARY TO CLEARLY ESTABLISHED SUPREME COURT PRECEDENT | 18

    A.   No Clearly Established Supreme Court Precedent For A Due Process Claim Of Delay Based On Negligence | 18

19 | II.   THE STATE COURT REASONABLY REJECTED PETITIONER'S CLAIM THAT THE TRIAL COURT'S EVIDENTIARY RULING DENIED HIM HIS RIGHT TO PRESENT A DEFENSE | 34

    A.   Applicable Legal Principles | 34

    B.   The State Court's Ruling | 37

    C.   The State Court's Analysis Was Not Unreasonable | 39

    D.   Any Error In Excluding The Evidence Did Not Have A Substantial Or Injurious Effect On The Verdict | 42

26 | III.   THE TRIAL COURT'S REMOVAL OF A BIASED JUROR WHO LIED DURING VOIR DIRE WAS NOT UNREASONABLE | 44

    A.   Factual Background | 44

15
16
17
18
19
20
21
22
23
24
25
26
27
28

Points and Authorities in Support of Answer - C 07-5719 CRB

i

**TABLE OF CONTENTS  (continued)**

|  |  | | Page |
|---|---|---|---|
| | B. | The State Court's Ruling Was Not Unreasonable | 48 |
| IV. | | PETITIONER'S CLAIM OF INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL IS MERITLESS | 56 |
| | A. | Standard Of Review | 56 |
| | B. | The State Court Reasonably Rejected Petitioner's Claim Of Ineffective Assistance | 58 |
| CONCLUSION | | | 63 |

1
# TABLE OF AUTHORITIES

2
**Page**

3
**Cases**

4

5
*Alvarado v. Hill*
252 F.3d 1066 (9th Cir. 2001) ............................................................................ 20

6
*Arizona v. Youngblood*
488 U.S. 51 (1988) .......................................................................................... 24, 25

7

8
*Babbit v. Calderon*
151 F.3d 1170 (9th Cir. 1998) ............................................................................ 56

9
*Bell v. Cone*
535 U.S. 685 (2002) ...................................................................................... 17, 57

10
*Brecht v. Abrahamson*
11
507 U.S. 619 (1993) ................................................................................ 18, 42, 44

12
*Burger v. Kemp*
483 U.S. 778 (1987) .......................................................................................... 57

13
*Carey v. Musladin*
14
127 S. Ct. 649 (2006) ...................................................................................... 19, 25

15
*Caspari v. Bohlen*
510 U.S. 383 (1994) .......................................................................................... 26

16
*Chambers v. Mississippi*
17
410 U.S. 284 (1973) ................................................................................ 35, 36, 42

18
*Chia v. Cambra*
360 F.3d 997 (9th. Cir. 2004) ...................................................................... 36, 37, 42

19
*Crane v. Kentucky*
20
476 U.S. 683 (1986) .......................................................................................... 34

21
*Early v. Packer*
537 U.S. 3 (2002) (per curiam) .......................................................................... 17

22
*Edwards v. Lamarque*
23
475 F.3d 1121 (9th Cir. 2007) (en banc) .............................................................. 57

24
*Estelle v. McGuire*
502 U.S. 62 (1991) .......................................................................................... 35

25
*Faretta v. California*
26
422 U.S. 806 (1975) .......................................................................................... 19

27
*Fields v. United States*
201 F.3d 1025 (8th Cir. 2000) ............................................................................ 62
28

**TABLE OF AUTHORITIES**  (continued)

**Page**

*Fry v. Pliler*
___ U.S. ___, 127 S. Ct. 2321 (2007) ............................................. 18, 42

*Garvin v. Farmon*
258 F.3d 951 (9th Cir. 2001) ........................................................ 17

*Houston v. Roe*
177 F.3d 901 (9th Cir. 1999) ........................................................ 36

*Jeffries v. Blodgett*
5 F.3d 1180 (9th Cir. 1993) .......................................................... 35

*Jones v. Angelone*
94 F.3d 900 (4th Cir. 1996) .......................................................... 24

*Jones v. Barnes*
463 U.S. 745 (1983) .......................................................... 56, 57, 60-62

*Kane v. Garcia Espitia*
546 U.S. 9 (2005) (per curiam) .................................................... 19

*Lockyer v. Andrade*
538 U.S. 63 (2003) ............................................................ 17, 19, 20

*Mackey v. United States*
401 U.S. 667 (1971) .................................................................... 27

*Marshall v. Lonberger*
459 U.S. 422 (1983) .......................................................... 17, 35, 50

*Miller v. Keeney*
882 F.2d 1428 (9th Cir. 1989) .................................................. 57, 61

*Miller v. Stagner*
757 F.2d 988 (9th Cir. 1985) ........................................................ 49

*Miranda v. Arizona*
384 U.S. 436 (1965) ................................................................ 19, 20

*Montana v. Egelhoff*
518 U.S. 37 (1996) ...................................................................... 35

*Murtishaw v. Woodford*
255 F.3d 926 (9th Cir. 2001) ........................................................ 62

*Penry v. Lynaugh*
492 U.S. 302 (1989) .................................................................... 26

*People v. Alcala*
4 Cal. 4th 742 (1992) .................................................................. 42

**TABLE OF AUTHORITIES**  (continued)

|  |  | Page |
|---|---|---|
| *People v. Barnwell*<br>41 Cal. 4th 1038 (2007) | | 49-51 |
| *People v. Boysen*<br>152 Cal. App. 4th 1409, 62 Cal. Rptr. 3d 350 (2007) | | 25 |
| *People v. Boysen*<br>181 P.3d 947, 75 Cal. Rptr. 3d 588 (2007) | | 25 |
| *People v. Catlin*<br>26 Cal. 4th 81 (2001) | | 25, 26 |
| *People v. Cleveland*<br>25 Cal. 4th 466 (2001) | | 49 |
| *People v. Feagin*<br>34 Cal. App. 4th 1427 (1995) | | 49 |
| *People v. Green*<br>27 Cal. 3d 1 (1980) | | 36 |
| *People v. Hall*<br>41 Cal. 3d 826 (1986) | | 36 |
| *People v. Kegle*<br>197 Cal. App. 3d 72 (1997) | | 42 |
| *People v. McDonald*<br>37 Cal. 3d 351 (1984) | | 61 |
| *People v. Nelson*<br>___ Cal. 4th ___, 78 Cal. Rptr. 3d 69, 185 P.3d 49 (2008) | | 25, 26 |
| *People v. Nesler*<br>16 Cal. 4th 561 (1997) | | 49 |
| *People v. Page*<br>2 Cal. App. 4th 161 (1991) | | 58, 59, 61 |
| *People v. Ramos*<br>121 Cal. App. 4th 1194 (2004) | | 62 |
| *People v. San Nicolas*<br>34 Cal. 4th 614 (2004) | | 53 |
| *People v. Son*<br>79 Cal. App. 4th 224 (2000) | | 58, 59 |
| *People v. Thomas*<br>218 Cal. App. 3d 1477 (1990) | | 49, 52 |

# TABLE OF AUTHORITIES  (continued)

**Page**

*People v. Tomzas*
26 Cal. App. 4th 1328 (1994) ............................................. 49

*People v. Williams*
25 Cal. 4th 441 (2001) ..................................................... 49

*Perez v. Marshall*
119 F.3d 1422 (9th Cir. 1997) ......................................... 50, 52

*Perry v. Rushen*
713 F.2d 1447 (9th Cir. 1983) ...................................... 35-37, 42

*Pollard v. White*
119 F.3d 1430 (9th Cir. 1997) ............................................. 62

*Price v. Vincent*
538 U.S. 634 (2003) ......................................................... 17

*Sanders v. Lamarque*
357 F.3d 943 (9th Cir. 2004) ...................................... 50, 53, 55

*Siripongs v. Calderon*
133 F.3d 732 (9th Cir. 1998) ............................................. 56

*Smith v. Murray*
477 U.S. 527 (1986) .................................................. 57, 60, 62

*Smith v. Robbins*
528 U.S. 259 (2000) ..................................................... 58, 61

*Sophanthavong v. Palmateer*
378 F.3d 859 (9th Cir. 2004) ............................................. 57

*Strickland v. Washington*
466 U.S. 668 (1984) ............................................ 56-58, 60, 63

*Sumner v. Mata*
449 U.S. 539 (1981) ..................................................... 17, 50

*Taylor v. Illinois*
484 U.S. 400 (1988) ....................................................... 35

*Teague v. Lane*
489 U.S. 288 (1989) ..................................................... 26, 27

*Torres v. Prunty*
223 F.3d 1103 (9th Cir. 2000) ........................................... 17

*United States v. Barken*
412 F.3d 1131 (9th Cir. 2005) ........................................ 25, 32

**TABLE OF AUTHORITIES** (continued)

Page

*United States v. Crouch*
84 F.3d 1497 (5th Cir. 1996) (en banc)          23, 24

*United States v. Ewell*
383 U.S. 116 (1966)                             20

*United States v. Gouveia*
467 U.S. 180 (1984)                             23, 25

*United States v. Lovasco*
431 U.S. 783 (1977)                             20-25, 34

*United States v. Manning*
56 F.3d 1188 (9th Cir. 1995)                    25

*United States v. Marion*
404 U.S. 307 (1971)                             20-25

*United States v. Mays*
549 F.2d 670 (9th Cir. 1977)                    22-24

*United States v. Moran*
759 F.2d 777 (9th Cir. 1985)                    23, 32

*United States v. Ross*
123 F.3d 1181 (9th Cir. 1997)                   32

*United States v. Scheffer*
523 U.S. 303 (1998)                             34

*Washington v. Texas*
388 U.S. 14 (1967)                              35

*Williams v. Calderon*
52 F.3d 1465 (9th Cir. 1995)                    57

*Williams v. Taylor*
529 U.S. 362 (2000)                             17, 19

*Woodford v. Visciotti*
537 U.S. 19 (2002) (per curiam)                 17

*Yarborough v. Alvarado*
541 U.S. 652 (2004)                             19

*Yarborough v. Gentry*
540 U.S. 1 (2003) (per curiam)                  57

## TABLE OF AUTHORITIES  (continued)

|  | Page |
|---|---|
| **Constitutional Provisions** | |
| | |
| United States Constitution | |
| Fifth Amendment | 23 |
| Sixth Amendment | 35, 56, 57 |
| Eighth Amendment | 20 |
| Fourteenth Amendment | 35 |
| | |
| **Statutes** | |
| | |
| United States Code, Title 28 | |
| § 2254(d)(1) | 17, 19, 20, 36, 57 |
| § 2254(d)(2) | 17 |
| § 2254(e)(1) | 17, 50 |
| | |
| Antiterrorism and Effective Death Penalty Act of 1996 | 17, 19, 23 |
| | |
| California Penal Code | |
| § 187 | 1 |
| § 1089 | 49, 53 |
| § 12022.5(a)(1) | 1 |

1   EDMUND G. BROWN JR.
      Attorney General of the State of California
2   DANE R. GILLETTE
      Chief Assistant Attorney General
3   GERALD A. ENGLER
      Senior Assistant Attorney General
4   GREGORY A. OTT
      Deputy Attorney General
5   JEFFREY M. LAURENCE
      Deputy Attorney General
6   State Bar No. 183595
       455 Golden Gate Avenue, Suite 11000
7     San Francisco, CA 94102-3664
       Telephone: (415) 703-5897
8   Fax: (415) 703-1234
       Email: Jeff.Laurence@doj.ca.gov
9   Attorneys for Respondent

10              IN THE UNITED STATES DISTRICT COURT

11             FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                  SAN FRANCISCO DIVISION

| | |
|---|---|
| **DAVID MICHAEL LEON,** | C07-5719 CRB |
|                Petitioner, | **POINTS AND AUTHORITIES IN SUPPORT OF ANSWER** |
|      v. | |
| **JAMES A. YATES, Warden,** | |
|                Respondent. | |

19                    **STATEMENT OF THE CASE**

20        On October 7, 2002, a jury found petitioner guilty of first degree murder (Cal. Penal Code

21 § 187), and found true an allegation that he personally used a firearm (Cal. Penal Code §

22 12022.5(a)(1)). (CT 1670-1673.) On May 23, 2003, the trial court sentenced petitioner to state

23 prison for 27 years to life. (CT 1816-1820.) The California Court of Appeal affirmed petitioner's

24 conviction for murder with the gun use enhancement, but set aside the $5,400 restitution fine, struck

25 the $5,400 parole revocation fine, and remanded for resentencing on the restitution fine. Pet. Exh.

26 A; Pet. Exh. C. The California Supreme Court denied petitioner's petition for review on May 24,

27 2006. Pet. Exh. B.

28        On remand, the trial court imposed a $200 restitution fine and a $200 parole revocation

1  fine. Pet. Exh. C. Petitioner appealed the new fines, and on February 7, 2007, the California Court

2  of Appeal again struck the parole revocation fine and reduced the restitution fine to $10. Pet. Exh.

3  C.

4          On March 7, 2007, petitioner filed a petition for writ of habeas corpus in Santa Clara

5  County Superior Court raising a claim of ineffective assistance of appellate counsel, which was

6  denied on April 18, 2007. Pet. Exh. D. Petitioner filed a petition for writ of habeas corpus in the

7  California Court of Appeal, which was denied July 16, 2007. Resp. Exh. 10. The California

8  Supreme Court denied petitioner's petition for review from that denial on October 10, 2007. Resp.

9  Exh. 11; Pet. Exh. E. Petitioner filed the instant federal petition for writ of habeas corpus on

10 November 9, 2007. This Court issued an order to show cause on November 19, 2007.

11                          **STATEMENT OF FACTS**

12     **Overview**

13         Marlon Bass, a small-time drug dealer, was murdered on November 30, 1983, when he

14 surprised petitioner in the act of burglarizing his bedroom for money and drugs. The police

15 conducted numerous interviews of friends and potential witnesses in the months following the

16 murder. However, after 1984, the police were not able to develop new leads to build a sufficient

17 case of murder. The case went cold until 2000, when Sergeant Gilbert Vizzusi, who was working

18 on cold cases for the San Jose Police Department's Homicide Unit, reopened the investigation.

19 Sergeant Vizzusi reviewed the police reports and tape recordings of the interviews that were

20 conducted by investigators during the initial investigation in 1983 and 1984. In the case file,

21 Sergeant Vizzusi found a 1986 report written by an investigator working with the District Attorney's

22 Office which mentioned that, during a phone interview concerning a domestic violence case

23 involving petitioner, petitioner's girlfriend Danette Arbuckle stated that petitioner had re-enacted

24 Marlon's murder for her. (RT 2035.) Sergeant Vizzusi conducted a new interview of Danette and

25 re-interviewed other witnesses, who together pointed the finger of guilt unerringly at petitioner as

26 the murderer.

27     **The Murder Of Marlon Bass**

28         On November 30, 1983, at 5:30 p.m., Palmer Bass, a lieutenant with the San Francisco

1    Police Department stationed at San Francisco International Airport, returned home to San Jose from

2    work with his wife Annie, a custodian with the San Francisco Unified School District. Upon

3    arriving at home, they noticed that a pane of glass from a window in the front door was broken and

4    the front door was ajar. (RT 563, 570-571, 590, 592, 613.) Despite her husband's warnings, Mrs.

5    Bass got out of the car and ran into their home. She first noticed that glass was on the ground in the

6    entryway, she then looked down the hallway and saw her son Marlon lying on the floor across from

7    his bedroom, with his head lying near the bathroom door. Mrs. Bass ran outside and told her

8    husband that someone had broken into their home and hurt their son, Marlon. (RT 571, 573-576,

9    593.)

10         Mr. Bass went into the home with his wife, and she showed him where their son's body

11    was lying. (RT 571, 573-576, 593.) Seeing that his son's eyes were wide open, Mr. Bass asked his

12    son to "get up" while shaking him, but he got no response. A small baseball bat fell from Marlon's

13    hand after Mr. Bass shook him. (RT 594.) Marlon's body was "stiff and hard," and felt cold. (RT

14    593-594, 599-600.) Mrs. Bass found a two-dollar bill lying on the floor next to Marlon's body. (RT

15    582.) No other part of the home appeared to be ransacked, only Marlon's bedroom. (RT 605, 610.)

16         When Marlon's body was checked by an investigator from the coroner's office at 8 p.m.

17    on the night of the murder, it was rigid and completely hard, and lividity had set in. This indicated

18    that Marlon's death had occurred at least six hours before his body was discovered, but probably no

19    more than 24 hours, placing the time of death sometime before 2 p.m. on November 30th. (RT 676-

20    679, 722-723.) The autopsy revealed Marlon had been shot five times. Based on the position and

21    angle of the bullet wounds and the position of the body, the forensic pathologist was able to form

22    an opinion about the nature and sequence of the shots. (RT 687.)

23         He opined that the attacker fired the first shot as Marlon and the attacker faced each other,

24    with Marlon advancing. The first shot entered the right side of Marlon's neck, moving directly front

25    to back. (RT 683, 690-692.) The attacker fired the second shot as Marlon was turning to escape.

26    That shot entered the left side of Marlon's chest, passing through the aorta and lung. (RT 683, 690-

27    692.) The next three shots were fired as Marlon collapsed while turning, with the third shot grazing

28    Marlon's back, the fourth shot hitting the left thigh, and the final shot entering Marlon's back,

1   moving at a 45 degree angle. (RT 683-686, 690-694.) None of the shots was from close range. (RT

2   694-695.) The gunpowder residue on Marlon's clothes indicated that the muzzle of the gun was at

3   least three feet away when the shots were fired. (RT 808.)

4           A sixth bullet fired from the gun was found lodged inside the wall across from the victim's

5   bedroom. (RT 716-718.) Based on the trajectory of that bullet, the shot had apparently been fired

6   from a position by the desk in Marlon's bedroom, toward the doorway to the hall where Marlon was

7   standing. (RT 719-722.) All six bullets examined were .22 caliber hollow-point Remington bullets

8   fired from a handgun. (RT 681, 723-724, 777-779, 1941, 1946-1947.) No murder weapon was

9   found at the crime scene. (RT 698.)

10          Marlon's green 1968 Ford Mustang was found around the corner from his house. (RT

11  763.) It was parked facing the wrong direction, nose to the curb and with the driver's door towards

12  the sidewalk. It was parked as if the driver got out in a hurry. (RT 654, 873.) A witness testified

13  that on the morning of November 30, 1983, the driver, a young black man, parked the car in front

14  of her house, took out a baseball bat, and walked around the corner to his house on Custer Drive.

15  (RT 873-875, 878-879.) She gave a time frame of approximately 9 a.m. to noon for seeing the car

16  pull up. (RT 880.)

17  **Events Leading Up To The Murder**

18          Prior to Marlon's murder, his father suspected Marlon was involved with drugs and would

19  occasionally check his bedroom. Mr. Bass testified on direct that he was not aware that Marlon was

20  a drug dealer and never suspected his son was dealing drugs out of the house.[1] (RT 590-591.) Mr.

21  Bass knew that Marlon had a lot of friends over when he and his wife were not home. Those friends

22  knew that they both worked in San Francisco, knew when they would usually arrive home from

23  work, and were gone before they got home. (RT 591-592, 638-639.) When he was interviewed by

24  the police on November 30th, Mr. Bass told the investigators that the night before, on November

25  29th, he discovered two white painter's buckets containing marijuana under a desk in his son's

26  _____

27      1. However, during cross-examination, Mr. Bass acknowledge that he told the police during
    an interview on November 30th that he was aware his son sold drugs and that he had a conversation
28  to dissuade his son from drug dealing. (RT 639, 650-651.)

1    bedroom. (RT 638, 649-650.) He removed the buckets of marijuana from his son's room and placed

2    them in the trunk of his car parked in the garage.[2/] (RT 625-626.) Mr. Bass informed the police that

3    he had found in excess of $4,000 in Marlon's desk drawer the Sunday (November 27th) before his

4    son's murder. When he checked Marlon's room again the next night, he found a lesser amount of

5    about $2,000. (RT 651-652.)

6         Marlon's close friend, David Brewster, had gone to the movies with Marlon the night

7    before his murder. (RT 816, 822, 1485.) Brewster knew that Marlon sold marijuana. Brewster

8    explained that Marlon typically met customers outside of the house, usually at a 7-Eleven at the

9    corner of Curtner Avenue and Leigh Avenue. Brewster had been in Marlon's bedroom several

10   times; however, he knew Marlon only allowed a few friends to enter his bedroom. (RT 817-818.)

11   Brewster had seen petitioner in Marlon's room on at least one occasion.[3/] (RT 818.) Brewster knew

12   that Marlon kept drugs in either his desk drawer or in a wooden box next to his bed, and that Marlon

13   stored large amounts of drugs in five-gallon buckets. (RT 818-819.) Marlon usually kept his money

14   locked in the desk drawer.[4/] (RT 819-820.) Brewster informed the police he was with Marlon the

15   night before his murder, and that Marlon had purchased a couple pounds of marijuana earlier that

16   day from Jeff Purrington. After the purchase, Marlon still had up to $1,500 in cash left in his desk

17   drawer. (RT 850.)

18        Jeff Purrington confirmed that, two days before the murder, Marlon paid him $2,000 to

19   purchase two pounds of marijuana. According to Purrington, Marlon had about the same amount

20   of money left over. Purrington also knew that Marlon would stash his cash in his center desk drawer.

21   _____

22   2.  The police later collected those buckets from the trunk. Inside the buckets, along with
     the marijuana, were psilocybin mushrooms and a scale. (RT 649-650, 735-736.)

23
     3.  Petitioner confirmed in his March 16, 2000, interview that Marlon typically did not allow
24   people into his house and would arrange to meet customers around the corner from his house.
     However, he and Marlon had "got to be close," and Marlon had invited him into his home. (CT
25   1342-1343.)

26
     4.  Petitioner similarly told police in the March 16, 2000 interview, that Marlon would throw
27   the money into his desk drawer, and only a few people were aware of where he kept his money.
     Petitioner acknowledged that, on one occasion, Marlon showed him the wad of cash in his drawer.
28   (CT 1342-1343.)

1 │ (RT 856-858.)

2 │      Troy Tibbils testified that, on the day of the murder, he had cut class and gone over to

3 │ petitioner's house to buy some marijuana. Tibbils explained that petitioner typically would take the

4 │ cash from Tibbils and then use the cash to purchase the marijuana from Marlon, acting as a

5 │ middleman in the transaction. (RT 1429-1430.)[5/] On the day of the murder, petitioner agreed to

6 │ purchase some marijuana from Marlon for Tibbils. However, he told Tibbils that he would not be

7 │ able to obtain the marijuana until later because Marlon was in school. (RT 1432-1433.) Tibbils

8 │ returned to petitioner's later that day, at about 12:30 or 1:00 p.m., and picked up the marijuana. (RT

9 │ 1432-1433, 1441-1442, 1447-1449, 1467-1468.)

10 │      When Tibbils heard about the murder several days later, he called petitioner and

11 │ commented that petitioner had purchased the marijuana from Marlon the same day Marlon was

12 │ murdered. Petitioner responded that he had purchased the drugs from Marlon at the 7-Eleven. (RT

13 │ 1442-1444.) Petitioner added that he saw Bernard Wesley at the 7-Eleven as well. (RT 1445.)

14 │ **Petitioner's Actions Before And After The Murder**

15 │      In 1983, petitioner was dating Danette Arbuckle.[6/] Shelby Arbuckle was Danette's younger

16 │ brother. (RT 898.) Shelby, who was 14 years old in 1983, explained petitioner first got him started

17 │ on smoking marijuana and later he began to sell marijuana for petitioner. (RT 902-903.) Shelby

18 │ recalled having many conversations with petitioner about committing burglaries in the neighborhood

19 │ around Doerr Park, which was the neighborhood in which both petitioner and Marlon lived. Shelby

20 │ recounted that petitioner would point out houses he had cased to burglarize as they drove through

21 │ the neighborhood, although petitioner never specifically pointed out Marlon's house. (RT 904-906,

22 │ 920.) Two months before Marlon's murder, petitioner told Shelby he had a handgun. Petitioner,

23 │

24 │
_____

25 │    5. Petitioner met Marlon a few years earlier at a party he had gone to with Tibbils. (CT
1339-1340.) Though petitioner was a only freshman at Del Mar when Marlon was a senior, Marlon

26 │ befriended him. Marlon taught petitioner how to deal drugs, and petitioner described himself as
"sub-dealer." (CT 1339-1340.)

27 │

28 │    6. After Danette broke up with petitioner, she assumed the married name of Rodriguez. By
the time she testified at trial, her last name was Edelberg.

Points and Authorities in Support of Answer - C 07-5719 CRB

1  however, refused to show it to Shelby.[7/] (RT 907-908.)

2          Shelby learned of the murder the day after it happened, and he told his sister and petitioner

3  about the rumor he heard in school that Marlon had been stabbed.  Petitioner laughed, and told

4  Shelby and Danette that somebody had broken into Marlon's house and had been surprised when

5  Marlon had returned.  Petitioner described that the burglar had been in Marlon's bedroom when he

6  fired a shot at Marlon, hitting Marlon in the heart.  (RT 908-909.)  Petitioner gave this specific

7  account to Shelby and Danette before accurate details of the slaying had appeared in the newspapers.

8  (RT 911.)

9          A few months later, petitioner told Shelby that he had hired "two black" guys to commit

10  the burglary for him.  (RT 913.)  Petitioner then gave a detailed account of the burglary at Marlon's

11  house that turned into a murder.  He said that the burglars knew that Marlon had a drawer full of

12  money and drugs in his bedroom and knew exactly where it was located.  The burglars waited

13  outside Marlon's house for Marlon to leave, and then broke in and headed directly for Marlon's

14  bedroom.  (RT 914-916.)  Petitioner said that Marlon came home unexpectedly and caught the

15  burglars in his room by surprise.  The burglars turned around, saw Marlon coming up with a baseball

16  bat, and shot Marlon. (RT 917.)  Shelby remembered this conversation because it was quite detailed

17  and he was wondering how petitioner had known so much detail.  (RT 918-919.)

18          Shelby recalled that, before Marlon's murder, petitioner was "cash strapped."  However,

19  approximately a week after the murder, petitioner suddenly had a lot of money.  Petitioner began

20  buying gifts for Danette and their mother.  (RT 920-921.)  Shelby also recounted that when he was

21  at petitioner's house, he observed petitioner cutting a large quantity of cocaine, far larger than he had

22  ever seen petitioner with before.  (RT 920-921.)  Petitioner's friend, Nicole DiFlavio, similarly

23  recalled that petitioner did not have a job at the time of the murder, and his money situation was

24  limited.  Petitioner's financial situation changed suddenly after Marlon's murder, and she became

25  suspicious.  (RT 1489-1491.)

26

27  _____

28      7.  Dan Barnett testified that petitioner had shown him a small handgun when they were in
either the 7th or 8th grade.  (RT 984-985.)

1    Brothers Dan and Sam Barnett were friends with petitioner and Marlon, respectively. (RT

2  979, 1011.) Dan had been friends with petitioner since 7th grade. (RT 980-981.) Dan recalled that,

3  before Marlon's murder, petitioner and Marlon had a falling out over a drug deal. He remembered

4  petitioner saying, "I'm so pissed off at that fucking nigger, I could just kill him." (RT 982.) Dan

5  said this statement stuck in his head because it was not too long after petitioner said this that Marlon

6  was killed. (RT 982-983.)

7    Sam Barnett was a good friend of Marlon's. He knew petitioner was friends with Dan, and

8  Sam had been to petitioner's house on a few occasions to purchase marijuana. Sam was also aware

9  that Marlon dealt marijuana out of his bedroom, and he had purchased marijuana from Marlon on

10  occasion. (RT 1011-1012.) Sam recalled that, shortly before his murder, Marlon was complaining

11  about a falling out he had with petitioner and said that he might have to "kick David's ass." (RT

12  1012-1013.)

13    A day after Marlon's murder, Sam received an unexpected call from petitioner. Petitioner

14  wanted Sam to buy a quarter pound of marijuana for him, and he offered to pay Sam $550 for the

15  drugs, which was the going price. (RT 1013-1015.) Sam explained that, at that time, his friend's

16  cousin grew marijuana in Boulder Creek, and Sam would, on rare occasions, act as a middle man

17  to arrange for a large purchase of marijuana, such as for a quarter pound. (RT 1018-1019.)

18  However, he had never had such a transaction with petitioner, who was just a small-time dealer. (RT

19  1013-1015.) Sam was shocked and disturbed by the timing of the call. When he mentioned to

20  petitioner that Marlon had just died the day before, petitioner said something to the effect of what

21  did that have to do with their transaction. Sam told petitioner never to call him again. (RT 1014-

22  1016.)

23    Troy Tibbils called petitioner a few days after the murder, soon after his father had shown

24  him a newspaper article about Marlon's death. (RT 1442.) Tibbils reminded petitioner that Tibbils

25  had been by petitioner's house to purchase marijuana that day, and that petitioner told Tibbils he had

26  met with Marlon that morning to buy the drugs. (RT 1442-1443.) Tibbils marveled over the timing,

27  and asked petitioner if he had been by Marlon's house the morning he was killed. Petitioner told

28  Tibbils that he had met Marlon that morning, either at Marlon's house or at the 7-Eleven, and that

1  he had seen Bernard Wesley near the 7-Eleven. (RT 1442-1445, 1451-1553.)[8/]

2       On December 2, 1983, two days after Marlon's murder, petitioner called the police and

3  told them he saw Bernard Wesley by the 7-Eleven near Marlon's house on the morning of the

4  murder. (RT 2313.) On December 12th, Bernard Wesley called detectives investigating the case,

5  concerned that petitioner had named him as a suspect. (RT 1132-1133.) Wesley knew both

6  petitioner and Marlon. (RT 1043-1044.) He also knew that petitioner and Marlon both knew each

7  other, because petitioner had mentioned he bought drugs from Marlon, and commented that Marlon

8  had "damn good" drugs. (RT 1046.) Petitioner told Wesley that Marlon would conduct his

9  transactions with petitioner at the 7-Eleven on Curtner and Leigh. (RT 1046-1047.)

10       Roughly a month before Marlon's murder, petitioner proposed to Wesley that they could

11  steal money and drugs from Marlon. (RT 1047, 1054-1055.) Petitioner told Wesley that he had seen

12  how Marlon kept his drugs and money in a desk drawer, and was amazed at the quantity of drugs and

13  money in Marlon's bedroom. Petitioner thought that Marlon had at least $10,000 stashed away in

14  his desk drawer.[9/] (RT 1047-1048.)

15       Petitioner already had a plan for the burglary. Petitioner explained he would gain entry

16  into Marlon's home by breaking a window pane and reaching his hand around to unlatch the door.

17  (RT 1048.) Petitioner already knew Marlon's parents' work schedule and he had a way to lure

18  Marlon away from the house. Petitioner told Wesley he would arrange a meeting with Marlon at the

19  7-Eleven where Marlon conducted his transactions. He would keep watch over the house from a safe

20  distance, and when he saw Marlon leave, he would break in.[10/] (RT 1049.) Petitioner described what

21  

22       8. Mary Keasling, who dated petitioner in 1990, similarly reported that petitioner told her
he had been at Marlon's house the day of the murder buying drugs. (RT 1357.)

23  

24       9. Troy Tibbils also testified that petitioner mentioned having seen that Marlon had a lot
money and drugs in his bedroom and had been impressed by the amount. (RT 1432.)

25       10. On the day of Marlon's murder, Bernard Wesley saw petitioner standing at a telephone

26  booth next to the 7-Eleven. Petitioner was kneeling and appeared to be sick. Wesley did not stop
because it appeared petitioner was having big problems. (RT 1065-1067.) Wesley had been driving

27  down Curtner Avenue and thought he recognized someone he knew at the corner of Leigh and
Curtner, near the 7-Eleven. When he pulled over and got out of the car he realized it was not anyone

28  he knew, so he got back in the car and drove off to meet his girlfriend. (RT 1069-1071.) This

1  he would wear to commit the burglary and then said he would need a gun in case Marlon came back

2  home unexpectedly.  (RT 1050-1052.)  After setting out his plan, petitioner asked Wesley to

3  participate in the burglary.  Wesley, however, refused to play any role in the scheme.  (RT 1052.)

4  After Wesley turned petitioner down, petitioner said that he would ask David and Marvin Smith to

5  help him.[11/]  (RT 1055, 1154.)  Wesley later spoke to the Smith brothers, and they asked him about

6  Marlon. When he mentioned that Marlon was someone they should not mess with, they told Wesley

7  they did not know what petitioner was trying to get them involved in.  (RT 1139-1141, 1154.)

8        During their initial interviews with the police the Smith brothers mentioned this

9  proposition by petitioner.  (RT 1315-1316, 1327-1329.)  During trial, however, they claimed no

10  knowledge of petitioner's request to rip off any drug dealers.  (RT 1292-1293, 1304.)  The Smith

11  brothers also denied being asked by petitioner to help collect on a debt.  (RT 1292, 1303.)

12  **Petitioner's Initial Interview And Sudden Departure**

13        During the murder investigation, petitioner left town without giving any warning to his

14  friends and associates, including his girlfriend at the time, Danette Arbuckle. His sudden departure

15  seemed very unusual to his close friends, and raised their suspicion of his involvement in Marlon's

16  murder. (RT 922-923, 985-986, 1493-1494, 1557-1559, 1588-1589, 1591.)  Petitioner did not call

17  his girlfriend Danette to say where he was until a month or two later, when he called her at work to

18  let her know that he moved to San Diego to live with his father because of the investigation into the

19  murder. (RT 1557, 1590-1591.)  Petitioner also talked with Danette's brother Shelby about why he

20  left town so abruptly.  Petitioner told him that "the heat was on" and "the police were bothering him,

21  that they were investigating him for the murder of Marlon." (RT 924-925.)  Petitioner told Shelby

22  

23  encounter was confirmed later by police and another witness at trial.  (RT 1511-1513, 1521-1524.)
   Petitioner also mentioned seeing Wesley near the 7-Eleven when he first contacted police in this
24  case. (RT 2313.)  Tibbils told the police, and testified at the preliminary hearing, that petitioner said
   he met Marlon at the 7-Eleven on the day of the murder, and that petitioner mentioned he had seen
25  Wesley after Marlon had left.  (RT 1443-1444, 1457, 1469-1470, 1528-1529.)  Tibbils also
   mentioned this to Nicole Diflavio, a mutual friend of his and petitioner's.  (RT 1497-1498.)
26  

27  11.  Wesley was familiar with the Smith brothers and their association with petitioner.
   Petitioner had enlisted their help previously to coerce Wesley to repay a drug debt Wesley owed him.
28  (RT 1076-1078.)

1  that he did not want to be arrested. (RT 924-925.)

2  　　　Before petitioner left town, he had contact with the police on three separate occasions: first

3  on December 2, 1983, when petitioner called them, and then on December 20th and 23rd when

4  petitioner was interviewed at the police station. (RT 1524-1526, 2313-2315, 2353-2354, 2356-2358,

5  2375, 2387.) The officers investigating the case did not hear from petitioner again until he called

6  them on February 8, 1984, stating that he had moved to San Diego. When detectives saw petitioner

7  at Danette's house on February 13, 1984, he told them he had not moved to San Diego yet, but he

8  was planning to move there and gave them an address. (RT 2351-2352, 2360-2361, 2376.)

9  Petitioner wanted to move his probation supervision from Santa Clara County to San Diego County.

10  Petitioner had been living with his mother in San Jose, but he told detectives that he now wanted to

11  live in Poway, California with his father. When petitioner received the authorization four days later

12  to change his probation supervision, he gave probation an address in Marietta, California. (RT 2352-

13  2353.)

14  **Petitioner's Confession To Danette**

15  　　　Danette testified at trial that petitioner was very possessive and jealous during their

16  relationship. At first he was verbally abusive, then he became physically abusive.[12] (RT 1555.)

17  Soon after Marlon's death, detectives started showing up at her house asking her and her family

18  questions. Although she knew Marlon, she had never been to his house and did not know the nature

19  of petitioner's relationship with him. (RT 1555-1556.)

20  　　　Danette described how petitioner treated the murder and the investigation as if it were it

21  were a joke. When the subject of Marlon's murder came up, petitioner would laugh and the subject

22  was quickly changed. Sometimes petitioner appeared to be nervous about the investigation. (RT

23  1556-1557.) When petitioner left town unexpectedly after Marlon's murder, Danette viewed their

24  relationship as pretty much over. When petitioner returned, they tried to continue the relationship,

25  but it was not the same and had become very tense due to the ongoing investigation. (RT 1560-

26  _____

27  　　　12. Danette's brother, Shelby, confirmed his sister's relationship with petitioner was abusive.
(RT 900-901.) Danette's friend Danielle Fournier also described petitioner's abusive behavior
28  towards her friend. (RT 1714-1715.)

1561.)

On March 12, 1984, Danette ended her relationship with petitioner after they got into a violent argument during a conversation about Marlon's murder. (RT 1561-1564.) She was visiting petitioner at his house and was in his bedroom when, during their conversation, petitioner described how he was in Marlon's bedroom trying to steal money and drugs from a desk drawer when he heard someone come into the house. Petitioner described how he saw Marlon in the hallway coming at him with a baseball bat in his hand. Marlon asked him what he was doing there. Petitioner got scared and shot Marlon. (RT 1565-1566.) Petitioner demonstrated for her how he had shot Marlon by making his hand into the shape of a gun. (RT 1566-1567.) When she began to cry, he told her he was just kidding and asked her whether she believed him. Danette continued to cry because "it was all too real" to her. She continued crying, and petitioner became very angry. (RT 1568.)

Danette tried to leave the house, but petitioner became violent, ordering her to get on her hands and knees. As she crawled towards the front door he began to kick her repeatedly. Petitioner followed her outside and chased her to her car. Petitioner then began pounding on the car window as she drove off. (RT 1568-1569.) Danette did not go immediately to the police about petitioner's re-enactment because she was scared and feared for herself and her family's safety. (RT 1570.) Eventually Danette confided in her friend Danielle about petitioner's re-enactment of the murder. (RT 1570, 1576, 1721-1722.) Danielle confirmed that Danette told her petitioner admitted committing the murder and reenacted it for her. (RT 1718-1722.)

Danette filed a report police about petitioner assaulting her. (RT 1603-1604.) However, she did not say anything about petitioner's re-enactment of Marlon's murder because she was still afraid of him. (RT 1606-1608, 1619-1620, 1630.) Over two years later, in 1986, Danette was contacted by an investigator with the Santa Clara County District Attorney's Office concerning her domestic violence case. On June 9,1986, during a phone interview about her assault complaint against petitioner, Danette disclosed that petitioner had reenacted his murder of Marlon Bass. (RT 1734-1735.) This information was later forwarded to Sergeant Brockman, the initial lead investigator in Marlon's murder case. (RT 1736.) Sergeant Brockman, however, had since been reassigned as the Commander of the Vice Unit, so he forwarded the information to the Homicide

1   Unit for follow up. (RT 1747-1748.)[13/]

2        Petitioner's father, Michael Leon, was interviewed in April 2000. During the interview,

3   the police asked Mr. Leon about any information petitioner related to him about the murder. Mr.

4   Leon explained to the detectives that petitioner only mentioned the homicide in passing, and did not

5   go into any detail. (CT 1308.) However, at one point, he told the officers that he could hear

6   petitioner's voice saying it was self-defense. (CT 1308.) Mr. Leon recalled his son said something

7   about it being self-defense, but petitioner did not go into any details. (CT 1309-1310.) Mr. Leon

8   told the detectives he assumed the murder was over a drug deal. (CT 1310.) Mr. Leon recalled

9   petitioner had mentioned something about a baseball bat. (CT 1316-1317.)

10       At the end of the interview, Mr. Leon told the detectives he remembered petitioner talking

11  about the homicide, that a black person was involved, and that a baseball bat was mentioned during

12  that conversation. Mr. Leon went on to qualify that statement by saying he had probably been

13  drinking at the time and did not want to hear it. (CT 1323-1324.) Mr. Leon said that although

14  petitioner seemed troubled when they talked about it, petitioner never went into any detail, and he

15  never probed his son for any further information. (CT 1324.)

16       At trial, Mr. Leon recanted all of the incriminating statements he made about petitioner

17  in his taped interview. Mr. Leon insisted that petitioner did not tell him he killed the victim in self-

18  defense, even though Mr. Leon had made that statement in the taped interview. (RT 1799-1800.)

19  He also claimed he lied when he said the murder was drug related and that petitioner mentioned a

20  baseball bat was involved. (RT 1800-1801.)

21

22

---

23   13. When discussing the reenactment at trial, Danette believed that she told Sergeant
Brockman about the reenactment back in 1984, within weeks after it happened. (RT 1571-1572,
24   1641, 1661-1663.) After going back over the police reports from her interviews with Sergeant
Brockman, the police report of petitioner's assault on March 12, 1984, and the tape of her 1986
25   phone interview with the District Attorney investigator, Danette agreed that the first time the
reenactment was documented by the authorities was in June 1986, when she reported the incident
26   to the investigator. (RT 1584-1588, 1622-1623, 1633.) Sergeant Brockman, confirmed that Danette
did not tell him about the reenactment in 1984. (RT 1745-1747.) He first learned of it from the
27   investigator in June 1986. (RT 1745-1747.) Sergeant Brockman explained he would have
documented any important information he learned from Danette in a report. (RT 1757-1758.)
28

**Petitioner's 2000 Interview**

On March 16, 2000, Sergeant Vizzusi interviewed petitioner. (CT 1333; RT 2393-2395.) Initially, petitioner stated that he did not recall going by Marlon's house to buy drugs on the day of the murder, and that he did not see Marlon at the 7-Eleven that day. (CT 1333.) Petitioner described how he met Marlon three years before his death, and that their relationship was "drug-oriented." Petitioner said he eventually branched out and started buying drugs from other people. Petitioner said that Marlon was an established drug dealer and that a lot of people knew he dealt drugs. (CT 1339-1342.) Petitioner had been inside Marlon's house and had hung out in Marlon's bedroom. Marlon also showed petitioner where he kept his money in his desk. (CT 1342-1343.) Petitioner stated that he mentioned this location to Tibbils, and somehow Bernard Wesley learned about it.

Petitioner asserted that Bernard Wesley was always asking about Marlon. Petitioner stated that Wesley had drug problems. Petitioner recounted that he once had someone "strong-arm" Wesley in order to recover some money Wesley owed him. (CT 1343-1345.) Petitioner also acknowledged that, at one point in the months before the murder, he owed Marlon money. However, petitioner claimed that he received an insurance settlement and paid Marlon back. (CT 1345.)[14]

Petitioner subsequently admitted that he had, in fact, stopped by Marlon's house the morning of his murder, but he claimed that did not go inside. Instead, Marlon came out to see him. (CT 1345-1346.) Petitioner described how he had seen Bernard Wesley with some associates in the area that morning. (CT 1347-1351.)

Petitioner stated that he either called or talked to Marlon before he passed by Marlon's house, and that he must have had some reason he needed to see Marlon that morning. (CT 1353.) Petitioner acknowledged he told the police back in 1983 that he had not seen or spoken to Marlon in about two weeks before the murder. Petitioner said he tried to call Marlon, but he could not get through. (CT 1372-1373.) Petitioner suggested that he probably went to see Marlon on the day of his murder in order to pay off a debt. (CT 1375-1376.)

---

14. Police found a "pay and owe" sheet on Marlon's body. It showed that before Marlon's death, petitioner still owed Marlon about $40. (RT 2332-2334.) Petitioner stated during his interview with police he thought it was about $60-$80. (CT 1374-1375.)

1      Petitioner asserted that he left petitioner's house, and then returned to the area later. By

2  the time he returned, the police had blocked off Marlon's street, which was how he learned that

3  petitioner had been killed. (CT 1377.) Petitioner knew Marlon had been shot in neck with a .22, and

4  that somebody went into Marlon's house to steal dope and money. Petitioner believed that either

5  police or friends had given him that information, or he read about it in the newspaper. (CT 1377-

6  1378.) Petitioner acknowledged that he told police Marlon carried around a small souvenir baseball

7  bat for protection. (CT 1378-1379.) Petitioner said he knew that Marlon did not have any guns, and

8  claimed he did not have a gun himself at the time. (CT 1379-1380.)

9      Petitioner told Sergeant Vizzusi that he left town during the investigation, but believed that

10  was some months after the murder. (CT 1380-1381.) Petitioner knew police were contacting a lot

11  of his friends, including his girlfriend Danette. He learned from his friends that his house was under

12  surveillance. Petitioner said he also heard that the reason the police thought it was him was due to

13  the way the bullets shot at Marlon had traveled upward, and that Marlon was 6 feet tall, while he was

14  5 feet, 7 inches. Petitioner thought that theory was "ludicrous," but said that was the story on the

15  street. (CT 1382-1383.) Petitioner admitted that his leaving town during the investigation was

16  somewhat suspicious. (CT 1383-1384.)

17      Petitioner initially claimed that, when he left town, he went to New Mexico to visit his

18  grandmother and denied he went his father's house in San Diego. (CT 1384-1385.) Petitioner then

19  recalled he had gone to San Diego for a short time to visit his father. (CT 1385-1386.) Petitioner

20  acknowledged calling the police on February 2, 1984, and being very upset about the police

21  investigating him and harassing his girlfriend Danette. (CT 1386-1387; RT 2350-2351.) During that

22  phone call petitioner also told the police that he had moved to San Diego. (RT 2351-2352.)

23      During his interview, petitioner said he believed that Danette broke up with him because

24  of pressure from her mother, who disapproved of his selling drugs. (CT 1390-1391.) Petitioner

25  estimated that 80 percent of his friends thought he might have killed Marlon. However, petitioner

26  denied giving them any reason to believe that. (CT 1391.) Petitioner insisted that he never told

27  Danette that he had killed Marlon. (CT 1392.) Petitioner repeatedly denied killing Marlon. (CT

28  1372, 1394-1397.)

1    At the end of the interview, petitioner reasserted that he did not remember seeing Marlon

2    the morning of the murder or going by Marlon's that morning to pick up some dope, nor did he see

3    Marlon at the 7-Eleven that day. (CT 1399-1400.)

4    **Defense Case**

5    Petitioner called his own forensic crime scene investigative expert, Dr. John Thornton,

6    as a witness. (RT 1926-1927.) Dr. Thornton did not interview anyone connected with the case and

7    relied entirely on a sampling of police and coroner reports supplied by the defense. (RT 1947-1948.)

8    He opined that the police were deficient for failing to fingerprint the bat, which he posited could

9    have been used by the intruder to break the pane of glass in the front door, and for failing to test the

10    shards for possible shoeprints. (RT 1936-1938, 1942-1945.) He suggested that it was possible there

11    could have been a struggle, and he questioned whether the order of shots could be determined from

12    the entry wounds. He agreed, however, that the shooter fired from the desk area at Marlon as Marlon

13    stood in the hall, and that Marlon simply collapsed at that spot. (RT 1938-1941, 1945-1946, 1955.)

14    Geoff Caplan, who was a friend and neighbor of Marlon's and who occasionally bought

15    drugs from Marlon, admitted that he had broken into Marlon's house on several occasions and had

16    stolen small quantities of marijuana for his personal use, the total value of which was about $120.

17    (RT 2240-2242, 2245-2246.) One time Marlon came home and caught Caplan in the act. Caplan

18    felt bad and tried to repair the relationship but Marlon remained mad and refused to speak to Caplan

19    after that incident. (RT 2242, 2247-2252.) Caplan noted his father owned a .22 caliber rifle. (RT

20    2244.)

21    Timothy Pantiga, who worked with Bernard Wesley at the time of the murder testified that,

22    when he mentioned an article in the paper about the murder of Marlon Bass, Wesley responded,

23    "Those are my boys." (RT 2227.) On another occasion when Pantiga was over at Wesley's house

24    and they were talking about the murder, Wesley said that he did it, and then promptly said he was

25    just joking. (RT 2228-2229.) Pantiga clarified that Wesley had a tendency to brag, joke around, and

26    make grandiose statements, and Pantiga viewed these statements relating to Marlon's murder as

27    jokes, based on their context. (RT 2227, 2233-2234.)

28

# STANDARD OF REVIEW UNDER THE AEDPA

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), which imposes "a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus." *Williams v. Taylor,* 529 U.S. 362, 412 (2000). The purpose of the AEDPA is "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone,* 535 U.S. 685, 693 (2002). The statute's "highly deferential" standard for evaluating state court rulings "demands that state court decisions be given the benefit of the doubt." *Woodford v. Visciotti,* 537 U.S. 19, 24 (2002) (per curiam).

Under the AEDPA, the federal court has no authority to grant habeas relief unless the state court's ruling was "contrary to, or involved an unreasonable application of," clearly established Supreme Court precedent. 28 U.S.C. § 2254(d)(1). A state court's decision is "contrary to" law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or reaches a different conclusion based on facts materially indistinguishable from a Supreme Court case. *Williams v. Taylor,* 529 U.S. at 413. A state court's decision constitutes an "unreasonable application" of Supreme Court precedent if the state court identifies the correct governing legal principles, but the application of law to the facts is not merely erroneous but objectively unreasonable. *Id.* at 411-13; *accord Price v. Vincent,* 538 U.S. 634, 641-42 (2003); *Lockyer v. Andrade,* 538 U.S. 63, 75-76 (2003). The petitioner bears the burden of showing that the state court's decision was unreasonable. *Woodford v. Visciotti,* 537 U.S. at 25. Habeas relief is unwarranted where the state court's ruling was "at least reasonable." *Price v. Vincent,* 538 U.S. at 642-43; *Early v. Packer,* 537 U.S. 3, 10-11 (2002) (per curiam).

A state court's ruling based on a factual determination also must be "unreasonable" to warrant habeas relief. 28 U.S.C. § 2254(d)(2); *Garvin v. Farmon,* 258 F.3d 951, 957 (9th Cir. 2001); *Torres v. Prunty,* 223 F.3d 1103, 1108 (9th Cir. 2000). State court findings of historical fact are presumed correct, unless rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see Marshall v. Lonberger,* 459 U.S. 422, 431-36 (1983); *Sumner v. Mata,* 449 U.S. 539, 546-47 (1981) (presumption of correctness applies to express and implied findings of fact by both trial and appellate

1  courts).

2       Finally, even if the state court's ruling is contrary to or an unreasonable application of

3  Supreme Court precedent, that error justifies overturning the conviction only if the error had a

4  "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v.*

5  *Abrahamson*, 507 U.S. 619, 637 (1993); *see Fry v. Pliler*, ___ U.S. ___, 127 S. Ct. 2321, 2325-27

6  (2007).

7  **ARGUMENT**

8  **I.**

9  **PETITIONER CANNOT DEMONSTRATE THE STATE COURT'S**
   **REJECTION OF HIS DUE PROCESS CLAIM BASED ON PRE-**
10  **ACCUSATION DELAY WAS CONTRARY TO CLEARLY**
   **ESTABLISHED SUPREME COURT PRECEDENT**

11

12       In his first claim, petitioner contends that the 17-year lapse between the murder and the

13  filing of an information violated his right to due process.  Petitioner challenges the state court's

14  factual finding that he failed to demonstrate actual prejudice, and he asserts that mere negligence by

15  the prosecution in causing the delay is sufficient to violate due process upon a showing of actual

16  prejudice.  Petitioner's claim fails on several grounds.  First, there is no clearly established Supreme

17  Court precedent that an allegation of mere negligence on the part of the prosecution in delaying filing

18  charges, in the absence of bad faith, can give rise to a due process violation for the delay irrespective

19  of proof of actual prejudice.  Petitioner has consistently asserted nothing more than prosecutorial

20  negligence without bad faith.  Second, petitioner has not rebutted the state court's finding that

21  petitioner had not demonstrated actual prejudice by clear and convincing evidence.

22  **A.  No Clearly Established Supreme Court Precedent For A Due Process Claim Of Delay**
   **Based On Negligence**

23

24       Petitioner's claim fails ab initio because it is predicated solely on an assertion of

25  prosecutorial negligence in causing the delay. Pet. at 45 (asserting "negligence in gathering evidence

26  or assembling a case for presentation to the district attorney or a district attorney's incompetence in

27  evaluating a case for possible prosecution will not justify a long delay which deprives a defendant

28  of his due process right to a fair trial."); *see also* Exh. 9 at 10-12 (Cal. Supreme Court review petition

1    making no allegation of bad faith, and asserting only negligence in support of due process delay

2    claim). However, the Supreme Court has never clearly held that mere negligence can give rise to

3    a due process claim.

4         The AEDPA limits the basis for federal habeas relief exclusively to "clearly established

5    Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

6    This refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the

7    time of the relevant state-court decision." *Williams v. Taylor,* 529 U.S. 362, 412 (2000). As a

8    "threshold matter" in resolving a claim under AEDPA, the federal habeas court must determine what

9    constitutes "clearly established" Supreme Court law. *Lockyer v. Andrade,* 538 U.S. 63, 71 (2003).

10        The Supreme Court has consistently held that this provision is construed narrowly. In

11   *Carey v. Musladin,* 127 S. Ct. 649 (2006), the Supreme Court acknowledged that it had previously

12   addressed whether certain courtroom practices, including requiring a defendant to wear prison

13   clothing and seating uniformed police officers immediately behind the defendant at trial, are so

14   inherently prejudicial that they deprive the defendant of a fair trial. *Id.* at 653. However, both of

15   those circumstances dealt with "government-sponsored practices;" the effect of "spectator practices"

16   was an open question in the Court's jurisprudence, even though it had been addressed by the Ninth

17   Circuit. *Id.* The Court concluded, "[g]iven the lack of holdings from this Court regarding the

18   potentially prejudicial effect of spectators' courtroom conduct of the kind involved here, it cannot

19   be said that the state court 'unreasonably applied clearly established Federal law.'" *Id.* at 654.

20        In *Kane v. Garcia Espitia,* 546 U.S. 9 (2005) (per curiam), the Supreme Court noted that

21   the federal appellate courts had split on whether the decision in *Faretta v. California,* 422 U.S. 806

22   (1975), establishing a criminal defendant's right to represent himself at trial, implied a corresponding

23   right to access to a law library. The Court rejected the view that *Faretta* itself "clearly established"

24   such a right, and therefore found no basis for federal habeas relief. *Id.* at 10.

25        In *Yarborough v. Alvarado,* 541 U.S. 652 (2004), the Ninth Circuit had held that the state

26   court erred by failing to account for the suspect's youth and inexperience in evaluating whether a

27   reasonable person would have felt free to leave for purposes of determining whether he was "in

28   custody" under *Miranda v. Arizona,* 384 U.S. 436 (1965). The Ninth Circuit relied on Supreme

1    Court decisions considering a suspect's juvenile status when evaluating the voluntariness of

2    confessions and the waiver of the privilege against self-incrimination, and concluded that age and

3    experience must also be a factor in the *Miranda* inquiry.  The Supreme Court disagreed, because its

4    opinions applying the *Miranda* custody test "have not mentioned the suspect's age, much less

5    mandated its consideration." *Id*. at 666.  The Court held, "if a habeas court must extend a rationale

6    before it can apply to the facts at hand then the rationale cannot be clearly established at the time of

7    the state-court decision. . . .  Section 2254(d)(1) would be undermined if habeas courts introduced

8    rules not clearly established under the guise of extensions to existing law." *Id*.; *accord, Alvarado*

9    *v. Hill*, 252 F.3d 1066, 1068-1069 (9th Cir. 2001) (question "is not whether [the challenged ruling]

10   violates due process as that concept might be extrapolated from the decisions of the Supreme Court.

11   Rather, it is whether [the ruling] violates due process under 'clearly established' federal law, as

12   already determined by the Court.").

13           In *Lockyer v. Andrade*, 538 U.S. 63, the Supreme Court recognized that its previous

14   opinions on whether a sentence for a term of years amounts to cruel and unusual punishment "have

15   not been a model of clarity," and "have not established a clear or consistent path for courts to

16   follow." *Id*. at 72.  "Through this thicket of Eighth Amendment jurisprudence, one governing legal

17   principle emerges as 'clearly established' under § 2254(d)(1):  A gross disproportionality principle

18   is applicable to sentences for terms of years." *Id*. at 72.  The Court concluded that where the only

19   clearly established principle's "precise contours" were "unclear," the state court's determination that

20   the defendant's sentence fit within those broad contours was not unreasonable. *Id*. at 76.

21           Judged by these principles, this Court must reach the conclusion that the Supreme Court

22   has not clearly established a rule authorizing a due process pre-accusation delay predicated on

23   prosecutorial *negligence* in bringing charges.  Specifically, the two primary cases on pre-accusation

24   delay from the United States Supreme Court are *United States v. Marion*, 404 U.S. 307 (1971) and

25   *United States v. Lovasco*, 431 U.S. 783, 789 (1977).  In *Marion*, the Court observed that "'the

26   applicable statute of limitations . . . is the primary guarantee against bringing overly stale criminal

27   charges'" (quoting *United States v. Ewell,* 383 U.S. 116, 122 (1966)), and "[s]uch statutes represent

28   legislative assessments of relative interests of the State and the defendant in administering and

Points and Authorities in Support of Answer - C 07-5719 CRB

1   receiving justice . . . ." *Id.* at 322.  However, *Marion* went on to hold that

2       the statute of limitations does not fully define the appellees' rights with respect to the
        events occurring prior to indictment.  Thus, the Government concedes that the Due
3       Process Clause of the Fifth Amendment would require dismissal of the indictment if it
        were shown at trial that the pre-indictment delay *in this case* caused substantial prejudice
4       to appellees' rights to a fair trial *and* that the delay was an intentional device to gain
        tactical advantage over the accused.

5

6   *Id.* at 324 (emphasis added).  *Marion* set aside the order of dismissal, observing: "No actual

7   prejudice to the conduct of the defense is alleged or proved, and there is no showing that the

8   Government intentionally delayed to gain some tactical advantage over appellees or to harass them."

9   *Id.* at 325.

10      *Lovasco* reaffirmed that "statutes of limitations . . . provide 'the primary guarantee against

11  bringing overly stale criminal charges.'  But . . . the 'statute of limitations does not fully define

12  [defendants'] rights with respect to the events occurring prior to indictment,' and . . . the Due Process

13  Clause has a limited role to play in protecting against oppressive delay." *United States v. Lovasco,*

14  431 U.S. at 789.  *Lovasco* emphasized that the defendant bears the burden of establishing prejudice

15  as a threshold requirement, but prejudice alone was not sufficient, and the reviewing court still "must

16  consider the reasons for the delay." *Id.* at 790.  *Lovasco* also rejected the suggestion that delay for

17  continued investigation implicated due process concerns, observing: "In our view, investigative delay

18  is fundamentally unlike delay undertaken by the Government solely 'to gain tactical advantage over

19  the accused.'" *Id.* at 795 (quoting *Marion,* 404 U.S. at 324).  *Lovasco* explained that the courts

20  should not second guess the a prosecutorial decision to withhold indictment for further investigation,

21  noting:

22      Judges are not free, in defining "due process," to impose on law enforcement officials our
        "personal and private notions" of fairness and to "disregard the limits that bind judges in
23      their judicial function."  Our task is more circumscribed.  We are to determine only
        whether the action complained of here, compelling respondent to stand trial after the
24      Government delayed indictment to investigate further violates those "fundamental
        conceptions of justice which lie at the base of our civil and political institutions," and
25      which define "the community's sense of fair play and decency."

26  *Id.* at 790 (citations omitted).

27      Finally, *Lovasco* observed as a postscript to its decision that

28      neither this Court nor any lower court has had a sustained opportunity to consider the

Points and Authorities in Support of Answer - C 07-5719 CRB

21

1　constitutional significance of various reasons for delay. We therefore leave to the lower courts, in the first instance, the task of applying the settled principles of due process that
2　we have discussed to the particular circumstances of individual cases.

3　*Id.* at 796-97 (footnote omitted). Notably, nothing in *Lovasco* countered the indication in *Marion*

4　that a showing that the delay was "an intentional device to gain tactical advantage over the accused,"

5　i.e., prosecutorial bad faith, was a prerequisite for a due process delay claim. *Marion*, 404 U.S. at

6　324.

7　　　　The Ninth Circuit first considered the question of the proper standard for asserting a due

8　process claim of delay under *Marion* in *United States v. Mays*, 549 F.2d 670 (9th Cir. 1977). In

9　*Mays*, the prosecution argued for a strict requirement of a showing of bad faith in conjunction with

10　actual prejudice, whereas the defense argued that actual prejudice was, by itself sufficient to violate

11　due process. *Id.* at 764-66. *Mays* began by noting that the proper interpretation of the test was far

12　from clear.

13　　　　Since the *Marion* decision, there has been a good deal of confusion as to whether the two elements delineated in the opinion actual (or substantial) prejudice, and intentional
14　delay by the government for an improper purpose are to be applied in a conjunctive or disjunctive manner. Indeed, as with the other circuits, this Circuit has not been entirely
15　consistent in its articulation of the proper standard.
　　　　The issue is a difficult one to decide as there are solid arguments for both
16　interpretations. In support of the conjunctive interpretation, it is initially noted that the Court in *Marion* specifically used a conjunctive connector ("and") between its articulation
17　of the two elements. *Marion, supra*, 404 U.S. at 324, 92 S.Ct. 455. Likewise in applying its standard to the facts of that case, the Supreme Court again uses the word "and," as
18　opposed to a disjunctive connector such as "or" or "conversely." Secondly, the language of the text strongly suggests that actual prejudice resulting from pre-indictment delay by
19　itself is not enough to establish the need for dismissal.

20　*Id.* at 765-66 (footnotes omitted).

21　　　　After identifying the arguments in favor of each possible interpretation, *Mays* focused on

22　the observation by *Marion* that such challenges would have to be evaluated by "judgment based on

23　the circumstances of each case." *Id.* at 677 (quoting *Marion*, 404 U.S. at 325). It therefore elected

24　to adopt a middle path allowing for consideration of governmental delay predicated on something

25　less than bad faith, notwithstanding that *Marion* did not expressly provide for such a balancing.

26　　　　We reject both the absolute position argued by the appellant (that there must be both actual prejudice and improper intentional delay) and that urged by appellees (that actual
27　prejudice due to pre-indictment delay is enough). We prefer an approach which balances the factors in the individual situation.
28　　　　Given that a balancing of the "circumstances" is to be made, a decision as to what

1      those "circumstances" are and who will bear the burden of proof naturally arises. *In this*

2      *regard, Marion is mute.* However, certainly the main elements suggest themselves.

3 *Id.* (emphasis added).

4      In *United States v. Moran,* 759 F.2d 777, 781-82 (9th Cir. 1985), the Ninth Circuit

5 reaffirmed its balancing approach allowing evidence of mere negligence, without a showing of bad

6 faith or intentional delay, as sufficient for a due process delay claim after *Lovasco.* In reaching its

7 conclusion, however, the panel acknowledged that its approach was not compelled by either *Marion*

8 or *Lovasco*, but rather that those cases did not explicitly compel a different conclusion. *Id.*

9      Consequently, while that *interpretation* of the ambiguous language of *Marion* and *Lovasco*

10 allowing a claim predicated on mere negligence has been adopted by the Ninth Circuit, the *Mays*

11 analysis makes clear that such an interpretation is not "clearly established" for purposes of applying

12 that broader rule to the states under the AEDPA. Indeed, the Ninth Circuit's interpretation is in the

13 distinct minority of federal circuits on this issue.

14      The Fifth Circuit, en banc, conducted a detailed analysis of *Marion* and *Lovasco*, as well

15 as subsequent Supreme Court cases, and reached the opposite conclusion in *United States v. Crouch,*

16 84 F.3d 1497, 1505-14 (5th Cir. 1996) (en banc). *Crouch* began by noting, as did *Mays*, that "neither

17 *Marion* nor *Lovasco* is crystal clear on this issue, and each opinion contains some language that can

18 give comfort to either view." *Id.* at 1510. *Crouch* concluded "that the better reading of these

19 opinions is that the Supreme Court, in instances where the statute of limitations has not run, has

20 refused to recognize a claim of preindictment delay absent some bad faith or improper purpose on

21 the part of the prosecution." *Id. Crouch* further observed that although those cases were ambiguous,

22 "[c]rucially, the Supreme Court itself, albeit in dicta, appears to have interpreted *Marion* and

23 *Lovasco* in essentially the same manner as we did." *Id. Crouch* noted that in *United States v.*

24 *Gouveia,* 467 U.S. 180, 192 (1984), the Supreme Court characterized *Marion* and *Lovasco* as

25 providing that "the Fifth Amendment requires the dismissal of an indictment, even if it is brought

26 within the statute of limitations, *if* the defendant can prove that *the Government's delay* in bringing

27 the indictment *was a deliberate device to gain an advantage over* him *and* that it caused him actual

28 prejudice in presenting his defense." *Crouch,* 84 F.3d at 1510 (quoting *Gouveia,* 467 U.S. at 192).

1 | *Crouch* also pointed out that in *Arizona v. Youngblood,* 488 U.S. 51 (1988), the Supreme Court

2 | similarly observed:

3 | > Our decisions in related areas have stressed the importance for constitutional purposes of
good or bad faith on the part of the Government when the claim is based on loss of
4 | > evidence attributable to the Government. In *United States v. Marion,* 404 U.S. 307, 92
S.Ct. 455, 30 L.Ed.2d 468 (1971), we said that '[n]o actual prejudice to the conduct of the
5 | > defense is alleged or proved, and there is no showing that the Government intentionally
delayed to gain some tactical advantage over appellees or to harass them.' *Id.* at 325, 92
6 | > S.Ct., at 466; see also *United States v. Lovasco,* 431 U.S. 783, 790, 97 S.Ct. 2044, 2048,
52 L.Ed.2d 752 (1977).

7 |

8 | *Crouch,* 84 F.3d at 1510 (quoting *Youngblood,* 488 U.S. at 57.)

9 | Finally, *Crouch* observed, "A significant majority of our sister circuits appear to now

10 | follow the same rule, namely that where limitations has not run dismissal for preindictment delay

11 | requires a showing not only of substantial, actual prejudice, but also that the prosecutor intentionally

12 | delayed to gain tactical advantage or to advance some other improper purpose." *Id.* at 1511-12

13 | (citing cases from various circuits). The Fourth Circuit, in *Jones v. Angelone,* 94 F.3d 900, 905 (4th

14 | Cir. 1996), highlighted the lopsided nature of this circuit split, noting:

15 | > On the authority of *Gouveia, Marion, Lovasco,* and *Youngblood,* every circuit, other
than our own and the Ninth Circuit, has indeed held that, in order to establish that a
16 | > lengthy pre-indictment delay rises to the level of a due process violation, a defendant must
show not only actual substantial prejudice, but also that "the government intentionally
17 | > delayed the indictment to gain an unfair tactical advantage or for other bad faith motives."
*United States v. Crooks,* 766 F.2d 7, 11 (1st Cir.) (Breyer, J.) (internal quotation marks
18 | > omitted), *cert. denied,* 474 U.S. 996, 106 S.Ct. 421, 88 L.Ed.2d 362 (1985); *see also, e.g.,
United States v. Lebron-Gonzalez,* 816 F.2d 823, 831 (1st Cir.), *cert. denied,* 484 U.S.
19 | > 843, 108 S.Ct. 135, 98 L.Ed.2d 92 (1987); *United States v. Hoo,* 825 F.2d 667, 671 (2d
Cir.1987), *cert. denied,* 484 U.S. 1035, 108 S.Ct. 742, 98 L.Ed.2d 777 (1988); *United
20 | > States v. Ismaili,* 828 F.2d 153, 167 (3d Cir.1987), *cert. denied,* 485 U.S. 935, 108 S.Ct.
1110, 99 L.Ed.2d 271 (1988); *United States v. Crouch,* 84 F.3d 1497 (5th Cir.1996) (*en
21 | > banc*); *United States v. Brown,* 959 F.2d 63, 66 (6th Cir.1992); *United States v. Sowa,* 34
F.3d 447, 450 (7th Cir.1994), *cert. denied,* 513 U.S. 1117, 115 S.Ct. 915, 130 L.Ed.2d 796
22 | > (1995); *United States v. Stierwalt,* 16 F.3d 282, 285 (8th Cir.1994); *United States v.
Engstrom,* 965 F.2d 836, 839 (10th Cir.1992); *United States v. Hayes,* 40 F.3d 362, 365
23 | > (11th Cir.1994), *cert. denied,* 516 U.S. 812, 116 S.Ct. 62, 133 L.Ed.2d 24 (1995); *Howell,*
904 F.2d at 902-03 (Russell, J., dissenting). Because Jones has presented no evidence
24 | > whatsoever that the Commonwealth delayed arresting or indicting him for tactical
advantage or that Virginia otherwise acted in bad faith, he could not possibly establish a
25 | > due process violation under this standard.

26 | *Id.*

27 | Accordingly, given the readily acknowledged ambiguity in the Supreme Court's decisions

28 | in *Marion* and *Lovasco,* as recognized in *Mays,* in conjunction with the Supreme Court's statements

1   contrary to the Ninth Circuit's interpretation in *Gouveia* and *Youngblood*, and the overwhelming

2   circuit authority reaching the opposite conclusion as the Ninth Circuit, the test espoused by petitioner

3   is not clearly established. *See Carey v. Musladin*, 127 S. Ct. at 654 (noting that "lower courts have

4   diverged widely in their treatment" of the issue as "[r]eflecting the lack of guidance from this Court"

5   and evidencing no clearly established law from Supreme Court precedent).

6           Petitioner, in a footnote, recognizes that "*Marion* and *Lovasco* both noted the prosecutorial

7   concession that deliberate delay to disadvantage a defendant would constitute a denial of due

8   process," yet maintains that "these cases do not hold that such a scenario is required in order to

9   obtain a dismissal on the basis of preaccusation delay." Pet. at 39, n.22.  To support his cursory

10  claim that the clearly established standard for a due process delay claim set out in *Marion* and

11  *Lovasco* does not require bad faith or intentional delay to gain advantage, petitioner quotes from

12  *People v. Boysen*, 152 Cal. App. 4th 1409, 62 Cal. Rptr. 3d 350 (2007), which in turn quoted the

13  Ninth Circuit standard applied on direct appeal, as reiterated in *United States v. Barken*, 412 F.3d

14  1131 (9th Cir. 2005) and *United States v. Manning*, 56 F.3d 1188, 1193 (9th Cir. 1995).

15          Petitioner's reliance on the California Court of Appeal decision *Boysen* is misplaced, given

16  that review was granted in that case by the California Supreme Court on October 17, 2007, *People*

17  *v. Boysen*, 181 P.3d 947, 75 Cal. Rptr. 3d 588 (2007), and *Boysen*'s analysis was then repudiated by

18  the California Supreme Court in *People v. Nelson*, ___ Cal. 4th ___, 78 Cal. Rptr. 3d 69, 185 P.3d

19  49 (2008). In *Nelson*, the California Supreme Court reaffirmed that this state has interpreted *Marion*

20  and *Lovasco*, consistent with the majority approach, as requiring a showing of bad faith by the

21  prosecution or intentional delay for the purpose of gaining advantage, in addition to actual prejudice,

22  to state a due process delay claim under the federal Constitution.[15/]  *People v. Nelson*, 78 Cal. Rptr.

23  3d at 76-78.  The California Supreme Court in *Nelson* pointed out that it had already endorsed the

24  majority view of requiring governmental bad faith in *People v. Catlin*, 26 Cal. 4th 81 (2001), in

25

26          15. *Nelson* also explained that the California Constitution provides a more relaxed standard
27  for a state due process delay claim, equivalent to that adopted by the Ninth Circuit for a federal due
    process claim, which can be predicated on mere governmental negligence, without a showing of bad
28  faith.  *People v. Nelson*, 78 Cal. Rptr. 3d at 78-80.

1  which it noted "[a] claim based upon the federal Constitution also requires a showing that the delay

2  was undertaken to gain a tactical advantage over the defendant." *People v. Nelson*, 78 Cal. Rptr. 3d

3  at 76 (quoting *Catlin*, 26 Cal. 4th at 107).

4  Notably, the California Court of Appeal in petitioner's case cited to *Catlin* as setting out

5  the standard for petitioner's state due process delay claim. Pet. Exh. A at 10. Moreover, the

6  California Court of Appeal found "there was no evidence that the delay in prosecution was for the

7  purpose of weakening the defense," Pet. Exh. A at 25, a finding that has never been challenged by

8  petitioner. Accordingly, the state court's rejection of petitioner's due process pre-accusation delay

9  claim, which was predicated solely on an allegation of prosecutorial negligence, without a showing

10  of bad faith, cannot be an unreasonable application of United States Supreme Court precedent

11  because there is no clearly established Supreme Court authority allowing a due process claim

12  predicated solely on negligence, without a showing of intentional delay for purposes of seeking

13  advantage. Petitioner's claim must be denied.

14  For this same reason, relief is precluded on habeas corpus by *Teague v. Lane*, 489 U.S.

15  288, 301 (1989), because petitioner seeks imposition of a new rule. New rules of constitutional

16  criminal procedure will not be applied or announced in cases on collateral review unless they fall

17  into one of two exceptions. *Penry v. Lynaugh*, 492 U.S. 302, 314 (1989). A case announces a new

18  rule when it breaks new ground or imposes a new obligation on the states or the federal government.

19  *Id.* A decision announces a new rule "if the result was not *dictated* by a precedent existing at the

20  time the defendant's conviction became final." *Id.* (quoting *Teague v. Lane*, 489 U.S. 288, 301

21  (1989) (emphasis in original)); see generally *Caspari v. Bohlen*, 510 U.S. 383, 395 (1994) (a rule is

22  not constitutionally compelled if the survey shows that reasonable jurists could differ about the

23  outcome). For the reasons explained above, predicating a due process violation on mere negligent

24  delay, without a showing of prosecutorial bad faith, is not dictated by precedent, as reflected in the

25  circuit split.

26  The first exception to the rule of nonretroactivity, which applies if the new rule places

27  "certain kinds of primary, private individual conduct beyond the power of the criminal law-making

28  authority to proscribe," *Teague v. Lane*, 489 U.S. at 307, is not implicated here. The second

1    exception, the "watershed" exception, which allows a new rule to be applied retroactively on

2    collateral review "if it requires the observance of 'those procedures that . . . are "implicit in the

3    concept of ordered liberty,"'" *Teague v. Lane*, 489 U.S. at 311 (quoting *Mackey v. United States*,

4    401 U.S. 667, 693 (1971) (Harlan, J., concurring in judgments in part and dissenting in part)), is also

5    not applicable, since the Supreme Court made clear that the primary protection for defendants against

6    excessive delay is the applicable statute of limitations, with a due process delay claim playing a

7    limited secondary role. Accordingly, application of the Ninth Circuit's interpretation on federal

8    habeas is barred by *Teague*.

9        Petitioner's claim also fails because he has not rebutted by clear and convincing evidence

10    the state court's findings that petitioner did not established actual prejudice. The California Court

11    of Appeal conducted an extensive analysis and rejected each of petitioner's claims of prejudice as

12    unsubstantiated or speculative.

13        Petitioner claims he lost his right to have his case adjudicated in juvenile court. (Pet. at

14    40.) Petitioner's claim ignores state law. As the California Court of Appeal observed, under state

15    law, a defendant who commits murder is not entitled to adjudication in juvenile court. Rather, he

16    is only entitled to a fitness hearing to determine his amenability for juvenile court adjudication, and

17    with a murder charge, there is a presumption against such amenability which the defendant must

18    overcome. Pet. Exh. A at 11-12. Notably, petitioner in fact received a fitness hearing prior to trial

19    and was found unfit. Pet. Exh. A at 12. Thus, petitioner lost nothing by the delay.

20        Petitioner also argues that he was prejudiced by lost evidence and fading memories. The

21    state court went through every assertion and rejected each one as speculative at best.

22        Defendant claims that as a result of the delay, the following evidence was lost or
23    unavailable: (1) the original 911 dispatch tape; (2) tapes of the interviews with Marvin and
        David Smith in 2000; (3) fingerprints from the baseball bat, glass shards, and the door
        latch; (4) a traffic ticket that Tibbils got on the day of the drug transaction between
24    defendant and Marlon; (5) a police report of an interview with Tibbils shortly after the
        murder; (6) documentation concerning Wesley's purchase of jewelry; (7) defendant's
25    employment records; (8) tape recordings of interviews and conversations with witnesses;
        and (9) records concerning Edelberg's 1984 domestic violence action against defendant.
26    Defendant also claims that potential witnesses Darryl Littlejohn, Ricky Ventimiglia, and
        Mitch Helms were dead or otherwise unavailable. He further claims that Sergeant
27    Kenneth Pitts, Detective Brockman, Crystal Custodia, and Mr. Bass were unable to recall
        important events and circumstances. We individually analyze each alleged source of
28    prejudice.

*The 911 Tape*

Defendant claims the tape would have shown exactly when the police were called and also helped the jury determine whether Mr. Bass removed the buckets of marijuana from Marlon's bedroom before or after the murder. Showing that they were removed before the murder would have helped him rebut the prosecution's theory that defendant derived his sudden wealth from the drugs he stole.

Defendant does not explain why the exact time of the 911 call is significant. In any event, other evidence established the time with sufficient exactitude. Officer Caren Hare of the San Jose Police Department explained that the 911 operator dispatches patrol officers within "[a] few minutes of a call. In this case, she received the dispatcher's call at 5:11 p.m. Detective Brockman testified that he received a dispatch shortly after 5:00 p.m. Moreover, evidence of Mr. Bass' interview with police immediately after the murder as well as his and Mrs. Bass' testimony similarly revealed that the call was made around 5:00 p.m.

Defendant also does not explain how the tape could have shed light on whether Mr. Bass removed Marlon's marijuana before *or after* the murder. There is no evidence that Mr. Bass or anyone else might have mentioned when he removed the marijuana to the 911 dispatcher. In any event, there was no factual dispute concerning when he did. At trial, Mr. Bass initially denied that he found any marijuana the night before the murder. However, after having his memory refreshed, he remembered that he found and removed it the night *before* the murder. Defense counsel emphasized that fact during his closing statement, arguing that defendant's sudden wealth could not have come from stealing Marlon's marijuana or money because they had been removed from Marlon's room before the burglary.[16]

In short, the 911 tape would have been cumulative of other evidence, and its unavailability was harmless.

*The Smith Brothers' Interview Tapes*

Defendant claims that tapes of the interviews with the Smith brothers were material because "the prosecution specifically discussed the Smith brothers during closing argument and there was a critical question of whether they were involved in the commission of the murder based on Bernard Wesley's testimony." He further argues that the tapes would have been helpful in determining the Smith brothers' credibility at trial.

The record reveals that the defense had transcripts of the tapes and used them to cross-examine the officer who interviewed both brothers. Moreover, the defense had a police report of the 1984 interview with David Smith and a report and transcript of the 1984 interview with Marvin Smith. Again, the tapes were cumulative, and their unavailability harmless.

. . . [¶] . . .

16.    For this reason, we reject defendant's claim of prejudice arising from Mr. Bass' faded memory, that is, his alleged inability "to recall with precision when he removed the drugs from Marlon's bedroom." On that issue, Mr. Bass' memory was refreshed.

### Tibbils's Traffic Ticket

Defendant argues that Tibbils's testimony that defendant got marijuana from Marlon on the day of the murder was the only evidence linking Marlon and defendant together that day. According to defendant, Tibbils also said he received a traffic ticket that day. Defendant claims that if he had had the ticket and if it revealed that it had been issued on a different day, then he could have proved that the marijuana deal did not occur on the day of the murder and therefore that he and Marlon had not been together.

Tibbils did not fix the date of the marijuana deal with certainty. Although initially he thought it occurred on the day of the murder, he later conceded that he was not sure of the day and could not say he had ever been sure. Likewise, Tibbils was not sure when he got the ticket. He told Sergeant Vizzusi that when he spoke with defendant after the murder, he "felt" that the marijuana deal and murder occurred on the same day, noting that defendant told him that he had seen Wesley acting suspiciously. Sergeant Vizzusi then asked Tibbils how else he might connect the drug transaction and the murder to the same day. Tibbils said he "thought" he had gotten a traffic ticket around the time of the murder and opined that it could have been on the same day as the transaction, but he was not sure. Later, at the preliminary hearing, Tibbils recalled this exchange with Sergeant Vizzusi and explained that he traveled to and from defendant's house a lot and "got a ticket one day, and whether it lined up to be the day or not, I couldn't–I was unaware." His trial testimony mirrored his testimony at the preliminary hearing.

Given Tibbils's admitted uncertainty concerning (1) whether the marijuana transaction and murder occurred on the same day and (2) whether he got the traffic ticket on the same day, we find that any tendency the ticket had to show that defendant and Marlon were not together the day of the murder was speculative, even if the ticket was issued on a different day. Furthermore, and contrary to defendant's claim, Tibbils's testimony was not the only evidence linking him to Marlon on the day of the murder. Defendant told the police that he spoke to Marlon the day of the murder and drove by his house, and he told Keasling that he went to Marlon's house that day to pick up some drugs. Under the circumstances, defendant has not shown that the unavailability of the traffic ticket was prejudicial as a matter of law.

### Report of the Tibbils's Interview

Tibbils testified that he spoke to police over the phone shortly after the murder. Defendant claims prejudice from the loss of the police report of that interview. However, defendant provides no evidence that a report was ever generated. Nor does defendant explain what he would have been able to prove with such a report. In this regard, we note that Tibbils remembered and was questioned about the interview. He testified that during that period of time, he did not cooperate with the police and refused to go to the police station. He said the interview was brief, and he provided no information about going to defendant's house for drugs the day of the murder or talking to defendant about it a few days later. Under the circumstances, defendant cannot establish actual prejudice from the alleged loss of a police report that may not have ever existed.

### Documentation of Wesley's Jewelry Purchase

Assuming that Wesley might not have bought jewelry on the day of the murder, defendant argues that the unavailability of documentation concerning the purchase prevented him from challenging Wesley's alibi concerning his whereabouts and bolstering the evidence implicating Wesley.

Defendant presented no evidence to support his assumption that the documentation

might show a different date of purchase. Thus, the explanation concerning what he might have been able to prove is speculative. Defendant's claim of actual prejudice is further undermined by the fact that (1) Crystal Custodia corroborated Wesley's testimony that he stopped on Curtner near the 7-Eleven on his way to meet his girlfriend during her lunch break; (2) defendant said he saw Wesley near the 7-Eleven around that time; and (3) Wesley's former girlfriend testified at that he would meet her at lunchtime on occasion and might have given her a piece of jewelry during her lunch break. Under the circumstances, defendant fails to show that the loss of whatever documentation there might have been was prejudicial as a matter of law.

### *Defendant's Employment Records*

Defendant argues that his employment records would have helped him prove where he was the day of the murder and provided "a point of reference for the time period." He argues that his own faded memory of events during that time aggravated the prejudice from the loss of records.

During his interview with Sergeant Vizzusi in 1983, one month after the murder, defendant said he was a trainee at a Great Western Bank. He also said that he did *not* work on the day of the murder. Defendant presented no evidence that his memory in 1983 had faded or was otherwise impaired. Defendant also spoke to police in 1984, 1989, and 2000, and his statements were documented in police reports and transcripts. During his interview in 2000, defendant recalled that he worked at a bank around the time of the murder. Defendant did not testify at trial. Under the circumstances, he cannot show that the lack of employment records and his allegedly faded memory before trial prevented him from being able to prove *at trial* that he might have been working at the bank on the day of the murder. Accordingly, he fails to demonstrate actual prejudice.

### *Records of Edelberg's Domestic Violence Complaint*

Edelberg testified that what triggered the domestic violence incident on March 12, 1984, was her reaction to defendant's admission that he killed Marlon. Defendant claims the unavailability of records documenting her complaint was prejudicial because "[h]er rendition of what occurred at the time it did occur would have either constituted powerful corroborating evidence or served to severely impeach her trial rendition."

As the People point out, defendant had the police report generated when Edelberg first complained to the police. At that time, she did not mention defendant's admission. As a result, defense counsel used the report to impeach Edelberg and suggest that she had fabricated his admission. Defendant does not now identify what, if any, additional records may have been generated that were later lost or unavailable. Again, he simply assumes the existence of such records. Under the circumstances, defendant fails to demonstrate that the alleged unavailability of records impaired his ability to undermine Edelberg's recorded statements and testimony about defendant's admission or caused some other sort of actual prejudice.

### *Unavailability of Darryl Littlejohn and Ricky Ventimiglia*

Darryl Littlejohn died before trial. Defendant asserts that there was evidence that Darryl "was owed $987 by Marlon Bass"; he once "said, 'Let's go over and get the Black guy,'" referring to Marlon; and he also "talked about a .22 gun." Defendant further notes that Ricky Ventimiglia apparently overheard Darryl make the comment but was unavailable to testify. Defendant argues that the unavailability of these two witnesses impaired his ability to show third-party culpability for the murder and thus raise a reasonable doubt about his own guilt.

There is evidence that Darryl uttered the statement attributed to him. However, the record does not suggest that Marlon owed him money. Rather, it reveals that Darryl's brother Darren owed Marlon the money. The record also reveals that it was Darren who talked about getting a gun for protection. Furthermore, Darren and Geoff Caplan overheard Darryl make his comment, and Kevin Camara later overheard Ventimiglia and Caplan talking about Darryl's comment.

Given the availability of other witnesses to testify about Darryl's comment, Darren's debt, and Darren's interest in a gun, we do not find that the unavailability of Darryl and Ventimiglia caused actual prejudice. This is especially so because the court ruled prior to trial and again during trial that the evidence implicating Darryl was inadmissible for the purpose of showing possible third-party culpability.

### Unavailability of Mitch Helms

Defendant asserts that "Mitch Helms, who also sold drugs to appellant, was missing at the time of trial." However, other than noting Helms's unavailability, defendant does not explain what Helms's testimony could have helped him prove. Thus, defendant fails to show actual prejudice.

### Sergeant Pitts's Faded Memory

Defendant asserts that Sergeant Pitts, who was involved in the initial investigation, was unable to recall any particulars about the case. The record reveals that Sergeant Pitts was called to testify about his interview with Geoff Caplan after the murder. He did not recall much, but defense counsel had the police report that Sergeant Pitts prepared after the interview. The report supported defendant's effort to show that Caplan, who had previously burglarized Marlon's house, committed the murder. Under the circumstances, defendant fails to show that Sergeant Pitts's inability to recall the interview was prejudicial.

### Detective Brockman's Faded Memory

Defendant notes that Detective Brockman had no recollection of whether Edelberg reported defendant's admission to him in early 1984. As noted, however, it was unclear whether Edelberg did so, and the court implicitly found that she did not. (See ante, fn. 7.) In any event, it is undisputed that Edelberg reported defendant's admission in 1986, and she testified about it at trial. Defense counsel impeached her with the fact that although she immediately reported defendant's physical abuse, she did not mention his admission. Under the circumstances, we fail to see how Detective Brockman's inability to remember for sure whether Edelberg told him about defendant's admission in 1984 caused actual prejudice.

### Crystal Custodia's Faded Memory

Defendant asserts that Custodia, who testified that Wesley pulled over at the bus stop on the day of the murder, "had a failure of recall." However, defendant does not explain what she could not recall, its significance, and the resulting prejudice. The record reflects that she could not remember any descriptive details about the man who stopped. However, she was able to describe the type of car he was driving, and her description closely matched Wesley's car. Moreover, the defense had a copy of the police report containing her statement to police in 1983, which was used to refresh her recollection. In her statement, she described the man who stopped and his vehicle in more detail. Last, Wesley admitted that he pulled over to the curb to talk to some people that day, and defendant said that he had seen him in the area that day. Again, the record does not

1    establish any prejudice from Custodia's inability to recall details about Wesley.

2    Pet. Exh. A at 12-21.[17/]

3        The state court concluded:

4    Here, none of the lost or unavailable evidence was as uniquely relevant and probative
     concerning a disputed material issue . . . . Nor did defendant make a comparable showing
5    sufficient to establish plausible explanations of what the lost or unavailable evidence
     might have enabled him to prove.  Rather, defendant's explanations were sometimes
6    general and vague and often based on faulty or factually unsupported assumptions and
     speculation.

7
        . . . [¶] . . .
8
     The record supports the trial court's finding that defendant failed to demonstrate actual
9    prejudice, and we do not find that he established actual prejudice as a matter of law.

10   Pet. Exh. A at 24.

11       The state court's findings are conclusive, and petitioner has not met his burden of rebutting

12   them by clear and convincing evidence.  Moreover, the state court's conclusion that petitioner had

13   not demonstrated actual prejudice in light of these findings was not an unreasonable application of

14   Supreme Court precedent. *Accord United States v. Barken*, 412 F.3d at 1134 ("First, 'a defendant

15   must prove that he suffered actual, non-speculative prejudice from the delay,' meaning proof that

16   demonstrates exactly how the loss of evidence or witnesses was prejudicial. The defendant's burden

17   to show actual prejudice is heavy and is rarely met." Citations omitted); *see also id.* at 1135

18   ("Moreover, where adequate substitutes exist for missing non-testimonial evidence, prejudice does

19   not exist."); *United States v. Ross*, 123 F.3d 1181, 1186 (9th Cir. 1997) ("Everything that Ross

20   claims Peter would have testified to is either speculative or cumulative.  There is no proof that

21   Peter's absence at the first trial caused actual prejudice to Ross's defense."); *United States v. Moran*,

22   759 F.2d at 782 ("Moran's assertions of prejudice consist solely of the loss of witness testimony and

23   the impairment of other witness testimony by the dimming of memory. . . . [W]e emphasized that

24   protection from lost testimony generally falls solely within the ambit of the statute of limitations.

25   We further questioned whether such lost testimony would ever qualify for the level of prejudice

26   _____

27       17. The court also rejected a claim of prejudice regarding inability to take fingerprints from
     a bat in the victim's possession. Pet. Exh. A at 14-16. Petitioner has not renewed that ground in his
28   petition.

Points and Authorities in Support of Answer - C 07-5719 CRB

32

1   necessary to establish a due process violation, and found that the defendant's claims of lost testimony

2   were speculative, and that no showing was made that the loss of such testimony had actually

3   impaired meaningfully the defendant's ability to defend himself.").

4        Finally, the state court also observed that, even if there were some prejudice to petitioner,

5   it did not rise to the level of a due process violation. The state court found that the delay was a result

6   of continuing investigation and the absence of credible leads for an extended period of time. The

7   court further found that any extended delay was attributable to resource management in light of the

8   absence of new leads, rather than negligence. It held:

9        We note, however, that the trial court did further find that even if there were some
10       prejudice from the delay, it was not sufficient to deny defendant a fair trial. The court's
       conclusion is not unreasonable.

11        The record reveals that in 1986, after learning about Edelberg's statement to the
12       district attorney's investigator—i.e., that defendant had admitted and reenacted the killing
       but had said he was only kidding—Detective Brockman forwarded it to the homicide unit.
13       However, by that time, the investigation had lapsed, and the case was considered cold.
       Apparently, the new information was given low priority compared with more current
14       ongoing investigation, especially because the information from Edelberg was that
       defendant had only been joking. Thereafter, the case languished apparently due to the
15       press of subsequent cases and investigations and the low priority given this case after two
       years of extensive but fruitless investigation. Then, in 2000, Sergeant Vizzusi reexamined
16       the file and reinterviewed Edelberg. In light of additional evidence incriminating
       defendant, the case was revived, and ultimately the charges were filed.

17        Generally, "'[t]he People cannot simply place gathered evidence of insubstantial
       crimes on the "back burner" hoping that it will some day simmer into something more
18       prosecutable....'" (People v. Pellegrino (1978) 86 Cal.App.3d 776, 781; accord, Hartman,
       supra, 170 Cal.App.3d at p. 582.) In hindsight, the record does not reveal any
19       insurmountable reason why the revival of the case in 2000 could have occurred back in
       1986, when Edelberg's statement came to light. However, that the investigation could
20       have been revived sooner does not necessarily establish that the police were negligent in
       failing to do so or that the apparent justification for the delay—the press of more current
21       cases—at least between 1986 and 2000, is invalid and unreasonable.

22        There is no strict rule establishing how much of a pre-complaint delay invariably
       constitutes a denial of due process. Each case is unique and must be resolved by balancing
23       the public interest and the rights of the defendant in light of its fact and circumstances.
       (See People v. Wright (1969) 2 Cal.App.3d 732, 736.) Where, as here, the delay did not
24       cause prejudice of any material significance, a minimal justification will counterbalance
       it. Furthermore, the balancing must also include consideration of the seriousness of the
25       alleged crimes and the public interest in resolving them. (See Penney v. Superior Court
       (1972) 28 Cal.App.3d 941, 953-954, implicitly disapproved on another ground in People
26       v. Hannon (1977) 19 Cal.3d 588, 610-611, fn. 12.) Murder is a serious crime, for which
       there is no statute of limitations, and therefore it is one for which society has a strong
27       interest in seeing the perpetrator brought to justice.

28        On balance, we do not find that any marginal prejudice from the delay necessarily

1    outweighed the explanation and compels reversal as a matter of law.  Rather, having
     reviewed the record, which, as the trial court observed, included 81 tapes and almost 200
2    pages of police reports, we do not find that defendant's ability to meet and challenge the
     prosecution's case, rebut its evidence, and impeach its witnesses or his ability to defend
3    himself were so impaired that he was denied a fair trial

4    Pet. Exh. A at 24-26.

5          Petitioner has not rebutted the state court's finding by clear and convincing evidence.

6    Moreover, petitioner has not demonstrated that its conclusion of no due process violation under the

7    circumstances was not an unreasonable interpretation of the Supreme Court's holding in *Lovasco*,

8    which held that delay attributable to further investigation and stemming from a decision not to file

9    charges until they had sufficient evidence to prove guilt is entirely appropriate and does not implicate

10   due process concerns. *United States v. Lovasco*, 431 U.S. at 792-96.  Petitioner's claim is without

11   merit.

12                                          **II.**

13   **THE STATE COURT REASONABLY REJECTED PETITIONER'S**
     **CLAIM THAT THE TRIAL COURT'S EVIDENTIARY RULING**
14   **DENIED HIM HIS RIGHT TO PRESENT A DEFENSE**

15         Petitioner complains that the trial court's exclusion of evidence denied him his right to

16   present a defense.  This claim is predicated on the trial court's ruling excluding third-party

17   culpability evidence relating to Blaine Buscher.[18]  The state court reasonably rejected this claim.

18   **A.    Applicable Legal Principles**

19         State evidentiary determinations ordinarily do not present federal constitutional issues.

20   *See Crane v. Kentucky*, 476 U.S. 683, 689 (1986) (noting Court's "traditional reluctance to impose

21   constitutional constraints on ordinary evidentiary rulings by state trial courts").  This is because

22   States have broad latitude under the Constitution to establish rules excluding evidence from criminal

23   trials. *See United States v. Scheffer,* 523 U.S. 303, 308 (1998); *see also Crane v. Kentucky*, 476 U.S.

24   at 689-90 ("[T]he Constitution leaves to the judges who must make these decisions 'wide latitude'

25   to exclude evidence that is 'repetitive . . . , only marginally relevant' or poses an undue risk of

26   _____

27         18. Petitioner also claimed on direct appeal that the trial court erred in excluding third party
     culpability evidence relating to Darryl Littlejohn. *See* Pet. Exh. A at 26, 30.  He does not renew that
28   claim here. Pet. at 46-47.

1  'harassment, prejudice, [or] confusion of the issues. . . . Moreover, [the Court has] never questioned

2  the power of States to exclude evidence through the application of evidentiary rules that themselves

3  serve the interests of fairness and reliability—even if the defendant would prefer to see that evidence

4  admitted."). As such, federal habeas review does not lie to review a state court's evidentiary ruling,

5  unless it was so prejudicial as to constitute a violation of due process. *Estelle v. McGuire,* 502 U.S.

6  62, 67 (1991); *Jeffries v. Blodgett,* 5 F.3d 1180, 1192 (9th Cir. 1993). As explained by the High

7  Court: "The Due Process Clause does not permit the federal courts to engage in a finely tuned

8  review of the wisdom of state evidentiary rules." *Marshall v. Lonberger,* 459 U.S. at 438 n.6; *Estelle*

9  *v. McGuire,* 502 U.S. at 72. However, the right of a defendant in a criminal trial to due process "is,

10  in essence, the right to a fair opportunity to defend against the State's accusations." *Chambers v.*

11  *Mississippi,* 410 U.S. 284, 294 (1973); *see also Washington v. Texas,* 388 U.S. 14, 19 (1967). Thus,

12  while the defendant's right to present evidence is not absolute, the restrictions imposed by the States

13  must be reasonable. *Perry v. Rushen,* 713 F.2d 1447, 1450 (9th Cir. 1983). As explained by the

14  High Court: "In the exercise of this right, the accused, as is required of the State, must comply with

15  established rules of procedure and evidence designed to assure both fairness and reliability in the

16  ascertainment of guilt and innocence." *Chambers,* 410 U.S. at 302; *Taylor v. Illinois,* 484 U.S. 400,

17  410 (1988) (defendant does not have an unfettered right to introduce evidence that is incompetent,

18  privileged, or otherwise inadmissible under standard rules of evidence). Thus, unless the state

19  court's evidentiary ruling offends a "fundamental principle of justice," due process will not be

20  violated and habeas relief will not lie. *Montana v. Egelhoff,* 518 U.S. 37, 42-43 (1996).

21         Consistent with these principles, the High Court has made clear that if a state court does

22  apply the State's evidentiary rules unfairly, preventing a defendant from presenting evidence that

23  is critical to his defense, a claim may lie under the Sixth Amendment and the due process clause of

24  the Fourteenth Amendment. *Chambers v. Mississippi,* 410 U.S. at 302. In *Chambers,* the Supreme

25  Court found a violation of due process where the state court excluded defense evidence that failed

26  to meet State hearsay rules, but had "persuasive assurances of trustworthiness" and was "critical"

27  to the defense. *Id.* at 302. Informing the Court's holding were the specific facts of the case. The

28  State had excluded the testimony of three witnesses who had heard another man confess to the crime.

1   *Id.* at 303. Given this circumstance, the defendant's due process right undeniably outweighed the

2   State interest in the evidentiary rule.

3          With respect to the admissibility of third party culpability evidence, California law

4   provides that to be admissible such evidence "need only be capable of raising a reasonable doubt of

5   defendant's guilt." *People v. Hall*, 41 Cal. 3d 826, 833 (1986). However, "evidence of mere motive

6   or opportunity to commit the crime in another person, without more, will not suffice to raise a

7   reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking

8   the third person to the actual perpetration of the crime." *Id.*

9          The United States Supreme Court has not issued an opinion addressing whether this

10  standard is an unconstitutional impediment to a defendant's right to present a defense. For this

11  reason alone, petitioner is not entitled to relief. *See* 28 U.S.C. § 2254 (d)(1); *Houston v. Roe*, 177

12  F.3d 901, 910 (9th Cir. 1999).

13          Moreover, California's standard regarding the admissibility of third-party evidence has

14  been found constitutional by the Ninth Circuit in *Perry v. Rushen*, 713 F.2d at 1451-52. There, the

15  Ninth Circuit articulated the standard for balancing the defendant's "undeniably strong" interest in

16  presenting third-party evidence with the state's "compelling" interest in reliable and efficient trials.

17  *Id.* The appellate court held that evidence of third party culpability is not admissible "if it simply

18  affords a possible ground of suspicion against such person; rather, it must be coupled with

19  substantial evidence tending to directly connect that person with the actual commission of the

20  offense." *Id.* at 1449 (quoting *People v. Green*, 27 Cal. 3d 1, 22 (1980)). Having reached this

21  conclusion, the Ninth Circuit found that California's standard did not offend any fundamental

22  principle of justice nor did it unfairly prevent a defendant from defending against the state's charges.

23  *Perry v. Rushen*, 713 F.2d at 1455.

24          In *Chia v. Cambra*, 360 F.3d 997, 1004 (9th. Cir. 2004), the Ninth Circuit identified a five

25  part balancing test to evaluate whether exclusion of evidence under state rules violated a defendant's

26  right to present a defense. It noted:

27          In assessing the interests at issue in this case, we invoke the five-part balancing test
            formulated in *Miller* [*v. Stagner*, 757 F.2d 988, 994 (9th Cir.), *amended on other grounds*,
28          768 F.2d 1090 (9th Cir.1985)]. These factors include: (1) the probative value of the

1  excluded evidence on the central issue; (2) its reliability; (3) whether it is capable of evaluation by the trier of fact; (4) whether it is the sole evidence on the issue or merely

2  cumulative; and (5) whether it constitutes a major part of the attempted defense.

3  *Id.* On the other side of the balancing equation, the court must give due weight to the state interests

4  underlying the state evidentiary rules on which the exclusion was based. *See Chia*, 360 F.3d at 1006

5  (balancing California's minimal interest in excluding reliable statements that constituted hearsay,

6  with petitioner's immense interest in presenting evidence "extraordinarily relevant" to a

7  determination of guilt or innocence). *Perry* made clear that " unusually compelling circumstances

8  [are] required to outweigh the strong state interest in administration of its trials." *Perry v. Rushen*,

9  713 F.2d at 1452. Petitioner has not demonstrated that the exclusion of evidence violated due

10  process under this test.

11  **B.    The State Court's Ruling**

12  Applying the legal standard employed by California and approved by the Ninth Circuit,

13  the state court reasonably rejected petitioner's claim:

14  Defendant contends that the trial court erred in excluding evidence that Blaine Buscher . . . killed Marlon.[19]

15

16  "'To be admissible, the third-party evidence need not show "substantial proof of a probability" that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt. At the same time, we do not require that any

17  evidence, however remote, must be admitted to show a third party's possible culpability. . . . [E]vidence of mere motive or opportunity to commit the crime in another

18  person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual

19  perpetration of the crime.' We emphasized that 'courts should simply treat third-party culpability evidence like any other evidence: if relevant it is admissible [citation] unless

20  its probative value is substantially outweighed by the risk of undue delay, prejudice, or confusion.' A trial court's discretionary ruling under Evidence Code section 352 will not

21  be disturbed on appeal absent an abuse of discretion." (*People v. Lewis* (2001) 26 Cal.4th 334, 372, fn. omitted; *People v. Bradford* (1997) 15 Cal.4th 1229, 1325; *People v. Hall*

22  (1986) 41 Cal.3d 826, 832-833.)

23  "[J]udicial discretion is . . . 'the sound judgment of the court, to be exercised according to the rules of law.' . . . [T]he term judicial discretion 'implies absence of

24  arbitrary determination, capricious disposition or whimsical thinking.' Moreover, discretion is abused whenever the court exceeds the bounds of reason, all of the

25  circumstances being considered." (*People v. Giminez* (1975) 14 Cal.3d 68, 72.)

26

27

19.    The court allowed the defendant to introduce evidence that implicated

28    Wesley and Caplan.

1    *Blaine Buscher*

2    Defendant sought to introduce the testimony of William Wall that Buscher admitted killing Marlon. He also sought to introduce the testimony of Kirk Hill, Laura Basolo, Shannon Murphy, and Mark Delaney as circumstantial evidence linking Buscher to the murder.

4    In his offer of proof, defendant asserted that in early 1984, several people, including Wall, Buscher, and an African-American man named Billy Baptiste, were at an all-night card party. Around 4:30 or 5:00 a.m., Wall leaned over to Buscher and whispered, "you killed the nigger[,]" referring to Marlon. According to Wall, Buscher slowly nodded once.

7    The record further reveals that sometime later, Wall called police with a tip about narcotics trafficking. He also mentioned the incident at the card party. Later, however, Wall denied knowing whether Buscher had known that his comment at the party referred to Marlon's murder. Wall also did not believe that Buscher had intended to accept responsibility for the murder. The police also questioned Buscher. He admitted being at the card party and said he knew Marlon from playing basketball together. However, he denied involvement in the murder.

11   Kirk Hill told police that around 7:30 p.m. the night before the murder, he, a friend, and Marlon were outside Marlon's house when an unkempt white man, wearing a green army jacket, drove up in a Mustang, got out, walked up to Hill and said, "you are not Buscher." The man, whom Marlon apparently did not know, then started yelling at Marlon. Laura Basolo said that around 11:00 a.m. the day of the murder, she saw a man in a green army jacket ringing the doorbell at Marlon's house. Shannon Murphy, who lived about three-quarters of a mile from Marlon, said that on the night of the murder, a shabby, unshaven man in a green army jacket, who seemed to be under the influence of something, came to his house. Mark Delaney said that around the time of the murder, Buscher used to wear a green army jacket.

17   In seeking to introduce this evidence, defendant argued that the man seen by Hill, Basolo, and Murphy could have been Buscher, and thus their testimony would circumstantially connect Buscher to Marlon's house before, around the time of, and after the murder. According to defendant, this evidence plus Buscher's silent nod at the card party was strong evidence of third-party culpability.

20   In excluding the evidence, the court noted that Wall's proposed testimony involved hearsay. Moreover, given the late-night, card-party context; ambiguity concerning the nature, meaning, and intent of Buscher's response to Wall's whispered comment; and the subsequent denials by Wall and Buscher that Buscher intended to admit killing Marlon, the court found the evidence of Buscher's alleged admission to be too unreliable, tentative, tenuous, and vague to connect him to commission of the murder. The court similarly found that Hill's, Basolo's, and Murphy's observations of an unidentified man in a green army jacket were too "every day" to establish such a connection.

24   The People argue that in essence the court found that the proposed evidence of Buscher's alleged admission was too vague and ambiguous concerning Buscher's understanding of Wall's reference to Marlon, the meaning of Buscher's response, and Wall's subjective impression of it to establish the necessary foundation to admit Wall's testimony under the hearsay exception for adoptive admissions. (See Evid. Code, §

1221;[20] cf. *People v. Vindiola* (1979) 96 Cal.App.3d 370, 382-383, disapproved on another ground in *People v. Carter* (2003) 30 Cal.4th 1166, 1197-1199.) We agree. The court could reasonably find that given Wall's proposed testimony in the context it was made, no reasonable person could find that Buscher knowingly intended his one slow nod to be an admission that he murdered Marlon. "[E]xclusion of evidence that produces only speculative inferences is not an abuse of discretion." (*People v. Babbitt* (1988) 45 Cal.3d 660, 684, 681-682.)

Given the inconsistencies among the descriptions of the man in the green army jacket and Hill's indication that the man was not Buscher, the court reasonably could also conclude that the three observations and evidence that Buscher was known to wear an army jacket were insufficient to link him to the scene of the crime around the time it happened. Moreover, even if the evidence had some tendency to do so, it was nevertheless insufficient to connect Buscher to perpetration of the crime because it only showed that Buscher had the opportunity to commit it. (See *People v. Hall, supra,* 41 Cal.3d at p. 833 [evidence of mere opportunity to commit crime not enough to admit to show third-party culpability].)

Pet. Exh. A at 26-30.

## C.    The State Court's Analysis Was Not Unreasonable

The state court's exclusion of third-party culpability evidence was clearly reasonable as petitioner was not prevented from presenting a defense. First, the trial court allowed petitioner to present third party culpability evidence with regard to two other individuals, Bernard Wesley and Geoffrey Caplan, for the purpose of raising suspicion that Wesley and Caplan might have been linked to the murder. (RT 2227-2234 [Wesley]; RT 2240-2252 [Caplan].) It excluded the ambiguous and dubious evidence petitioner hoped to introduce in an effort to raise suspicion that Blaine Buscher might also have been responsible for Marlon's murder.

Petitioner's claim hinges on his assertion that Buscher's nod to a comment regarding killing someone made at 5:00 a.m. during an all-night card party constituted an adoptive admission that Buscher killed Marlon Bass. However, the state court reasonably found the evidence did not establish the foundational predicate that Buscher even heard the comment, let alone that understood it to be a reference to the Bass murder, which occurred two months earlier, and was nodding in assent, as opposed to an acknowledgment that he was beating his opponent in cards during that very

20.    Evidence Code section 1221 provides, "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth."

1    game, and thus did not constitute an adoptive admission.

2        Petitioner made an offer of proof relating to Blaine Buscher at two separate stages of the

3    trial, first at the hearing on the prosecution's in limine motions, and again mid-trial.  During the in

4    limine motions hearing, petitioner proffered that two months after the murder, William Wall was at

5    a party at the home of John Lopez where several people including Buscher were playing cards.  At

6    around 4:30 or 5:00 in the morning, Buscher was playing "21" with Billy Baptiste, when Wall leaned

7    over and said to Buscher, "You killed the nigger."  Buscher nodded his head slowly in response.  (RT

8    147-152; CT 1094.)  Petitioner contended that Buscher and Wall both understood that Wall's

9    reference was to Marlon's murder and that Buscher's affirmative nod constituted an adoptive

10   admission.  (RT 147-152; CT 1094.)  The prosecution pointed out, however, that the evidence did

11   not support petitioner's position.

12       The prosecution detailed that, sometime after the party, Wall called the police in relation

13   to a tip on a drug transaction and mentioned this incident to the police as something they might find

14   interesting in connection with their investigation into Marlon's murder.  (RT 146.)  However, Wall

15   subsequently explained that he did not know whether Buscher understood the reference to be to

16   Marlon Bass's murder.  (RT 145-146, 1994-1995; CT 973.)  Buscher was also questioned by the

17   police in 1984 about the conversation.  He agreed that he was at the party, but he did not understand

18   anyone at the party to be asking him about Marlon's murder, and he denied ever adopting anyone's

19   suggestion that he was responsible.  (RT 145-149, 1994-1995; CT 973.)  The prosecution also

20   pointed out that the initial statement by Wall, to which Buscher apparently nodded was ambiguous

21   at best, given the fact that Buscher was, at the time, playing cards with Billy Baptiste, who was

22   African American, and given that Wall made the statement at 4:30 or 5:00 in the morning after a

23   long night of drinking.  (RT 145-149, 1994-1995; CT 973-974.)  Given the ambiguous nature of the

24   comment and the circumstances, Buscher's nod could not be deemed an adoptive admission.

25       The trial court agreed.  It concluded that the assertion that Buscher made an admission was

26   "incredibly tenuous and vague," given the context in which the statement was made to Buscher,

27   namely at 5 a.m. during an all-night party and card game, the ambiguous nature and scope of

28   Buscher's response, the confusion over what was said and meant, and subsequent statements by both

1  Buscher and Wall denying that Buscher made an admission. (RT 154, 160; *see also* RT 1993 [court

2  pointing out that alleged adoptive admission was hearsay, "[a]nd it's somebody's impression that

3  because of body language they thought possibly a person's acknowledging the culpability"].)  The

4  court essentially concluded that petitioner had not sufficiently established the foundational

5  requirement under California Evidence Code section 1221 for an adoptive admission, and thus it

6  lacked sufficient connection to the murder.  Moreover, without the foundational requirement that

7  Buscher understood the nature of the comment to be an accusation that he in fact murdered Marlon

8  Bass, there was nothing to directly connect Buscher to the crime charged.

9      Petitioner attempted to shore up this weakness by pointing out that Kirk Hill saw a man

10  wearing a green army jacket approach Bass's home and yell at Bass, the night before the murder, and

11  another witness saw a man in a green army jacket by Bass's house on the morning of the murder.

12  (RT 1988-1989, 1997.)  A third witness, Shannon Murphy, who lived almost a mile away from

13  Marlon, told police that on the night of November 30, he was alone in the house when a man wearing

14  a green army jacket walked into the house uninvited.  (RT 1991, 1996.)  Another witness was

15  prepared to testify that Buscher was known to wear a green army jacket. (RT 1992.)

16      Petitioner hoped to use this jacket connection to tie Buscher to the scene.  However,

17  undermining petitioner's claim was the fact that Kirk Hill knew Buscher, and he made clear to the

18  police that the man he saw drive up wearing the army jacket and yell at petitioner was a stranger, not

19  Buscher. (RT 1988-1989.)[21/]  Indeed, defense counsel *conceded this point* at the hearing, agreeing

20  that "[t]his [person] is nobody that Marlon Bass knew." (RT 1988.)[22/]  Similarly, Shannon Murphy

21  described the man who entered his house as a homeless person who seemed confused and under the

22  influence. (RT 1996.)  There was no suggestion that Blaine Buscher was a homeless person.  The

23  trial court reasonably excluded this evidence as far to tenuous and equivocal to establish that Buscher

24

25      21. Indeed, Hill told the police that the stranger first walked up to Hill and said, "You are

26  not Buscher," before starting to yell at Marlon. (RT 1988.)

27      22. Defense counsel even posited that one would have expected Marlon Bass to call Buscher

    later that evening to ask Buscher why some stranger was arguing with him and mentioning Buscher's

28  name. (RT 1989.)

1  was the man in the army jacket near the victim's residence in the evening before or morning of the

2  murder. A green army jacket is hardly distinctive, and any tenuous inference that Buscher may have

3  been that individual evaporated with Hill's indication that the stranger he saw was not Buscher, as

4  well as Shannon's account. *Accord People v. Alcala*, 4 Cal. 4th 742, 792-793 (1992) (offer of proof

5  that paroled murderer was in the area of the crime insufficient for admission of third party culpability

6  evidence); *People v. Kegle*, 197 Cal. App. 3d 72, 80 (1997) (descriptions of third party fit defendant

7  as well as "probably 100,000 people in Los Angeles").

8        The state court's ruling was not unreasonable given that the excluded evidence fails the

9  test set out in *Chia v. Cambra*, 360 F.3d at 1004. The state court reasonably concluded the evidence

10  of the alleged adoptive head nod was of little probative value and lacked reliability owing to the

11  circumstances under which it was made, the foundational problems for proving it, and the fact that

12  both of the parties involved in alleged adoptive admission the statement contradicted the claim of

13  adoption. The state has a substantial interest in preserving orderly trials, judicial efficiency and in

14  excluding unreliable hearsay evidence. *See Perry v. Rushen*, 713 F.2d 1447. Furthermore, the

15  evidence was not the sole evidence of third party culpability claim nor a major part of the defense

16  given that the defense had already been permitted to offer less tenuous third party culpability

17  evidence relating to two other individuals, Bernard Wesley and Geoffrey Caplan, in order to argue

18  either of those men could have been the actual killer. In light of the fact that the *Chia* factors largely

19  weigh against petitioner, the state court reasonably concluded that the exclusion of evidence did not

20  amount to a violation of petitioner's constitutional rights. Its holding that petitioner's interest in

21  presenting the evidence did not outweigh the state's legitimate interest in excluding the evidence

22  through application of its rules of evidence was not an unreasonable application of *Chambers*.

23  **D.   Any Error In Excluding The Evidence Did Not Have A Substantial Or Injurious**
        **Effect On The Verdict**

24

25        Petitioner's claim also fails because, even assuming the exclusion of the evidence relating

26  to Buscher was erroneous, its exclusion did not have a substantial and injurious effect or influence

27  on the verdict. *Brecht v. Abrahamson*, 507 U.S. at 637; *Fry v. Pliler*, 127 S. Ct. at 2325-27. As

28  detailed in our statement of facts, the evidence against petitioner was overwhelming.

1          Petitioner confessed to his girlfriend Danette Arbuckle (RT 1561-1570, 1576, 1718-1722),

2 and to her younger brother, Shelby Arbuckle, who had no motive to lie, particularly given that

3 Shelby had no interaction with petitioner for seventeen years. (RT 908-909, 911, 913-919.) Indeed,

4 petitioner revealed details of the murder to Shelby that had not yet been reported by the press. (RT

5 913-919.) Similarly, petitioner's friend Troy Tibbils, who also had no motive to lie, spoke with

6 petitioner the morning of the murder in order to purchase marijuana from petitioner, and petitioner

7 informed Tibbils that he was going over to Marlin's house to buy the marijuana shortly. When

8 Tibbils returned for the marijuana, petitioner indicated he had purchased it from Marlon that

9 morning, which was in direct contradiction to petitioner's claims to the police that he had not seen

10 Marlon. (RT 1429-1433, 1441-1445.) Bernard Wesley described how petitioner tried to recruit him

11 to help burglarize Marlon's home for drugs and money. During his recruitment pitch, petitioner laid

12 out his plan for burglary which was exactly the plan that the murderer used in breaking into Marlon's

13 home. (RT 1047-1048, 1050-1052, 1054-1055.)

14          Shelby described how petitioner suddenly had more cash after the murder, and petitioner's

15 friend Nicole DiFlavio confirmed petitioner's sudden wealth. (RT 920-921, 1489-1491.) Sam

16 Barnett described how petitioner, who was just a small time dealer, tried to place a very large order

17 to purchase $550 of marijuana from Sam the day after Marlon's murder. (RT 1013-1015, 1018-

18 1019.) Petitioner subsequently fled the area when the police began to focus on him as a suspect.

19 (RT 922-923, 985-986, 1493-1494, 1557-1559, 1588-1589, 1591.)

20          By contrast, the evidence relating to Buscher was of minimal significance. As the

21 prosecution reported, both Buscher and William Wall, the only two witnesses to the conversation

22 at the party would have denied that Buscher made any admission to the murder. The circumstances

23 of the alleged adoptive admission were highly ambiguous and equivocal at best. Petitioner's theory

24 that Buscher was outside Marlon's house was completely undercut by the fact that Kirk Hill knew

25 Buscher, and he told police the man in the green army jacket was a stranger, not Buscher. Similarly,

26 Shannon Murphy described the man who entered his home as a confused homeless person. This

27 evidence would not have had any effect on the outcome of the trial.

28          Finally, the court allowed petitioner to introduce much more directly connected third-party-

1    culpability evidence with respect to Geoffrey Caplan and Bernard Wesley, which the jury plainly

2    rejected in light of the abundant evidence of petitioner's guilt. As the trial court noted at sentencing,

3    "Mr. Leon, as to your statements about that you're an innocent person, I respectfully disagree. I

4    think the jury found you guilty because the evidence against you was, in my humble opinion,

5    overwhelming." RT 2822; *see also* Pet. Exh. A at 30-31 (finding no prejudice in light of evidence

6    of guilt).

7           Given the overwhelming nature of the evidence, and the minimal significance of the

8    excluded third-party-culpability evidence, it cannot reasonably be said that the excluded evidence

9    had a substantial and injurious effect or influence in determining the jury's verdict. *Brecht v.*

10   *Abrahamson*, 507 U.S. 63.

11

12                                              **III.**

13   **THE TRIAL COURT'S REMOVAL OF A BIASED JUROR WHO LIED**
     **DURING VOIR DIRE WAS NOT UNREASONABLE**
14

15          Petitioner next contends that his constitutional rights were violated by the removal of a

16   biased juror during deliberations. He asserts the state court's rejection of his constitutional claim

17   was objectively unreasonable. Petitioner's claim is meritless.

18   **A.    Factual Background**

19          During deliberations, several jurors jointly sent the court a note raising concerns about

20   Juror No. 6. The note, which was signed by Jurors 1, 3, 4, 5, 9, 11, and 12, provided,

21          Your Honor,

22          The undersigned jurors below are concerned with the unwillingness of one of the
            jurors, Juror #6, to participate in the process of evaluating and examining the evidence in
23          this case. This juror has expressed negative bias based on his personal experience. This
            experience has caused him to disregard all police testimony. He has had personal
24          experience with violence, guns and corrupt police and has informed us that we are naive
            about the police. In addition, he believes all of the witnesses were lying and has thus
25          disregarded all testimony. Based on his comments and behavior, it appears to us that he
            does not understand, respect or accept our legal system.
26
            We feel that he may have misrepresented himself . . . during jury selection. We
27          would appreciate your advice or additional jury instructions in this matter.

28   (CT 1631.)

Points and Authorities in Support of Answer - C 07-5719 CRB .

44

1    The court indicated that it was concerned about the allegation that Juror No. 6 may have

2    withheld information about his experiences with the police during voir dire and that he was biased.

3    (RT 2730.) The court conducted a hearing in which it questioned each juror individually.

4    First, the court questioned Juror No. 6. The court read Juror No. 6 the note and asked for

5    his side of the story. (RT 2731.) Juror No. 6 denied harboring any negative views of or bias against

6    police officers. He denied any negative experiences with law enforcement. He asserted that he

7    merely expressed his view that the investigators had not done a good enough job in this case, and

8    claimed that the note arose from a personal disagreement with one of the jurors. (RT 2731-2732.)

9    He also claimed not to have had any personal experience with violence, guns, or corrupt officers.

10   (RT 2732.)

11   The court then questioned the other 11 jurors individually. Jurors Nos. 1, 3, 4, 5, 9, and

12   11, reported that Juror No. 6 stated that he had extensive knowledge of the police from personal

13   experience growing up in a tough neighborhood, and he knew that all police officers are dishonest,

14   trained to lie, and cannot be believed. (RT 2734, 2738, 2739, 2740, 2743, 2745.) Juror No. 7 said

15   Juror No. 6 acknowledged that "he had problems with the law enforcement belief." (RT 2741.)

16   Juror No. 5 characterized Juror No. 6 as "very biased." (RT 2740.) Juror No. 12 could not remember

17   exactly what Juror No. 6 had said, but explained that Juror No. 6 "was very negative on the law

18   enforcement and didn't really like 'em." (RT 2747.)

19   Jurors Nos. 1, 2, 3, 11, and 12, testified that Juror No. 6 recounted a specific experience

20   from his past when he saw a friend get shot in the stomach when "he" was 13 years old.[23/] (RT 2734,

21   2737, 2738, 2745, 2747.) Juror No. 8 did not mention that specific story, but recalled that Juror No.

22   6 reported he had been raised in a difficult part of San Jose and had experience with shootings and

23   stabbings. (RT 2742.) Juror No. 9 testified that Juror No. 6 had bad experiences in the past. (RT

24   2743.) Jurors Nos. 4 and 5 reported that Juror No. 6 often intimated that the other jurors had not

25   seen the things he had seen growing up in a troubled neighborhood. (RT 2739, 2740.)

26   _____

27   23. It was not clear from the testimony if "he" referred to Juror No. 6 as being 13 at the time
he saw the shooting, or his friend being 13 at the time. Even the jurors were not certain. (See RT

28   2747.)

Points and Authorities in Support of Answer - C 07-5719 CRB

1    Only Juror No. 10 did not report Juror No. 6 was biased, stating instead that he simply did

2    not take Juror No. 6's comments the way the rest of the jurors did. (RT 2744.)

3    After receiving this testimony, the court called Juror No. 6 back in and asked about the

4    incident involving the shooting of a friend. Juror No. 6 denied ever seeing any friend shot in the

5    stomach and he expressly denied ever telling any of the jurors that he saw a friend shot in the

6    stomach. (RT 2748 ["The Court: You never made that statement? Juror Number Six: Never."].)

7    The court also informed Juror No. 6 that it had obtained his rap sheet and asked about his

8    numerous prior arrests and arraignments. (RT 2749.) The juror claimed that those were his mistakes

9    and he harbored no animus against the police. (RT 2749.)[24]

10   The court next reviewed Juror No. 6's responses to voir dire. During voir dire, both parties

11   extensively questioned the first panel of prospective jurors on their views of the police generally, and

12   whether the jurors harbored any beliefs about whether the police were more or less trustworthy than

13   civilian witnesses. (ART 51-58, 91-94.) For example, the first panel of prospective jurors was

14   asked: "Does anybody think that police are always totally objective or are totally biased on one side

15   or the other?" (ART 55.) Similar questions were asked of later prospective jurors. (*See, e.g.*, ART

16   119.)

17   The court questioned other prospective jurors by asking, "[I]f the court instructs you to

18   weigh the credibility of witnesses equally; do not prejudge somebody just by the fact that they are

19   a police officer or the person is the accused, I assume you can do that as well, correct?" (ART 115.)

20   As the parties progressed through the available prospective jurors in the venire, the court

21   and parties frequently asked if the prospective jurors had anything to add based on the prior

22   questioning they had heard of other jurors. (*See, e.g.*, ART 113, 119.)

23   When Juror No. 6 was seated, the court asked: "Can you think of any reason why you

24   cannot be fair?" (ART 175.) Juror No. 6 replied, "No." When the prosecution questioned Juror No.

25

---

26   24. Juror No. 6's rap sheet showed numerous arrests for misdemeanors and infractions,
27   including a misdemeanor conviction for Cal. Penal Code section 148 (resisting or obstructing an
     officer). (ACT 6 [Court Exh. I at 6].) The court noted Juror No. 6 had been "booked" 29 times. (RT
28   2759.)

1  6, the prosecution referred back to the earlier exchanges with previous jurors and asked Juror No.

2  6 if any of those prior questions raised any questions or issues.

3      [Prosecution]: When I asked the earlier questions about particularly good or bad experiences with law enforcement, about the victim's background, dealing drugs, and the

4  other questions about being able to weigh the evidence at the end of trial, any questions that were outstanding, is there anything that came to mind?

5      Juror No. 6: No.

6  

7      [Prosecution]: Nothing at all?

    Juror No. 6: No.

8  

9  (ART 177.)

10      After considering the testimony and voir dire statements, the court made a credibility

11  determination that Juror No. 6 had lied and was biased against police officers. The court found:

12      [I]t's this court's opinion that Juror Number Six was not truthful on voir dire about his background or bias against police officers.

13      And that in assessing credibility the court in this situation finds that this Juror Number Six lacks credibility. I disbelieve his denial that he never saw anything with a

14  thirteen year old friend being shot. And that I cannot believe that other jurors would fabricate that statement.

15      So I feel, based upon the evidence presented to the court, that this is a demonstrable reality that this juror has lied under oath and was not truthful regarding his bias about

16  police officers.

17  (RT 2759-2760.)

18      The court then dismissed Juror No. 6 and seated an alternate. (RT 2760-2761.) The

19  defense subsequently filed a new trial motion challenging the removal of Juror No. 6, and included

20  a declaration from Juror No. 6, in which among other things, he repeated his assertion that he never

21  said anything about the shooting of his 13 year old friend, and disclaimed any bias against the police.

22  (CT 1777-1780.)

23      The court first clarified its earlier ruling, explaining that it did not remove Juror No. 6 for

24  failing to deliberate. (RT 2780.) The court explained that it did not get into the issue of failure to

25  deliberate. Rather, the court removed the juror for misconduct based on his bias and lying to the

26  court. (RT 2780 ["I want to make it perfectly clear . . . that Juror No. 6. was removed for

27  misconduct, not for a failure to deliberate."].)

28      After listening to argument by both sides, the court denied the motion. With respect to

1    Juror No. 6's declaration, the court explained:

2         I'll simply say that I had to determine his credibility at the time when I had the hearing.
     He was not believable, and his credibility on this [declaration] is also not believable.
3         He's asking the court, if you will, to consider the fact that this was a conspiracy by
     eight jurors to remove him because of his attitude toward law enforcement. That was not
4    my impression.

5    (RT 2794; *see also* RT 2795 [same].) The court explained that it conducted the hearing to determine

6    whether Juror No. 6 was biased, and concluded he was. (RT 2795.) The court therefore denied the

7    new trial motion. (RT 2811.)

8    **B.    The State Court's Ruling Was Not Unreasonable**

9         The California Court of Appeal denied petitioner's challenge explaining that trial court did

10   not abuse its discretion in removing the juror for actual bias and for intentional misrepresentation

11   to the trial court during voir dire and during the hearing on juror bias. The court explained:

12        Under Penal Code section 1089, a court may remove a juror for good cause if it finds
     a "demonstrable reality" that the juror is unable to perform his or her duty.[25/] (*People v.*
13   *Cleveland* (2001) 25 Cal.4th 466, 474.) A finding that a juror harbors an actual bias and
     concealed it during voir dire constitutes good cause to remove that juror. (*Id.* at p. 478,
14   106 Cal.Rptr.2d 313, 21 P.3d 1225;*People v. Keenan* (1988) 46 Cal.3d 478, 532; e.g.,
     *People v. Thomas* (1990) 218 Cal.App.3d 1477, 1482-1485; *People v. Feagin* (1995) 34
15   Cal.App.4th 1427, 1437.)

16        On appeal, we review a decision to remove a juror for abuse of discretion: If there is
     any substantial evidence to support the decision, we will uphold it. (*People v. Samuels*
17   (2005) 36 Cal.4th 96, 131-132.)

18        Here, the testimony of other jurors supports the court's findings that Juror No. 6
     lacked credibility, had lied during voir dire about not having negative experiences of the
19   police and a bias that would prevent him from being fair and impartial, and later lied again
     to the court about not making certain statements during deliberations.

20
21        Defendant argues that the statements attributed to Juror No. 6 merely reflect his
     personal experience, which jurors are allowed to bring to bear during deliberations.
     However, his statement that he thought all police were dishonest and trained to lie reflects
22

23        25.    Penal Code section 1089 provides in pertinent part, "If at any time,
24        whether before or after the final submission of the case to the jury, a
          juror dies or becomes ill, or upon other good cause shown to the court
25        is found to be unable to perform his or her duty, or if a juror requests
          a discharge and good cause appears therefor, the court may order the
26        juror to be discharged and draw the name of an alternate, who shall
          then take a place in the jury box, and be subject to the same rules and
27        regulations as though the alternate juror had been selected as one of
          the original jurors."
28

Points and Authorities in Support of Answer - C 07-5719 CRB

1   actual bias and an inability to be fair and impartial that is sufficient by itself to support a
    discharge. This is especially so because Juror No. 6 concealed his views concerning
2   police during voir dire. Moreover, the trial court was not obliged to believe either his
    denial about making the statements attributed to him or his assurance that he harbored no
3   hard feelings toward police. Last, we find defendant's reliance on *People v. San Nicolas*
    (2004) 34 Cal.4th 614, *People v. Kelly* (1986) 185 Cal.App.3d 118, *People v. Jackson*
4   (1985) 168 Cal.App.3d 700, and *Sanders v. Lamarque* (9th Cir.2004) 357 F.3d 943 to be
    misplaced. Those cases are distinguishable and do not convince us that the court here
5   abused its discretion.

6   Pet. Exh. A at 34-35.

7          California law on removal of a sitting juror for cause is governed by California Penal Code

8   section 1089. A trial court has good cause under section 1089 to remove a juror if the record reflects

9   a "demonstrable reality" that the juror is unable to perform his or her duty. *People v. Williams*, 25

10  Cal. 4th 441, 447-48 (2001). A juror who demonstrates an "actual bias" that would have supported

11  a challenge for cause is unable to perform his or her duty and is subject to discharge and substitution.

12  *People v. Cleveland*, 25 Cal. 4th 466, 478 (2001). "Actual bias" is "'the existence of a state of mind

13  . . . which will prevent the juror from acting with entire impartiality, and without prejudice to the

14  substantial rights of any party.'" *People v. Nesler*, 16 Cal. 4th 561, 581 (1997). "An impartial juror

15  is someone 'capable and willing to decide the case solely on the evidence' presented at trial." *Id.*

16  A juror is not impartial if he has "strong and deep impressions which close the mind against the

17  testimony that may be offered in opposition to them." *Id.* (internal quotation marks omitted). Even

18  if a juror claims he can be impartial, he may be properly discharged "'if there are so many factors

19  weighing against this possibility, that neither he, nor any other person similarly situated, could render

20  a fair and unbiased decision.'" *People v. Tomzas*, 26 Cal. App. 4th 1328, 1485 (1994).

21         Actual bias sufficient to establish good cause includes a preexisting belief that all police

22  officers are liars or dishonest. *People v. Barnwell*, 41 Cal. 4th 1038, 1051 (2007) ("Specifically, a

23  bias against law enforcement officers that renders a juror unable to fairly weigh police testimony is

24  grounds for the juror's replacement."); *People v. Thomas*, 218 Cal. App. 3d 1477, 1485 (1990);

25  *People v. Feagin*, 34 Cal. App. 4th 1427, 1437 (1995). "Bias may be established by the testimony

26  of other jurors." *People v. Barnwell*, 41 Cal. 4th at 1051.

27         California law applicable to the removal of a sitting juror for good cause under section

28  1089 is constitutional. *Miller v. Stagner*, 757 F.2d 988, 995 (9th Cir.), *amended*, 768 F.2d 1090

1    (1985). Accordingly, the only issue on federal habeas is the existence of good cause for the removal.

2    *Perez v. Marshall*, 119 F.3d 1422, 1426 (9th Cir. 1997). State court findings on the question of juror

3    bias are entitled to a presumption of correctness, and petitioner bears the burden of rebutting them

4    by clear and convincing evidence. *Id.*; *Sanders v. Lamarque*, 357 F.3d 943, 948 (9th Cir. 2004).

5            Here, the trial court was obligated under state law to hold a hearing on the issue once it

6    was raised by the jurors' note raising a claim of bias. *People v. Barnwell*, 41 Cal. 4th at 1054. The

7    trial held an evidentiary hearing on the matter and heard accounts of Juror No. 6's bias against police

8    officers from the other jurors and expressly credited those accounts over the denials of Juror No. 6,

9    making factual findings that Juror No. 6 harbored actual bias against the police and was not credible

10   in his denials.

11           Petitioner begins his challenge by arguing that "the trial court's finding, adopted by the

12   California Court of Appeal that Juror 6's comments that police were dishonest, that he had grown

13   up in a tough neighborhood and one of his friends had been shot in the stomach constituted actual

14   and impermissible bias against law enforcement that would render him unable to be fair and

15   impartial was not supported by clear and convincing evidence." (Pet. at 58.) Petitioner's argument

16   fundamentally misconceives the standard of review on federal habeas. The federal court does not

17   review the state court's findings to see if those findings are supported by clear and convincing

18   evidence. Rather, the this Court must presume the state court's findings are correct unless and until

19   such findings are rebutted by petitioner by clear and convincing evidence. 28 U.S.C. § 2254(e)(1);

20   *see Marshall v. Lonberger*, 459 U.S. at 431-36; *Sumner v. Mata*, 449 U.S. at 546-47. Petitioner has

21   not met that burden here.

22           Petitioner offers nothing new by way of evidence. He does nothing more than ask this

23   Court to reevaluate the factual findings made, based on the same evidence heard by the state court,

24   and reach a different conclusion. Petitioner's claims are unavailing. Petitioner asserts that the

25   testimony by the other jurors revealing that Juror No. 6 told them his view that all officers are liars

26   and trained to lie and corrupt was nothing more than a legitimate comment on the evidence.

27   Petitioner points to testimony of one of the officers regarding standard interview tactics, which

28   includes lying to suspects. (Pet. at 57-58.) This creative interpretation of the statements, however,

1    is directly undercut by the fact that the other jurors recounted that Juror No. 6 tied his assertions

2    regarding police being liars to his own personal experiences growing up and dealing with the police.

3    (*See* RT 2734 ["He looked at us and said you all don't know the police like we do. . . . [He] saw . . .

4    a friend shot in the stomach when he was thirteen years old.  You all didn't grow up in the

5    neighborhood that I grew up in.  And that he thought police were trained to mislead or lie . . . ."]; RT

6    2738 ["He basically said they are all trained to lie and he's had some bad experiences with a friend

7    being shot in the stomach, this had been a while back but, you know, I just feel like he brought the

8    bias with him into this trial . . . ."]; RT 2739 ["He's made a couple of inferences about you don't

9    understand.  You haven't seen the things that I've seen throughout my lifetime.  You haven't seen

10    the way police act.  Probably the biggest thing that struck me was a direct comment that he said is,

11    and this is a direct quote, he said as far as I'm concerned all police are trained liars."]; RT 2740

12    ["[H]e's said . . . he didn't believe anything that police said . . . .  And I said it sounds like you have

13    had experience, he said yes, I have had a lot of experience with police."]; RT 2741 [noting Juror No.

14    6 mentioned during break his "problems" "with the law enforcement belief" based on problems with

15    police in the past]; RT 2743 [recounting Juror No. 6 "said [the police] are dishonest, they are liars,

16    you can't believe anything that anyone tells you," and noting he acknowledged his views stemmed

17    from "bad experiences" in the past]; RT 2745 ["Um, he said that all police are liars, and he grew up

18    with police in his neighborhood all the time, and we – none of us, we're all naive, we don't know

19    how police operate.  He also expressed that one of his friends was shot in the stomach and has

20    problems with guns."]; RT 2747 ["[H]e was very negative on the law enforcement and he didn't

21    really like 'em. . . .  He said when he was younger . . . one of his friends got shot but he didn't

22    actually say if it was from a police officer or if it was from another person."].)  The trial court

23    properly found that Juror No. 6 was biased against the police because of past negative experiences

24    and was not simply basing decisions on witness testimony.  Petitioner has not proven that the court's

25    factual finding was incorrect by clear and convincing evidence.

26          Petitioner next asserts that it is proper for jurors to bring their own life experiences into

27    the jury room.  (Pet. at 60.)  However, as detailed above, jurors may not bring their personal biases

28    into the jury room, and may not conceal those biases during voir dire.  *People v. Barnwell*, 41 Cal.

1     4th at 1051; *People v. Thomas*, 218 Cal. App. 3d at 1485.

2           Petitioner also asserts that the state court failed to give sufficient credit to the fact that

3 Juror No. 6 was a lone holdout when evaluating that juror's credibility. Pet. at 60-61. This claim

4 is belied by the record. The court expressly did not inquire about the numerical breakdown of the

5 jury with respect to their deliberations and questioned all jurors without any knowledge of their

6 alignment. (RT 2722-2748.)

7           The court first asked Juror No. 6 to comment on the jurors' note. He denied any bias or

8 any negative experience with law enforcement, and denied any personal experience with bad police.

9 (RT 2731-2733.) The court then questioned the other jurors and received numerous reports of Juror

10 No. 6 describing negative experiences and specifically relating an incident in which a friend was shot

11 in the stomach when he was 13. (RT 2734-2747.) The court then called Juror No. 6 back and asked

12 him about that incident in light of the consistent recounting of that incident by the other jurors. Juror

13 No. 6 denied ever saying that and denied any knowledge of such an incident. (RT 2748 [Asserting,

14 "I don't know anyone who got shot in the stomach," and "But I do not have any, I do not know of

15 anyone who's been shot in the stomach, and I've never made that comment before."].) It was only

16 after the court pointed out that his claim was contrary to the reports of nearly all the jurors that Juror

17 No. 6 intimated that the other jurors were making misrepresentations because they were mad at him

18 because it was already eleven to one, and he was the one. (RT 2749.) The court responded to this

19 unsolicited information, "Well, I don't – I'm not asking that, and I can't – don't care about that, you

20 know in regards to this motion." (RT 2749.) Thus, the trial court made it clear that the fact that

21 Juror No. 6 may have been a holdout was not relevant to its consideration of the claim of bias and

22 would not be a factor in its decision to remove him. *Accord Perez v. Marshall*, 119 F.3d at 1426

23 ["The fact that the trial judge knew that Robles was the sole juror holding out for an acquittal when

24 he dismissed her does not invalidate his decision to excuse her from jury service," where "'[n]othing

25 in the record indicates that the trial court's discretion was clouded by the desire to have an

26 unanimous guilty verdict.'"].) Indeed, the trial court made it clear that it found that Juror No. 6 had

27 lied to the court in making his denials, crediting the other jurors who testified to the contrary. (RT

28 2754-55.) The court asked of defense counsel, "Do you think all those other jurors fabricated the

Points and Authorities in Support of Answer - C 07-5719 CRB

1  incident of someone being shot in the stomach at thirteen?" (RT 2752.) The court ultimately found,

2  "[I]n assessing credibility the court in this situation finds that this Juror number six lacks credibility.

3  I disbelieve his denial that he never saw anything with a thirteen year old friend being shot. And that

4  I cannot believe that other jurors would fabricate that statement. So I feel, based upon the evidence

5  presented to the court, that this is a demonstrable reality that this juror has lied under oath and was

6  not truthful regarding his bias about police officers." (RT 2759-60.) Given the state of the record,

7  petitioner has not and cannot rebut the court's factual findings by clear and convincing evidence.

8      The trial court also found Juror No. 6 lied during voir dire in disclaiming any negative

9  experiences with law enforcement. Intentional concealment during voir dire also constitutes good

10  cause for removal under California Penal Code section 1089. *People v. San Nicolas*, 34 Cal. 4th

11  614, 644 (2004). Petitioner counters that, at worst, Juror No. 6 was not completely forthcoming

12  during voir dire, and likens this case to *Sanders v. Lamarque*, 357 F.3d 943. (Pet. at 62.) This case

13  is nothing like *Sanders*.

14      Here the trial court made a factual finding that the juror intentionally concealed his bias.

15  As detailed above, the prospective jurors were asked numerous and repeated questions about their

16  views of police officers and whether they had any preconceived ideas about the veracity of officers

17  compared to other non-officer witnesses. The prospective jurors were also asked about whether their

18  life experiences impacted their ability to be fair in evaluating police officer testimony or evaluating

19  the evidence in this case. (*See, e.g.*, ART 51-58, 91-94, 113, 115, 119.)

20      Juror No. 6 was part of the venire during the jury selection process and therefore was

21  present for all of these discussions. He was one of the last jurors seated. (ART 174.) Long before

22  Juror No. 6 was seated, the court and the parties began expediting the voir dire process by referring

23  to the earlier questions asked of prospective jurors and asking newly seated jurors if they had

24  anything to add about their ability to be fair in light of those earlier questions. (*See, e.g.*, ART 113,

25  119.)

26      Indeed, the court explained to prospective jurors at the outset: "If for some reason there

27  is something that troubles you about being a juror and we don't ask that juror, I would ask you to

28  volunteer, you know, raise your hand, you know, oh, you may want to know this or I may have a

Points and Authorities in Support of Answer - C 07-5719 CRB

1  problem with that, if that's the case." (ART 39.) In other words, the court informed the prospective

2  jurors of their affirmative obligation to volunteer information about any potential problems that may

3  come to mind as a result of questioning they hear which was directed to another prospective juror.

4         It was against this backdrop that the court asked Juror No. 6: "Can you think of any reason

5  why you cannot be fair?" (ART 175.) Juror No. 6 replied, "No." Similarly, the prosecution referred

6  back to the earlier exchanges with previous jurors and asked Juror No. 6 if any of those prior

7  questions raised any questions or issues.

8         [Prosecution]: When I asked the earlier questions about particularly good or bad
           experiences with law enforcement, about the victim's background, dealing drugs, and the
9          other questions about being able to weigh the evidence at the end of trial, any questions
           that were outstanding, is there anything that came to mind?
10
           Juror No. 6: No.
11
           [Prosecution]: Nothing at all?
12
           Juror No. 6: No.
13

14  (ART 177.)

15         Based on the full hearing it conducted at the end of the case, the court made a factual

16  finding that Juror No. 6, had a pre-existing and severe bias against law enforcement officers.

17  Specifically, the court concluded that Juror No. 6 had affirmatively lied to the court about his

18  comments during deliberations and about his bias, and concluded that Juror No. 6 had affirmatively

19  withheld his biased views during voir dire.

20         Petitioner counters that the prosecutor's question was ambiguous, and therefore Juror No.

21  6's failure to reveal his views of law enforcement was an unintentional omission. Petitioner's claim

22  is contrary to the record. First, the prosecutor's question was not ambiguous when viewed in the

23  context of the extensive voir dire already conducted of other jurors on this very point. (ART 51-58,

24  91-94.) Indeed, defense counsel had already expressly asked of the first venire panel seated, "Does

25  anybody think that police officer [sic] are always totally objective or always are totally biased on one

26  side or another?" (ART 55.) Similarly, the prosecutor asked: "I just wanted to get attitudes about

27  law enforcement, and if there were any strong attitudes about the way the police conduct

28  investigations. [¶] Before I move on, is there anything else, on that subject, generally anyone that

1 | thinks it might affect their judgment?" (ART 94.)

2 | Consequently, when the court's admonition to volunteer information on such topics is

3 | combined with the very explicit questions asked of the first prospective panel seated, the remaining

4 | prospective juror could have harbored no doubt that his or her preexisting beliefs as to the veracity

5 | of law enforcement officers was a serious concern of the court and parties and was directly

6 | referenced in the prosecutor's question. At that point, Juror No. 6 had an obligation to reveal his

7 | views that police officers are trained liars who could never be believed in any case.

8 | More importantly, the trial court's question, asking if there was any reason Juror No. 6

9 | could not be fair, was not ambiguous in any way. A preexisting belief that police officers cannot be

10 | believed is necessarily a reason why he could not be fair to the prosecution. Indeed, the court

11 | expressly indicated to the venire that they must not "prejudge somebody just by the fact that they are

12 | a police officer or the person is the accused" when clarifying a question posed by defense counsel

13 | as to whether a prospective juror could follow such an instruction. (ART 115.) Moreover, Juror No.

14 | 6 was well aware that "be[ing] fair" meant being "completely fair and impartial to both sides." (See

15 | ART 113.)

16 | This case is nothing like *Sanders* in which the juror did not report any connection to the

17 | neighborhood of the incident because she had not lived in that neighborhood for 25 years and did

18 | not realize the question called for such outdated information. *Sanders v. Lamarque*, 357 F.3d at 947,

19 | 949. The record showed clearly that she did not affirmatively withhold any information or bias and

20 | was quite forthcoming during voir dire. *Id.* By contrast, petitioner's case did not involve an

21 | innocent omission. As detailed above, the court and parties asked detailed and pointed questions

22 | designed to elicit bias, which Juror No. 6 expressly disclaimed. He then actively revealed that bias

23 | during deliberations. The court therefore found willful concealment on voir dire. Petitioner has not

24 | rebutted the state court's finding by clear and convincing evidence.

25 | Given the state court's findings of actual bias and willful concealment during voir dire,

26 | the court's decision to remove the juror was not an unreasonable application of Supreme Court

27 | precedent.

28 |

1

### IV.

2    **PETITIONER'S CLAIM OF INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL IS MERITLESS**

3

4          In his last claim, petitioner asserts that the state court's denial of his claim of ineffective

5    assistance of appellate counsel was unreasonable.  Petitioner's claim is without merit.

6    **A.   Standard Of Review**

7          It is well settled that a defendant has a right to counsel on first appeal and that this

8    appellate counsel must provide effective assistance.  *Jones v. Barnes*, 463 U.S. 745, 751 (1983).  A

9    claim of ineffective assistance of trial counsel has two components.  First, petitioner must show that

10   counsel's performance was deficient.  Specifically, he must establish that counsel's representation

11   fell below an objective standard of reasonableness under prevailing professional norms.  *Strickland*

12   *v. Washington*, 466 U.S. 668, 687-88 (1984).  Second, petitioner must establish prejudice before he

13   can obtain relief on his ineffective-assistance claim.  It is not enough for petitioner to show that the

14   errors had some conceivable effect on the outcome of the proceeding.  He must show that there is

15   a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

16   would have been different.  A reasonable probability is a probability sufficient to undermine

17   confidence in the outcome.  *Id.* at 693-94.

18          In considering the first prong of the test, the reviewing court "must indulge a strong

19   presumption that counsel's conduct falls within the wide range of reasonable professional

20   assistance."  *Strickland*, 466 U.S. at 689.  "Representation is an art, and an act or omission that is

21   unprofessional in one case may be sound or even brilliant in another."  *Id.* at 693.  Thus, "the test

22   is not whether another lawyer, with the benefit of hindsight, would have acted differently, but

23   whether 'counsel made errors so serious that counsel was not functioning as the "counsel"

24   guaranteed the defendant by the Sixth Amendment.'"  *Babbit v. Calderon*, 151 F.3d 1170, 1173 (9th

25   Cir. 1998) (quoting *Strickland* at 687, 689).  "The relevant inquiry under *Strickland* is not what

26   defense counsel could have pursued, but rather whether the choices made by defense counsel were

27   reasonable."  *Siripongs v. Calderon*, 133 F.3d 732, 736 (9th Cir. 1998).  "*Strickland* does not

28   mandate prescience, only objectively reasonable advice under prevailing professional norms."

Points and Authorities in Support of Answer - C 07-5719 CRB

1   *Sophanthavong v. Palmateer*, 378 F.3d 859, 870 (9th Cir. 2004). The petitioner also "must

2   overcome the presumption that, under the circumstances, the challenged action 'might be considered

3   sound trial strategy.'" *Id.* at 689. Strategic decisions by counsel are "virtually unchallengeable."

4   *Id.* at 690. As to the second prong, a "reasonable probability" is "a probability sufficient to

5   undermine confidence in the outcome." *Id.* at 694. In order to prevail the petitioner must

6   "affirmatively prove prejudice." *Id.* at 693. The reviewing court need not assess counsel's

7   performance where it is clear that petitioner cannot show the requisite prejudice. *Id.* at 697; *Williams*

8   *v. Calderon*, 52 F.3d 1465, 1470 n.3 (9th Cir. 1995).

9         Further, for petitioner to succeed, "he must do more than show that he would have satisfied

10   *Strickland*'s test if his claim were being analyzed in the first instance, because under § 2254(d)(1),

11   it is not enough to convince a federal habeas court that, in its independent judgment, the state-court

12   decision applied *Strickland* incorrectly." *Bell v. Cone*, 535 U.S. 685, 698-699 (2002). Rather,

13   petitioner must show that the state court applied *Strickland* to the facts of his case in an objectively

14   unreasonable manner. *Id.* Thus, federal habeas review of a claim of ineffective assistance is "doubly

15   deferential." *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003) (per curiam); *Edwards v. Lamarque*, 475

16   F.3d 1121, 1126 (9th Cir. 2007) (en banc) ("Because this case involves a claim of ineffective

17   assistance of counsel, there is an additional layer of deference to the choices of trial counsel.").

18         As with claims of ineffective assistance of trial counsel, claims of ineffective assistance

19   of counsel on appeal are governed by the standards set out in *Strickland v. Washington*, 466 U.S. at

20   692, which requires a showing of both deficient representation and actual prejudice. *Smith v.*

21   *Murray*, 477 U.S. 527, 535-36 (1986). The Supreme Court has made it clear that the Sixth

22   Amendment right to effective assistance of appellate counsel does not require that counsel raise all

23   arguable claims on appeal. *Jones v. Barnes,* 463 U.S. at 751-54. As the Court explained in *Smith*

24   *v. Murray,* 477 U.S. at 536, "Th[e] process of 'winnowing out weaker arguments on appeal and

25   focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark

26   of effective appellate advocacy." *See also Burger v. Kemp*, 483 U.S. 778, 784 (1987) (same); *Jones*

27   *v. Barnes,* 463 U.S. at 751-53 (same); *accord Miller v. Keeney*, 882 F.2d 1428, 1433-34 (9th Cir.

28   1989) ("the weeding out of weaker issues is widely recognized as one of the hallmarks of effective

1   appellate advocacy"). Thus, "it is still possible to bring a *Strickland* claim based on [appellate]

2   counsel's failure to raise a particular claim, but it is difficult to demonstrate that counsel was

3   incompetent." *Smith v. Robbins*, 528 U.S. 259, 288 (2000).

4   **B.   The State Court Reasonably Rejected Petitioner's Claim Of Ineffective Assistance**

5   Petitioner contends appellate counsel was ineffective for failing to raise on appeal a claim

6   that the trial court erred in refusing to allow expert testimony on the subject of police coerced

7   statements by witnesses. (Pet. at 66-68.) Petitioner's claim relates to the interview of petitioner's

8   father, Michael Leon. Specifically, when Mr. Leon, was interviewed by the police in 2000, he stated

9   that recalled his son saying something about the murder being self-defense, but without going into

10  any details. (CT 1308-1310.) Mr. Leon recanted his statements to the police at trial. (RT 1799-

11  1801.) Petitioner argues that expert testimony was necessary to bolster his claim that the police

12  improperly coerced his father into making an incriminating statement about him. Petitioner contends

13  appellate counsel was constitutionally deficient for not challenging on appeal the trial court's

14  exclusion of the proposed expert testimony. Petitioner's claim of ineffective assistance of appellate

15  counsel is specious and was properly rejected by the state court on state habeas.

16  As petitioner concedes, at the time appellate counsel filed her opening brief, the law in

17  California on the propriety of exclusion of such expert testimony was, at best, unsettled (Pet. at 69-

18  70), if not wholly unfavorable to petitioner's claim. Two cases referred to the admission of such

19  testimony, *People v. Son*, 79 Cal. App. 4th 224, 240-241 (2000), and *People v. Page*, 2 Cal. App.

20  4th 161, 184-89 (1991).

21  In *Son*, the trial court excluded identical expert testimony offered by the very same expert

22  proposed originally tendered in petitioner's case, Dr. Ofshe. *Son* upheld the trial court's ruling.

23  *People v. Son*, 79 Cal. App. 4th at 240-41. *Son* explained that the admissibility of such expert

24  testimony on police tactics in obtaining statements falls within the broad discretion of the trial court,

25  and the trial court does not abuse its discretion when excluding such evidence, particularly where

26  there was no evidence that police engaged in tactics to wear down the subject of the questioning into

27  making a false statement. *Id.* The holding in *Son* is directly on point and posed a substantial hurdle

28  for appellate counsel to have to overcome in pursuing the issue on appeal.

1        The other case mentioning such expert testimony was *Page*. However, contrary to

2   petitioner's assertion, *Page* provided no direct support his legal claim. In *Page*, the defendant

3   offered expert testimony on three areas: "(1) the general psychological factors which might lead to

4   an unreliable confession, along with descriptions of the supporting experiments; (2) the particular

5   evidence in Page's taped statements which indicated that those psychological factors were present

6   in this case; and (3) the reliability of Page's confession, given the overall method of interrogation."

7   *People v. Page*, 2 Cal. App. 4th at 183. The trial court precluded testimony on the second and third

8   areas, and permitted it only on the first. The issue on appeal was whether the trial court erred in

9   precluding the expert testimony on the second and third grounds. *Page* ruled the trial court did not

10  err in limiting the scope of the testimony. *Id.* at 185-189. Notably, the People did not cross appeal

11  on the admission of the expert testimony on the first ground. Thus, the *Page* court was *not* called

12  upon to decide the legal issue of the admissibility of such expert testimony on the first ground, and

13  it necessarily did not reach that question which was never presented. Consequently, the discussion

14  in *Page* provides no legal authority for petitioner's claim.[26]

15        Given this legal landscape, petitioner's claim of ineffective assistance of counsel is devoid

16  of merit. First, appellate counsel was well aware of the prevailing law in California upholding the

17  exclusion of such expert testimony. Appellate counsel provided petitioner with a declaration

18  explaining her tactical decision not to raise the claim now being advanced. Pet. Exh. F (declaration

19  of Lynda Romero). Appellate counsel explained she was well aware of *Son*, which upheld the

20  exclusion of such evidence, and she was well versed in the relevant authorities pertaining to the

21  appellate review of a trial court's decision to exclude of such expert testimony. Pet. Exh. F at 1. She

22  elaborated that she had pursued a similar claim on appeal in another case without success. Pet. Exh.

23  F at 1. Second, appellate counsel explained that she listened to the taped police interview of Michael

24  Leon and concluded that "the tape did not substantiate a claim of coercive tactics employed by the

---

26. Petitioner points to the fact that *Page* referred to the expert testimony that was admitted as supporting its alternative finding that any error in the limitation on the testimony was harmless. Pet. at 70. However, given that the propriety of the admissibility of that portion of the expert testimony was not at issue on appeal in *Page*, the appellate court's reliance on it in discussing prejudice on other matters cannot be transformed into an endorsement of its admission at trial.

1  police." Pet. Exh. F at 2. Third, appellate counsel made an assessment as to the likelihood that even

2  a successful claim of trial error on this point would ultimately be beneficial to petitioner. She

3  considered the likelihood that the appellate court would find such trial error to be prejudicial

4  warranting reversal, and concluded that "prejudice would be a major problem." Pet. Exh. F at 2.

5  Counsel conducted a detailed evaluation of the weight of the evidence of guilt balanced against the

6  marginal benefit of having the expert testimony to bolster the defense argument regarding the

7  assertion of police coercion of petitioner's father, and concluded that any finding of trial error would

8  have be found harmless by the reviewing court. Pet. Exh. F at 2.

9          Consequently, the record established that appellate counsel made an informed tactical

10  decision not to raise this issue given that it was not supported by the relevant California case law and

11  the likelihood of a successful outcome was minimal given that the statement was not obtained by

12  coercion and in light of its insignificance compared to the weight of evidence of guilt.  As the

13  Supreme Court explained in *Strickland*, "strategic choices made after thorough investigation of law

14  and facts relevant to plausible options are virtually unchallengeable." *Strickland v. Washington*, 466

15  U.S. at 690.

16          The state court's rejection of petitioner's claim of ineffective assistance was not an

17  unreasonable application of *Strickland*, *Jones*, and *Smith*.  In denying petitioner's state habeas

18  petition, the state court concluded that appellate counsel made a reasonable tactical decision to

19  forego the claim at issue in favor of raising other stronger points on appeal. Pet. Exh. D at 1-2. The

20  state court found that the claim "was not a winning argument for counsel to present on appeal." Pet.

21  Exh. D at 1.  The state court agreed with counsel's assessment that the likelihood of succeeding in

22  on this claim in obtaining a better outcome was low and that the claim provided minimal benefit to

23  petitioner.  The court observed that the challenged statement made by petitioner's father was one

24  small piece in a large body of evidence showing guilt, and the testimony of the expert would not

25  have nullified that piece, but would only have implicated the weight of that one piece of evidence,

26  if anything. Pet. Exh. D at 2-4.  The court found that a reviewing court on appeal would not have

27  found the exclusion of the expert testimony to be prejudicial, even if erroneous, and thus concluded

28  that counsel's tactical decision to pursue other stronger claims on appeal was not constitutionally

Points and Authorities in Support of Answer - C 07-5719 CRB

60

1  deficient performance. Pet. Exh. D at 2-4. For this same reason, the court concluded that petitioner

2  could not meet his burden of demonstrating prejudice. The state court's conclusion was not

3  unreasonable.

4        Petitioner's challenge to the state court's conclusion starts by employing an erroneous legal

5  standard. Petitioner claims that "[a]ppellate counsel has a duty to present a brief to the reviewing

6  court that among other things, sets forth all arguable issues, meaning one that is no frivolous. (*Smith*

7  *v. Robbins*, 528 U.S. at 282.)" Pet. at 66. Contrary to petitioner's assertion, the Constitution

8  compels no such duty on appellate counsel. *Jones v. Barnes*, 463 U.S. at 754 ("For judges to

9  second-guess reasonable professional judgments and impose on appointed counsel a duty to raise

10  every 'colorable' claim suggested by a client would disserve the very goal of vigorous and effective

11  advocacy that underlies *Anders*. Nothing in the Constitution or our interpretation of that document

12  requires such a standard."); *see also Miller v. Keeney*, 882 F.2d at 1433-34 ("the weeding out of

13  weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy"). *Smith*

14  *v. Robbins*, 528 U.S. at 282, cited by petitioner, does not support petitioner's claim of a greater duty

15  on appellate counsel.

16        Here, appellate counsel raised four claims on direct appeal, one of which was successful

17  in dramatically reducing the fines assessed against petitioner. (Pet. Exhs. A & C.) Appellate counsel

18  assessed and considered the additional claim now offered and rejected it in favor of stronger claims.

19  Nothing more was required of appellate counsel.

20        Petitioner contends that counsel's assessment of the claim was itself deficient because

21  appellate counsel "failed to review the <u>Page</u> case from California that would have supported the

22  admission of the expert testimony in this case as well as numerous authorities from other

23  jurisdictions cited above in existence at the time [of] Petitioner's direct appeal." Pet. at 75.

24  Petitioner's claim is unavailing. First, the record does not support petitioner's claim. Appellate

25  counsel's declaration merely notes that she could not recall if she considered the cases cited by

26  petitioner, it does not relate that counsel "failed to review" *Page*. Pet. Exh. F at 2. Second, as

27  explained above, *Page* is not legal authority for the principle being advocated petitioner, and was

28  at best dicta. Moreover, *Page* relied on *People v. McDonald*, 37 Cal. 3d 351, 373 (1984) for its

Points and Authorities in Support of Answer - C 07-5719 CRB

61

1   analysis, *Page*, 2 Cal. App. 4th at 187-89, which was reviewed by appellate counsel. Thus counsel

2   was familiar with the applicable legal principles. Third, petitioner's claim is not that counsel

3   misunderstood the law, or got the law wrong. Rather, petitioner contends counsel was

4   constitutionally deficient for recognizing that the primary authority on point in California was against

5   petitioner but failing to urge the appellate court reject the central case on point and adopt a different

6   interpretation of the law. Indeed, during the time that briefing was still ongoing on petitioner's

7   appeal, another published California case affirmed the exclusion of such expert testimony and

8   rejected the suggestion that *Page* required its admission. *People v. Ramos*, 121 Cal. App. 4th 1194,

9   1204-07 (2004). The state court properly rejected petitioner's claim of ineffective assistance for

10   failing to assert a legal position that was unsettled and had already been rejected in the state courts.

11   *Accord Murtishaw v. Woodford*, 255 F.3d 926, 949-50 (9th Cir. 2001); *Fields v. United States*, 201

12   F.3d 1025, 1027-28 (8th Cir. 2000); *Pollard v. White*, 119 F.3d 1430, 1435 (9th Cir. 1997)

13   ("Because it is not at all clear that the argument was available, counsel's failure to [raise it on appeal]

14   . . . did not fall below an objective standard of competence.").

15        The remainder of petitioner's claim of ineffective assistance amounts to nothing more than

16   disagreements with the informed decisions made by appellate counsel. Pet. at 76-79. Disagreements

17   with counsel's assessment of the merits of raising a particular claim on appeal are insufficient to

18   demonstrate ineffective assistance of counsel. The state court considered and rejected petitioner's

19   challenges to appellate counsel's tactical decisions. For the reasons discussed above, the state

20   court's rejection of petitioner's claim was not an unreasonable application of controlling Supreme

21   Court authority. *Jones v. Barnes*, 463 U.S. at 751-53; *Smith v. Murray*, 477 U.S. at 536.

22        The state court also reasonably concluded that petitioner failed to meet his burden of

23   demonstrating prejudice. As detailed above, the evidence of petitioner's guilt was overwhelming,

24   including his confessions to Danette Arbuckle and her younger brother, Shelby Arbuckle, who had

25   no motive to lie, and his incriminating statements to Troy Tibbils and Bernard Wesley. (RT 908-

26   909, 911, 913-19, 1047-48, 1050-52, 1054-55, 1429-33, 1441-45, 1561-70, 1576, 1718-22.) As the

27   state court observed, the statement by petitioner's father was but a small component of the evidence

28   of guilt, and the excluded evidence directed only a glancing blow at the weight of that statement.

1   The state court's conclusion of no prejudice was not an unreasonable application of *Strickland*.

2                                    **CONCLUSION**

3          Accordingly, respondent respectfully requests that the petition for writ of habeas corpus

4   be denied.

5          Dated:  July 10, 2008

6                              Respectfully submitted,

7                              EDMUND G. BROWN JR.
                               Attorney General of the State of California

8                              DANE R. GILLETTE
                               Chief Assistant Attorney General
9
                               GERALD A. ENGLER
10                             Senior Assistant Attorney General

11                             GREGORY A. OTT
                               Deputy Attorney General
12
                               /s/ Jeffrey M. Laurence
13
                               JEFFREY M. LAURENCE
14                             Deputy Attorney General

                               Attorneys for Respondent
15
    JML:jw
16  20121298.wpd

17

18

19

20

21

22

23

24

25

26

27

28

Points and Authorities in Support of Answer - C 07-5719 CRB

63