1    JULIE SCHUMER, Esq.
     SBN 82814
2    PMB 120, 120 Village Square
     Orinda, CA. 94563
3    (925) 254-3650
     (505) 466-6247 (fax)
4
     Attorney for Petitioner
5    DAVID MICHAEL LEON

6

7

8              IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                         COUNTY OF SANTA CLARA

10
     IN RE THE MATTER OF                    )
11                                          )   No._____
           DAVID MICHAEL LEON,             )
12                                          )    (Filed in conjunction
     On Habeas Corpus.                      )   with Case No.
13   _____   )   CC093326)

14

15

16              **PETITION FOR WRIT OF HABEAS CORPUS**

17

18

19

20

21

22

23

24

25

26

27

28

                    EXHIBIT  H

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES                                                                ii

LIST OF EXHIBITS                                                                    v

PETITION FOR WRIT OF HABEAS CORPUS                                                 1

VERIFICATION                                                                        4

MEMORANDUM OF POINTS AND AUTHORITIES                                               5

    STATEMENT OF FACTS                                                            5

    ARGUMENT

        I.      HABEAS CORPUS IS THE PROPER VEHICLE FOR
THE PRESENTATION OF PETITIONER'S CLAIM.                                            36

        II.    APPELLATE COUNSEL RENDERED INEFFECTIVE
ASSISTANCE OF COUNSEL TO PETITIONER IN HIS
DIRECT APPEAL.                                                                     36

        A.    The standard of review.                                           36

        B.    Appellate counsel was ineffective in failing to raise
on direct appeal the issue of the trial court's refusal to
allow the defense to present the testimony of Dr.
Ofshe or Dr. Leo, experts on the subject of police
coerced statements by witnesses.                                                   37

            1.    The proceedings at Petitioner's trial.                     37

            2.    The merits.                                                41

                a.    Counsel on direct appeal should have
briefed the issue of the trial court's
exclusion of the expert testimony at issue.                                        41

                b.    Prejudice.                                                 49

CONCLUSION                                                                         52

-i-

# TABLE OF AUTHORITIES

**PAGE**

## FEDERAL CASES

Evitts v. Lucey (1985)                                               36
469 U.S. 387

Sanders v. Ratelle (9th Cir. 1994)                                  48
439 U.S. 510

Smith v. Robbins (2000)                                             36
528 U.S. 259

Strickland v. Washington (1984)                                     36
466 U.S. 668

United States v. Hall (7th Cir. 1996)                           43, 46
93 F.3d 1337

United States v. Hall (C.D. Ill. 1997)                          43, 46
974 F.Supp. 1198

United States v. Shay (1st Cir. 1995)                               43
57 F.3d 126

Wiggins v. Smith (2003)                                             48
539 U.S. 510

## STATE CASES

Auto Equity Sales, Inc., v. Superior Court (1962)                   44
57 Cal.2d 450

Barnett v. Rosenthal (2006)                                         44
40 Cal.4th 33

Boyer v. State (2002)                                               43
825 So.2d 418

Fireman's Fund Insurance Co. v. Maryland Casualty Company (1998)    44
65 Cal.App. 4th 1279

Hood v. Santa Barbara Bank and Trust (2006)                         44
143 Cal.App.4th 526

In re Barnett (2003)                                                36
31 Cal.4th 466

In re Spears (1984)                                                 36

-ii-

157 Cal.App.3d 1203

Greyhound Lines, Inc.v. County of Santa Clara (1986)                44
187 Cal.App.3d 480

Kansas v. Cobb (Kan.Ct.App.2002)                                   42
43 P.3d 855

Martinez v. Enterprise Rent-A-Car Company (2004)                   45
119 Cal.App.4th 46

Miller v. State (Ind. 2002)                                     43, 46
770 N.E.2d 763

Nabors v. Worker's Compensation Appeals Board (2006)           44, 48
140 Cal.App.4th 217

New Jersey v. Free (2002)                                          42
798 A.2d 83

People v. Barton (1978)                                            37
21 Cal.3d 513

People v. Feggans (1967)                                           37
67 Cal.2d 444

People v. Harris (1993)                                            37
19 Cal.App.4th 709

People v. Hill (2000)                                              48
78 Cal.App.4th 232

People v. Johnson (1981)
123 Cal.App.3d 106

People v. Kelly (1976)                                             52
17 Cal.3d 24

People v. McCary (1985)                                           36
166 Cal.App.3d 1

People v. Page (1991)                                          42, 43
2 Cal.App.4th 161

People v. Ramos (2004)                                         42, 45
121 Cal.App.4th 1194

People v. Reilly (1988)                                            45
196 Cal.App.3d 1127

People v. Son (2000)                                        41, 45, 47
79 Cal.App.4th 224

People v. Valenzuela (1985)                                    37
175 Cal.App.3d 381

Scott v. Texas (Tex.App. 2005)                                45
165 So.W.3d 27

State v. Conn. (Ct. 1976)                                     44
370 A.2d 1002

State v. Davis (2000)                                         42
32 S.W.3d 603

**OTHER AUTHORITES**

Appeals and Writs in Criminal Cases (2d.Ed.)                  45

1

## LIST OF EXHIBITS

2

**EXHIBIT A**

3

    Court of Appeal opinion in H026042

4

**EXHIBIT B**

5

    Supreme Court denial of review dated 5-24-06

6

**EXHIBIT C**

7

    Court of Appeal opinion in H030578

8

**EXHIBIT D**

9

    Declaration of Lynda Romero, Esq., dated 2-25-07

10

**EXHIBIT E**

11

    Declaration of Sam Polverino, Esq., dated 2-22-07

12

**EXHIBIT F**

13

    Relevant pages of Clerk's Transcript

14

**EXHIBIT G**

15

    Relevant pages of Reporter's Transcript plus volumes 6 through 23 in their

16

entirety

17

18

19

20

21

22

23

24

25

26

27

28

-v-

1
2
3
4
5          IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
6
7                          COUNTY OF SANTA CLARA
8
9
10   IN RE THE MATTER OF                    )   No._____
11          DAVID MICHAEL LEON,             )
                                            )    (Filed in conjunction
12   On Habeas Corpus.                      )   with Case No.
     _____       )   CC093326)

13              **PETITION FOR WRIT OF HABEAS CORPUS**

14   TO:       THE HONORABLE PRESIDING JUSTICE OF THE
               SUPERIOR COURT, COUNTY OF SANTA CLARA,
15             STATE OF CALIFORNIA:

16             Petitioner, DAVID MICHAEL LEON by and through his attorney, JULIE

17   SCHUMER, petitions this Court for a writ of habeas corpus and by this verified petition

18   sets forth the following facts and cause for the issuance of the writ.

19                                    I

20             Petitioner is presently unlawfully confined and restrained of his liberty by

21   the Director of the Department of Corrections at Pleasant Valley State Prison, Coalinga,

22   California.

23                                    II

24             Petitioner is unlawfully confined pursuant to the judgment of the Superior

25   Court of Santa Clara County in Case No. CC093326, rendered May 23, 2003 following

26   his conviction for the first degree murder of Marlon Bass with the personal use of a

27
28                                   -1-

1   weapon per Penal Code section 12022.5(a)(1).

2   .

3                                    III

4          This Petition is being filed in this Court pursuant to its original habeas

5   corpus jurisdiction.  (California Constitution, article VI, section 10.)

6                                    IV

7          Following his conviction and sentencing, Petitioner appealed to the Sixth

8   District Court of Appeal on the grounds that the lengthy delay between the commission of

9   the crime and the filing of criminal charges against him violated his state and federal

10  constitutional due process rights, he was denied due process due to the wrongful

11  exclusion of third party culpability evidence, he was deprived of his federal constitutional

12  rights to a jury trial by the wrongful dismissal of a juror during deliberations, and the

13  imposition of certain restitution fines had to be stricken.  On February 24, 2006,

14  Petitioner's conviction was affirmed, but the fines were reversed and the matter remanded

15  to Superior Court for rehearing for a new hearing as to said fines.  A copy of the appellate

16  court opinion is attached hereto as Exhibit A.  On May 30, 2006, Petitioner's petition for

17  review was denied.  A copy of the order denying review is attached hereto as Exhibit B.

18  On June 20, 2006, the trial court reimposed fines from which order Petitioner appealed.

19  On February 7, 2007, the Sixth District Court of Appeal reduced the restitution fine to

20  $10 and struck the parole revocation fine.  A copy of the appellate court opinion is

21  attached hereto as Exhibit C.

22                                    V

23         The judgment rendered against Petitioner in Santa Clara County No.

24  CC093326 is invalid for the following reason.  Petitioner was deprived of his Sixth

25  Amendment right to  the effective assistance of counsel on appeal.  Specifically, appellate

26  counsel failed to raise an arguable issue on direct appeal.  Said failure was objectively

27

28                                    -2-

1   unreasonable and there is a reasonable probability that but for the omission, Petitioner

2   would have prevailed on appeal.  Specifically, appellate counsel failed to brief the trial

3   court's refusal to allow the defense to present an expert concerning police coercion of a

4   witness's statement.  This testimony related to the statement of Petitioner's father,

5   Michael Leon, who ultimately told police in a tape recorded interview that Petitioner had

6   confessed to committing the murder in self-defense.

7

8                                        VI

9            The contentions in support of this Petition are fully set forth in the

10   accompanying Memorandum of Points and Authorities, and the Declarations of Lynda

11   Romero and Sam Polverino.  (Exhibits D and E, respectively.)  A copy of the relevant

12   portions of the Clerk's and Reporter's Transcripts pertaining to Petitioner's trial in this

13   Court is being lodged with the court concurrently with the filing of this Petition as

14   Exhibits F and G, respectively.[1]

15                                       VII

16           Petitioner has no other plain, speedy or adequate remedy at law other than

17   this Petition.

18           WHEREFORE, Petitioner respectfully requests that this Court:

19           1.  Issue its Order to Show Cause to the Director of the Department of

20   Corrections to inquire into the legality of Petitioner's present confinement;

21           2.  If this Court concludes an evidentiary hearing is required in this matter,

22   order such a hearing be held in Superior Court.

23           3.  After a full hearing, issue the writ, vacate the judgment of conviction

24

25   _____

26      [1]      The Clerk's Transcript will hereinafter be referred to as CT,
             the Reporter's Transcript as RT with the applicable volume
27             number.

28                                       -3-

1  with instructions to release Petitioner;

2        4. Grant Petitioner whatever alternative or further relief is appropriate or in

3  the interest of justice.

4  Dated:    3-5-07

5

6                      Respectfully submitted,

7

8                      **Julie Schumer**

                    JULIE SCHUMER, Attorney

9                      for Petitioner DAVID LEON

10

11                      **<u>VERIFICATION</u>**

12        I, JULIE SCHUMER declare as follows:

13        I am an attorney at law duly admitted to practice before the courts of the

14  state of California and have my office in Contra Costa County at 120 Village Square,

15  PMB 120, Orinda, CA. 94563.  I am the attorney of record for Petitioner DAVID LEON

16  and am authorized to file this Petition.  Petitioner is unable to make this verification

17  because he is absent from Contra Costa County due to his confinement out of the county

18  in Pleasant Valley State Prison in Coalinga, California.  For that reason I make this

19  Verification on his behalf.

20        I have read the foregoing Petition for Writ of Habeas Corpus and verify that

21  all the facts alleged therein not otherwise supported by citations to the record are true and

22  are supported by the attached declarations.

23        I declare under penalty of perjury that the foregoing is true and correct.

24        Executed this 5th day of March, 2007 at Lamy, New Mexico.

25

26        **Julie Schumer**

      JULIE SCHUMER

27

28                      -4-

## MEMORANDUM OF POINTS AND AUTHORITIES

### STATEMENT Of THE FACTS

**A.  The Prosecution's case in chief.**

<u>The discovery of the body of Marlon Bass and the crime scene investigation</u>

On November 30, 1983, Deborah Gerkin, age 16, attended Del Mar High School. She had made plans with Marlon Bass and other friends to leave school and get high at lunch. (7 RT 888-889.) Marlon did not show up. (7 RT 890.)

On November 30 1983, Annie and Palmer Bass and their two sons, Marcus and Marlon[2] lived at 2568 Custer Drive in San Jose. (6 RT 562-563; 589-590.) Marlon was 20 years old. (6 RT 563.) He had graduated Del Mar High School. (6 RT 564.) He drove a 1968 Mustang. (6 RT 564-565.)  During November, 1983, the Bass's received a lot of hang up calls.  (6 RT 640.)

Mr. and Mrs. Bass arrived home from work at about 5:30 p.m. (6 RT 571; 592.)  The door to their residence was ajar and there was glass on the ground. (6 RT 571, 574; 593.)  Marlon was laying on the floor in the hall with a bat in his hand. (6 RT 575-576, 581-582; 593-594, 596.)  Mr. Bass attempted to revive Marlon and the bat rolled out of Marlon's hand.  (6 RT 576; 594, 599.)  According to Mr. Bass, Marlon was stiff. (6 RT 594.)

Nothing had been disturbed in the residence except a desk was out of place in Marlon's bedroom. (6 RT 577-578; 603- 604.)  However, the desk drawer where Marlon usually kept his money was locked. (6 RT 607-608; 650.)  Two cans and a towel were under Marlon's desk. (RT 636-637; 755-756, Exhibit Nos. D, E.) A $2 bill was found on the floor in Marlon's bedroom but no other money was

[2]Because of the testimony of family members, the victim will be referred to at times as Marlon to avoid confusion.

1    present. (6 RT 582; 609.)  Mr. Bass did not find money in Marlon's room after the

2    police left.  (6 RT 582,  609.)

3                    Before the police arrived, Mr. Bass checked a safe Marlon had

4    underneath his room and moved it into the garage. About a week later, Mr. Bass

5    took the safe to a locksmith and it was empty. (6 RT 601-602, 623; Exhibit no. 15.)

6                    The night before he found Marlon dead, Mr. Bass had checked

7    Marlon's room and found drugs. (6 RT 623-625; 648-649.)  Initially he testified he

8    did not remember doing this.  (6 RT 623.)  Mr. Bass removed two large buckets of

9    marijuana and locked them in the trunk of a black car he had parked in the garage.

10   (6 RT 626; 649, Exhibits A, B, C.)  Mr. Bass had spoken to Marlon regarding his

11   drug dealing and constantly having friends over. (6 RT 638-639.)  Mr. Bass told

12   the police he had found $4200 in Marlon's desk drawer on the Sunday before

13   Marlon died. (6 RT 651.) On Monday, there was no money. (6 RT 652.)  Mr. Bass

14   had seen up to $10,000 previously in Marlon's room. (6 RT 653.)

15                   At the beginning of the investigation, Sgt. Brockman told Mr. Bass

16   that his son was shot with possibly a .22 caliber weapon but he had not

17   substantiated that yet with lab analysis.  (6 RT 653.)  Brockman cautioned Mr.

18   Bass about revealing any information about the case.  (6 RT 658.)

19                   On the day he died, Marlon's car was parked around the corner

20   facing the wrong way and nosed into the curb. (6 RT 654.)  A neighbor, Pamala

21   Anderson, who lived at 2564 Tioga Way on November 30, 1983, saw Marlon park

22   a green Mustang on the wrong side of the street in front of her house in the mid to

23   late morning. (8 RT 880.)   He took a baseball bat out of the car and walked away.

24   (8 RT 872-875, 878.)  He was wearing a red or blue work shirt. (8 RT 876.)  He

25   walked south toward Custer. (8 RT 878.)

26                   Marlon Bass suffered five gunshot wounds and a small abrasion to

27

28                                                6

his right forearm.. (7 RT 679-681; 769.)  The cause of death was gunshot wounds to the chest and neck. (7 RT 695.)  From the state of the body and clothing, it appeared death occurred before 2:00 p.m. from shots fired from further than three feet away. (7 RT 678, 694; 806-808.)  Death in the morning of November 30, 1983 was consistent with the degree of rigor mortis and lividity observed.  (7 RT 679.)  Five bullets were recovered during the autopsy. (7 RT 681, 724.)  The bullets were Remington .22 caliber gold coat hollow point bullets and were most likely fired from a .22 caliber Rohm, RG Industry, Liberty Arms, Burgo, Arminus, or Mossberg revolver. (7 RT 778-779.)  Seven dollars were in the wallet in Marlon's pants pocket. (7 RT 733-734.)

According to the Medical Examiner, it appeared likely Bass was facing and approaching his assailant when he was first shot and the remaining shots were inflicted as he was attempting to flee and eventually fell. (RT 690-694.)[3]  In arriving at this opinion it appeared the Medical Examiner assumed that the shooter remained stationary.  (7 RT 693.)

San Jose Police Officer Willam Santos examined the crime scene.  (7 RT 700-701.)  A glass panel nearest the latch on the Bass' front door was broken. (7 RT 708.) There were bullet strikes in the walls of the residence near where Marlon's body was found. (7 RT 716-717.)  A bullet was recovered from the wall. (RT 723; Exhibit No. 37.)  No bullet casings were found.  (7 RT 725.)  A $2 bill was recovered from the floor in the garage and a $2 bill was recovered from the night stand in Marlon's bedroom. (7 RT 732-733, 734; 762, Exhibit Nos. 42, 43.)  Marijuana in two plastic bucket was found in a the trunk of a car in the garage. (7 RT 735-737, 767.)

---

[3]According to defense expert Dr. John Thornton, Marlon Bass was shot by someone inside his bedroom.  (RT 1955.)

7

A gray button, from the right sleeve of Marlon's shirt, was recovered close to Marlon's leg. (7 RT 752-754; 769, Exhibits F, G.)  Other items found at the scene included a Taco Bell cup, nunchukas, baggies with marijuana and white powder, a tan cloth bag with gold strings with a glass rod, and a balance scale. (7 RT 758-762.)

Officer Santos agreed that moving things around at the crime scene can contaminate it and that that could affect the conclusions drawn.  (7 RT 741-744.)

<u>The ensuing investigation.</u>

Many of Marlon's friends were interviewed about their contacts with Marlon and their whereabouts on the day of the offense.

David Brewster knew Marlon Bass from junior high and high school. (8 RT 815- 810.)  Marlon sold marijuana - and drove a green Mustang. (8 RT 817.) He sold the drugs from Doerr Park, the 7-Eleven or a friend's house 90% of the time.  The rest of the time he sold from his residence.  (8 RT 817.)  Brewster saw Petitioner around the neighborhood and at Marlon's house once. (8 RT 818.) Marlon did not have enemies or debts. (RT 818.)  Marlon kept his drugs in a bucket or a small wooden jewelry box in his room.  He kept pre weighed drugs in a wooden drawer by his bed. (8 RT 819, 828-829, Exhibit No. 30.)  He kept his money locked in his desk drawer, (8 RT 819, Exhibit No. 32.)  Every once in a while, Marlon carried money in a wad. (8 RT 821.)  According to Brewster, besides himself, only a few others knew where Marlon kept his drugs and money although he was open with his drug dealing. (8 RT 837-838.)  Brewster told police the opposite, that many people knew Marlon's habits. (8 RT 836.)  He did not let too many people into his room.  (8 RT 835.)  Marlon had a baseball bat which he kept in his bedroom and sometimes in the trunk of his car. (8 RT 822.)

8

1    Brewster went to a movie with Marlon the night before his death. (8

2    RT 822.)  They were drinking and might have smoked a joint before going to the

3    movie. (8 RT 832-833.) Marlon did not have a falling out with Petitioner. (8 RT

4    847.)

5    Brewster told officers Marlon picked up a couple of pounds of

6    marijuana from Jeff Purrington on Monday, November 28, 2003. (8 RT 848-849. )

7    Marlon had $1300 to $1400 left after buying the marijuana. (8 RT 849-850.)  On

8    Tuesday night, Brewster saw Marlon with between $1000 and $1500 in his locked

9    desk drawer. (8 RT 850, 853-854.)  Brewster said Marlon was pretty open in his

10   drug dealing and everyone he dealt with knew where his money and drugs were

11   kept. (8 RT 851.)  Brewster said Marlon got some of the drugs from "Tony." (8 RT

12   852.)

13   Jeffrey Purrington was with Marlon Bass at the Bass residence two

14   days before Marlon' s death. (8 RT 857.)  Marlon gave Purrington $2000 to

15   purchase marijuana. (8 RT 857.) It appeared Marlon had about $2000 left over. (8

16   RT 857-858.)  Marlon kept his money in the center drawer of his desk which was

17   locked. (RT 858, 869, Exhibit No. 30.)  He did not see money stored in any other

18   place. (8 RT 858.)  Purrington delivered the marijuana later that same day. (8 RT

19   859.)  Marlon was nervous that day. (8 RT 860.) Purrington told the police Marlon

20   was under the influence of cocaine. (8 RT 861.)

21   According to Purrington, Marlon was open and bragged about selling

22   drugs. (RT 866.)  Purrington knew many of Marlon's customers. ( RT 868.)

23   However, Marlon also dealt with a lot of people Purrington did not know. (8 RT

24   869.)  Purrington had never seen Petitioner and Marlon together.  (8 RT 865.)

25   Brothers Daniel and Samuel Barnett attended junior high school with

26   Petitioner and Marlon Bass. (9 RT 979-980; 1011.)  Daniel was closer to Petitioner

27

28                                          9

and Samuel was closer to Marlon Bass. (9 RT 981; 1011-1012.)  Daniel had gone to Petitioner's house one day when Petitioner was waiting for Marlon. (9 RT 982.) Petitioner said he was "so pissed off at that fucking nigger.  I could just kill him." (9 RT 982.)  At the Preliminary Hearing Daniel testified that Petitioner had said, "that fucking nigger, I'll kick his ass."  (9 RT 989.)  Daniel could not say what day or month he heard the statement, it could have been one to two years before the killing. (9 RT 991.)  At the Preliminary Hearing he said it was within six months. (9 RT 993.)  Petitioner disappeared after the murder and Daniel did not know where he was for two or three years. (9 RT 983.)

As much as a year and a half prior to the murder, Petitioner showed a gun to Daniel Barnett. (9 RT 984-985.)  Daniel never saw Petitioner with a gun on any other occasion.  (9 RT 1003.)  In 2000, Daniel told Detective Vizzusi he never saw Petitioner with a gun but was pretty sure Petitioner's family had a gun in their house.  (9 RT 1001.)

Samuel Barnett had purchased marijuana from Marlon Bass and knew he dealt drugs out of his bedroom. (9 RT 1012.)  According to Samuel, Marlon "sometimes" kept his desk drawer locked.  (9 RT 1026.)

Before Marlon was murdered, Marlon complained about a falling out with Petitioner and said he might need to "kick his ass." (9 RT 1013.)  The day after Marlon died Petitioner called Samuel to ask him to purchase some marijuana. (9 RT 1013.)  Petitioner wanted $550 for a quarter pound.  (9 RT 1014.)  Samuel was shocked because he thought Petitioner was a small time dealer. (9 RT 1014-1015.)  Samuel asked Petitioner if he knew that Marlon had been killed. Petitioner responded that it had nothing to do with the transaction. (9 RT 1017.) Samuel told Petitioner never to call him again because he was uncomfortable that Petitioner might have had something to do with Marlon's death. (9 RT 1017.)

10

Samuel had been convicted of felony violation of a protective order and corporal injury on a spouse. (9 RT 1017-1018.)

Shortly after Marlon's death, Samuel told the police Marlon was mad at someone who ripped him off and it was either Jeffrey Caplan or Petitioner and most likely it was Caplan. (9 RT 1028-1029.) Marlon caught Jeff Caplan ripping off drugs from his house. (9 RT 1032.) Marlon believed a man in a hooded sweatshirt was casing his house a few days before he died. (9 RT 1032-1033.) Samuel saw the man in the hooded sweatshirt walk by. (9 RT 1033.) Marlon yelled at the guy and the guy said he was waiting for his girlfriend. (9 RT 1034.) The guy then fled. (9 RT 1034.) Marlon did not mention Petitioner as being the stalker. (9 RT 1037.)

Troy Tibbils started Mar Vista High School with Petitioner but then transferred to another school. (12 RT 1424-1425.) Petitioner started hanging out with Bernard Wesley and the Smith brothers. (12 RT 1425-1426.) Petitioner bought marijuana from Marlon Bass. (12 RT 1427.) Petitioner told Tibbils that Marlon had money and drugs all over his room. (12 RT 1432.) Petitioner had been attacked by David and Marvin Smith and told Tibbils to stay away from them. (12 RT 1473.) Petitioner owned a BB gun. (12 RT 1474.)

Tibbils related that Petitioner was in a car accident in 1983 and received a monetary settlement. (12 RT 1475.) Petitioner received $2500 and some amount for medical. He also fixed his car and sold it. (12 RT 1477.) Tibbils was never involved in a burglary and did not know Petitioner to be involved. (12 RT 1477-1478.) Sometimes, Petitioner would make large purchases of marijuana and resell it. (12 RT 1483.)

On the day Marlon was killed, Tibbils and Ron Delgado were with Petitioner at Petitioner's residence at about 10:00 a.m. (12 RT 1429.) They were

11

going to buy marijuana. (12 RT 1430.)  Petitioner said he could not get marijuana

that day because Marlon was in school and he could get it later. (12 RT 1433,

1440, 1446.)  Tibbils went back to school and returned to Petitioner's residence

around 12:30 or 1 p.m. and picked up the marijuana. (12 RT 1441-1442.)   He did

not notice any difference in Petitioner's demeanor.  (12 RT 1470.)  Although

Tibbils testified at trial that believed he made this purchase the day of the

homicide, he had nothing to back this up.  (12 RT 1448.)  By contrast, in 2000, he

told Detective Vizzusi that he wasn't sure that he was with Petitioner the day of

the killing.  (12 RT 1454.)

       Four to five days later, Tibbil's father saw an article in the newspaper

and asked him whether he knew Marlon Bass.  Tibbils immediately telephoned

Petitioner. (12 RT 1443.)  Tibbils had testified previously that Petitioner said he

had met Marlon at the 7-Eleven that morning to get drugs.  Petitioner told Tibbils

he had seen Bernard Wesley near Marlon's residence on Curtner. (12 RT 1443-

1445.)  Tibbils was unable to recall if he told Nicole DiFlavio, a mutual friend,

that he had asked Petitioner if he was involved. (12 RT 1458, 1460.)  Tibbils did

not believe Petitioner was involved. (12 RT 1461.)

       After the killing Tibbils saw less of Petitioner.  When Petitioner told

him he was going to New Mexico, Tibbils was surprised.  (12 RT 1462-1463.)

Tibbils could not recall how long after the killing Petitioner left but at the

preliminary hearing he stated it was six months.  (12 RT 1464.)  Tibbils told

Detective Vissuzi in 2000 that when Petitioner left town he owed people money.

(12 RT 1481.)

       Detective Vizzusi interviewed Troy Tibbils on May 10, 2002. (RT

1527-1528.)  Tibbils felt the killing was the same day he bought marijuana from

Petitioner.  (12 RT 1528.)  Tibbils talked to Petitioner and Petitioner said he met

12

Marlon at the 7-Eleven and purchased marijuana from him.  Petitioner said after Marlon left he saw Bernard Wesley driving down the street and stop at a house on Curtner.  (12 RT 1528.)  Petitioner said Wesley was acting real suspicious.  (12 RT 1528-1529.)  Tibbils said he had gotten a traffic ticket that day.  By the time of trial records of that ticket were destroyed.  (12 RT 1529.)  There was no indication Tibbils had been interviewed prior to 2002.  (12 RT 1530.)  Detective Vizzusi testified that had he been interviewed earlier, there would have been better success in tracking down the ticket.  (12 RT 1531.)

Petitioner and Nicole DiFlavio were good friends and used marijuana and cocaine together in 1983.  DiFlavio also was friendly with Marlon Bass.  (12 RT 1485-1486.)  According to DiFlavio, Petitioner was envious of Marlon.  (12 RT 1509 .)  Tibbils told her Petitioner got marijuana from Marlon on the morning of the murder.  (12 RT 1496, 1498.)  According to DiFlavio, Petitioner was very concerned about money.  (12 RT 1490.)  After Marlon's death, Petitioner had a little more money and seemed to have more drugs which caused DiFlavio to become suspicious.  (12 RT 1490.)  Admittedly, DiFlavio did not know if Petitioner was working.  (12 RT 1501.)

Petitioner left town shortly after Marlon's death without saying he was leaving.  (12 RT 1488.)  On cross-examination, DiFlavio said he left between one to six months after Marlon's death.  (12 RT 1504.)  A month or two after Petitioner left, he called DiFlavio from New Mexico or Arizona.  (12 RT 1494.)  Petitioner never said he killed Marlon.  (12 RT 1502.)

Petitioner's statements about the Marlon Bass homicide

Danette Edelberg, formerly known as Danette Arbuckle, was

13

Petitioner's girlfriend for three or four years in high school.[4] (13 RT 1550-1552.)
Danette talked to Petitioner almost every day. (13 RT 1558.)  Petitioner was
physically abusive to her and was very jealous and possessive. (13 RT 1555-1556.)
Danette knew Marlon Bass from school but did not associate with him and did not
know if Petitioner did. (13 RT 1556.)  It was common knowledge that Marlon was
involved in drugs. (13 RT 1674.) According to Danette, Petitioner had large sums
of money before and after Marlon's death. (13 RT 1674.)

Petitioner acted as if the murder investigation regarding Bass was a
joke. (13 RT 1557.)  Petitioner went to visit his father in San Diego sometime after
the murder. (13 RT 1557.)  Danette told Inspector Brockman Petitioner told her he
was moving to San Diego to be with his dad because his dad wanted him out of the
environment and said she took him to the airport when he departed. (13 RT
1591-1592.)[5]  When he returned, the relationship and the physical abuse resumed.
(13 RT 1560-1561.)

On March 12, 1984, Petitioner and Danette had an argument.
Petitioner became abusive and Danette went to a doctor and made a police report.
(13 RT 1562.)  The argument ensued when they were discussing the Bass
investigation.  According to Danette, Petitioner admitted the murder.  He said he
went to the Bass home to steal money and drugs which were in Marlon Bass's desk
drawer.  He said he was in the bedroom when he heard a noise and Marlon was in
the hall with a baseball bat.  They had words, Petitioner became frightened and he

---

[4]Danette Arbuckle had a petty theft conviction in 1984. (RT 1578.)  The witnesses
at trial referred to her as Danette Arbuckle and Danette Edelberg.  She also used the
married name Danette Rodriguez for a period of time.  To avoid confusion, Danette will
be used throughout this pleading.

[5]Danielle admitted that she lied to the police during the course of the murder
investigation.  (13 RT 1581.)

14

shot Marlon. (13 RT 1563-1566.) Petitioner demonstrated how he had held the gun. (13 RT 1567.) Petitioner stood up and put hands out in front of him as though he were holding a gun and said he had shot Marlon. (13 RT 1567.) When Danette started crying, Petitioner said he was just kidding. (RT 1568.) She tried to leave but he locked the door. He told her to get on her knees and he started kicking her. She crawled to the door. (13 RT 1569.) She got outside, got in her car and left. (13 RT 1569, 14 RT 1744.) That was the end of the relationship. (13 RT 1570.) Danette didn't tell the police about his statements at the time she initially made the police report because she was scared. (13 RT 1571.)[6]

According to Danette, she told Inspector William Brockman about Petitioner's statements and about his reenactment of the offense sometime after the reenactment.[7] She talked to Brockman six times between November 30, 1983 and February 10, 1984. (13 RT 1597; 1745-1746.) Danette told Brockman Petitioner had a pellet gun but no other gun, (RT 1680.) On March 12, 1984, she spoke to Detective Vizzusi but she did not tell him about the reenactment. (RT 1603-1605.) When she spoke to Sgt. Brockman on February 10 and February13, 1984, there had been no reenactment. (RT 1628.) On March 13, 1984, she told police she felt 100% certain that Petitioner did not kill Marlon. (13 RT 1630.) She never saw Petitioner with a gun. (13 RT 1679.)

On June 9 and June 11, 1986, Danette was interviewed by Annette

---

[6]The report indicated Danette said she was slapped in the face, punched in the ribs, told to get on her knees and then she crawled out of the house. The report stated Petitioner kicked Danette in the buttocks. (14 RT 1743.) Danette ran to her car and got inside while Petitioner was punching the windows. (14 RT 1744.)

[7]She told another officer that as she drove, Petitioner followed her home. (13 RT 1603.) On that occasion she did not mention the reenactment or Petitioner's alleged admission. (13 RT 1605.)

15

Rodriguez, a DA investigator, about the domestic violence charges she had reported against Petitioner in 1984. (13 RT 1572; 1733.)[8] Danette told Rodriguez Petitioner had acted out the murder of Marlon Bass then said he was kidding. (13 RT 1574; 14 RT 1735.) DAI Rodriguez contacted Inspector Brockman. However, no one followed up with Danette until she talked to Detective Vizzusi in 2000. (13 RT 1574; 14 RT 1736.) The only other person Danette told about the reenactment was her best friend Danielle but she did not give her the details. (13 RT 1575, 1577.) She never told her brother, Shelby Arbuckle, until years later. (13 RT 1575.)

In 2000, Danette told Detective Vizzusi that the reenactment was in the midst of the murder investigation and could have taken place between December, 1983 and March, 1984. (13 RT 1626.) At the Preliminary Hearing, she testified it could have been a year after the crime. (13 RT 1637.) The portion of Vizzusi's interview with Danette where he asked her about the reenactment was not on tape. (17 RT 2069.)[9]

In 2002, Danette met with Sgt. Brockman for lunch at the suggestion of the prosecutor who wanted them to remember the details of the reenactment. (13 RT 1572; 14 RT 1746.) The lunch was not documented. (13 RT 1665.) Danette told Brockman she had told him about the Petitioner's reenactment of the Marlon Bass murder when he interviewed her in 1984. Brockman had no memory of being told about the reenactment and had she done so he would have remembered.

---

[8]At the Preliminary Hearing Danette did not recall this conversation. (13 RT 1574.)

[9]Vizzusi noted that with some interviews in the case the tape was turned on at some point into the interview. (17 RT 2075.) Vizzusi noted that Danielle (infra) described the reenactment as showing the shooting to be execution style whereas Danette stated Petitioner put his right arm out. (17 RT 2079.)

(14 RT 1746.)  If Danette had talked to him about the facts of the case before February 10, 1984, he would have written a report. (14 RT 1757.)  Brockman had no recorded contacts with Danette prior to February 10, 1984.  (14 RT 1758.)

Brockman was contacted by DAI Rodriguez in 1986 and she told him about the reenactment.  He was delighted to receive the information and made arrangements to interview Danette.  He then decided to refer the matter to the homicide unit instead. (14 RT 1747.)  He prepared some questions for Danette and talked to Mo Reyes in the homicide unit. (14 RT 1748.)

Danielle Fournier was a childhood friend of Danette's. (14 RT 1712.)  Danette told her Petitioner had committed the murder of Marlon Bass and had reenacted the actual murder. (14 RT 1719.)  According to Danette, Petitioner made her kneel down and put a gun to her head and said he was going to do to her what he had done to Marlon.  (14 RT 1719.)  Danette said Marlon was shot. (14 RT 1719.)  Danette told Fournier Petitioner said he was kidding. (14 RT 1726.)

Danielle claimed Danette had called her and she went to pick Danette up at Petitioner's house right after the alleged reenactment but agreed she could have picked her up from someplace else. (14 RT 1721.)  Danette appeared afraid. (14 RT 1723.)  Danielle thought this was a week after Marlon's death.  (14 RT 1724.)

Shelby Arbuckle is Danette Edelberg's younger brother. (8 RT 899; 1553.)  Petitioner was his sister's boyfriend when Shelby was 12 to about 15 years old. (8 RT 900.) Petitioner was abusive to him and they used drugs together. (8 RT 900.)  Petitioner started Shelby selling joints of marijuana when Shelby was in the sixth grade. (8 RT 902.)  Shelby started selling marijuana in the seventh grade to kids at his junior high school. (8 RT 903.)

Petitioner talked to Shelby about doing burglaries in the Doeer Park

17

neighborhood. (8 RT 904.)  He described casing houses and discussed the ones he

planned to hit. (8 RT 905.)  Petitioner never said he was going to hit the Bass

residence. (8 RT 906.)  He did say a person should never burglarize a house where

the owner or occupier was a police officer.[10] (8 RT 945.)  Troy Tibbils, Ronny

Cortez and Darryl Ramos were also involved in burglaries when Petitioner was

involved. (8 RT 944.)  Shelby was not involved with Petitioner in burglaries but he

was a lookout in burglaries involving other people. (8 RT 944.)  Petitioner

mentioned having a gun one or two months before Marlon Bass died but Shelby

did not see it. (8 RT 906-907.)  On cross-examination, Shelby thought Petitioner

mentioned the gun a lot longer before that.  (9 RT 967.)

The day after Marlon Bass's death, Shelby heard a rumor about it.

Shelby told the rumor to Danette and Petitioner. (8 RT 908.)  Petitioner laughed

and said Marlon had not been stabbed; he had been shot. (8 RT 909.)  Petitioner

said someone had broken into the Bass residence, that the perpetrator was in

Marlon's bedroom and was surprised by Marlon Bass.  Petitioner said Marlon was

shot once or twice in the heart. (8 RT 909.)  Shelby's memory was foggy about

that part.  (9 RT 965.)  According to Shelby, at the time of the statements, there

had been nothing in the newspaper or news about the murder. (8 RT 911.) Later,

Shelby saw a newspaper article about the murder which in his opinion was

consistent with what Petitioner had told him. (8 RT 911.)  Shelby did not notice

any thing unusual in Petitioner's demeanor after the killing.  (8 RT 946.)

According to Shelby, a month to three months later, Petitioner

admitted his involvement in the murder. (8 RT 913.)  He said he had hired two

Black men to do the burglary for him and the police were looking in the wrong

direction.  He said the men were big and had played for the San Francisco 49ers.

---

[10]Marlon Bass's father Palmer Bass was a police officer. (6 RT 592.)

18

He and the men he had hired were going to split the money and drugs they took from the Bass residence. (8 RT 913.) Petitioner was confident and cocky. (8 RT 914.)  In another conversation, Petitioner said there was a drawer full of drugs and money.  He said the perpetrator was going to wait for Marlon to leave.  Then he was going to go into the back door of the house.  He would then go directly to Marlon's room where he knew there was a drawer full of money and a separate drawer full of drugs. (8 RT 915-917.)  He said the perpetrator was caught by surprise when Marlon sneaked up with a baseball bat. (8 RT 917.)  The perpetrator shot Marlon, who was in the hallway, twice. (8 RT 917- 918.)

According to Shelby, Petitioner was strapped for money before the murder. (8 RT 920.)  After the murder, Petitioner started buying gifts for Danette and his mother. (8 RT 921.)  Petitioner also had cocaine and a triple beam scale. (8 RT 921-922.)  Petitioner left town for about four months. (8 RT 922-924.)  He said he left because the police were bothering him and investigating him for the Bass murder. (8 RT 925.)  Petitioner never said he killed Bass. (8 RT 943.)

Shelby had only recently disclosed all this information to Detective Vizzusi in 2002.  (8 RT 927.)

Mary Keasling was Petitioner's girlfriend starting on December 27, 1990 until December 1994. (11 RT 1346-1347.) The relationship ended because Petitioner left Alamogordo, New Mexico. (11 RT 1348.)

One night in 1991 when Keasling had been drinking, Petitioner told her he was a suspect in a murder that happened when he was seventeen years old. (11 RT 1350.)  He knew the victim who was a drug dealer and had been a friend. (11 RT 1351.)  Although she told officers Petitioner told her the victim had been shot, Keasling was unable to recall the topic at trial. (11 RT 1353, 1357.)  She was unable to recall if a statement was made about the victim being Black. (11 RT

19

1354.)  Petitioner said no weapon had been found. (11 RT 1355.)  He did not say anything regarding fingerprints. (11 RT 1355.)  Petitioner said he had been to the guy's house that day to pick up drugs and had left before it happened. (11 RT 1357.)  He said he saw someone else approach the victim's house as he left. Keasling recalled the name of the person was Ed, Eddie, Fred or Freddie or Jack or Jackie. (11 RT 1357.)  Petitioner never said he killed Bass.  That would have caused her concern.  (12 RT 1370.)

According to Keasling, when she was interviewed by the officers in 2000 about what Petitioner had told, she had been drinking and they were rude to her. (11 RT 1358.)  Officers told her she was going to jail for being an accessory to murder. (12 RT 1386.)  Keasling felt they were trying to get her to make certain incriminating statements about Petitioner such as that he committed the crime in self-defense. (12 RT 1373-1374.)  She felt threatened and felt the officers could make trouble in her life.  (12 RT 1382.)  She kept telling them Petitioner never mentioned self-defense, all he said was the victim had been murdered.  (12 RT 1382.)  The officers played her a snippet of a tape of Petitioner's father saying Petitioner had said it was self-defense and told her self-defense could potentially help Petitioner.  (12 RT 1389-1390.)  Keasling would not lie under oath for Petitioner.  (12 RT 1374.)

Keasling's interview was tape recorded and the tape was played for the jury. (21 RT 2398-2399.)  The officers said that if she knew about a crime and did not tell about it she could be prosecuted as an accessory. (6 CT 1427.) According to Keasling, Petitioner told her there had been a murder but he did not know anything about it. (6 CT 1429.)  They were drinking when it was discussed. (CT 1429, 1439.)  The officers asked Keasling if self defense was involved and told her Petitioner's father had said it was self defense. (6 CT 1430-1431, 1435,

20

1440, 1445-1446.) She said Petitioner had beaten her but he wouldn't kill a cat even when she begged him because it was injured. According to Keasling, Petitioner was incapable of committing a murder. (6 CT 1430, 1498.) Keasling insisted she did not know anything and he never mentioned self defense. She insisted Petitioner had caused her much pain and she would never lie for him. (6 CT 1432, 1436-1438, 1440, 1443-1448, 1458-1461, 1463, 1468-1469, 1472, 1475-1477, 1486-1487, 1503-1504.) The officers threatened to get the FBI involved and to arrest her for conspiracy. (6 CT 1478.) She persisted in saying she knew nothing. (6 CT 1479, 1483.) The officers threatened to arrest her and she told them to go ahead because she didn't know anything. (6 CT 1502-1504.) She said she did not like being threatened in her own home. (6 CT 1504.)

 Keasling told the officers all Petitioner said was he had been under suspicion for murder when he was 17 or 18, the victim was a friend, was shot, was Black and a drug dealer and he had been to the victim's house the day before or the day after it happened. (6 CT 1434, 1436, 1448-1449, 1451.) He said no fingerprints or weapon was found. (6 CT 1449.)

 David Michael Leon is Petitioner's father. (14 RT 1766.) Mr. Leon did not recall Petitioner visiting him in San Diego unexpectedly in late 1983 or early 1984 but he did recall Petitioner being in New Mexico in July of 1984. (14 RT 1771-1772.) Petitioner stayed with him in San Diego from one to three weeks at times when he visited. At that time Mr. Leon lived with a woman who was not keen on his children visiting him. (14 RT 1772.) Petitioner lived in Alamogordo in the 1990s. (14 RT 1774.) Mr. Leon admitted he told officers his son had first mentioned the homicide in 1982 when he was living in San Diego. (15 RT 1882.)

 The police came to Mr. Leon's house in New Mexico in 2000 to discuss Petitioner's alleged involvement in the Bass homicide. (14 RT 1779.) He

21

was home alone. (14 RT 1828.) Mr. Leon was not expecting them and the interview lasted nearly an hour and a half. (14 RT 1792.) He was nervous. (14 RT 1792.) At the beginning of the interview, he told the police he all he knew was that Petitioner had told him he had been a suspect. (14 RT 1783, 1832.) He could not recall when Petitioner told him this but he (Mr. Leon) was not concerned at the time. (14 RT 1788-1789.)

Mr. Leon lied to the police in stating that Petitioner told him he had killed Bass in self-defense. (14 RT 1767, 1799, 1800.) Petitioner did not tell him this. (14 RT 1800, 1889.) He did this to help Petitioner and regretted having done so. (14 RT 1864.) He felt threatened in the middle of the interview. The officers didn't seem satisfied with the answers he was providing. (14 RT 1795-1796.) They threatened him with prosecution for accessory to murder. (RT 1795-1796.) Mr. Leon was concerned about this. (14 RT 1859.) Mr. Leon believed that if he would corroborate that it was in self defense he would be helping his son. (14 RT 1802-1803.) The police gave him this impression. (14 RT 1802.) He felt if he agreed on the self-defense issue it would be the end of the interview. (14 RT 1860.) He felt the police pressured him to say something that wasn't true. (14 RT 1797.) Toward the end of the interview he made up answers. (14 RT 1798.) During the interview, the police played him a snippet of a tape of Petitioner's 2000 interview with the police wherein he said, "My father, I told him. . ." (14 RT 1888, 17 RT 2033 .)

Mr. Leon had been drinking alcohol before the officers arrived. (14 RT 1827-1828.) He was into his second six pack of beer. (14 RT 1828.) He told the officers he had a problem with drinking and sometimes Petitioner talked to him when he had been drinking. (14 RT 1837.) Detective Vizzusi opined that Mr. Leon did not show objective symptoms of intoxication. (16 RT 1958.)

22

Mr. Leon's statements to the officers were recorded and played for the jury. (16 RT 1963.)

Mr. Leon told the officers Petitioner might have mentioned a friend of his being murdered in 1983. (6 CT 1283, 1290.)  Mr. Leon said Petitioner might have mentioned he was a suspect in the case but Mr. Leon often called Petitioner when Mr. Leon had been drinking. (6 CT 1287, 1307, 1317.)  Early on in the interview, the officers told Mr. Leon that if he was untruthful he might be charged with something and if he had knowledge and concealed it he might be an accessory, a theme which was repeated. (6 CT 1288-1289, 1306.)  The officers also told Mr. Leon he might help by corroborating what Petitioner had said. (6 CT 1289, 1296.)  Mr. Leon denied knowing anything about the crime but acknowledged several times Petitioner mentioned he was a suspect. (6 CT 1297, 1298, 1301, 1304, 1320.)  The officers again told Mr. Leon he could be prosecuted and implied Petitioner had said it was "self defense." (6 CT 1306-1307.)  Shortly thereafter, Mr. Leon said Petitioner had said it was self defense.  Mr. Leon said Petitioner had not elaborated and did not mention a gun. (6 CT 1308, 1309-1310, 1315.)  The officers told Mr. Leon the crime scene corroborated the self defense claim. (6 CT 1315.)  When asked, Mr. Leon agreed Petitioner might have said something about a baseball bat. (6 CT 1316, 1324.)  He said he was probably drinking the night Petitioner talked to him. (6 CT 1323, 1329.)

Petitioner was interviewed by the police on March 16, 2000. (6 CT 1332.)  His statements were recorded and played for the jury. (17 RT 2037.)

Petitioner met Marlon Bass at a party then started selling drugs for him.  Eventually, Petitioner branched out and conducted his own sales.  Petitioner had been to Marlon's house. (17 CT 1339-1342.) Marlon would have sales lined up on the street and would throw his money in a big drawer.  He did not allow people

23

into his house. However, Petitioner was allowed in. (17 CT 1343.) Petitioner told some of his friends about all the money. (17 CT 1344.) Bernard Wesley started hanging around. (17 CT 1344.) Wesley had stolen some drugs from Petitioner. (17 CT 1344-1345.)

Petitioner first said he did not remember seeing Marlon Bass on the day he died. (17 CT 1333.) Later, Petitioner said he thought he stopped by to see Marlon on that day but did not think he went into the Bass residence. (17 CT 1346 .) When Petitioner was in the neighborhood in his car, he saw Bernard Wesley and somebody with Wesley on Leigh Avenue. (17 CT 1346-1347, 1352.) Wesley was moving very fast. (18 RT 2152.) Petitioner also had someone with him in the car but he did not recall who it was. He named a number of his friends as possibilities. (17 CT 1349, 1354-1356.) He had told the police about this when interviewed shortly after the killing. (17 CT 1353.) He was aware then that he was being looked at for the crime. (6 CT 1382-1383.)

When asked, Petitioner said Marlon had been shot with a .22 caliber gun by someone who entered his house for dope or money while he was gone. Somebody, such as a police officer,  told Petitioner this or he read it in a newspaper. (6 CT 1377-1378.)[11] He was told that someone went into Marlon's house for dope or money. Marlon had left and come back for some reason. According to Petitioner, Marlon carried a souvenir bat under the seat in his car. (CT 13784379.) Petitioner did not know if Marlon had a gun. (CT 1379-1380.)

Petitioner was probably working at Great Western Bank during this time period. (6 CT 1358.)

Danette was Petitioner's girlfriend at the time. (6 CT 1355.) Danette

---

[11]According to Detective Vissuzi the caliber of the weapon used was never publicly divulged. (18 RT 2157.)

24

asked him if he was involved in the murder and he told her he was not. (6 CT 1392.)  If Danette had said otherwise, she was lying. (6 CT 1392.)

Petitioner knew the Smith brothers. (6 CT 1361.)  Petitioner denied telling anyone he had been involved in Marlon's murder even as a joke or in anger. (6 CT 1370-1371.) Petitioner said he was truthful when he was interviewed almost 20 years prior and said he hadn't seen Marlon for two weeks before Marlon's death. (6 CT 1373.)  However, Petitioner remembered owing Marlon some money and having to repay him. (6 CT 1373.)  He left town after Marlon's death because of drugs and because he was being investigated. (6 CT 1380-1384.)  He went to stay with his father in Murietta Hot Springs and then to New Mexico to stay with his grandmother. (6 CT 1384-1386.)   Some of his friends thought he had done it because of the way the police were acting. (6 CT 1391.)

Petitioner adamantly denied killing Marlon Bass. (6 CT 1395, 1397.) Petitioner denied telling anyone he was involved. (6 CT 1397-1398.) During the interview, the officers told Petitioner that they believe they could prove he was involved and that it would make a big difference if it were a cold-blooded murder versus self-defense.  (6 CT 1394.)  Petitioner denied being involved.  (6 CT 1395.)

Petitioner' s statements to Bernard Wesley and Wesley's activities on November 30 1983

At the time in question Bernard Wesley knew Petitioner and Marlon. (9 RT 1043-1044.)

According to Bernard Wesley, prior to Marlon Bass's death, Petitioner told him that Marlon had good drugs. (9  RT 1046.)  Petitioner said Marlon had at least $10,000 and they should steal money and drugs from him. (10 RT 1047.)  Petitioner said Marlon kept the money in a dresser drawer. (9 RT

1047.)[12] He said it would be easy to break a window and reach his hand inside. (9 RT 1048.) He said he knew Marlon's parent's schedule and it would be easy for him to get Marlon away from the house. (9 T 1049.) Petitioner said he would meet Marlon at the nearby 7-Eleven for a drug deal then double back to his house. (9 RT 1049.) He said he would wear a ninja outfit which would conceal his face. (9 RT 1050-1051.) He said he would need a gun in case Marlon went back. (9 RT 1051.) Petitioner asked Wesley to participate. (9 RT 1052.) According to Wesley, Petitioner's sister Dede was present during part of the conversation which took place in Petitioner's room. (9 RT 1053.) Wesley also discussed the plot with Greg Chatman and the Smith brothers.[13] (10 RT 1140, 1154, 1176, 1288.)

Wesley saw a crime stopper program about the Marlon Bass homicide and heard about it through the streets. (9 RT 1056-1057.)[14] He and a co-worker Tim Pantiga joked about the murder. (RT 1057.) He thought this happened after there was something in the paper about the killing. (9 RT 1057.) Tim and Wesley often took work breaks together during which Tim read the newspaper. When Tim read him an article about the killing, Bernard did not tell him, "Those are my boys." (9 RT 1091, 1098.) He denied telling Tim that he (Bernard) committed the murder or that the police were looking for him in connection with the case. (9 RT 1058, 1098.) His friends teased him that the police were after him. (RT 1058.) Wesley was angry with Petitioner for identifying him to the

---

[12]Wesley had been in Marlon's room before. (9 RT 1045, 1117.) He also had his phone number. (10 RT 1131.)

[13]Gregory Chatman knew Bernard Wesley in 1983. Wesley did not tell him that he had ever been told about a plan to burglarize the home of Marlon Bass by Petitioner. (18 RT 2161.)

[14]He claimed to have seen the program after his initial interviews with the police. (10 RT 1229.)

26

1    police as a suspect. (10 RT 1144, 1177.)

2            Wesley first talked to the police by phone on December 12, 1983.

3    He said he had seen a large amount of drugs in Marlon's desk drawer. (10 RT

4    1200.) The purpose of his call was to report Petitioner's plan. (10 RT 1201.) He

5    went to the police station on December 20, 1983 and tried to tell the police

6    everything he knew. (10 RT 1203.) He claimed to have gotten nervous and tired

7    so his intention was thwarted. (10 RT 1208.) He denied telling the police that he

8    had the conversation with Petitioner about the plan while they were watching the

9    fights and was impeached with a contrary statement. (10 RT 1204-1205.) He

10   recalled telling the police he visited with Petitioner's sister that day and Petitioner

11   was not home. (10 RT 1206.) During that interview, Wesley stated that the Smith

12   brothers (infra) were the only ones who would have the intestinal fortitude to go

13   into Marlon's house with a gun. (18 RT 2123.) Detective Vizzusi did not recall

14   that in that interview Wesley said that the Smith brothers had wasted Marlon like

15   they threatened to waste him. (18 RT 2122.)

16           Wesley first told the police that on the day Marlon Bass died, Wesley

17   was with a neighborhood friend named Renee. (9 RT 1061, 1073-1074,

18   1256-1258.) He also told the police he heard he was a prime suspect because he

19   had heard Petitioner was naming him because Wesley had been in the area (9 RT

20   1133.) When the police asked Wesley if he had driven down Curtner and stopped

21   when he saw a couple he knew, his memory of where he had been was jogged. He

22   had stopped to talk to the people; but, it turned out he did not know them so he

23   apologized.[15] (9 RT 1061-1062, 1069- 1071, 1074, 10 RT 1264.) Wesley was

24

25           [15]Crystal Custodia lived at 1953 Curtner Avenue in San Jose in November of 1983.
     (12 RT 1511.) The 7-Eleven was on the opposite side of Curtner. (12 RT 1512.) In late
26   1983, a person in a "cool car" approached her and a friend named Bruce as they were
27   standing in her front yard. (12 RT 1513-1514.) She could not remember anything about

28                                              27

1   driving a new Camaro Z28 painted white with multiple colored stripes. (9 RT

2   1082.)  The car was white, orange and black.  (9 RT 1082.)  He denied keeping a

3   roach clip in his car in 1983 and 1984. (11 RT 1289.)  He told the police he drove

4   by Marlon's house. (12 RT 1285- 1286.)  Before driving on Curtner, Wesley had

5   been at Eastridge Mall buying an opal necklace and a pair of earrings for his

6   girlfriend, Marianne Digiovanni. (9 RT 1062, 1265-1266.)  He bought the gift on

7   credit.  He previously testified he paid cash.  (9 RT 1063.)  He no longer had a

8   receipt for this purchase.  (10 RT 1265.)  He thought he left the mall at 10:30 a.m.

9   but it could have been 11:30 a.m. (9 RT 1071.)   He was on his way to Marianne's

10  job when he saw Petitioner kneeling down at a phone booth at a 7-Eleven. (9 RT

11  1064-1065)[16] They made eye contact. Petitioner looked like he was throwing up. (9

12  RT 1066.) Wesley went to Marianne's job and gave her the jewelry.[17] (9 RT 1072.)

---

14  him. (12 RT 1513.)  He said he thought they were someone else. (12 RT 1514.) The
15  person got out of his vehicle. (12 RT 1516.)  She did not remember the time of day this
    occurred or the day of the week.  (12 RT 1514.)

16          Inspector Joe Brockman interviewed Crystal Custodia on December 23,
17  1983. (12 RT 1520.)  She reported that she and her boyfriend were sitting in front of her
    house near a bus stop when a Black male, average build, driving a white Camaro or
18  Firebird with an orange pinstripe pulled past the house, honked and backed up. (12 RT
19  1521- 1522.)  He approached them, then said he thought they were someone else and
    departed. (12 RT 1522.)  She said it was a Monday or a Wednesday three to four weeks
20  prior in the late afternoon between two and three p.m. (12 RT 1522-1523.)

21          [16]Marianne's job was near Camden Ave. and Hwy. 17.  From the Eastridge Mall
22  Wesley took Curtner all the way to her job.  (9 RT 1064.)

23          [17]Marianne Brown, formerly known as Marianne Digiovanni, was Wesley's
24  girlfriend in 1983. Wesley gave her an aquamarine ring at the beginning of 1983. (12 RT
    1539, 1547.)  He might have given her an opal necklace during her lunch break.  He
25  sometimes visited her at her job at lunchtime.  The job was not far from Camden Ave. and
    Hwy 17. (12 RT 1540.)  He was not the type to give several items of jewelry at one time.
26  (12 RT 1543.)  Brown vaguely remembered Wesley's involvement in a drug rip off.  (RT
27  1542-1543.)  At that time Wesley used and sold drugs.  (12 RT 1541.) She told a defense

28                                      28

Wesley knew David and Marvin Smith.  (9 RT 1075.)  Wesley had seen Petitioner with David and Marvin Smith. (RT 1076.)  Wesley had taken some drugs from Petitioner before the murder of Marlon Bass. (RT 1076.)   Petitioner unsuccessfully tried to get payment from him and enlisted the assistance of the Smith brothers, who were physically large.  (9 RT 1076, 1078-1079.)  David and Marvin Smith and Petitioner threatened to beat him up and take his car for a joyride. (RT 1077.)  Before Marlon's death, Wesley was at Petitioner's house when the Smith brothers confronted him about taking Petitioner's cocaine. (RT 1139.)  Bernard denied he was mad at Petitioner because of this.  (10 RT 1171.)  At one point the Smith brothers  asked his help to "take off" Petitioner.  (10 RT 1162.)

Wesley called the police on December 27, 1983 and reported he had seen David Smith walking on Bascom at 3:30 p.m. and that he looked different than when he had last seen him, now sporting a new hairstyle and expensive coat. (10 RT 1209.)  During this call, Wesley did not initially mention having seen Petitioner on Curtner.  (11 RT 1278.)

Wesley did not remember telling the police that he did not think Petitioner was involved in Marlon's murder.  (10 RT 1185.)  He denied that he rode on a bus with the Smith brothers at some time after the murder.  (10 RT 1186.)

David and Marvin Smith are twin brothers.[18] (11 RT 1291; 1298,

---

investigator she was not certain that Bernard Wesley gave the ring to her for her birthday or Christmas but he was not the type of person to give her a ring out of the blue. (RT 2289.)

[18]In 1990, David Smith was convicted of misdemeanor destroying or concealing documentary evidence (Pen. Code § 135) and Marvin Smith suffered a misdemeanor conviction of false identification to a police officer in 1985 (Pen. Code § 148.9). (RT 2473.)

29

1302.) David frequented a deli on Bascom Avenue where Petitioner worked. (11RT 1291; 12 RT1474.)  Marvin knew Petitioner but denied having a relationship with him. (11 RT 1303.) Neither Smith brother knew Marlon Bass or Bernard Wesley. (11 RT 1292; 1301, 1303, 1309.)  Neither brother was able to recall Petitioner asking him to collect a drug debt from anyone. (11 RT 1293, 1303.)  However, in 1984 they might have told the police that Petitioner had used them to collect a drug debt. (11 RT 1292; 1303-1304.)  Petitioner never asked them to rip off some drug dealers and they never told that to police officers. (11 RT 1292-1294; 1305.)  Nor did Petitioner tell them he was planning such a thing. (11 RT 1305.)  David never told Det. Vizzusi that Petitioner kept saying he wanted to rip-off somebody and he wanted to get their drugs nor that Petitioner offered to pay him to do so. (11 RT 1294.)  Petitioner asked him and his brother to help at the store with a beer theft.(RT 1296-1297.)  David denied having a falling out with Petitioner.  (11 RT 1297.)  After the police talked to David, Petitioner disappeared. (11 RT 1296-1297.)  David had never seen Petitioner with a gun. (11 RT 1299.)

     Former Officer John Kracht interviewed David and Marvin Smith on February 6, 1984. (11 RT 1312.)  David said he and his brother backed up Petitioner when he collected a drug debt from Bernard Wesley. (11 RT 1314-1315.)  He also said Petitioner wanted them to rip off some drug dealers and he said he would pay them. (11 RT 1315.)  Martin Smith was interviewed on February 4 and confirmed what his brother had told Officer Kracht.  According to Marvin, Petitioner did not name the dealer and he said he was going to set it up. (11 RT 1316-1317.)  Petitioner said he knew the drug dealer and the dealer did not have a gun. (11 RT 1319.)  David said he had not seen Petitioner for six to seven months prior to February 6, 1984. (11 RT 1321.)

     Detective Gilbert Vizzusi interviewed David and Marvin Smith on

30

February 11, 2000. (11 RT 1327.)  They confirmed the statements they had made in 1984 were true and accurate. (11 RT 1328.)  David recalled that Petitioner had asked him to participate in a robbery of a drug dealer. (11 RT 1329.)  At the time of these interviews Vizzusi had not completely excluded the Smith brothers as suspects.  (11 RT 1331.)  Vizzusi told Marvin that his name had come up because Petitioner had pointed the finger at him and his brother.  (11 RT 1337.)  At the time he interviewed the Smiths, Vizzusi also knew that Wesley had also made a statement identifying them as possibly being involved.  (11 RT 1342.)

## B.  The defense case.

Bernard Wesley and Timothy Pantiga were coworkers in late 1983 and early 1984 and they took breaks together. (18 RT 2223-2225.)  They would smoke marijuana and read the newspaper. (18 RT 2225-2226.)  Wesley, who normally did not take an interest in the newspaper, was checking it for a few days looking for an article regarding a murder and a "Black kid" killed in a home invasion. (18 RT 2226.)  After he found the article, Wesley said "those were his boys." (18 RT 2227-2228.)  Pantiga told Wesley there was no statute of limitations on murder. (18 RT 2228.) Later, when Pantiga visited Wesley at his residence to purchase marijuana, Wesley said the police wanted to talk to him about the murder.  Pantiga told Wesley if he had nothing to worry about he should talk to the police. (18 RT 2229.)  Wesley admitted the killing.  He quickly said he was joking and he didn't do it. (18 RT 2229.)[19]  Wesley appeared nervous like something was bugging him. (18 RT 2230.)  Wesley never said Petitioner asked him to commit a burglary of Marlon Bass. (18 RT 2232.)

According to Pantiga, Wesley had a roach clip with a feather in his

---

[19]Pantiga told a district attorney's investigator that he did not take this admission seriously.  (18 RT 2233.)

31

car. (18 RT 2232) Wesley borrowed Marianne Mai's car occasionally. (18 RT 2232.)

Marianne Mai was the girlfriend of Bernard Wesley in the early 80's for two or three years. (18 RT 2236-2237.) According to Mai, Wesley drove a white and red Camaro and carried a red roach clip with red feathers on it in the car. (RT 2237-2238.) The clip matched the car. (18 RT 2238.)

According to Dr. John Thornton, a forensic scientist, the crime scene processing in this case was rather casual. (16 RT 1926-1927, 1935.) It was important to protect the crime scene to avoid contamination. (16 RT 1933.) The crime scene was not limited to the immediate area where the body was found. (16 RT 1935.)

The front door area of the Bass residence where the glass was broken and the bat should have been processed for fingerprints. (16 RT 1936-1938.) The missing button and the injury to the victim's arm could be consistent with a struggle. (16 RT 1939-1940.) There was no damage to the desk drawer, indicating it was not forced open. (16 RT 1942.) A towel and a red feather were found in the victim's bedroom. (16 RT 1945.) Dr. Thornton could not rule out the possibility of more than one perpetrator. (16 RT 1941.) The evidence at the scene did not reveal much of a story. Nothing established the sequence of events. (16 RT 1947.) Because there was only one bullet remaining in the wall with the others in Marlon, the positions of the shooter and Marlon could not be determined. (16 RT 1946.)

In 1982, there had been a petty theft at the Bass residence and two theft related crimes on the same street. (18 RT 2165.) Ken Auda was a suspect in the crime based on rumors he had been committing burglaries in the area. (RT 2166.) However, Detective Vizzusi never interviewed Auda. (18 RT 2168.) Vizzusi never attempted to interview Blaine Buscher or Kirk Woods who were

1    mentioned in the investigation. (18 RT 2169-2170.)

2           Petitioner was seen at the Arbuckle residence on January 24, 1984.

3    (18 RT 2191.)

4           Geoffrey Caplan lived around the corner from Marlon Bass in 1983.

5    (18 RT 2240.)  Caplan broke into the Bass residence five times through a

6    bathroom window to take drugs. (18 RT 2241-2242.)  According to Caplan,

7    Marlon kept drugs and some money, but not his big money, in a small wooden

8    box.  He also kept money in a metal box. (18 RT 2242- 2243.)

9           Marlon caught Caplan stealing about a year before the murder. (18

10   RT 2248.)  This caused their friendship to end.  (18 RT 2249.)  About a week

11   before Marlon died, Caplan and Marlon got into a scuffle. (18 RT 2244.)  In 1983,

12   Caplan's father owned a .22 caliber rifle. (18 RT 2244.)  According to Caplan, he

13   was with Eddie King on the day of the murder. (18 RT 2252.)

14          Caplan was unaware of a falling out between Petitioner and Marlon

15   Bass prior to Marlon's death. (20 RT 2312.)

16          Kenneth Pitts interviewed Caplan on July 2, 1985. (18 RT 2257.)

17   Caplan told him Marlon bass kept his money and drugs in a small handmade

18   wooden box. (18 RT 2257.)

19          According to defense investigator Robert Bortnick, Shelby Arbuckle

20   said he had a conversation with Petitioner about Marlon's death between 24 to 72

21   hours after the death.  His sister Danette was present. (20 RT 2286.)  Shelby said at

22   some point Danette had told him about the reenactment.  (20 RT 2287.)

23          A pay owe sheet recovered from Marlon Bass's bedroom reflected a

24   person named Dave L. owed $40. (20 RT 2338-2339.)

25          In an interview with Danette Edelberg on February 10, 1984,

26   Inspector Brockman told her Bass attacked the perpetrator who was in the

27

28                        33

1    bedroom with a baseball bat. (20 RT 2321-2322.)[20]  He possibly told her Marlon's

2    connection  had cut him off because his drugs were not good and he was getting

3    them elsewhere.  (20 RT 2323.)  Brockman possibly disclosed the caliber of the

4    bullets to Palmer Bass. (20 RT 2340.) During an interview of Anthony James, a

5    drug dealer who knew Marlon through the drug trade, on December 22, 1983, the

6    involvement of a .22 weapon was mentioned. (20 RT 2342-.2343.)

7            Petitioner telephoned Detective Brockman at 2:09 on December 2,

8    1983.  He told Brockman he had seen Bernard Wesley near Marlon Bass's

9    residence on November 30, 1983. (20 RT 2314, 2316.)  Wesley stopped, backed

10   up and left in a big rush.  (21 RT 2388.)  Petitioner told Inspector Brockman that

11   he and Marlon Bass had been friends for 4 ½ years and he saw him at least five

12   times a week. (20 RT 2354.)  He said he knew Marlon did not have a gun and he

13   saw $15,000 in Marlon's money drawer once several months before the murder.

14   (20 RT 2354.)  He said he stopped seeing Marlon two weeks before the murder

15   and he did not go to Marlon's funeral. (20 RT 2354.)  Petitioner mentioned

16   working at Great Western Bank as the reason he did not see Marlon for two weeks.

17   (20 RT 2359-2360.)[21]  Petitioner said he had no grudges against Bernard Wesley.

18   (20 RT 2355.)  He said he did not think Wesley killed Marlon Bass. (20 RT

19   2356.)[22]

20           Bernard Wesley called Brockman on December 12, 1983 . (RT

21   _____

22   [20]In his conversations with Danette, Brockman discussed with her that Petitioner
     worked as a bank teller and that he was earning good money.  (20 RT 2328-2329.)

23

24   [21]Brockman did not recall following up on Petitioner's statement about working at
     Great Western.  (20 RT 2331.)

25

26   [22]Petitioner called Brockman on February 8, 1984 , upset because Danette had
     called him, hysterical, asking if she should talk to the police.  Petitioner was upset about

27   being investigated and said he was calling from San Diego.  (20 2351.)

28                                    34

2317.) Bernard Wesley told him two "Black guys," David and Martin, beat up Petitioner twice, once when they ripped off cocaine and again when he damaged their front door. (RT 2325.) They intimidated him into telling them about drug dealers so they could rip him off. (20 RT 2326.) Wesley also said that he had had a conversation with Petitioner three weeks earlier where Petitioner mentioned how much money Marlon had and he (Petitioner) was impressed. Wesley inferred from that that Petitioner wanted to rip off Marlon. (20 RT 2326.)

Petitioner had a phone interview with Brockman on December 20, 1983. (21 RT 2385.) Petitioner said he owed Marlon $20 or $30 at the time of his death. He told Brockman he had seen money in Marlon's money drawer and that on the day of Marlon's death, he saw Wesley cruising on Curtner. (21 RT 2388.) Wesley stopped, backed up and left the area in a rush. (21 RT 2388.) Wesley was interested in the subject of Marlon's money drawer. (21 RT 2388.)

### C. The prosecution's rebuttal.

Eight fingerprints were collected from Marvin Bass's bedroom or the door to the bedroom by Officer Bill Santos. (22 RT 2475.) Santos was unable to recall dusting the entry for fingerprints. (22 RT 2477.) There was no record of the removal of any prints from the latch of the front door. (22 RT 2488.) Santos collected a towel and a red fiber from Marvin's bedroom. (22 RT 2478.) The crime lab described the fiber as a feather. (22 RT 2481.)

35

# ARGUMENT

## I

### HABEAS CORPUS IS THE PROPER VEHICLE FOR THE PRESENTATION OF PETITIONER'S CLAIM

A criminal defendant may attack the effectiveness of his appellate counsel in a petition for writ of habeas corpus.  (In re Barnett (2003) 31 Cal.4th 466, 476; In re Spears (1984) 157 Cal.App.3d 1203, 1209-1210.

## II

### APPELLATE COUNSEL RENDERED INEFFECTIVE ASSISTANCE TO PETITIONER IN HIS DIRECT APPEAL.

#### A.  The standard of review.

Petitioner had a Sixth Amendment right to effective counsel on appeal.  (Evitts v. Lucey (1985) 469 U.S. 387.)  In order to find counsel was ineffective, the test set forth in Strickland v. Washington (1984) 466 U.S. 668, 687-8 requires a showing that counsel's performance fell below an objective standard of reasonableness and that, but for counsel's error, a different result would have been reached.  "'[C]ounsel is expected. . .to possess knowledge of those plain and elementary principles of law which are commonly known by well-informed attorneys. . .'"  (People v. McCary (1985) 166 Cal.App.3d 1, 8, quoting Smith v. Lewis (1975) 15 Cal.3d 349, 358.)

The Strickland test applies to appellate counsel.  (Smith v. Robbins (2000) 528 U.S. 259, 285.)  To establish constitutionally deficient representation on appeal, the defendant must show that (1) the act or omission in question was objectively unreasonable, and (2) there is a reasonable probability that but for counsel's error, the defendant would have prevailed on appeal.  (Id., at p. 285.)

36

Appellate counsel has a duty to present a brief to the reviewing court that among other things, sets forth all arguable issues. (<u>People</u> v. <u>Barton</u> (1978) 21 Cal.3d 513, 519; <u>People</u> v. <u>Harris</u> (1993) 19 Cal.App.4th 709, 714.) As explained in <u>People</u> v. <u>Johnson</u> (1981) 123 Cal.App.3d 106, 109, 112:

> ". . .an arguable issue consists of two elements. First, the issue must be one which, in counsel's professional opinion, is meritorious. That is not to say that the contention must necessarily achieve success. Rather, it must have a reasonable potential for success. Second, if successful, the issue must be such that, if resolved favorably to the Petitioner, the result will either be a reversal or a modification of the judgment."

Further, "counsel serves both the court and his client by advocating changes in the law if argument can be made supporting change." <u>People</u> v. <u>Feggans</u> (1967) 67 Cal.2d 444, 447-448; <u>Harris</u>, <u>supra</u>, 19 Cal.App.4th at 714.)

The reviewing court in <u>People</u> v. <u>Valenzuela</u> (1985) 175 Cal.App.3d 381, 391, observed:

> "The question of ineffective assistance of counsel must be decided on a case by case basis, 'and the determination of each will depend on whether the Petitioner's counsel failed to raise assignments of error which were crucial in the context of the particular circumstances at hand.' (Citation omitted)."

**B.  Appellate counsel was ineffective in failing to raise on direct appeal the issue of the trial court's refusal to allow the defense to present the testimony of Dr. Ofshe or Dr. Leo, experts on the subject of police coerced statements by witnesses.**

**1.    The proceedings at Petitioner's trial.**

Defense counsel made repeated attempts to induce the court to allow him to present the testimony of an expert, Dr. Richard Ofshe. The purpose of the testimony was to show that the statement Petitioner's father gave to the police in which he admitted that Petitioner had informed him the murder was committed in self-defense was coerced as a result of police tactics. Petitioner unsuccessfully

37

sought to exclude the statement of his father on this basis. (4 CT 984-985.) When

Dr. Ofshe proved to be unavailable, defense counsel sought permission to present

the same type of testimony through Dr. Ofshe's colleague, Dr. Richard Leo. (5 CT

1172-1174.)

        The prosecution opposed the admission of this testimony on the

grounds that it dealt with the credibility of a witness which was not a proper

subject for expert testimony, that it was not relevant as to the voluntariness or

credibility of witnesses' statements and that Dr. Ofshe was not an expert on the

subject to which his testimony pertained. The prosecutor asserted that there was

no evidence that the police used coercion to obtain witnesses' statements. (4 CT

976-983.) Petitioner filed a written opposition to the prosecutor's position. (5

CT 1090.) Petitioner stated that the purpose of Dr. Ofshe's testimony was not to

establish the credibility of a witness but rather to show the subtle and not obvious

ways a statement can be coerced. Defense counsel argued:

> "We submit that the statement by Mr. Leon [Petitioner's father]
> was the product of police coercion, specifically putting Mr. Leon
> in a position where he was coerced into stating that his son
> said to him that 'it was self-defense.' The evidence will show
> that Mr. Leon stated numerous times that his son did not tell
> him anything about the murder other than he had been a suspect.
> It was only when the police make statements to Mr. Leon that if he
> told them that his son said it was in self-defense they could go
> to the District Attorney and see that his son was freed from
> custody. The police also went on to tell the father that they had
> been to the crime scene and that the crime scene corroborated
> that self-defense was a viable conclusion. All they needed to
> hear was corroboration. The police even went the extent of
> playing a tape for the father using an excerpt lifted from the
> defendant's earlier statement to the police and implying that
> from this snippet that his son said he killed Marlon Bass in
> self-defense. This was not only untrue but furnished the basis
> for the father to believe that the police were telling him the
> truth. The police also threatened the father that if he did not
> tell him what they want to hear he would be 'charged with
> something' and that he could be 'an accessory' to the murder.
> It was only after the police preyed upon him for approximately
> one hour that he finally corroborated what he believes they told
> him existed, e.g. that they have been to the crime scene and if

he just told the police his son mentioned that it was in self-defense it will result in his son's 'life' and 'his son's freedom.' 'Now is the time to get it out so we can go to the DA before he is even charged and tell the DA that this is what he told us. . .' All of these ploys can be demonstrated to produce unreliable and coerced responses. This is especially true where Mr. Leon who had consumed approximately two six packs of beer at the time. This coerced statement goes to the very core of the prosecution's case. There is a substantial nexus between the way the interview was conducted and the statement that was finally elicited from Mr. Leon's father. The prosecution's attempt to mask this as a credibility question is an attempt to obfuscate the evidence." (5 CT 1088-1089.)

After listening to the tape of Michael Leon's statement, the trial court ruled that "you [meaning defense counsel] do not need an expert to tell me that this tape was a statement by someone who was coerced or not coerced." (3 RT 281.) The court made a finding that Mr. Leon's statement was voluntary without hint of coercion and whatever tactics were used by the police were permissible under California law. The court then excluded expert testimony as it would not assist the jury "because there's something of common experience that juries have in regarding the credibility of people under the circumstances under which they are given." (3 RT 283.) Defense counsel reiterated that how police interrogation worked was beyond the common experience of the jury, that the average juror did not know what kind of specific and specialized training police officers underwent in the subject of interrogation, the average juror did not know or appreciate why "it is psychologically a person will make a statement against his or her self interest, " and that it was counter-intuitive that a person would make a false statement talking to the police. (3 RT 283-286.) The court again stated it would not allow the testimony because it was "sufficiently satisfied" that the expert could not assist the jury, but that defense counsel was not precluded from attacking the credibility of Mr. Leon's statement either from examination or argument. ( 3 RT 287.)

39

Petitioner sought reconsideration of this ruling.  (3 RT 377.)
Defense counsel cited various cases to the court and acknowledged that the trial
court had found Mr. Leon's statement voluntary but objected to the trial court's
blanket exclusion of expert testimony to educate the jury as to general principles
concerning police interrogation.  Defense counsel noted that the techniques could
not be readily recognized by jurors, jurors did not know that police were
necessarily specifically trained in how to interrogate witnesses, that these
techniques were designed to cause someone to make a statement against their self-
interest, and that it was counter intuitive for a juror to believe a person would make
a false statement and come to court to testify that it was false.  (3 RT 384-385.)
Counsel restated the coercive tactics inherent in the police handling of Mr. Leon.
(3 RT 386-387.)

The trial court ruled that the issue was  not false confession but
rather of the credibility of a witness and "expert witnesses are not necessary to
assist the trier of fact in determining credibility."  (3 RT 393.)  The court noted on
cross-examination of Michael Leon, counsel could elicit various factors and argue
to the jury about what value and weight they should accord his statement.  (3 RT
393.)   The court denied Petitioner's request to reconsider its earlier ruling, stating:

> "The court has already ruled that it did not need an expert witness
> to assist it in making the determination that the statement was
> so coercive that it was the type that had to be excluded. . .And the
> Court has to rule also contingently no expert witness will be
> allowed to assist the jury in making a determination on
> credibility."  (3 RT 394.)

Petitioner raised the issue again unsuccessfully  in a motion for new
trial.  In the motion defense counsel argued:

> "Dr. Leo was prepared to testify with respect to the techniques
> utilized by Sgt. Vizzusi in coercing David Leon's father, Michael
> Leon, to make a statement that his son purportedly told him that
> the death of Marlon Bass was done in self-defense or words to
> that effect as well as the techniques used with other witnesses.

40

His testimony would have included police interviewing and interrogation training, the psychology of police interviewing and interrogation, and coercion and factors related to the taking of involuntary and/or unreliable statements. . . .The court's preclusion of Dr. Leo's testimony was extremely damaging to the defendant's case and in error. Essentially, the court precluded the defense from establishing an explanation as to why Mr. Michael Leon's statement to the police was made and allowed the District Attorney to seize upon this statement to the detriment of the defendant. Not only was Dr. Leo not permitted to testify, but after precluding him from testifying on the course of nature of the police techniques and tactics, the court also precluded testimony as to the general means of how police interrogate witnesses and defendants without relating it to the specifics involved in the interview of the witness in this case. The preclusion of this evidence was error by the court and a deprivation of Mr. Leon's right to a fair trial." (7 CT 1727-1728.)[23]

## 2. The merits.

### a. Counsel on direct appeal should have briefed the issue of the trial court's exclusion of the expert testimony at issue.

Here, as outlined above, defense counsel sought to present the testimony of Drs. Ofshe or Leo to attest to the factors that would cause Michael Leon to make a false statement to the police, a statement which was incredibly damaging to Petitioner and a key component of the evidentiary puzzle against him. As set forth above, defense counsel was clear that the testimony would be in the form of general education of the jury as to police interrogation techniques, interview training and why a person would make a false statement to the police, and would not cross into the arena of commentary on witness credibility.

At the time appellate counsel filed the opening brief, there was one published California decision disallowing the testimony of Dr. Ofshe. This was People v. Son (2000) 79 Cal.App.4th 224, 240-241, a decision from the Fourth District Court of Appeal. In that case:

---

[23]    Dr. Leo was essentially a substitute for Dr. Ofshe whose schedule apparently did not permit him to be a witness at the time counsel needed him. (2 RT 195.)

41

1

2

3

4

5

> "Son asserted Ofshe could testify about police tactics in
> wearing down suspects into making false admissions. The court
> declined to admit Ofshe's testimony. The court stated such
> expert testimony was unnecessary in light of Son's testimony
> that he had confessed falsely due to Detective Gallivan's
> asserted offer of not more than one year in custody. The
> court also stated there was no evidence that police engaged in
> tactics wearing down Son into making false admissions."
> (Id., at p. 241.)

6    The court found the exclusion of Dr. Ofshe's testimony as irrelevant was proper

7    due to the lack of evidence of coercive tactics coupled with the defendant's

8    admission that he confessed only because of the promise of not more than one year

9    in custody. (Id., at p. 241.) At that time, there were cases from other jurisdictions

10    also disallowing Dr. Ofshe's testimony on false confessions. (See e.g., Kansas v.

11    Cobb 43 P.3d 855 (Kan.Ct.App.2002); State v. Davis (2000) 32 S.W.3d 603; New

12    Jersey v. Free (2002) 798 A.2d 83.)[24]

13            On the other hand, at the time Petitioner's opening brief was filed

14    there was a published California case as well as cases from other jurisdictions

15    authorizing the admission of the type of evidence sought to be admitted here, in

16    some cases specifically the testimony of Dr. Ofshe. The California case was

17    People v. Page (1991) 2 Cal.App.4th 161. In that case the defendant sought the

18    admissibility of expert testimony in three categories as follows:

19

20

21

> "(1) the general psychological factors which might lead to
> an unreliable confession, along with descriptions of the
> supporting experiments; (2) the particular evidence in Page's
> taped statements which indicated that those psychological
> factors were present in this case; and (3) the reliability of Page's

22

23    [24]    A more recent case disallowing the testimony of Dr. Leo is People v.

24    Ramos (2004) 121 Cal.App.4th 1194, a decision from the Second District. The reviewing
court found no abuse of discretion in the exclusion of Dr. Leo's testimony on police

25    interrogation techniques and false confessions because the defense extensively cross-
examined the officer on the interrogation techniques he used in the interview of Ramos

26    and other witnesses and called witnesses who attested to the officer threatening them and

27    attempting to coerce statements from them.

28                                    42

confession given the overall method of interrogation." (Id., at p. 183, emphasis in original.)

The trial court allowed evidence in category one but not two and three. The reviewing court upheld these restrictions:

> ". . .Professor Aronson outlined the factors which might influence a person to give a false statement or confession during an interrogation. Having been educated concerning those factors, the jurors were as qualified as the professor to determine if those factors played a role in Page's confession, and whether, given those factors, the confession was false." (Id., at p. 189.)

In our case, trial counsel limited his request to category one. (7 CT 1727-1728, 3 RT 384-385.) Page is thus authority for defense counsel's request.

Other cases authorizing the admission of Dr. Ofshe's testimony specifically or testimony like it include United States v. Shay (1st Cir. 1995) 57 F.3d 126, 133 [error to exclude psychiatric testimony that the defendant suffered from a mental disorder that caused him to make false statements against his interest]; United States v. Hall (7th Cir. 1996) 93 F.3d 1337 [reversible error in refusing to hold a full Daubert hearing before excluding Dr. Ofshe's testimony regarding false confessions and the indicia recognized as present when that is likely to occur]; United States v. Hall (C.D. Ill. 1997) 974 F. Supp. 1198 [Dr. Ofshe found to be a qualified expert who could testify "that false confessions do exist, that they are associated with the use of certain police interrogation techniques, and that certain of those techniques were used in Hall's interrogation; Dr. Ofshe could not explicitly testify about matters of causation, specifically whether the interrogation methods used in this case caused Hall to falsely confess]; Boyer v. State (2002) 825 So.2d 418 reversible error due to exclusion of Dr. Ofshe's testimony as to "a phenomenon that causes innocent people to confess to a criminal offense; police techniques that secure false confessions under certain circumstances; and his explanation of the parameters within which one can

43

evaluate a confession to determine its veracity]; <u>Miller</u> v. <u>State</u> (Ind. 2002) 770
N.E.2d 763 [exclusion of Dr. Ofshe's expert testimony to assist jury in
understanding psychology of interrogation of mentally retarded persons deprived
defendant of opportunity to present a defense, requiring reversal]; <u>State</u> v. <u>Conn.</u>
(Ct. 1976) 370 A.2d 1002) [testimony of psychologist admissible to assist jury in
considering weight and credibility of confession].

    In short, at the time appellate counsel was handling Petitioner's
direct appeal, there was one California appellate court case supporting the
admission of the type of expert testimony sought herein, and one specifically
declining to admit Dr. Ofshe's testimony as well as caselaw from the federal courts
and other states authorizing its admission and finding reversible error when it was
excluded.  Under such circumstances, appellate counsel Romero was ineffective in
failing to raise this issue.   First, there was no California Supreme Court case
squarely holding such evidence inadmissible, thus appellate counsel was free to
argue that the <u>Son</u> case, the only negative published decision at that time, was ill-
reasoned and should not be followed or to distinguish it factually from the instant
case.[25]  Further, the Sixth District Court of Appeal was not bound by a decision of
the Fourth District, the district that decided <u>Son</u>. (<u>Nabors</u> v. <u>Worker's</u>
<u>Compensation Appeals Board</u> (2006) 140 Cal.App.4th 217, 226; <u>Greyhound Lines.</u>
<u>Inc</u>. v. <u>County of Santa Clara</u> (1986) 187 Cal.App.3d 480, 485.)  Second, counsel
had a plethora of favorable authority from other states as well as federal appellate
courts upon which to base an argument that it was error to exclude the expert
testimony in question.  While not binding, the decisions of other state and federal

---

[25]  Had there been applicable, negative California Supreme Court authority, the
appellate court in Petitioner's direct appeal would have been obliged to follow it. (<u>Auto</u>
<u>Equity Sales, Inc.</u> v. <u>Superior Court</u> (1962) 57 Cal.2d 450, 455-456; <u>Fireman's Fund</u>
<u>Insurance Company</u> v. <u>Maryland Casualty Company</u> (1998) 65 Cal.App.4th 1279, 1301.)

courts are persuasive.  (Barnett v. Rosenthal (2006) 40 Cal.4th 33, 58; Hood v.

Santa Barbara Bank and Trust (2006) 143 Cal.App.4th 526, 547; Martinez v.

Enterprise Rent-A-Car Company, et al. (2004) 119 Cal.App.4th 46, 55; People v.

Reilly (1988) 196 Cal.App.3d 1127, 1135 [in considering the general acceptance

of a new scientific technique, "a court should examine relevant decisions from

other jurisdictions on the question of consensus"].)  Further, appellate counsel's

obligation to advance the law

in the face of contrary authority per Feggans, supra, is described in Appeals and

Writs in Criminal Cases (2d Ed.) as follows:

> "Counsel, however, should make arguments he or she
> believes to be sound even if there is current case law
> solidly against the position.  This is how new law is made.
> . . . .[negative] authority should be analyzed rigorously and
> its flaws demonstrated to the appellate court." (Id., Section 1D.42,
> p. 201.)

In the case at bar, appellate counsel could have made a compelling

argument that the trial court's exclusion of Dr. Ofshe or Leo's testimony was

reversible error.  The only negative California authority at the relevant time, Son,

was readily distinguishable as in that case, the defendant gave a specific reason as

to why he falsely confessed.  Thus there was no reason for Dr. Ofshe in that case

to describe police tactics that result in false confessions.  (Son, supra, 79

Cal.App.4th 224, 241.)  That is not the case here.  Both Dr. Ofshe and Dr. Leo had

been found to be experts in the relevant subject area in other published decisions.

(Hall, 974 F.Supp. 1198.)  Dr. Leo has since implicitly been so found.  (Scott v.

Texas (Tex.App. 2005) 165 S. W.3d 27; Ramos, supra [no objection in either case

that Dr. Leo was not an expert in the field about which the defense sought his

testimony].)  The scope of expert testimony Petitioner sought to have admitted was

in line with what the Page court had approved some years earlier.  The court's

expressed reason for excluding the expert testimony in this case, that such

45

testimony was not necessary to help the jury resolve the issue of witness credibility was not well taken inasmuch as, as more fully set forth in the preceding subsection, defense counsel specifically indicated he would not be asking his expert to render an opinion on the credibility of the particular false statement by Michael Leon but rather would allow the jury to draw their own conclusion in that regard.  Further, the trial court could have admitted the testimony then sustained individualized objections to any testimony that appeared to cross the line into improper opinion as to witness credibility.  (State v. Miller, supra, 770 N.E.2d at p. 774.)  Indeed, defense counsel was prepared to limit his expert in the manner approved by the court in United States v. Hall, supra, 974 F.Supp. at p. 1205 ["It is beyond Dr. Ofshe's knowledge as a social psychologist to assess the weight of the evidence and the credibility of witnesses."].  Further, appellate counsel could have argued that the fact that the court decided it did not need expert testimony to assist it in its determination that Michael Leon's statement was voluntary was similarly not a principled basis to exclude the proffered expert testimony.  As stated in Miller v. State, supra,  "The trial court's threshold determination of sufficient voluntariness for admissibility of the videotape did not preclude the defendant's challenge to its weight and credibility at trial." (770 N.E.2d at p. 773.)  Also see Hall, supra, 93 F.3d at p. 1344.)

        Further, appellate counsel could have made an equally compelling argument that the refusal to allow the requested expert testimony was prejudicial error warranting reversal.  Michael Leon's alleged statement that Petitioner essentially admitted the crime to him, stating it had been committed in self-defense was one of the centerpieces of the prosecution's case, right alongside Danette Edelberg's claim that Petitioner had not only admitted to her that he committed the murder but reenacted it as well to her.  Indeed, the prosecutor argued the

46

importance of Michael Leon's statement in the scheme of the case during his

opening argument to the jury.  (22 RT 2563-2564.)   Petitioner's defense depended

upon his ability to demonstrate the unreliability of his father's highly incriminating

statement to the police.    Counsel's cross-examination of Mr. Leon was no

substitute for the requested expert testimony, for if it were, such testimony would

never be admitted on the theory that the defense could always elicit coercive

factors on cross-examination.  Cases allowing such expert testimony implicitly

demonstrate that cross-examination of the witness making the statement or the

police officer taking it is not an adequate substitute.

Appellate counsel Lynda Romero has provided a declaration as to

why she did not raise this issue..  In said declaration (Exhibit D), she states she had

familiarity with the issue from two prior cases and had actually raised it on appeal

in one case.  In evaluating the issue, she reviewed several cases, which included

People v. Son, supra, the case upon which the People relied in arguing against the

admission of the expert testimony and two Evidence Code sections.  She also

listened to the tape of Michael Leon's interview with police which she opined did

not show that any coercive tactics were used.  She also felt that establishing

prejudice from the exclusion of the requested testimony would be problematic and

that the fact that the testimony in question was that of a witness as opposed to a

defendant impacted the viability of the issue.  She vaguely recalls discussing the

issue with trial counsel.

Petitioner contends that Ms. Romero's explanation for her failure to

raise this issue is unavailing. First, although she claims familiarity with the issue, it

is clear that her research was inadequate as she failed to review the Page case from

California that would have supported the admission of the expert testimony in this

case as well as the numerous authorities from other jurisdictions cited above in

47

existence at the time Petitioner's direct appeal was pending which would have supported it as well and which in some instances found reversible error in its exclusion. To analogize to IAC in the trial counsel context, Ms Romero made a tactical choice based on an inadequate investigation. As such her choice is not entitled to the deference of this court:

> "'Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgements support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." (Wiggins v. Smith (2003) 539 U.S. 510, 123 S.Ct. 2527, 2535; also see Sanders v. Ratelle (9th Cir. 1994) 21 F.3d 1446, 1456.)

Second, the case she had personally handled on appeal which involved an unfavorable and unpublished disposition of this same issue, People v. Hall (2000) 78 Cal.App.4th 232 was from the Fourth District. The Sixth District appellate court, which reviewed Petitioner's appeal, was not bound to follow Hall if the relevant portion of the case had been published. (Nabors v. Worker's Compensation Appeals Board, supra, 140 Cal.App. 4th at p. 226.)

Third, Ms. Romero's negative judgement of the issue based on her own review of the tape of Michael Leon's police interview does not warrant excluding the issue from Petitioner's direct appeal. She was not qualified to judge whether or not coercive tactics were used in extracting the statement from Mr. Leon. As more fully set forth above, the whole point of the proffered testimony, as argued by defense counsel, was that such techniques were subtle and not necessarily apparent to untrained eyes.

Fourth, Ms. Romero's conclusion that the issue was not worthy of arguing because the coerced statement testimony was that of a witness as opposed to a defendant is similarly not well taken. While it is true that the applicable cases

48

happens to involve statements by defendants, nothing in those cases indicates they do not apply to witness statements as well.

Attached hereto as Exhibit E is the declaration of Sam Polverino, Petitioner's trial counsel, a veteran of many homicide trials and a certified specialist in criminal law. Mr. Polverino's assessment of the issue is that it was a critical one because of the importance of Michael Leon's testimony to the prosecution's case and that its exclusion deprived Petitioner of his right to a fair trial. Further, Mr. Polverino recalls discussing this issue with appellate counsel and so informing her of this opinion.

**b. Prejudice.**

Ms. Romero's assessment that the error in excluding the expert testimony was harmless is unavailing. She indicates in her declaration (Exhibit D) that Petitioner's father's statements were not the most damaging evidence of guilt, and that even if his statements had been excluded, there was other more damaging evidence of guilt sufficient to sustain the conviction. She points to the testimony of Danette Edelberg and her brother, Shelby Arbuckle, as to Petitioner's admission of guilt and his reenactment of the crime which she characterizes as the strongest evidence of guilt. She also points to Bernard Wesley's testimony as to Petitioner's admissions concerning the crime and Danette Edelberg's testimony as to Petitioner's admission he was with Marlon Bass on the day of the murder. She also opines that Michael Leon's testimony that he had been drinking before the police interviewed him provided an alternative attack on his statements to the police and gave the jury a basis to reject said statements.

Appellate counsel's argument as to lack of prejudice is unpersuasive. Michael Leon's statement concerning Petitioner's alleged admission to him that he committed the crime in self-defense was a crucial piece of the prosecution's case.

49

Edelberg's testimony regarding Petitioner's admissions/reenactment was not strong evidence of his guilt. Edelberg's testimony was rife with inconsistencies as to when the reenactment took place, how Petitioner reenacted the crime, and when Edelberg informed law enforcement of it. Further, she admitted lying to the police. Her testimony conflicted with that of her friend, Danielle Fournier as to how Petitioner reenacted the crime and whether or not Danielle picked Edelberg up or she left his house in her own car. Both Danette and her brother had a reason to be biased against Petitioner because of his alleged physical and emotional abuse of them. Danette and Shelby's testimony differed as to whether or not Danette told Shelby about the alleged reenactment. Further, Shelby never disclosed Petitioner's supposed admissions until shortly before his testimony. As for Bernard Wesley, his testimony was filled with contradictory statements and was inconsistent with other witnesses. In addition, he had been a suspect in the case as he was seen near the Bass residence on the day of the crime and thus had a bias toward incriminating Petitioner. He gave the police inconsistent alibis and his girlfriend did not corroborate his story of giving her jewelry on the day in question. He admitted the crime to a co-worker although he claimed to be joking. Even the prosecution admitted that Wesley was not a good witness. (22 RT 2545.) The Smith brothers, who in 1984 told police that Petitioner had asked their help in collecting a drug debt were obvious liars. They claimed to have no relationship with Petitioner and claimed not to know Bernard Wesley despite the fact that Wesley identified them as possibly involved and they had backed Petitioner up when he collected a drug debt from Wesley.

Other evidence relied upon by the People to establish Petitioner's guilt was equivocal. No physical evidence connected him to the crime. No one saw him at the Bass house on the day of the crime. His former girlfriend Mary

50

Keasling did not incriminate him. The case against him rested entirely on the statements of various witnesses made years after the fact. Although the prosecution pointed to the fact that Petitioner appeared to have money after the crime, there was evidence that he was employed at the time, plus had received funds from the sale of his car and an insurance settlement. Although there was evidence that he had been seen with a gun, as it turned out, this was not at the time of the killing and moreover was not shown to be the type of weapon used to kill Bass. The prosecution relied on the fact that Petitioner appeared to know facts about the killing that had not been released to the public. The defense presented evidence that such facts had not been kept secret. The prosecution argued that Petitioner's allegedly abrupt departure from the San Jose area was evidence of his guilt. Yet the defense presented evidence that said departure was planned as Petitioner had to obtain advance permission from the court to change the location of his then probation.

Defense trial counsel argued that Michael Leon had been drinking at the time he was interviewed by the police and that the statements were "a product of how police get the information they want when they want to build a case against somebody." (22 RT 2629-2630.) It will be recalled that Michael Leon testified that he felt pressured and threatened. (15 RT 1832, 1851.) Counsel continued:

> "And the way the police operate is that there is this, they provide inducements and they provide threats. You could be an accessory. All of these sorts of threats that are addressed to somebody. At the same time they are providing inducements; this could help your son, just tell us what was told to you. It was self-defense, just tell us. . .
>
> What you have is their [sic] is a gradual inducements of threats and inducements. And inducements and threats. Sometimes it works with respect to Mr. Leon, sometimes it doesn't."
> (22 RT 2630.)

Defense counsel's argument rang hollow without any expert testimony to support

51

it, leaving the jury free to reject it as lacking in evidentiary support.  The absence of Dr. Leo or Ofshe thus cast a long shadow over this case.  Without the necessary expert testimony, counsel's argument concerning the coerced nature of Michael Leon's statement to police  was doomed to failure. As a previous case has observed, jurors tend to ascribe great importance to expert testimony by a qualified expert.  (<u>People</u> v. <u>Kelly</u> (1976) 17 Cal.3d 24, 31.)

Based on the foregoing, Petitioner contends that he was deprived of the effective assistance of appellate counsel due to her failure to raise  on direct appeal the issue of the trial court's exclusion of expert testimony concerning police coerced statements.  As demonstrated above, the issue had a reasonable potential for success.  Not only did counsel have favorable authority on which to rely but she could have shown the prejudice to Petitioner's case of the exclusion of the requested testimony.

## CONCLUSION

Based on the foregoing, Petitioner respectfully submits that his present confinement in Santa Clara County CC093326 is illegal and a writ of habeas corpus should issue.

Dated:  3-5-07                              Respectfully submitted,


# Julie Schumer
JULIE SCHUMER, Attorney
For Petitioner DAVID M. LEON

52

## PROOF OF SERVICE

I declare that I am over the age of eighteen years and am not a party to the within action; my business address is PMB 120, 120 Village Square, Suite 120, Orinda, California, 94563.

On March 5, 2007, I served the foregoing PETITION FOR WRIT OF HABEAS CORPUS and EXHIBITS A THROUGH G (related case Santa Clara Co. No. CC093326, <u>People v David Leon</u>) on the below named in said cause by placing a true copy thereof enclosed in a sealed envelope with postage fully prepaid, in the United States mail at Santa Fe, New Mexico addressed as follows:

David Leon
T-93769
PVSP A3-240
Box 8501
Coalinga, Ca.  93210

District Attorney
70 W. Hedding St.
San Jose, Ca. 95110

I declare under penalty of perjury that the foregoing is true and correct. Executed March 5, 2007, at Lamy,  New Mexico.

*Julie Schumer*
_____
JULIE SCHUMER