IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | | |
|---|---|---|
| IN RE THE MATTER OF | ) | No._____ |
| | ) | |
| DAVID MICHAEL LEON, | ) | Santa Clara Co. No. |
| | ) | CC093326 |
| On Habeas Corpus. | ) | |

<u>PETITION FOR WRIT OF HABEAS CORPUS</u>

Julie Schumer, Esq.
SBN 82814
120 Village Square, PMB 120
Orinda, CA 94563
(925) 254-3650
(505) 466-6247 fax

Attorney for Petitioner
DAVID MICHAEL LEON

EXHIBIT    I

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES     ii

LIST OF EXHIBITS     v

PETITION FOR WRIT OF HABEAS CORPUS     1

VERIFICATION     6

MEMORANDUM OF POINTS AND AUTHORITIES     7

    STATEMENT OF FACTS     7

    ARGUMENT

       I.    HABEAS CORPUS IS THE PROPER VEHICLE FOR THE PRESENTATION OF PETITIONER'S CLAIM.     42

       II.    APPELLATE COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL TO PETITIONER IN HIS DIRECT APPEAL.     42

          A.    The standard of review.     42

          B.    Appellate counsel was ineffective in failing to raise on direct appeal the issue of the trial court's refusal to allow the defense to present the testimony of Dr. Ofshe or Dr. Leo, experts on the subject of police coerced statements by witnesses.     43

             1.    The proceedings at Petitioner's trial.     43

             2.    The merits.     47

                a.    Counsel on direct appeal should have briefed the issue of the trial court's exclusion of the expert testimony at issue.     47

                b.    Prejudice.     54

       III.    THE SUPERIOR COURT ERRED IN CONCLUDING THAT THIS COURT WOULD HAVE FOUND ANY ERROR IN EXCLUDING THE EXPERT TESTIMONY IN QUESTION HARMLESS AND THUS DENYING THE PETITION ON THAT BASIS.     58

CONCLUSION                                                              60

CERTIFICATE OF WORD COUNT                                               60

## TABLE OF AUTHORITIES

                                                                     **PAGE**

**FEDERAL CASES**

Evitts v. Lucey (1985)                                                   42
469 U.S. 387

Sanders v. Ratelle (9th Cir. 1994)                                      54
439 U.S. 510

Smith v. Robbins (2000)                                                 42
528 U.S. 259

Strickland v. Washington (1984)                                         42
466 U.S. 668

United States v. Hall (7th Cir. 1996)                               49, 52
93 F.3d 1337

United States v. Hall (C.D. Ill. 1997)                              49, 52
974 F.Supp. 1198

United States v. Shay (1st Cir. 1995)                                   49
57 F.3d 126

Wiggins v. Smith (2003)                                                 53
539 U.S. 510

**STATE CASES**

Auto Equity Sales, Inc., v. Superior Court (1962)                       50
57 Cal.2d 450

Barnett v. Rosenthal (2006)                                             50
40 Cal.4th 33

Boyer v. State (2002)                                                   49
825 So.2d 418

Fireman's Fund Insurance Co. v. Maryland Casualty Company (1998)        50
65 Cal.App. 4th 1279

Hood v. Santa Barbara Bank and Trust (2006)                          50
143 Cal.App.4th 526

In re Barnett (2003)                                                 42
31 Cal.4th 466

In re Spears (1984)                                                  42
157 Cal.App.3d 1203

Greyhound Lines, Inc.v. County of Santa Clara (1986)                50
187 Cal.App.3d 480

Kansas v. Cobb (Kan.Ct.App.2002)                                    48
43 P.3d 855

Martinez v. Enterprise Rent-A-Car Company (2004)                    51
119 Cal.App.4th 46

Miller v. State (Ind. 2002)                                       49, 52
770 N.E.2d 763

Nabors v. Worker's Compensation Appeals Board (2006)              50, 54
140 Cal.App.4th 217

New Jersey v. Free (2002)                                           48
798 A.2d 83

People v. Barton (1978)                                             42
21 Cal.3d 513

People v. Feggans (1967)                                            43
67 Cal.2d 444

People v. Harris (1993)                                             43
19 Cal.App.4th 709

People v. Hall (2000)                                               54
78 Cal.App.4th 232

People v. Johnson (1981)                                            43
123 Cal.App.3d 106

People v. Kelly (1976)                                            57, 58
17 Cal.3d 24

People v. McCary (1985)                                             42
166 Cal.App.3d 1

People v. Page (1991)                                              48
2 Cal.App.4th 161

|  | PAGE |
|---|---|
| People v. Ramos (2004)<br>121 Cal.App.4th 1194 | 48, 51 |
| People v. Reilly (1988)<br>196 Cal.App.3d 1127 | 51 |
| People v. Son (2000)<br>79 Cal.App.4th 224 | 47, 51 |
| People v. Valenzuela (1985)<br>175 Cal.App.3d 381 | 43 |
| Scott v. Texas (Tex.App. 2005)<br>165 So.W.3d 27 | 51 |
| State v. Conn. (Ct. 1976)<br>370 A.2d 1002 | 50 |
| State v. Davis (2000)<br>32 S.W.3d 603 | 48 |

## OTHER AUTHORITES

| Appeals and Writs in Criminal Cases (2d.Ed.) | 51 |
|---|---|

## LIST OF EXHIBITS

Volume 1:

| EXHIBIT A | |
|---|---|
| Court of Appeal opinion in H026042 | 1-37 |
| EXHIBIT B | |
| Supreme Court denial of review dated 5-24-06 | 38 |
| EXHIBIT C | |
| Court of Appeal opinion in H030578 | 39-43 |
| EXHIBIT D | |
| Declaration of Lynda Romero, Esq., dated 2-25-07 | 44-45 |
| EXHIBIT E | |
| Declaration of Sam Polverino, Esq., dated 2-22-07 | 46-47 |

EXHIBIT F
Relevant pages of Clerk's Transcript 48-156

Volume 2:
EXHIBITt G:
Relevant pages of Reporter's Transcript 157-313
Volume 3:
EXHIBITt G:
Relevant pages of Reporter's Transcript 314-432
Volume 4:
EXHIBIT G:
Relevant pages of Reporter's Transcript 433-596
Volume 5:
EXHIBIT G:
Relevant pages of Reporter's Transcript 597-766
Volume 6:
EXHIBIT G:
Relevant pages of Reporter's Transcript 767-919
Volume 7
EXHIBIT G:
Relevant pages of Reporter's Transcript 920-1011
Volume 8:
EXHIBIT G:
Relevant pages of Reporter's Transcript 1012-1183

Volume 9:

    EXHIBIT G:

    Relevant pages of Reporter's Transcript    1184-1350

Volume 10:

    EXHIBIT G:

    Relevant pages of Reporter's Transcript    1351-1542

Volume 11:

    EXHIBIT G:

    Relevant pages of Reporter's Transcript    1543-1764

Volume 12:

    EXHIBIT G:

    Relevant pages of Reporter's Transcript    1765-1930

Volume 13:

    EXHIBIT G:

    Relevant pages of Reporter's Transcript    1931-2052

Volume 14:

    EXHIBIT G:

    Relevant pages of Reporter's Transcript    2053-2224

Volume 15:

    EXHIBIT G:

    Relevant pages of Reporter's Transcript    2225-2273

    EXHIBIT H:

    Petition for Writ of Habeas Corpus filed
    in Superior Court 3-7-07    2274-2332

    EXHIBIT I:

    Superior Court Order denying Petition for
    Writ of Habeas Corpus 4-18-07    2333-2337

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

IN RE THE MATTER OF                    )
                                       )   No._____
    DAVID MICHAEL LEON,                )
                                       )   (Santa Clara Co. No.
On Habeas Corpus.                      )    CC093326
                                       )

## PETITION FOR WRIT OF HABEAS CORPUS

TO:      THE HONORABLE PRESIDING JUSTICE OF THE
COURT OF APPEAL, STATE OF CALIFORNIA,
SIXTH DISTRICT:

Petitioner, DAVID MICHAEL LEON by and through his attorney, JULIE

SCHUMER, petitions this Court for a writ of habeas corpus and by this verified petition

sets forth the following facts and cause for the issuance of the writ.

I

Petitioner is presently unlawfully confined and restrained of his liberty by

the Director of the Department of Corrections at Pleasant Valley State Prison, Coalinga,

California.

II

Petitioner is unlawfully confined pursuant to the judgment of the Superior

Court of Santa Clara County in Case No. CC093326, rendered May 23, 2003 following

his conviction for the first degree murder of Marlon Bass with the personal use of a weapon per Penal Code section 12022.5(a)(1).

### III

This Petition is being filed in this Court pursuant to its original habeas corpus jurisdiction.  (California Constitution, article VI, section 10.)

### IV

Following his conviction and sentencing, Petitioner appealed to the Sixth District Court of Appeal on the grounds that the lengthy delay between the commission of the crime and the filing of criminal charges against him violated his state and federal constitutional due process rights, he was denied due process due to the wrongful exclusion of third party culpability evidence, he was deprived of his federal constitutional rights to a jury trial by the wrongful dismissal of a juror during deliberations, and the imposition of certain restitution fines had to be stricken.  On February 24, 2006, Petitioner's conviction was affirmed, but the fines were reversed and the matter remanded to Superior Court for rehearing for a new hearing as to said fines. [See Exhibit A; Exhibits Vol. 1:1-37: The appellate court opinion.]    On May 30, 2006, Petitioner's petition for review was denied. [See Exhibit B: Exhibits Vol. 1:38: The order denying review.]   On June 20, 2006, the trial court reimposed fines from which order Petitioner appealed.  On February 7, 2007, the Sixth District Court of Appeal reduced the restitution fine to $10 and struck the parole revocation fine. [See Exhibit C: Exhibits Vol. 1:37: The appellate court opinion.]

### V

The judgment rendered against Petitioner in Santa Clara County No. CC093326 is invalid for the following reason.  Petitioner was deprived of his Sixth Amendment right to  the effective assistance of counsel on appeal.  Specifically, appellate

counsel failed to raise an arguable issue on direct appeal. Said failure was objectively unreasonable and there is a reasonable probability that but for the omission, Petitioner would have prevailed on appeal. Specifically, appellate counsel failed to brief the trial court's refusal to allow the defense to present an expert concerning police coercion of a witness's statement. This testimony related to the statement of Petitioner's father, Michael Leon, who ultimately told police in a tape recorded interview that Petitioner had confessed to committing the murder in self-defense.

VI

The contentions in support of this Petition are fully set forth in the accompanying Memorandum of Points and Authorities, and the Declarations of Lynda Romero and Sam Polverino. [See Exhibit D: Exhibits Vol. 1:44-45: Declaration of Lynda Romero; Exhibit E: Exhibits Vol. 1:46-47: Declaration of Sam V. Polverino.][1] [See the relevant portions of the Clerk's and Reporter's Transcripts pertaining to Petitioner's trial in the Superior Court which were lodged with the court concurrently with the filing of the Petition fir Writ of Habeas Corpus in the Superior Court of Santa Clara County: Exhibits F-G: Exhibits Vol. 1:48-154; Exhibits Vol. 2:157-313; Exhibits Vol. 3:314-432; Exhibits Vol. 4:433-596; Exhibits Vol. 5:597-766; Exhibits Vol. 6:767-919; Exhibits Vol. 7:820-1011; Exhibits Vol. 8:1012-1183: Exhibits Vol. 9:1184-1350: Exhibits Vol. 10:1351-1542: Exhibits Vol. 11:1543-1913: Exhibits Vol. 12:1914-1930: Exhibits Vol. 13:1931-2052: Exhibits Vol. 14:2053-2224: Exhibits Vol. 15:2225-2332.) .[2]

---

[1] The originals of said declarations were filed with the petition for writ of habeas corpus Petitioner filed in Santa Clara County Superior Court. (See VIII, infra.)

[2] The Clerk's Transcript will hereinafter be referred to as CT, the Reporter's Transcript as RT with the applicable exhibit volume number. Citations to the record will include the

VII

      As noted in paragraph IV above, Petitioner's case was previously before this Court on direct appeal in case no. H026042.  Pursuant to Evidence Code section 459, Petitioner requests that this Court take judicial notice of the all the records, files, pleadings and transcripts in this previous appeal.

VIII

      The claim presented herein was previously presented by Petitioner in his Petition for Writ of Habeas Corpus filed in Santa Clara County Superior Court on March 7, 2007. [Exhibit H: Exhibits Vol. 15:2274-2332.)   The Superior Court denied said petition in an Order dated April 18, 2007. [Exhibit I: Exhibits Vol. 15:;2333-237.]

IX

      Petitioner has no other plain, speedy or adequate remedy at law other than this Petition.

      WHEREFORE, Petitioner respectfully requests that this Court:

      1.     Issue its Order to Show Cause to the Director of the Department of Corrections to inquire into the legality of Petitioner's present confinement;

      2.     If this Court concludes an evidentiary hearing is required in this matter, order such a hearing be held in Superior Court.

---

      original volume and page number of the Clerk's or Reporter's Transcript, as the case may be, as well as the bate stamped number consecutively in the upper right-hand corner, assigned to each page of the exhibits, as well as the exhibit volume number.

3.    After a full hearing, issue the writ, vacate the judgment of conviction with instructions to release Petitioner;

4.    Grant Petitioner whatever alternative or further relief is appropriate or in the interest of justice.

Dated:    May 9, 2007

Respectfully submitted,

*Julie Schumer*

JULIE SCHUMER, Attorney
for Petitioner DAVID LEON

## VERIFICATION

I, JULIE SCHUMER declare as follows:

I am an attorney at law duly admitted to practice before the courts of the state of California and have my office in Contra Costa County at 120 Village Square, PMB 120, Orinda, CA. 94563.  I am the attorney of record for Petitioner DAVID LEON and am authorized to file this Petition.  Petitioner is unable to make this verification because he is absent from Contra Costa County due to his confinement out of the county in Pleasant Valley State Prison in Coalinga, California.  For that reason I make this Verification on his behalf.

I have read the foregoing Petition for Writ of Habeas Corpus and verify that all the facts alleged therein not otherwise supported by citations to the record are true and are supported by the attached declarations.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 9th day of May, 2007 at Lamy, New Mexico.

_Julie Schumer_
JULIE SCHUMER

-6-

## MEMORANDUM OF POINTS AND AUTHORITIES

## STATEMENT OF THE FACTS

### A.    The Prosecution's case in chief.

The discovery of the body of Marlon Bass and the crime scene investigation

On November 30, 1983, Deborah Gerkin, age 16, attended Del Mar High School. She had made plans with Marlon Bass and other friends to leave school and get high at lunch. [Exhibits Vol. 4:1091-1092 (7 RT 888-889).] Marlon did not show up. [Exhibits Vol. 4: 538 (7 RT 890).]

On November 30 1983, Annie and Palmer Bass and their two sons, Marcus and Marlon[3] lived at 2568 Custer Drive in San Jose. [Exhibits Vol. 2:210-211; 237-238 (6 RT 562-563; 589-590).] Marlon was 20 years old. [Exhibits Vol. 2:211 (6 RT 563).] He had graduated Del Mar High School. [Exhibits Vol. 2:212 (6 RT 564).] He drove a 1968 Mustang. [Exhibits Vol. 2:212-213 (6 RT 564-565).] During November, 1983, the Bass's received a lot of hang up calls. [Exhibits Vol. 2:288 (6 RT 640).]

Mr. and Mrs. Bass arrived home from work at about 5:30 p.m. [Exhibits Vol. 2:219; 240 (6 RT 571; 592).] The door to their residence was ajar and there was glass on the ground. [Exhibits Vol. 2:219; 222; 241 (6 RT 571, 574; 593).] Marlon was laying on the floor in the hall with a bat in his hand. [Exhibits Vol. 2:223-224; 229-230; 241-242; 244 (6 RT 575-576, 581-582; 593-594, 596).] Mr. Bass attempted to revive Marlon and the bat rolled out of Marlon's hand. [Exhibits Vol. 2:224; 242; 217 (6 RT 576; 594, 599).] According to Mr. Bass, Marlon was stiff. [Exhibits Vol. 2:242 (6 RT 594).]

Nothing had been disturbed in the residence except a desk was out of place in Marlon's bedroom. [Exhibits Vol. 2:225-226; 251-252 (6 RT 577-578; 603- 604).]

---

[3]    Because of the testimony of family members, the victim will be referred to at times as Marlon to avoid confusion.

7

However, the desk drawer where Marlon usually kept his money was locked. [Exhibits Vol. 2:255-256; 298 (6 RT 607-608; 650).] Two cans and a towel were under Marlon's desk. [Exhibits Vol. 2:284-285; 403-404 (6 RT 636-637; 755-756).] A $2 bill was found on the floor in Marlon's bedroom but no other money was present. [Exhibits Vol. 2:230, 257 (6 RT 582; 609).] Mr. Bass did not find money in Marlon's room after the police left. [Exhibits Vol. 2:230, 257 (6 RT 582,  609).]

Before the police arrived, Mr. Bass checked a safe Marlon had underneath his room and moved it into the garage. About a week later, Mr. Bass took the safe to a locksmith and it was empty. [Exhibits Vol. 2:249-250, 271 (6 RT 601-602, 623).]

The night before he found Marlon dead, Mr. Bass had checked Marlon's room and found drugs. [Exhibits Vol. 2:271-273; 296-297 (6 RT 623-625; 648-649).] Initially he testified he did not remember doing this.  [Exhibits Vol. 2:271 (6 RT 623).] Mr. Bass removed two large buckets of marijuana and locked them in the trunk of a black car he had parked in the garage. [Exhibits Vol. 2: (6 RT 626; 649, Exhibits A, B, C).] Mr. Bass had spoken to Marlon regarding his drug dealing and constantly having friends over. [Exhibits Vol. 2:352-353 (6 RT 638-639).] Mr. Bass told the police he had found $4200 in Marlon's desk drawer on the Sunday before Marlon died. [Exhibits Vol. 2:299 (6 RT 651).] On Monday, there was no money. [Exhibits Vol. 2:300 (6 RT 652).] Mr. Bass had seen up to $10,000 previously in Marlon's room. [Exhibits Vol. 2:301 (6 RT 653).]

At the beginning of the investigation, Sgt. Brockman told Mr. Bass that his son was shot with possibly a .22 caliber weapon but he had not substantiated that yet with lab analysis.  [Exhibits Vol. 2:653 (6 RT 653).] Brockman cautioned Mr. Bass about revealing any information about the case.  [Exhibits Vol. 2:306 (6 RT 658).]

On the day he died, Marlon's car was parked around the corner facing the wrong way and nosed into the curb. [Exhibits Vol. 2:302 (6 RT 654).] A neighbor, Pamala Anderson, who lived at 2564 Tioga Way on November 30, 1983, saw Marlon

8

park a green Mustang on the wrong side of the street in front of her house in the mid to late morning. [Exhibits Vol. 4:528 (8 RT 880).]  He took a baseball bat out of the car and walked away.  [Exhibits Vol. 4:520-523, 526 (8 RT 872-875, 878).]  He was wearing a red or blue work shirt. [Exhibits Vol. 4:524 (8 RT 876).]  He walked south toward Custer. [Exhibits Vol. 4:526 (8 RT 878).]

       Marlon Bass suffered five gunshot wounds and a small abrasion to his right forearm.. [Exhibits Vol. 3:327-329 (7 RT 679-681; 769).]  The cause of death was gunshot wounds to the chest and neck. [Exhibits Vol. 3:307 (7 RT 695).]  From the state of the body and clothing, it appeared death occurred before 2:00 p.m. from shots fired from further than three feet away. [Exhibits Vol. 3:326, 372; 454-456 (7 RT 678, 694; 806-808).]  Death in the morning of November 30, 1983 was consistent with the degree of rigor mortis and lividity observed.  [Exhibits Vol. 3:352 (7 RT 679).] Five bullets were recovered during the autopsy. [Exhibits Vol. 3: 239, 372 (7 RT 681, 724).]  The bullets were Remington .22 caliber gold coat hollow point bullets and were most likely fired from a .22 caliber Rohm, RG Industry, Liberty Arms, Burgo, Arminus, or Mossberg revolver. [Exhibits Vol. 3:426-427 (7 RT 778-779).]  Seven dollars were in the wallet in Marlon's pants pocket. [Exhibits Vol. 3:401-402 (7 RT 733-734).]

       According to the Medical Examiner, it appeared likely Bass was facing and approaching his assailant when he was first shot and the remaining shots were inflicted as he was attempting to flee and eventually fell. [Exhibits Vol. 3:338-339 (RT 690-694).][4] In arriving at this opinion it appeared the Medical Examiner assumed that the shooter remained stationary.  [Exhibits Vol. 3:341 (7 RT 693).]

       San Jose Police Officer Willam Santos examined the crime scene.  [Exhibits

---

[4]    According to defense expert Dr. John Thornton, Marlon Bass was shot by someone inside his bedroom.  [Exhibits Vol. 16:1604 (RT 1955).]

Vol. 3:348-349 (7 RT 700-701).] A glass panel nearest the latch on the Bass' front door was broken. [Exhibits Vol. 3:356 (7 RT 708).] There were bullet strikes in the walls of the residence near where Marlon's body was found. [Exhibits Vol. 3:364-365 (7 RT 716-717).] A bullet was recovered from the wall. [Exhibits Vol. 7:371(7 RT 723).] No bullet casings were found. [Exhibits Vol. 3:373 (7 RT 725).] A $2 bill was recovered from the floor in the garage and a $2 bill was recovered from the night stand in Marlon's bedroom. [Exhibits Vol. 3:380-381; 382; 410 (7 RT 732-733, 734; 762).] Marijuana in two plastic bucket was found in a the trunk of a car in the garage. [Exhibits Vol. 3:383-385, 415 (7 RT 735-737, 767).]

A gray button, from the right sleeve of Marlon's shirt, was recovered close to Marlon's leg. [Exhibits Vol. 3:400-402; 417 (7 RT 752-754; 769).] Other items found at the scene included a Taco Bell cup, nunchakus, baggies with marijuana and white powder, a tan cloth bag with gold strings with a glass rod, and a balance scale. [Exhibits Vol. 3:406-410 (7 RT 758-762).]

Officer Santos agreed that moving things around at the crime scene can contaminate it and that that could affect the conclusions drawn. [Exhibits Vol. 3:389-392 (7 RT 741-744).]

The ensuing investigation.

Many of Marlon's friends were interviewed about their contacts with Marlon and their whereabouts on the day of the offense.

David Brewster knew Marlon Bass from junior high and high school. [Exhibits Vol. 4:453-463 (8 RT 815- 816).] Marlon sold marijuana - and drove a green Mustang. [Exhibits Vol. 4:465 (8 RT 817).] He sold the drugs from Doerr Park, the 7-Eleven or a friend's house 90% of the time. The rest of the time he sold from his residence. [Exhibits Vol. 4:465 (8 RT 817).] Brewster saw Petitioner around the neighborhood and at Marlon's house once. [Exhibits Vol. 4:466 (8 RT 818).] Marlon did

not have enemies or debts. [Exhibits Vol. 4:466 (8 RT 818).] Marlon kept his drugs in a bucket or a small wooden jewelry box in his room. He kept pre weighed drugs in a wooden drawer by his bed. [Exhibits Vol. 4:467, 476-477 (8 RT 819, 828-829).] He kept his money locked in his desk drawer, [Exhibits Vol. 4:467 (8 RT 819).] Every once in a while, Marlon carried money in a wad. [Exhibits Vol. 4:469 (8 RT 821).] According to Brewster, besides himself, only a few others knew where Marlon kept his drugs and money although he was open with his drug dealing. [Exhibits Vol. 4:485-486 (8 RT 837-838).] Brewster told police the opposite, that many people knew Marlon's habits. [Exhibits Vol. 4:484 (8 RT 836).] He did not let too many people into his room. [Exhibits Vol. 4:483 (8 RT 835).] Marlon had a baseball bat which he kept in his bedroom and sometimes in the trunk of his car. [Exhibits Vol. 4:470 (8 RT 822).]

Brewster went to a movie with Marlon the night before his death. [Exhibits Vol. 4:470 (8 RT 822).] They were drinking and might have smoked a joint before going to the movie. [Exhibits Vol. 4:480-481 (8 RT 832-833).] Marlon did not have a falling out with Petitioner. [Exhibits Vol. 4:495 (8 RT 847).]

Brewster told officers Marlon picked up a couple of pounds of marijuana from Jeff Purrington on Monday, November 28, 2003. [Exhibits Vol. 4:496-847 (8 RT 848-849. ) Marlon had $1300 to $1400 left after buying the marijuana. [Exhibits Vol. 4:497-498 (8 RT 849-850).] On Tuesday night, Brewster saw Marlon with between $1000 and $1500 in his locked desk drawer. [Exhibits Vol. 4:498, 501-502 (8 RT 850, 853-854).] Brewster said Marlon was pretty open in his drug dealing and everyone he dealt with knew where his money and drugs were kept. [Exhibits Vol. 4:499 (8 RT 851).] Brewster said Marlon got some of the drugs from "Tony." [Exhibits Vol. 4:500 (8 RT 852).]

Jeffrey Purrington was with Marlon Bass at the Bass residence two days before Marlon's death. [Exhibits Vol. 4:505 (8 RT 857).] Marlon gave Purrington $2000

11

to purchase marijuana. [Exhibits Vol. 4:505 (8 RT 857).] It appeared Marlon had about $2000 left over. [Exhibits Vol. 4:505-506 (8 RT 857-858).] Marlon kept his money in the center drawer of his desk which was locked. (RT 858, 869, Exhibit No. 30).] He did not see money stored in any other place. [Exhibits Vol. 4:506 (8 RT 858).] Purrington delivered the marijuana later that same day. [Exhibits Vol. 4:507 (8 RT 859).] Marlon was nervous that day. [Exhibits Vol. 4:508 (8 RT 860).] Purrington told the police Marlon was under the influence of cocaine. [Exhibits Vol. 4:509 (8 RT 861).]

According to Purrington, Marlon was open and bragged about selling drugs. [Exhibits Vol. 4:514 (8 RT 866).] Purrington knew many of Marlon's customers. [Exhibits Vol. 4:506 (8 RT 868).] However, Marlon also dealt with a lot of people Purrington did not know. [Exhibits Vol. 4:517 (8 RT 869).] Purrington had never seen Petitioner and Marlon together. [Exhibits Vol. 4:513 (8 RT 865).]

Brothers Daniel and Samuel Barnett attended junior high school with Petitioner and Marlon Bass. [Exhibits Vol. 5:627-628; 659 (9 RT 979-980; 1011).] Daniel was closer to Petitioner and Samuel was closer to Marlon Bass. [Exhibits Vol. 5:629; 659-670 (9 RT 981; 1011-1012).] Daniel had gone to Petitioner's house one day when Petitioner was waiting for Marlon. [Exhibits Vol. 5:630 (9 RT 982).] Petitioner said he was "so pissed off at that fucking nigger. I could just kill him." [Exhibits Vol. 5:630 (9 RT 982).] At the Preliminary Hearing Daniel testified that Petitioner had said, "that fucking nigger, I'll kick his ass." [Exhibits Vol. 5:637 (9 RT 989).] Daniel could not say what day or month he heard the statement, it could have been one to two years before the killing. [Exhibits Vol. 5:639 (9 RT 991).] At the Preliminary Hearing he said it was within six months. [Exhibits Vol. 5:641 (9 RT 993).] Petitioner disappeared after the murder and Daniel did not know where he was for two or three years. [Exhibits Vol. 5:631 (9 RT 983).]

As much as a year and a half prior to the murder, Petitioner showed a gun to

Daniel Barnett. [Exhibits Vol. 5:632-633 (9 RT 984-985).] Daniel never saw Petitioner with a gun on any other occasion. [Exhibits Vol. 5:651 (9 RT 1003).] In 2000, Daniel told Detective Vizzusi he never saw Petitioner with a gun but was pretty sure Petitioner's family had a gun in their house. [Exhibits Vol. 5:649 (9 RT 1001).]

Samuel Barnett had purchased marijuana from Marlon Bass and knew he dealt drugs out of his bedroom. [Exhibits Vol. 5:660 (9 RT 1012).] According to Samuel, Marlon "sometimes" kept his desk drawer locked. [Exhibits Vol. 5:674 (9 RT 1026).]

Before Marlon was murdered, Marlon complained about a falling out with Petitioner and said he might need to "kick his ass." [Exhibits Vol. 5:661 (9 RT 1013).] The day after Marlon died Petitioner called Samuel to ask him to purchase some marijuana. [Exhibits Vol. 5:661 (9 RT 1013).] Petitioner wanted $550 for a quarter pound. [Exhibits Vol. 5:662 (9 RT 1014).] Samuel was shocked because he thought Petitioner was a small time dealer. [Exhibits Vol. 5:662-663 (9 RT 1014-1015).] Samuel asked Petitioner if he knew that Marlon had been killed. Petitioner responded that it had nothing to do with the transaction. [Exhibits Vol. 5:665 (9 RT 1017).] Samuel told Petitioner never to call him again because he was uncomfortable that Petitioner might have had something to do with Marlon's death. [Exhibits Vol. 5:665 (9 RT 1017).] Samuel had been convicted of felony violation of a protective order and corporal injury on a spouse. [Exhibits Vol. 5:655-666 (9 RT 1017-1018).]

Shortly after Marlon's death, Samuel told the police Marlon was mad at someone who ripped him off and it was either Jeffrey Caplan or Petitioner and most likely it was Caplan. [Exhibits Vol. 5:676-678 (9 RT 1028-1029).] Marlon caught Jeff Caplan ripping off drugs from his house. [Exhibits Vol. 5:680 (9 RT 1032).] Marlon believed a man in a hooded sweatshirt was casing his house a few days before he died. [Exhibits Vol. 5:380-681 (9 RT 1032-1033).] Samuel saw the man in the hooded sweatshirt walk by. [Exhibits Vol. 5:681 (9 RT 1033).] Marlon yelled at the guy and the guy said he was

waiting for his girlfriend. [Exhibits Vol. 5:682 (9 RT 1034).] The guy then fled. [Exhibits Vol. 5:682 (9 RT 1034).] Marlon did not mention Petitioner as being the stalker. [Exhibits Vol. 5:685 (9 RT 1037).]

Troy Tibbils started Mar Vista High School with Petitioner but then transferred to another school. [Exhibits Vol. 8:1073-1074 (12 RT 424-1425).] Petitioner started hanging out with Bernard Wesley and the Smith brothers. [Exhibits Vol. 8:1074-1075 (12 RT 1425-1426).] Petitioner bought marijuana from Marlon Bass. [Exhibits Vol. 8:1076 (12 RT 1427).] Petitioner told Tibbils that Marlon had money and drugs all over his room. [Exhibits Vol. 8:1081 (12 RT 1432).] Petitioner had been attacked by David and Marvin Smith and told Tibbils to stay away from them. [Exhibits Vol. 8:1122 (12 RT 1473).] Petitioner owned a BB gun. [Exhibits Vol. 8:1123 (12 RT 1474).]

Tibbils related that Petitioner was in a car accident in 1983 and received a monetary settlement. [Exhibits Vol. 8:1124 (12 RT 1475).] Petitioner received $2500 and some amount for medical. He also fixed his car and sold it. [Exhibits Vol. 8:1126 (12 RT 1477).] Tibbils was never involved in a burglary and did not know Petitioner to be involved. [Exhibits Vol. 8:1126-1127 (12 RT 1477-1478).] Sometimes, Petitioner would make large purchases of marijuana and resell it. [Exhibits Vol. 8:1132 (12 RT 1483).]

On the day Marlon was killed, Tibbils and Ron Delgado were with Petitioner at Petitioner's residence at about 10:00 a.m. [Exhibits Vol. 8:1078 (12 RT 1429).] They were going to buy marijuana. [Exhibits Vol. 8:1079 (12 RT 1430).] Petitioner said he could not get marijuana that day because Marlon was in school and he could get it later. [Exhibits Vol. 8:1082, 1089, 1095 (12 RT 1433, 1440, 1446).] Tibbils went back to school and returned to Petitioner's residence around 12:30 or 1 p.m. and picked up the marijuana. [Exhibits Vol. 8:1090-1091 (12 RT 1441-1442).] He did not notice any difference in Petitioner's demeanor. [Exhibits Vol. 8:1119 (12 RT 1470).] Although Tibbils testified at trial that believed he made this purchase the day of the

14

homicide, he had nothing to back this up. [Exhibits Vol. 8:1097 (12 RT 1448).] By contrast, in 2000, he told Detective Vizzusi that he wasn't sure that he was with Petitioner the day of the killing. [Exhibits Vol. 8:1103 (12 RT 1454).]

       Four to five days later, Tibbil's father saw an article in the newspaper and asked him whether he knew Marlon Bass. Tibbils immediately telephoned Petitioner. [Exhibits Vol. 8:1092 (12 443).] Tibbils had testified previously that Petitioner said he had met Marlon at the 7-Eleven that morning to get drugs. Petitioner told Tibbils he had seen Bernard Wesley near Marlon's residence on Curtner. [Exhibits Vol. 8:1092-1094 (12 RT 1443-1445).] Tibbils was unable to recall if he told Nicole DiFlavio, a mutual friend, that he had asked Petitioner if he was involved. [Exhibits Vol. 8:1107, 1109 (12 RT 1458, 1460).] Tibbils did not believe Petitioner was involved. [Exhibits Vol. 8:1110 (12 RT 1461).]

       After the killing Tibbils saw less of Petitioner. When Petitioner told him he was going to New Mexico, Tibbils was surprised. [Exhibits Vol. 8:1111-1112 (12 RT 1462-1463).] Tibbils could not recall how long after the killing Petitioner left but at the preliminary hearing he stated it was six months. [Exhibits Vol. 8:1113 (12 RT 1464).] Tibbils told Detective Vissuzi in 2000 that when Petitioner left town he owed people money. [Exhibits Vol. 8:1130 (12 RT 1481).]

       Detective Vizzusi interviewed Troy Tibbils on May 10, 2002. [Exhibits Vol. 9:1176-1177(13 RT 1527-1528).] Tibbils felt the killing was the same day he bought marijuana from Petitioner. [Exhibits Vol. 8:1177 (12 RT 1528).] Tibbils talked to Petitioner and Petitioner said he met Marlon at the 7-Eleven and purchased marijuana from him. Petitioner said after Marlon left he saw Bernard Wesley driving down the street and stop at a house on Curtner. [Exhibits Vol. 8:1177 (12 RT 1528).] Petitioner said Wesley was acting real suspicious. [Exhibits Vol. 8:1177-1178 (12 RT 1528-1529).] Tibbils said he had gotten a traffic ticket that day. By the time of trial records of that

15

ticket were destroyed. [Exhibits Vol. 8:1189 (12 RT 1529).] There was no indication Tibbils had been interviewed prior to 2002. [Exhibits Vol. 8:1179 (12 RT 1530).] Detective Vizzusi testified that had he been interviewed earlier, there would have been better success in tracking down the ticket. [Exhibits Vol. 8:1180 (12 RT 1531).]

Petitioner and Nicole DiFlavio were good friends and used marijuana and cocaine together in 1983. DiFlavio also was friendly with Marlon Bass. [Exhibits Vol. 8:1134-1135 (12 RT 1485-1486).] According to DiFlavio, Petitioner was envious of Marlon. [Exhibits Vol. 8:1158 (12 RT 1509 ).] Tibbils told her Petitioner got marijuana from Marlon on the morning of the murder. [Exhibits Vol. 8:1145 (12 RT 1496, 1498).] According to DiFlavio, Petitioner was very concerned about money. [Exhibits Vol. 8:1139 (12 RT 1490).] After Marlon's death, Petitioner had a little more money and seemed to have more drugs which caused DiFlavio to become suspicious. [Exhibits Vol. 8:1139 (12 RT 1490).] Admittedly, DiFlavio did not know if Petitioner was working. [Exhibits Vol. 8:1150 (12 RT 1501).]

Petitioner left town shortly after Marlon's death without saying he was leaving. [Exhibits Vol. 8:1137 (12 RT 1488).] On cross-examination, DiFlavio said he left between one to six months after Marlon's death. [Exhibits Vol. 8:1153 (12 RT 1504).] A month or two after Petitioner left, he called DiFlavio from New Mexico or Arizona. [Exhibits Vol. 8:1143 (12 RT 1494).] Petitioner never said he killed Marlon. [Exhibits Vol. 8:1151 (12 RT 1502).]

Petitioner's statements about the Marlon Bass homicide

Danette Edelberg, formerly known as Danette Arbuckle, was Petitioner's girlfriend for three or four years in high school.[5] [Exhibits Vol. 9:1199-1201 (13 RT

---

[5] Danette Arbuckle had a petty theft conviction in 1984. [Exhibits Vol. 9:1227 (13 RT 1578).] The witnesses at trial referred to her as Danette Arbuckle and Danette Edelberg. She also used the married name Danette Rodriguez for a

16

1550-1552).] Danette talked to Petitioner almost every day. [Exhibits Vol. 9:1207 (13 RT 1558).] Petitioner was physically abusive to her and was very jealous and possessive. [Exhibits Vol. 9:1204-1205 (13 RT 1555-1556).] Danette knew Marlon Bass from school but did not associate with him and did not know if Petitioner did. [Exhibits Vol. 9:1205 (13 RT 1556).] It was common knowledge that Marlon was involved in drugs. [Exhibits Vol. 9:1323 (13 RT 1674).] According to Danette, Petitioner had large sums of money before and after Marlon's death. [Exhibits Vol. 9:1323 (13 RT 1674).]

Petitioner acted as if the murder investigation regarding Bass was a joke. [Exhibits Vol. 9:1206 (13 RT 1557).] Petitioner went to visit his father in San Diego sometime after the murder. [Exhibits Vol. 9:1206 (13 RT 1557).] Danette told Inspector Brockman Petitioner told her he was moving to San Diego to be with his dad because his dad wanted him out of the environment and said she took him to the airport when he departed. [Exhibits Vol. 9:1240-1241 (13 RT 1591-1592).][6] When he returned, the relationship and the physical abuse resumed. [Exhibits Vol. 9:1209-1210 (13 RT 1560-1561).]

On March 12, 1984, Petitioner and Danette had an argument. Petitioner became abusive and Danette went to a doctor and made a police report. [Exhibits Vol. 9:1211 (13 RT 1562).] The argument ensued when they were discussing the Bass investigation. According to Danette, Petitioner admitted the murder. He said he went to the Bass home to steal money and drugs which were in Marlon Bass's desk drawer. He said he was in the bedroom when he heard a noise and Marlon was in the hall with a baseball bat. They had words, Petitioner became frightened and he shot Marlon.

---

period of time. To avoid confusion, Danette will be used throughout this pleading.

[6]     Danielle admitted that she lied to the police during the course of the murder investigation. [Exhibits Vol. 9:1230 (13 RT 1581).]

17

[Exhibits Vol. 9:1212-1213 (13 RT 1563-1566).] Petitioner demonstrated how he had held the gun. [Exhibits Vol. 9:1216 (13 RT 1567).] Petitioner stood up and put hands out in front of him as though he were holding a gun and said he had shot Marlon. [Exhibits Vol. 9:1216 (13 RT 1567).] When Danette started crying, Petitioner said he was just kidding. [Exhibits Vol. 9:1217 ((RT 1568).] She tried to leave but he locked the door. He told her to get on her knees and he started kicking her. She crawled to the door. [Exhibits Vol. 9:1218 (13 RT 1569).] She got outside, got in her car and left. [Exhibits Vol. 9:1218, Exhibits Vol. 10:1393 (13 RT 1569, 14 RT 1744).] That was the end of the relationship. [Exhibits Vol. 9:1219 (13 RT 1570).] Danette didn't tell the police about his statements at the time she initially made the police report because she was scared. [Exhibits Vol. 9:1220 (13 RT 1571).][7]

According to Danette, she told Inspector William Brockman about Petitioner's statements and about his reenactment of the offense sometime after the reenactment.[8] She talked to Brockman six times between November 30, 1983 and February 10, 1984. [Exhibits Vol. 9:1246, Exhibits Vol. 10:1394-1395 (13 RT 1597; 14 RT 1745-1746).] Danette told Brockman Petitioner had a pellet gun but no other gun, [Exhibits Vol. 1329 (9 RT 1680).] On March 12, 1984, she spoke to Detective Vizzusi but she did not tell him about the reenactment. [Exhibits Vol. 1252-1254 (13 RT

-------------------

[7]     The report indicated Danette said she was slapped in the face, punched in the ribs, told to get on her knees and then she crawled out of the house. The report stated Petitioner kicked Danette in the buttocks. [Exhibits Vol. 10:1392 (14 RT 1743).] Danette ran to her car and got inside while Petitioner was punching the windows. [Exhibits Vol. 10:1393 (14 RT 1744).]

[8]     She told another officer that as she drove, Petitioner followed her home. [Exhibits Vol. 9:1252 (13 RT 1603).] On that occasion she did not mention the reenactment or Petitioner's alleged admission. [Exhibits Vol. 9:1254 (13 RT 1605).]

1603-1605).] When she spoke to Sgt. Brockman on February 10 and February13, 1984, there had been no reenactment. [Exhibits Vol. 9:1277 (13 RT 1628).] On March 13, 1984, she told police she felt 100% certain that Petitioner did not kill Marlon. [Exhibits Vol. 9:1279 (13 RT 1630).] She never saw Petitioner with a gun. [Exhibits Vol. 9:1328 (13 RT 1679).]

On June 9 and June 11, 1986, Danette was interviewed by Annette Rodriguez, a DA investigator, about the domestic violence charges she had reported against Petitioner in 1984. [Exhibits Vol. 9:1382 Exhibits Vol. 10:1382 (13 RT 1572; 1733).][9] Danette told Rodriguez Petitioner had acted out the murder of Marlon Bass then said he was kidding. [Exhibits Vol. 9:1223, Exhibits Vol. 10:1384 (13 RT 1574; 14 RT 1735).] DAI Rodriguez contacted Inspector Brockman. However, no one followed up with Danette until she talked to Detective Vizzusi in 2000. [Exhibits Vol. 9:1223; Exhibits Vol. 10:1385 (13 RT 1574; 14 RT 1736).] The only other person Danette told about the reenactment was her best friend Danielle but she did not give her the details. [Exhibits Vol. 9:1224, 1226 (13 RT 1575, 1577).] She never told her brother, Shelby Arbuckle, until years later. [Exhibits Vol. 9:1224 (13 RT 1575).]

In 2000, Danette told Detective Vizzusi that the reenactment was in the midst of the murder investigation and could have taken place between December, 1983 and March, 1984. [Exhibits Vol. 9:1275 (13 RT 1626).] At the Preliminary Hearing, she testified it could have been a year after the crime. [Exhibits Vol. 9:1286 (13 RT 1637).] The portion of Vizzusi's interview with Danette where he asked her about the reenactment was not on tape. [Exhibits Vol. 11:1720 (17 RT 2069).][10]

---

[9]    At the Preliminary Hearing Danette did not recall this conversation. [Exhibits Vol. 9:1223 (13 RT 1574).]

[10]    Vizzusi noted that with some interviews in the case the tape was turned on at some point into the interview. [Exhibits Vol.

In 2002, Danette met with Sgt. Brockman for lunch at the suggestion of the prosecutor who wanted them to remember the details of the reenactment. [Exhibits Vol. 9:1221, Exhibits. Vol. 10:1395 (13 RT 1572; 14 RT 1746).] The lunch was not documented. [Exhibits Vol. 9:1314 (13 RT 1665).] Danette told Brockman she had told him about the Petitioner's reenactment of the Marlon Bass murder when he interviewed her in 1984. Brockman had no memory of being told about the reenactment and had she done so he would have remembered. [Exhibits Vol. 10:1395 (14 RT 1746).] If Danette had talked to him about the facts of the case before February 10, 1984, he would have written a report. [Exhibits Vol. 10:1406 (14 RT 1757).] Brockman had no recorded contacts with Danette prior to February 10, 1984. [Exhibits Vol. 10:1407 (14 RT 1758).]

Brockman was contacted by DAI Rodriguez in 1986 and she told him about the reenactment. He was delighted to receive the information and made arrangements to interview Danette. He then decided to refer the matter to the homicide unit instead. [Exhibits Vol. 10:1396 (14 RT 1747).] He prepared some questions for Danette and talked to Mo Reyes in the homicide unit. [Exhibits Vol. 10:1127 (14 RT 1748).]

Danielle Fournier was a childhood friend of Danette's. [Exhibits Vol. 10:1361 (14 RT 1712).] Danette told her Petitioner had committed the murder of Marlon Bass and had reenacted the actual murder. [Exhibits Vol. 10:1368 (14 RT 1719).] According to Danette, Petitioner made her kneel down and put a gun to her head and said he was going to do to her what he had done to Marlon. [Exhibits Vol. 10:1368 (14 RT 1719).] Danette said Marlon was shot. [Exhibits Vol. 10:1368 (14 RT 1719).] Danette told Fournier Petitioner said he was kidding. [Exhibits Vol. 10:1375 (14 RT 1726).]

Danielle claimed Danette had called her and she went to pick Danette up at

_____

11:1726 (17 RT 2075).] Vizzusi noted that Danielle (infra) described the reenactment as showing the shooting to be execution style whereas Danette stated Petitioner put his right arm out. [Exhibits Vol. 11:1730 (17 RT 2079).]

Petitioner's house right after the alleged reenactment but agreed she could have picked her up from someplace else. [Exhibits Vol. 10:1370 (14 RT 1721).] Danette appeared afraid. [Exhibits Vol. 10:1372 (14 RT 1723).] Danielle thought this was a week after Marlon's death. [Exhibits Vol. 10:1373 (14 RT 1724).]

Shelby Arbuckle is Danette Edelberg's younger brother. [Exhibits Vol. 4:547; Exhibits Vol. 9:1201 (8 RT 899; 1553).] Petitioner was his sister's boyfriend when Shelby was 12 to about 15 years old. [Exhibits Vol. 4:548 (8 RT 900).] Petitioner was abusive to him and they used drugs together. [Exhibits Vol. 4:548 (8 RT 900).] Petitioner started Shelby selling joints of marijuana when Shelby was in the sixth grade. [Exhibits Vol. 4:550 (8 RT 902).] Shelby started selling marijuana in the seventh grade to kids at his junior high school. [Exhibits Vol. 4:551 (8 RT 903).]

Petitioner talked to Shelby about doing burglaries in the Doeer Park neighborhood. [Exhibits Vol. 4:552 (8 RT 904).] He described casing houses and discussed the ones he planned to hit. [Exhibits Vol. 4:553 (8 RT 905).] Petitioner never said he was going to hit the Bass residence. [Exhibits Vol. 4:554 (8 RT 906).] He did say a person should never burglarize a house where the owner or occupier was a police officer.[11] [Exhibits Vol. 4:593 (8 RT 945).] Troy Tibbils, Ronny Cortez and Darryl Ramos were also involved in burglaries when Petitioner was involved. [Exhibits Vol. 4:592 (8 RT 944).] Shelby was not involved with Petitioner in burglaries but he was a lookout in burglaries involving other people. [Exhibits Vol. 4:59\2 (8 RT 944).] Petitioner mentioned having a gun one or two months before Marlon Bass died but Shelby did not see it. [Exhibits Vol. 4:554-555 (8 RT 906-907).] On cross-examination, Shelby thought Petitioner mentioned the gun a lot longer before that. [Exhibits Vol. 5:615 (9 RT 967).]

---

[11]    Marlon Bass's father Palmer Bass was a police officer. [Exhibits Vol. 3:240 (6 RT 592).]

21

The day after Marlon Bass's death, Shelby heard a rumor about it. Shelby told the rumor to Danette and Petitioner. [Exhibits Vol. 4:556 (8 RT 908).] Petitioner laughed and said Marlon had not been stabbed; he had been shot. [Exhibits Vol. 4:557 (8 RT 909).] Petitioner said someone had broken into the Bass residence, that the perpetrator was in Marlon's bedroom and was surprised by Marlon Bass. Petitioner said Marlon was shot once or twice in the heart. [Exhibits Vol. 4:557 (8 RT 909).] Shelby's memory was foggy about that part. [Exhibits Vol. 5:613 (9 RT 965).] According to Shelby, at the time of the statements, there had been nothing in the newspaper or news about the murder. [Exhibits Vol. 4:559 (8 RT 911).] Later, Shelby saw a newspaper article about the murder which in his opinion was consistent with what Petitioner had told him. [Exhibits Vol. 4:559 (8 RT 911).] Shelby did not notice any thing unusual in Petitioner's demeanor after the killing. [Exhibits Vol. 4:594 (8 RT 946).]

According to Shelby, a month to three months later, Petitioner admitted his involvement in the murder. [Exhibits Vol. 4:561 (8 RT 913).] He said he had hired two Black men to do the burglary for him and the police were looking in the wrong direction. He said the men were big and had played for the San Francisco 49ers. He and the men he had hired were going to split the money and drugs they took from the Bass residence. [Exhibits Vol. 4:561 (8 RT 913).] Petitioner was confident and cocky. [Exhibits Vol. 4:562 (8 RT 914).] In another conversation, Petitioner said there was a drawer full of drugs and money. He said the perpetrator was going to wait for Marlon to leave. Then he was going to go into the back door of the house. He would then go directly to Marlon's room where he knew there was a drawer full of money and a separate drawer full of drugs. [Exhibits Vol. 4:563-565 (8 RT 915-917).] He said the perpetrator was caught by surprise when Marlon sneaked up with a baseball bat. [Exhibits Vol. 4:565 (8 RT 917).] The perpetrator shot Marlon, who was in the hallway, twice. [Exhibits Vol. 4:565-566 (8 RT 917-918).]

According to Shelby, Petitioner was strapped for money before the murder. [Exhibits Vol. 4:568 (8 RT 920).] After the murder, Petitioner started buying gifts for Danette and his mother. [Exhibits Vol. 4:569 (8 RT 921).] Petitioner also had cocaine and a triple beam scale. [Exhibits Vol. 4:569-570 (8 RT 921-922).] Petitioner left town for about four months. [Exhibits Vol. 4:570-571 (8 RT 922-924).] He said he left because the police were bothering him and investigating him for the Bass murder. [Exhibits Vol. 4:573 (8 RT 925).] Petitioner never said he killed Bass. [Exhibits Vol. 4:591 (8 RT 943).]

Shelby had only recently disclosed all this information to Detective Vizzusi in 2002. [Exhibits Vol. 4:575 (8 RT 927).]

Mary Keasling was Petitioner's girlfriend starting on December 27, 1990 until December 1994. [Exhibits Vol. 7:995-996 (11 RT 1346-1347).] The relationship ended because Petitioner left Alamogordo, New Mexico. [Exhibits Vol. 7:997 (11 RT 1348).]

One night in 1991 when Keasling had been drinking, Petitioner told her he was a suspect in a murder that happened when he was seventeen years old. [Exhibits Vol. 7:999 (11 RT 1350).] He knew the victim who was a drug dealer and had been a friend. [Exhibits Vol. 7:1000 (11 RT 1351).] Although she told officers Petitioner told her the victim had been shot, Keasling was unable to recall the topic at trial. [Exhibits Vol. 7:1002, 1006 (11 RT 1353, 1357).] She was unable to recall if a statement was made about the victim being Black. [Exhibits Vol. 7:1003 (11 RT 1354).] Petitioner said no weapon had been found. [Exhibits Vol. 7:1004 (11 RT 1355).] He did not say anything regarding fingerprints. [Exhibits Vol. 7:1004 (11 RT 1355).] Petitioner said he had been to the guy's house that day to pick up drugs and had left before it happened. [Exhibits Vol. 7:1006 (11 RT 1357).] He said he saw someone else approach the victim's house as he left. Keasling recalled the name of the person was Ed, Eddie, Fred or Freddie or Jack

23

or Jackie. [Exhibits Vol. 7:1006 (11 RT 1357).] Petitioner never said he killed Bass. That would have caused her concern. [Exhibits Vol. 8:1019 (12 RT 1370).]

According to Keasling, when she was interviewed by the officers in 2000 about what Petitioner had told, she had been drinking and they were rude to her. [Exhibits Vol. 7:1007 (11 RT 1358).] Officers told her she was going to jail for being an accessory to murder. [Exhibits Vol. 8:1035 (12 RT 1386).] Keasling felt they were trying to get her to make certain incriminating statements about Petitioner such as that he committed the crime in self-defense. [Exhibits Vol. 8:1022-1023 (12 RT 1373-1374).] She felt threatened and felt the officers could make trouble in her life. [Exhibits Vol. 8:1031 (12 RT 1382).] She kept telling them Petitioner never mentioned self-defense, all he said was the victim had been murdered. [Exhibits Vol. 8:1031 (12 RT 1382).] The officers played her a snippet of a tape of Petitioner's father saying Petitioner had said it was self-defense and told her self-defense could potentially help Petitioner. [Exhibits Vol. 8:1038-1039 (12 RT 1389-1390).] Keasling would not lie under oath for Petitioner. [Exhibits Vol. 8:1023 (12 RT 1374).]

Keasling's interview was tape recorded and the tape was played for the jury. [Exhibits Vol. 13: 2049-2050 (21 RT 2398-2399).] The officers said that if she knew about a crime and did not tell about it she could be prosecuted as an accessory. (6 CT 1427.) According to Keasling, Petitioner told her there had been a murder but he did not know anything about it. (6 CT 1429.) They were drinking when it was discussed. (CT 1429, 1439.) The officers asked Keasling if self defense was involved and told her Petitioner's father had said it was self defense. (6 CT 1430-1431, 1435, 1440, 1445-1446.) She said Petitioner had beaten her but he wouldn't kill a cat even when she begged him because it was injured. According to Keasling, Petitioner was incapable of committing a murder. (6 CT 1430, 1498.) Keasling insisted she did not know anything and he never mentioned self defense. She insisted Petitioner had caused her much pain and she would

24

never lie for him. (6 CT 1432, 1436-1438, 1440, 1443-1448, 1458-1461, 1463, 1468-1469, 1472, 1475-1477, 1486-1487, 1503-1504.) The officers threatened to get the FBI involved and to arrest her for conspiracy. (6 CT 1478.) She persisted in saying she knew nothing. (6 CT 1479, 1483.) The officers threatened to arrest her and she told them to go ahead because she didn't know anything. (6 CT 1502-1504.) She said she did not like being threatened in her own home. (6 CT 1504.)

Keasling told the officers all Petitioner said was he had been under suspicion for murder when he was 17 or 18, the victim was a friend, was shot, was Black and a drug dealer and he had been to the victim's house the day before or the day after it happened. (6 CT 1434, 1436, 1448-1449, 1451.) He said no fingerprints or weapon was found. (6 CT 1449.)

David Michael Leon is Petitioner's father. [Exhibits Vol. 10:1415 (14 RT 1766).] Mr. Leon did not recall Petitioner visiting him in San Diego unexpectedly in late 1983 or early 1984 but he did recall Petitioner being in New Mexico in July of 1984. [Exhibits Vol. 10:1420-1421 (14 RT 1771-1772).] Petitioner stayed with him in San Diego from one to three weeks at times when he visited. At that time Mr. Leon lived with a woman who was not keen on his children visiting him. [Exhibits Vol. 10:1421 (14 RT 1772).] Petitioner lived in Alamogordo in the 1990s. [Exhibits Vol. 10:1423 (14 RT 1774).] Mr. Leon admitted he told officers his son had first mentioned the homicide in 1982 when he was living in San Diego. (15 RT 1882).]

The police came to Mr. Leon's house in New Mexico in 2000 to discuss Petitioner's alleged involvement in the Bass homicide. [Exhibits Vol. 10:1428 (14 RT 1779).] He was home alone. [Exhibits Vol. 10:1477 (14 RT 1828).] Mr. Leon was not expecting them and the interview lasted nearly an hour and a half. [Exhibits Vol. 10: 1441 (14 RT 1792).] He was nervous. [Exhibits Vol. 10:1441 (14 RT 1792).] At the beginning of the interview, he told the police he all he knew was  that Petitioner had told

25

him he had been a suspect. [Exhibits Vol. 10:1432, 1481 (14 RT 1783, 1832).]  He could not recall when Petitioner told him this but he (Mr. Leon) was not concerned at the time. [Exhibits Vol. 10:1437-1438: (14 RT 1788-1789).]

        Mr. Leon lied to the police  in stating that Petitioner told him he had killed Bass in self-defense. [Exhibits Vol. 10:1416, 1448, 1449 (14 RT 1767, 1799, 1800).] Petitioner did not tell him this. [Exhibits Vol. 10:1449, Exhibits Vol. 11:1538  (14 RT 1800, 16 RT 1889).] He did this to help Petitioner and regretted having done so. [Exhibits Vol. 10:1513 (14 RT 1864).] He felt threatened in the middle of the interview. The officers didn't seem satisfied with the answers he was providing. [Exhibits Vol. 10:1444-1445 (14 RT 1795-1796).]  They threatened him with prosecution for accessory to murder. [Exhibits Vol. 10:1444-1445 (14 RT  1795-1796).]  Mr. Leon was concerned about this. [Exhibits Vol. 10:1508 (14 RT 1859).]  Mr. Leon believed that if he would corroborate that it was in self defense he would be helping his son. [Exhibits Vol. 10:1451-1452 (14 RT 1802-1803).]  The police gave him this impression.  [Exhibits Vol. 10:1451 (14 RT 1802).]  He felt if he agreed on the self-defense issue it would be the end of the interview.  [Exhibits Vol. 10:1509 (15 RT 1860).]  He felt the police pressured him to say something that wasn't true. [Exhibits Vol. 10:1446 (14 RT 1797).]  Toward the end of the interview he made up answers. [Exhibits Vol. 10:1447 (14 RT 1798).]  During the interview, the police played him a snippet of a tape of Petitioner's 2000 interview with the police wherein he said, "My father, I told him. . ." [Exhibits Vol. 10:1537, Exhibits Vol. 13: 1680 (15 RT 1888, 17 RT 2033 ).]

        Mr. Leon had been drinking alcohol before the officers arrived. [Exhibits Vol. 10:1476-1477 (14 RT 1827-1828).]  He was into his second six pack of beer. [Exhibits Vol. 10:1477 (14 RT 1828).]  He told the officers he had a problem with drinking and sometimes Petitioner talked to him when he had been drinking. [Exhibits Vol. 10:1486 (14 RT 1837).]  Detective Vizzusi opined that Mr. Leon did not show

objective symptoms of intoxication. [Exhibits Vol. 11:1607 (16 RT 1958).]

Mr. Leon's statements to the officers were recorded and played for the jury. [Exhibits Vol. 11:1612 (16 RT 1963).]

Mr. Leon told the officers Petitioner might have mentioned a friend of his being murdered in 1983. [Exhibits Vol. 1:83, 90 (6 CT 1283, 1290).] Mr. Leon said Petitioner might have mentioned he was a suspect in the case but Mr. Leon often called Petitioner when Mr. Leon had been drinking. [Exhibits Vol. 1:87, 107, 117 (6 CT 1287, 1307, 1317).] Early on in the interview, the officers told Mr. Leon that if he was untruthful he might be charged with something and if he had knowledge and concealed it he might be an accessory, a theme which was repeated. [Exhibits Vol. 1:88-89, 106 (6 CT 1288-1289, 1306).] The officers also told Mr. Leon he might help by corroborating what Petitioner had said. [Exhibits Vol. 1:89, 96 (6 CT 1289, 1296).] Mr. Leon denied knowing anything about the crime but acknowledged several times Petitioner mentioned he was a suspect. [Exhibits Vol. 1:97, 98, 101, 104, 120 (6 CT 1297, 1298, 1301, 1304, 1320).] The officers again told Mr. Leon he could be prosecuted and implied Petitioner had said it was "self defense." [Exhibits Vol. 1:106-107 (6 CT 1306-1307).] Shortly thereafter, Mr. Leon said Petitioner had said it was self defense. Mr. Leon said Petitioner had not elaborated and did not mention a gun. [Exhibits Vol. 1:108. 109-110, 115 (6 CT 1308, 1309-1310, 1315).] The officers told Mr. Leon the crime scene corroborated the self defense claim. [Exhibits Vol. 1:115 (6 CT 1315).] When asked, Mr. Leon agreed Petitioner might have said something about a baseball bat. [Exhibits Vol. 1:116, 124 (6 CT 1316, 1324).] He said he was probably drinking the night Petitioner talked to him. [Exhibits Vol. 1:123-129 (6 CT 1323, 1329).]

Petitioner was interviewed by the police on March 16, 2000. (6 CT 1332).] His statements were recorded and played for the jury. [Exhibits Vol. 11:1688 (17 RT 2037).]

27

Petitioner met Marlon Bass at a party then started selling drugs for him. Eventually, Petitioner branched out and conducted his own sales. Petitioner had been to Marlon's house. (17 CT 1339-1342).] Marlon would have sales lined up on the street and would throw his money in a big drawer. He did not allow people into his house. However, Petitioner was allowed in. (17 CT 1343).] Petitioner told some of his friends about all the money. (17 CT 1344).] Bernard Wesley started hanging around. (17 CT 1344).] Wesley had stolen some drugs from Petitioner. (17 CT 1344-1345).]

Petitioner first said he did not remember seeing Marlon Bass on the day he died. (17 CT 1333).] Later, Petitioner said he thought he stopped by to see Marlon on that day but did not think he went into the Bass residence. (17 CT 1346 ).] When Petitioner was in the neighborhood in his car, he saw Bernard Wesley and somebody with Wesley on Leigh Avenue. (17 CT 1346-1347, 1352).] Wesley was moving very fast. [Exhibits Vol. 11:1803 (18 RT 2152).] Petitioner also had someone with him in the car but he did not recall who it was. He named a number of his friends as possibilities. (17 CT 1349, 1354-1356).] He had told the police about this when interviewed shortly after the killing. (17 CT 1353).] He was aware then that he was being looked at for the crime. (6 CT 1382-1383).]

When asked, Petitioner said Marlon had been shot with a .22 caliber gun by someone who entered his house for dope or money while he was gone. Somebody, such as a police officer, told Petitioner this or he read it in a newspaper. (6 CT 1377-1378).][12] He was told that someone went into Marlon's house for dope or money. Marlon had left and come back for some reason. According to Petitioner, Marlon carried a souvenir bat under the seat in his car. (CT 1378-1379).] Petitioner did not know if Marlon had a gun.

---

[12]    According to Detective Vissuzi the caliber of the weapon used was never publicly divulged. [Exhibits Vol. 11:1808 (18 RT 2157).]

28

(CT 1379-1380).]

Petitioner was probably working at Great Western Bank during this time period.  (6 CT 1358).]

Danette was Petitioner's girlfriend at the time. (6 CT 1355).]  Danette asked him if he was involved in the murder and he told her he was not. (6 CT 1392).]  If Danette had said otherwise, she was lying. (6 CT 1392).]

Petitioner knew the Smith brothers. (6 CT 1361).]  Petitioner denied telling anyone he had been involved in Marlon's murder even as a joke or in anger. (6 CT 1370-1371).]  Petitioner said he was truthful when he was interviewed almost 20 years prior and said he hadn't seen Marlon for two weeks before Marlon's death. (6 CT 1373).]  However, Petitioner remembered owing Marlon some money and having to repay him. (6 CT 1373).]  He left town after Marlon's death because of drugs and because he was being investigated. (6 CT 1380-1384).]  He went to stay with his father in Murietta Hot Springs and then to New Mexico to stay with his grandmother. (6 CT 1384-1386).]   Some of his friends thought he had done it because of the way the police were acting. (6 CT 1391).]

Petitioner adamantly denied killing Marlon Bass. (6 CT 1395, 1397).]  Petitioner denied telling anyone he was involved. (6 CT 1397-1398).]  During the interview, the officers told Petitioner that they believe they could prove he was involved and that it would make a big difference if it were a cold-blooded murder versus self-defense. (6 CT 1394).]  Petitioner denied being involved.  (6 CT 1395).]

Petitioner' s statements to Bernard Wesley and Wesley's activities on November 30 1983

At the time in question Bernard Wesley knew Petitioner and Marlon. [Exhibits Vol. 5:691-692 (9 RT 1043-1044).]

According to Bernard Wesley, prior to Marlon Bass's death, Petitioner told him that Marlon had good drugs. [Exhibits Vol. 5:694 (9 RT 1046).]  Petitioner said

29

Marlon had at least $10,000 and they should steal money and drugs from him. [Exhibits Vol. 6:695 (10 RT 1047).] Petitioner said Marlon kept the money in a dresser drawer. [Exhibits Vol. 5:695 (9 RT 1047).][13] He said it would be easy to break a window and reach his hand inside. [Exhibits Vol. 5:696 (9 RT 1048).] He said he knew Marlon's parent's schedule and it would be easy for him to get Marlon away from the house. [Exhibits Vol. 5:697 (9 RT 1049).] Petitioner said he would meet Marlon at the nearby 7-Eleven for a drug deal then double back to his house. [Exhibits Vol. 5:697 (9 RT 1049).] He said he would wear a ninja outfit which would conceal his face. [Exhibits Vol. 5:698-699 (9 RT 1050-1051).] He said he would need a gun in case Marlon went back. [Exhibits Vol. 5:699 (9 RT 1051).] Petitioner asked Wesley to participate. [Exhibits Vol. 5:700 (9 RT 1052).] According to Wesley, Petitioner's sister Dede was present during part of the conversation which took place in Petitioner's room. [Exhibits Vol. 5:701 (9 RT 1053).] Wesley also discussed the plot with Greg Chatman and the Smith brothers.[14] [Exhibits Vol. 10:688. 802, 824, Exhibits Vol. 11:937 (10 RT 1140, 1154, 1176, 11 RT 1288).]

       Wesley saw a crime stopper program about the Marlon Bass homicide and heard about it through the streets. [Exhibits Vol. 5:701-7005 (9 RT 1056-1057).][15] He and a co-worker Tim Pantiga joked about the murder. (RT 1057).] He thought this

---

[13]    Wesley had been in Marlon's room before. [Exhibits Vol. 5:693, 765 (9 RT 1045, 1117).] He also had his phone number. [Exhibits Vol. 6:779 (10 RT 1131).]

[14]    Gregory Chatman knew Bernard Wesley in 1983. Wesley did not tell him that he had ever been told about a plan to burglarize the home of Marlon Bass by Petitioner. [Exhibits Vol. 11:1812 (18 RT 2161).]

[15]    He claimed to have seen the program after his initial interviews with the police. [Exhibits Vol. 6:878 (10 RT 1229).]

happened after there was something in the paper about the killing. [Exhibits Vol. 5:705 (9 RT 1057).] Tim and Wesley often took work breaks together during which Tim read the newspaper. When Tim read him an article about the killing, Bernard did not tell him, "Those are my boys." [Exhibits Vol. 5:739, 746 (9 RT 1091, 1098).] He denied telling Tim that he (Bernard) committed the murder or that the police were looking for him in connection with the case. [Exhibits Vol. 5:706, 746 (9 RT 1058, 1098).] His friends teased him that the police were after him. [Exhibits Vol. 5:706 (RT 1058).] Wesley was angry with Petitioner for identifying him to the police as a suspect. [Exhibits Vol. 6:352, 825 (10 RT 1144, 1177).]

Wesley first talked to the police by phone on December 12, 1983. He said he had seen a large amount of drugs in Marlon's desk drawer. [Exhibits Vol. 6:849 (10 RT 1200).] The purpose of his call was to report Petitioner's plan. [Exhibits Vol. 6:850 (10 RT 1201).] He went to the police station on December 20, 1983 and tried to tell the police everything he knew. [Exhibits Vol. 6:851 (10 RT 1203).] He claimed to have gotten nervous and tired so his intention was thwarted. [Exhibits Vol. 6: 857 (10 RT 1208).] He denied telling the police that he had the conversation with Petitioner about the plan while they were watching the fights and was impeached with a contrary statement. [Exhibits Vol. 853-8546: (10 RT 1204-1205).] He recalled telling the police he visited with Petitioner's sister that day and Petitioner was not home. [Exhibits Vol. 6:855 (10 RT 1206).] During that interview, Wesley stated that the Smith brothers (infra) were the only ones who would have the intestinal fortitude to go into Marlon's house with a gun. [Exhibits Vol. 11:1774 (18 RT 2123).] Detective Vizzusi did not recall that in that interview Wesley said that the Smith brothers had wasted Marlon like they threatened to waste him. [Exhibits Vol. 11:1773 (18 RT 2122).]

Wesley first told the police that on the day Marlon Bass died, Wesley was with a neighborhood friend named Renee. [Exhibits Vol. 5:553-555. 709, 721-722,

31

Exhibits Vol. 6:905-907 (9 RT 1061, 1073-1074, 10 RT 1256-1258).] He also told the police he heard he was a prime suspect because he had heard Petitioner was naming him because Wesley had been in the area [Exhibits Vol. 6:781 (9 RT 1133).] When the police asked Wesley if he had driven down Curtner and stopped when he saw a couple he knew, his memory of where he had been was jogged. He had stopped to talk to the people; but, it turned out he did not know them so he apologized.[16] [Exhibits Vol. 5:709-710, 717-71 722, Exhibits Vol. 6:713 (9 RT 1061-1062, 1069- 1071, 1074, 10 RT 1264).] Wesley was driving a new Camaro Z28 painted white with multiple colored stripes. [Exhibits Vol. 5:730 (9 RT 1082).] The car was white, orange and black. [Exhibits Vol. 5:730 (9 RT 1082).] He denied keeping a roach clip in his car in 1983 and 1984. [Exhibits Vol. 7:938

---

[16]    Crystal Custodia lived at 1953 Curtner Avenue in San Jose in November of 1983. [Exhibits Vol. 8:1160 (12 RT 1511).] The 7-Eleven was on the opposite side of Curtner. [Exhibits Vol. 8:1161 (12 RT 1512).] In late 1983, a person in a "cool car" approached her and a friend named Bruce as they were standing in her front yard. [Exhibits Vol. 8:1162-1163 (12 RT 1513-1514).] She could not remember anything about him. [Exhibits Vol. 8: (12 RT 1513).] He said he thought they were someone else. [Exhibits Vol. 8:1163 (12 RT 1514).] The person got out of his vehicle. [Exhibits Vol. 8:1165 (12 RT 1516).] She did not remember the time of day this occurred or the day of the week. [Exhibits Vol. 8:1163 (12 RT 1514).]

Inspector Joe Brockman interviewed Crystal Custodia on December 23, 1983. [Exhibits Vol. 8:1169 (12 RT 1520).] She reported that she and her boyfriend were sitting in front of her house near a bus stop when a Black male, average build, driving a white Camaro or Firebird with an orange pinstripe pulled past the house, honked and backed up. [Exhibits Vol. 8:1170-1171 (12 RT 1521-1522).] He approached them, then said he thought they were someone else and departed. [Exhibits Vol. 8:1171 (12 RT 1522).] She said it was a Monday or a Wednesday three to four weeks prior in the late afternoon between two and three p.m. [Exhibits Vol. 8:1171-1172 (12 RT 1522-1523).]

(11 RT 1289).] He told the police he drove by Marlon's house. [Exhibits Vol. 8:934-935 (12 RT 1285-1286).] Before driving on Curtner, Wesley had been at Eastridge Mall buying an opal necklace and a pair of earrings for his girlfriend, Marianne Digiovanni. [Exhibits Vol. 5:562. Exhibits Vol. 6: 914-915 (9 RT 1062, 1265-1266).] He bought the gift on credit. He previously testified he paid cash. [Exhibits Vol. 5:711 (9 RT 1063).] He no longer had a receipt for this purchase. [Exhibits Vol. 6:914 (10 RT 1265).] He thought he left the mall at 10:30 a.m. but it could have been 11:30 a.m. [Exhibits Vol. 5:719 (9 RT 1071).] He was on his way to Marianne's job when he saw Petitioner kneeling down at a phone booth at a 7-Eleven. [Exhibits Vol. 5:712-713 (9 RT 1064-1065)[17] They made eye contact. Petitioner looked like he was throwing up. [Exhibits Vol. 5:714 (9 RT 1066).] Wesley went to Marianne's job and gave her the jewelry.[18] [Exhibits Vol. 5:720 (9 RT 1072).]

Wesley knew David and Marvin Smith. [Exhibits Vol. 5:723 (9 RT 1075).]

---

[17]    Marianne's job was near Camden Ave. and Hwy. 17. From the Eastridge Mall Wesley took Curtner all the way to her job. [Exhibits Vol. 5:712 (9 RT 1064).]

[18]    Marianne Brown, formerly known as Marianne Digiovanni, was Wesley's girlfriend in 1983. Wesley gave her an aquamarine ring at the beginning of 1983. [Exhibits Vol. 8:1188. 1196 (12 RT 1539, 1547).] He might have given her an opal necklace during her lunch break. He sometimes visited her at her job at lunchtime. The job was not far from Camden Ave. and Hwy 17. [Exhibits Vol. 8:1189 (12 RT 1540).] He was not the type to give several items of jewelry at one time. [Exhibits Vol. 8:1192 (12 RT 1543).] Brown vaguely remembered Wesley's involvement in a drug rip off. (RT 1542-1543).] At that time Wesley used and sold drugs. [Exhibits Vol. 8:1190 (12 RT 1541).] She told a defense investigator she was not certain that Bernard Wesley gave the ring to her for her birthday or Christmas but he was not the type of person to give her a ring out of the blue. [Exhibits

Wesley had seen Petitioner with David and Marvin Smith. [Exhibits Vol. 5:724 (RT 1076).] Wesley had taken some drugs from Petitioner before the murder of Marlon Bass. [Exhibits Vol. 5:724 (RT 1076).] Petitioner unsuccessfully tried to get payment from him and enlisted the assistance of the Smith brothers, who were physically large. [Exhibits Vol. 5:724, 726-727 (9 RT 1076, 1078-1079).] David and Marvin Smith and Petitioner threatened to beat him up and take his car for a joyride. [Exhibits Vol. 5:725 (RT 1077).] Before Marlon's death, Wesley was at Petitioner's house when the Smith brothers confronted him about taking Petitioner's cocaine. [Exhibits Vol. 5:787 (RT 1139).] Bernard denied he was mad at Petitioner because of this. [Exhibits Vol. 6:819 (10 RT 1171).] At one point the Smith brothers asked his help to "take off" Petitioner. [Exhibits Vol. 6:810 (10 RT 1162).]

Wesley called the police on December 27, 1983 and reported he had seen David Smith walking on Bascom at 3:30 p.m. and that he looked different than when he had last seen him, now sporting a new hairstyle and expensive coat. [Exhibits Vol. 6:858 (10 RT 1209).] During this call, Wesley did not initially mention having seen Petitioner on Curtner. [Exhibits Vol. 7:927 (11 RT 1278).]

Wesley did not remember telling the police that he did not think Petitioner was involved in Marlon's murder. [Exhibits Vol. 6:833 (10 RT 1185).] He denied that he rode on a bus with the Smith brothers at some time after the murder. [Exhibits Vol. 6:834 (10 RT 1186).]

David and Marvin Smith are twin brothers.[19] [Exhibits Vol. 7:940; 947; 951 (11 RT 1291; 1298, 1302).] David frequented a deli on Bascom Avenue where Petitioner

---

[19]   In 1990, David Smith was convicted of misdemeanor destroying or concealing documentary evidence (Pen. Code § 135) and Marvin Smith suffered a misdemeanor conviction of false identification to a police officer in 1985 (Pen. Code § 148.9). [Exhibits Vol. 14:2061 (22 RT 2473).]

worked. [Exhibits Vol. 7:940; Exhibits Vol. 8:1123 (11 RT 1291; 12 RT 1474).] Marvin knew Petitioner but denied having a relationship with him. [Exhibits Vol. 7:952 (11 RT 1303).] Neither Smith brother knew Marlon Bass or Bernard Wesley. [Exhibits Vol. 7:941, 950, 952, 958 (11 RT 1292; 1301, 1303, 1309).] Neither brother was able to recall Petitioner asking him to collect a drug debt from anyone. [Exhibits Vol. 7:942, 952 (11 RT 1293, 1303).] However, in 1984 they might have told the police that Petitioner had used them to collect a drug debt. [Exhibits Vol. 7:941; 952-953 (11 RT 1292; 1303-1304).] Petitioner never asked them to rip off some drug dealers and they never told that to police officers. [Exhibits Vol. 7:943-944; 954 (11 RT 1292-1294; 1305).] Nor did Petitioner tell them he was planning such a thing. [Exhibits Vol. 7:954 (11 RT 1305).] David never told Det. Vizzusi that Petitioner kept saying he wanted to rip-off somebody and he wanted to get their drugs nor that Petitioner offered to pay him to do so. [Exhibits Vol. 7:743 (11 RT 1294).] Petitioner asked him and his brother to help at the store with a beer theft. [Exhibits Vol. 7:945-955 (RT 1296-1297).] David denied having a falling out with Petitioner. [Exhibits Vol. 7:946 (11 RT 1297).] After the police talked to David, Petitioner disappeared. [Exhibits Vol. 7:945-955 (11 RT 1296-1297).] David had never seen Petitioner with a gun. [Exhibits Vol. 7:948 (11 RT 1299).]

Former Officer John Kracht interviewed David and Marvin Smith on February 6, 1984. [Exhibits Vol. 7:961 (11 RT 1312).] David said he and his brother backed up Petitioner when he collected a drug debt from Bernard Wesley. [Exhibits Vol. 7:963-964 (11 RT 1314-1315).] He also said Petitioner wanted them to rip off some drug-dealers and he said he would pay them. [Exhibits Vol. 7:964 (11 RT 1315).] Martin Smith was interviewed on February 4 and confirmed what his brother had told Officer Kracht. According to Marvin, Petitioner did not name the dealer and he said he was going to set it up. [Exhibits Vol. 7:965-966 (11 RT 1316-1317).] Petitioner said he knew the drug dealer and the dealer did not have a gun. [Exhibits Vol. 7:968 (11 RT 1319).]

35