David said he had not seen Petitioner for six to seven months prior to February 6, 1984. [Exhibits Vol. 7:970 (11 RT 1321).]

Detective Gilbert Vizzusi interviewed David and Marvin Smith on February 11, 2000. [Exhibits Vol. 7:976 (11 RT 1327).] They confirmed the statements they had made in 1984 were true and accurate. [Exhibits Vol. 7:977 (11 RT 1328).] David recalled that Petitioner had asked him to participate in a robbery of a drug dealer. [Exhibits Vol. 7:978 (11 RT 1329).] At the time of these interviews Vizzusi had not completely excluded the Smith brothers as suspects. [Exhibits Vol. 7:980 (11 RT 1331).] Vizzusi told Marvin that his name had come up because Petitioner had pointed the finger at him and his brother. [Exhibits Vol. 7:986 (11 RT 1337).] At the time he interviewed the Smiths, Vizzusi also knew that Wesley had also made a statement identifying them as possibly being involved. [Exhibits Vol. 7:991 (11 RT 1342).]

## B. The defense case.

Bernard Wesley and Timothy Pantiga were coworkers in late 1983 and early 1984 and they took breaks together. [Exhibits Vol. 11:1884-1886 (18 RT 2223-2225).] They would smoke marijuana and read the newspaper. [Exhibits Vol. 11:1886-1887 (18 RT 2225-2226).] Wesley, who normally did not take an interest in the newspaper, was checking it for a few days looking for an article regarding a murder and a "Black kid" killed in a home invasion. [Exhibits Vol. 11:1887 (18 RT 2226).] After he found the article, Wesley said "those were his boys." [Exhibits Vol. 11:1878-1879 (18 RT 2227-2228).] Pantiga told Wesley there was no statute of limitations on murder. [Exhibits Vol. 11:1879 (18 RT 2228).] Later, when Pantiga visited Wesley at his residence to purchase marijuana, Wesley said the police wanted to talk to him about the murder. Pantiga told Wesley if he had nothing to worry about he should talk to the police. [Exhibits Vol. 11:1880 (18 RT 2229).] Wesley admitted the killing. He quickly said he was joking and

he didn't do it. [Exhibits Vol. 11:1880 (18 RT 2229).][20] Wesley appeared nervous like something was bugging him. [Exhibits Vol. 11:1881 (18 RT 2230).] Wesley never said Petitioner asked him to commit a burglary of Marlon Bass. [Exhibits Vol. 11:1883 (18 RT 2232).]

According to Pantiga, Wesley had a roach clip with a feather in his car. [Exhibits Vol. 11:1883 (18 RT 2232).] Wesley borrowed Marianne Mai's car occasionally. [Exhibits Vol. 11:1883 (18 RT 2232).]

Marianne Mai was the girlfriend of Bernard Wesley in the early 80's for two or three years. [Exhibits Vol. 11:1888-1889 (18 RT 2236-2237).] According to Mai, Wesley drove a white and red Camaro and carried a red roach clip with red feathers on it in the car. [Exhibits Vol. 11:1888-1889 (RT 2237-2238).] The clip matched the car. [Exhibits Vol. 11:1889 (18 RT 2238).]

According to Dr. John Thornton, a forensic scientist, the crime scene processing in this case was rather casual. [Exhibits Vol. 11:1575-1576, 1584 (16 RT 1926-1927, 1935).] It was important to protect the crime scene to avoid contamination. [Exhibits Vol. 11:1582 (16 RT 1933).] The crime scene was not limited to the immediate area where the body was found. [Exhibits Vol. 11:1584 (16 RT 1935).]

The front door area of the Bass residence where the glass was broken and the bat should have been processed for fingerprints. [Exhibits Vol. 11:1585-11587 (16 RT 1936-1938).] The missing button and the injury to the victim's arm could be consistent with a struggle. [Exhibits Vol. 11:1588-1589 (16 RT 1939-1940).] There was no damage to the desk drawer, indicating it was not forced open. [Exhibits Vol. 11:1591 (16 RT 1942).] A towel and a red feather were found in the victim's bedroom. [Exhibits

---

20    Pantiga told a district attorney's investigator that he did not take this admission seriously. [Exhibits Vol. 11:1884 (18 RT 2233).]

Vol. 11:1594 (16 RT 1945).] Dr. Thornton could not rule out the possibility of more than one perpetrator. [Exhibits Vol. 11:1590 (16 RT 1941).] The evidence at the scene did not reveal much of a story. Nothing established the sequence of events. [Exhibits Vol. 11:1596 (16 RT 1947).] Because there was only one bullet remaining in the wall with the others in Marlon, the positions of the shooter and Marlon could not be determined. [Exhibits Vol. 11:1595 (16 RT 1946).]

In 1982, there had been a petty theft at the Bass residence and two theft related crimes on the same street. [Exhibits Vol. 11:1816 (18 RT 2165).] Ken Auda was a suspect in the crime based on rumors he had been committing burglaries in the area. [Exhibits Vol. 11:1817 (RT 2166).] However, Detective Vizzusi never interviewed Auda. [Exhibits Vol. 11:1819 (18 RT 2168).] Vizzusi never attempted to interview Blaine Buscher or Kirk Woods who were mentioned in the investigation. [Exhibits Vol. 11:1820-2821 (18 RT 2169-2170).]

Petitioner was seen at the Arbuckle residence on January 24, 1984. [Exhibits Vol. 11:1842 (18 RT 2191).]

Geoffrey Caplan lived around the corner from Marlon Bass in 1983. [Exhibits Vol. 11:1891 (18 RT 2240).] Caplan broke into the Bass residence five times through a bathroom window to take drugs. [Exhibits Vol. 11:1892-1893 (18 RT 2241-2242).] According to Caplan, Marlon kept drugs and some money, but not his big money, in a small wooden box. He also kept money in a metal box. [Exhibits Vol. 11:1893-1894 (18 RT 2242- 2243).]

Marlon caught Caplan stealing about a year before the murder. [Exhibits Vol. 11:1899 (18 RT 2248).] This caused their friendship to end. [Exhibits Vol. 11:1900 (18 RT 2249).] About a week before Marlon died, Caplan and Marlon got into a scuffle. [Exhibits Vol. 11:1895 (18 RT 2244).] In 1983, Caplan's father owned a .22 caliber rifle. [Exhibits Vol. 11:1895 (18 RT 2244).] According to Caplan, he was with Eddie King on the day of the murder. [Exhibits Vol. 11:1903 (18 RT 2252).]

Caplan was unaware of a falling out between Petitioner and Marlon Bass prior to Marlon's death. [Exhibits Vol. 13:1963 (20 RT 2312).]

Kenneth Pitts interviewed Caplan on July 2, 1985. [Exhibits Vol. 11:1908 (18 RT 2257).] Caplan told him Marlon bass kept his money and drugs in a small handmade wooden box. [Exhibits Vol. 11:1908 (18 RT 2257).]

According to defense investigator Robert Bortnick, Shelby Arbuckle said he had a conversation with Petitioner about Marlon's death between 24 to 72 hours after the death. His sister Danette was present. [Exhibits Vol. 13:1937 (20 RT 2286).] Shelby said at some point Danette had told him about the reenactment. [Exhibits Vol. 13:1938 (20 RT 2287).]

A pay owe sheet recovered from Marlon Bass's bedroom reflected a person named Dave L. owed $40. [Exhibits Vol. 13:1989-1990 (20 RT 2338-2339).]

In an interview with Danette Edelberg on February 10, 1984, Inspector Brockman told her Bass attacked the perpetrator who was in the bedroom with a baseball bat. [Exhibits Vol. 13:1972-1973 (20 RT 2321-2322).][21] He possibly told her Marlon's connection had cut him off because his drugs were not good and he was getting them elsewhere. [Exhibits Vol. 13:1974 (20 RT 2323).] Brockman possibly disclosed the caliber of the bullets to Palmer Bass. [Exhibits Vol. 13:1991 (20 RT 2340).] During an interview of Anthony James, a drug dealer who knew Marlon through the drug trade, on December 22, 1983, the involvement of a .22 weapon was mentioned. [Exhibits Vol. 13:1993-1994 (20 RT 2342-2343).]

Petitioner telephoned Detective Brockman at 2:09 on December 2, 1983. He told Brockman he had seen Bernard Wesley near Marlon Bass's residence on

---

[21]    In his conversations with Danette, Brockman discussed with her that Petitioner worked as a bank teller and that he was earning good money. [Exhibits Vol. 13:1979-1980 (20 RT 2328-2329).]

November 30, 1983. [Exhibits Vol. 13:1965, 1967 (20 RT 2314, 2316).] Wesley stopped, backed up and left in a big rush. [Exhibits Vol. 13:2039 (21 RT 2388).] Petitioner told Inspector Brockman that he and Marlon Bass had been friends for 4 ½ years and he saw him at least five times a week. [Exhibits Vol. 13:2005 (20 RT 2354).] He said he knew Marlon did not have a gun and he saw $15,000 in Marlon's money drawer once several months before the murder. [Exhibits Vol. 13:2005 (20 RT 2354).] He said he stopped seeing Marlon two weeks before the murder and he did not go to Marlon's funeral. [Exhibits Vol. 13:2005 (20 RT 2354).] Petitioner mentioned working at Great Western Bank as the reason he did not see Marlon for two weeks. [Exhibits Vol. 13:2010-2011 (20 RT 2359-2360).][22] Petitioner said he had no grudges against Bernard Wesley. [Exhibits Vol. 13:2006 (20 RT 2355).] He said he did not think Wesley killed Marlon Bass. [Exhibits Vol. 13:2007 (20 RT 2356).][23]

Bernard Wesley called Brockman on December 12, 1983 . [Exhibits Vol. 13:1968 (RT 2317).] Bernard Wesley told him two "Black guys," David and Martin, beat up Petitioner twice, once when they ripped off cocaine and again when he damaged their front door. [Exhibits Vol. 13:1976 (RT 2325).] They intimidated him into telling them about drug dealers so they could rip him off. [Exhibits Vol. 13:1977 (20 RT 2326).] Wesley also said that he had had a conversation with Petitioner three weeks earlier where Petitioner mentioned how much money Marlon had and he (Petitioner) was impressed. Wesley inferred from that that Petitioner wanted to rip off Marlon. [Exhibits Vol.

---

22    Brockman did not recall following up on Petitioner's statement about working at Great Western. [Exhibits Vol. 13:1982 (20 RT 2331).]

23    Petitioner called Brockman on February 8, 1984 , upset because Danette had called him, hysterical, asking if she should talk to the police. Petitioner was upset about being investigated and said he was calling from San Diego. [Exhibits Vol. 13:2002 (20 RT 2351).]

13:1977 (20 RT 2326).]

Petitioner had a phone interview with Brockman on December 20, 1983. [Exhibits Vol. 13:2036 (21 RT 2385).] Petitioner said he owed Marlon $20 or $30 at the time of his death. He told Brockman he had seen money in Marlon's money drawer and that on the day of Marlon's death, he saw Wesley cruising on Curtner. [Exhibits Vol. 13:2039 (21 RT 2388).] Wesley stopped, backed up and left the area in a rush. [Exhibits Vol. 13:2039 (21 RT 2388).] Wesley was interested in the subject of Marlon's money drawer. [Exhibits Vol. 13:2039 (21 RT 2388).]

### C.    The prosecution's rebuttal.

Eight fingerprints were collected from Marvin Bass's bedroom or the door to the bedroom by Officer Bill Santos. [Exhibits Vol. 14:2063 (22 RT 2475).] Santos was unable to recall dusting the entry for fingerprints. [Exhibits Vol. 14:2065 (22 RT 2477).] There was no record of the removal of any prints from the latch of the front door. [Exhibits Vol. 14:2076 (22 RT 2488).] Santos collected a towel and a red fiber from Marvin's bedroom. [Exhibits Vol. 14:2066 (22 RT 2478).] The crime lab described the fiber as a feather. [Exhibits Vol. 14:2069 (22 RT 2481).]

41

# ARGUMENT

## I

# HABEAS CORPUS IS THE PROPER VEHICLE FOR THE PRESENTATION OF PETITIONER'S CLAIM

A criminal defendant may attack the effectiveness of his appellate counsel in a petition for writ of habeas corpus. (In re Barnett (2003) 31 Cal.4th 466, 476; In re Spears (1984) 157 Cal.App.3d 1203, 1209-1210.

## II

# APPELLATE COUNSEL RENDERED INEFFECTIVE ASSISTANCE TO PETITIONER IN HIS DIRECT APPEAL.

### A. The standard of review.

Petitioner had a Sixth Amendment right to effective counsel on appeal. (Evitts v. Lucey (1985) 469 U.S. 387.) In order to find counsel was ineffective, the test set forth in Strickland v. Washington (1984) 466 U.S. 668, 687-8 requires a showing that counsel's performance fell below an objective standard of reasonableness and that, but for counsel's error, a different result would have been reached. "'[C]ounsel is expected. . .to possess knowledge of those plain and elementary principles of law which are commonly known by well-informed attorneys. . .'" (People v. McCary (1985) 166 Cal.App.3d 1, 8, quoting Smith v. Lewis (1975) 15 Cal.3d 349, 358.)

The Strickland test applies to appellate counsel. (Smith v. Robbins (2000) 528 U.S. 259, 285.) To establish constitutionally deficient representation on appeal, the defendant must show that (1) the act or omission in question was objectively unreasonable, and (2) there is a reasonable probability that but for counsel's error, the defendant would have prevailed on appeal. (Id., at p. 285.)

Appellate counsel has a duty to present a brief to the reviewing court that among other things, sets forth all arguable issues. (People v. Barton (1978) 21 Cal.3d

513, 519; People v. Harris (1993) 19 Cal.App.4th 709, 714.) As explained in People v. Johnson (1981) 123 Cal.App.3d 106, 109, 112:

> " . . .an arguable issue consists of two elements. First, the issue must be one which, in counsel's professional opinion, is meritorious. That is not to say that the contention must necessarily achieve success. Rather, it must have a reasonable potential for success. Second, if successful, the issue must be such that, if resolved favorably to the Petitioner, the result will either be a reversal or a modification of the judgment."

Further, "counsel serves both the court and his client by advocating changes in the law if argument can be made supporting change." People v. Feggans (1967) 67 Cal.2d 444, 447-448; Harris, supra, 19 Cal.App.4th at 714.

The reviewing court in People v. Valenzuela (1985) 175 Cal.App.3d 381, 391, observed:

> "The question of ineffective assistance of counsel must be decided on a case by case basis, 'and the determination of each will depend on whether the Petitioner's counsel failed to raise assignments of error which were crucial in the context of the particular circumstances at hand.' (Citation omitted)."

**B. Appellate counsel was ineffective in failing to raise on direct appeal the issue of the trial court's refusal to allow the defense to present the testimony of Dr. Ofshe or Dr. Leo, experts on the subject of police coerced statements by witnesses.**

**1.   The proceedings at Petitioner's trial.**

Defense counsel made repeated attempts to induce the court to allow him to present the testimony of an expert, Dr. Richard Ofshe. The purpose of the testimony was to show that the statement Petitioner's father gave to the police in which he admitted that Petitioner had informed him the murder was committed in self-defense was coerced as a result of police tactics. Petitioner unsuccessfully sought to exclude the statement of his father on this basis. [Exhibits Vol. 1:68-69(4 CT 984-985).] When Dr. Ofshe proved to be unavailable, defense counsel sought permission to present the same type of testimony

through Dr. Ofshe's colleague, Dr. Richard Leo. (5 CT 1172-1174].)

The prosecution opposed the admission of this testimony on the grounds that it dealt with the credibility of a witness which was not a proper subject for expert testimony, that it was not relevant as to the voluntariness or credibility of witnesses' statements and that Dr. Ofshe was not an expert on the subject to which his testimony pertained. The prosecutor asserted that there was no evidence that the police used coercion to obtain witnesses' statements. [Exhibits Vol. 1-59-67 (4 CT 976-983).]

Petitioner filed a written opposition to the prosecutor's position. [Exhibits Vol. 1-77 (5 CT 1090).] Petitioner stated that the purpose of Dr. Ofshe's testimony was not to establish the credibility of a witness but rather to show the subtle and not obvious ways a statement can be coerced. Defense counsel argued:

> "We submit that the statement by Mr. Leon [Petitioner's father] was the product of police coercion, specifically putting Mr. Leon in a position where he was coerced into stating that his son said to him that 'it was self-defense.' The evidence will show that Mr. Leon stated numerous times that his son did not tell him anything about the murder other than he had been a suspect. It was only when the police make statements to Mr. Leon that if he told them that his son said it was in self-defense they could go to the District Attorney and see that his son was freed from custody. The police also went on to tell the father that they had been to the crime scene and that the crime scene corroborated that self-defense was a viable conclusion. All they needed to hear was corroboration. The police even went the extent of playing a tape for the father using an excerpt lifted from the defendant's earlier statement to the police and implying that from this snippet that his son said he killed Marlon Bass in self-defense. This was not only untrue but furnished the basis for the father to believe that the police were telling him the truth. The police also threatened the father that if he did not tell him what they want to hear he would be 'charged with something' and that he could be 'an accessory' to the murder. It was only after the police preyed upon him for approximately one hour that he finally corroborated what he believes they told him; he just told the police his son mentioned that it was in self-defense it will result in his son's 'life' and 'his son's freedom.' 'Now is the time to get it out so we can go to the DA before he is even charged and tell the DA that this is what he told us.. .' All of these ploys can be demonstrated to produce unreliable and coerced responses. This is especially true where Mr. Leon who had consumed approximately two six packs of beer at the time. This

44

coerced statement goes to the very core of the prosecution's case. There is a substantial nexus between the way the interview was conducted and the statement that was finally elicited from Mr. Leon's father. The prosecution's attempt to mask this as a credibility question is an attempt to obfuscate the evidence." [Exhibits Vol. 1:75-76(5 CT 1088-1089).]

After listening to the tape of Michael Leon's statement, the trial court ruled that "you [meaning defense counsel] do not need an expert to tell me that this tape was a statement by someone who was coerced or not coerced." [Exhibits Vol. 2:183 (3 RT 281).] The court made a finding that Mr. Leon's statement was voluntary without hint of coercion and whatever tactics were used by the police were permissible under California law. The court then excluded expert testimony as it would not assist the jury "because there's something of common experience that juries have in regarding the credibility of people under the circumstances under which they are given." [Exhibits Vol. 2:185 (3 RT 283).] Defense counsel reiterated that how police interrogation worked was beyond the common experience of the jury, that the average juror did not know what kind of specific and specialized training police officers underwent in the subject of interrogation, the average juror did not know or appreciate why "it is psychologically a person will make a statement against his or her self interest," and that it was counter-intuitive that a person would make a false statement talking to the police. [Exhibits Vol. 2:186-189 (3 RT 283-286).] The court again stated it would not allow the testimony because it was "sufficiently satisfied" that the expert could not assist the jury, but that defense counsel was not precluded from attacking the credibility of Mr. Leon's statement either from examination or argument. [Exhibits Vol. 2:190 (3 RT 287).]

Petitioner sought reconsideration of this ruling. [Exhibits Vol. 191 (3 RT 377).] Defense counsel cited various cases to the court and acknowledged that the trial court had found Mr. Leon's statement voluntary but objected to the trial court's blanket exclusion of expert testimony to educate the jury as to general principles concerning police interrogation. Defense counsel noted that the techniques could not be readily

45

recognized by jurors, jurors did not know that police were necessarily specifically trained in how to interrogate witnesses, that these techniques were designed to cause someone to make a statement against their self-interest, and that it was counter intuitive for a juror to believe a person would make a false statement and come to court to testify that it was false. [Exhibits Vol. 2:195-196 (3 RT 384-385).]  Counsel restated the coercive tactics inherent in the police handling of Mr. Leon. [Exhibits Vol. 2:197-198 (3 RT 386-387).]

The trial court ruled that the issue was not false confession but rather of the credibility of a witness and "expert witnesses are not necessary to assist the trier of fact in determining credibility." [Exhibits Vol. 2:204 (3 RT 393).] The court noted on cross-examination of Michael Leon, counsel could elicit various factors and argue to the jury about what value and weight they should accord his statement. [Exhibits Vol. 2:204 (3 RT 393).]  The court denied Petitioner's request to reconsider its earlier ruling, stating:

"The court has already ruled that it did not need an expert witness to assist it in making the determination that the statement was so coercive that it was the type that had to be excluded.. And the Court has to rule also contingently no expert witness will be allowed to assist the jury in making a determination on credibility." [Exhibits Vol. 2:205 (3 RT 394.]

Petitioner raised the issue again unsuccessfully in a motion for new trial.

In the motion defense counsel argued:

"Dr. Leo was prepared to testify with respect to the techniques utilized by Sgt. Vizzusi in coercing David Leon's father, Michael Leon, to make a statement that his son purportedly told him that the death of Marion Bass was done in self-defense or words to that effect as well as the techniques used with other witnesses. His testimony would have included police interviewing and interrogation training, the psychology of police interviewing and interrogation, and coercion and factors related to the taking of involuntary and/or unreliable statements. . . .The court's preclusion of Dr. Leo's testimony was extremely damaging to the defendant's case and in error.  Essentially, the court precluded the defense from establishing an explanation as to why Mr. Michael Leon's statement to the police was made and allowed the District Attorney to seize upon this statement to the detriment of the defendant. Not only was Dr. Leo not permitted to testify, but after precluding him from testifying on the course of nature of the police techniques and tactics, the court also precluded testimony as to the general means of how police interrogate

46

witnesses and defendants without relating it to the specifics involved in the interview of the witness in this case. The preclusion of this evidence was error by the court and a deprivation of Mr. Leon's right to a fair trial." [Exhibits Vol. 1:151-152 (7 CT 1727-1728).][24]

## 2. The merits.

**a. Counsel on direct appeal should have briefed the issue of the trial court's exclusion of the expert testimony at issue.**

Here, as outlined above, defense counsel sought to present the testimony of Drs. Ofshe or Leo to attest to the factors that would cause Michael Leon to make a false statement to the police, a statement which was incredibly damaging to Petitioner and a key component of the evidentiary puzzle against him. As set forth above, defense counsel was clear that the testimony would be in the form of general education of the jury as to police interrogation techniques, interview training and why a person would make a false statement to the police, and would not cross into the arena of commentary on witness credibility.

At the time appellate counsel filed the opening brief, there was one published California decision disallowing the testimony of Dr. Ofshe. This was People v. Son (2000) 79 Cal.App.4th 224, 240-241, a decision from the Fourth District Court of Appeal. In that case:

"Son asserted Ofshe could testify about police tactics in wearing down suspects into making false admissions. The court declined to admit Ofshe's testimony. The court stated such expert testimony was unnecessary in light of Son's testimony that he had confessed falsely due to Detective Gallivan's asserted offer of not more than one year in custody. The court also stated there was no evidence that police engaged in tactics wearing down Son into making false admissions." (Id., at p. 241.)

---

[24] Dr. Leo was essentially a substitute for Dr. Ofshe whose schedule apparently did not permit him to be a witness at the time counsel needed him. [Exhibits Vol. 2:163 (2 RT 195).]

The court found the exclusion of Dr. Ofshe's testimony as irrelevant was proper due to the lack of evidence of coercive tactics coupled with the defendant's admission that he confessed only because of the promise of not more than one year in custody. (Id., at p. 241.) At that time, there were cases from other jurisdictions also disallowing Dr. Ofshe's testimony on false confessions. (See e.g., Kansas v. Cobb 43 P.3d 855 (Kan.Ct.App.2002); State v. Davis (2000) 32 S.W.3d 603; New Jersey v. Free (2002) 798 A.2d 83,)[25]

On the other hand, at the time Petitioner's opening brief was filed there was a published California case as well as cases from other jurisdictions authorizing the admission of the type of evidence sought to be admitted here, in some cases specifically the testimony of Dr. Ofshe. The California case was People v. Page (1991) 2 Cal.App.4th 161. In that case the defendant sought the admissibility of expert testimony in three categories as follows:

"(1) the general psychological factors which might lead to an unreliable confession, along with descriptions of the supporting experiments; (2) the particular evidence in Page's taped statements which indicated that those psychological factors were present in this case; and (3) the reliability of Page's confession given the overall method of interrogation." (Id., at p. 183, emphasis in original.)

---

[25]    A more recent case disallowing the testimony of Dr. Leo is People v. Ramos (2004) 121 Cal.App.4th 1194, a decision from the Second District. The reviewing court found no abuse of discretion in the exclusion of Dr. Leo's testimony on police interrogation techniques and false confessions because the defense extensively cross-examined the officer on the interrogation techniques he used in the interview of Ramos and other witnesses and called witnesses who attested to the officer threatening them and attempting to coerce statements from them.

The trial court allowed evidence in category one but not two and three. The reviewing court upheld these restrictions:

> " . . .Professor Aronson outlined the factors which might influence a person to give a false statement or confession during an interrogation. Having been educated concerning those factors, the jurors were as qualified as the professor to determine if those factors played a role in Page's confession, and whether, given those factors, the confession was false." (Id., at p. 189.)

In our case, trial counsel limited his request to category one. ([Exhibits Vol. 1:151-152 (7 CT 1727-1728).] [Exhibits Vol.2:195-196 (3 RT 384-385).] Page is thus authority for defense counsel's request.

Other cases authorizing the admission of Dr. Ofshe's testimony specifically or testimony like it include United States v. Shay (1st Cir. 1995) 57 F.3d 126, 133 [error to exclude psychiatric testimony that the defendant suffered from a mental disorder that caused him to make false statements against his interest]; United States v. Hall (7th Cir. 1996) 93 F.3d 1337 [reversible error in refusing to hold a full Daubert hearing before excluding Dr. Ofshe's testimony regarding false confessions and the indicia recognized as present when that is likely to occur]; United States v. Hall (C.D. Ill. 1997) 974 F. Supp. 1198 [Dr. Ofshe found to be a qualified expert who could testify "that false confessions do exist, that they are associated with the use of certain police interrogation techniques, and that certain of those techniques were used in Hall's interrogation; Dr. Ofshe could not explicitly testify about matters of causation, specifically whether the interrogation methods used in this case caused Hall to falsely confess]; Boyer v. State (2002) 825 So.2d 418 reversible error due to exclusion of Dr. Ofshe's testimony as to "a phenomenon that causes innocent people to confess to a criminal offense; police techniques that secure false confessions under certain circumstances; and his explanation of the parameters within which one can evaluate a confession to determine its veracity]; Miller v. State (Ind. 2002) 770 N.E.2d 763 [exclusion of Dr. Ofshe's expert testimony to assist jury in understanding psychology of interrogation of mentally retarded persons deprived

defendant of opportunity to present a defense, requiring reversal]; State v. Conn. (Ct.
1976) 370 A.2d 1002) [testimony of psychologist admissible to assist jury in considering
weight and credibility of confession].

In short, at the time appellate counsel was handling Petitioner's direct
appeal, there was one California appellate court case supporting the admission of the type
of expert testimony sought herein, and one specifically declining to admit Dr. Ofshe's
testimony as well as caselaw from the federal courts and other states authorizing its
admission and finding reversible error when it was excluded.  Under such circumstances,
appellate counsel Romero was ineffective in failing to raise this issue.  First, there was
no California Supreme Court case squarely holding such evidence inadmissible, thus
appellate counsel was free to argue that the Son case, the only negative published
decision at that time, was ill-reasoned and should not be followed or to distinguish it
factually from the instant case. [26]  Further, the Sixth District Court of Appeal was not
bound by a decision of the Fourth District, the district that decided Son.  (Nabors v.
Worker's Compensation Appeals Board (2006) 140 Cal.App.4th 217, 226; Greyhound
Lines, Inc. v.  County of Santa Clara (1986) 187 Cal.App.3d 480, 485.)  Second, counsel
had a plethora of favorable authority from other states as well as federal appellate courts
upon which to base an argument that it was error to exclude the expert testimony in
question.  While not binding, the decisions of other state and federal courts are
persuasive.  (Barnett v. Rosenthal (2006) 40 Cal.4th 33, 58; Hood v. Santa Barbara Bank

---

[26]    Had there been applicable, negative California
Supreme Court authority, the appellate court in
Petitioner's direct appeal would have been
obliged to follow it.  (Auto Equity Sales, Inc. v.
Superior Court (1962) 57 Cal.2d 450, 455-456;
Fireman's Fund Insurance Company v.
Maryland Casualty Company (1998) 65
Cal.App.4th 1279, 1301.)

and Trust (2006) 143 Cal.App.4th 526, 547; Martinez v. Enterprise Rent-A-Car Company, et al. (2004) 119 Cal.App.4th 46, 55; People v. Reilly (1988) 196 Cal.App.3d 1127, 1135 [in considering the general acceptance of a new scientific technique, "a court should examine relevant decisions from other jurisdictions on the question of consensus"].) Further, appellate counsel's obligation to advance the law in the face of contrary authority per Feggans, supra, is described in Appeals and Writs in Criminal Cases (2d Ed.) as follows:

> "Counsel, however, should make arguments he or she believes to be sound even if there is current case law solidly against the position. This is how new law is made. . . . [negative] authority should be analyzed rigorously and its flaws demonstrated to the appellate court." (Id., Section 1D.42, p. 201.)

In the case at bar, appellate counsel could have made a compelling argument that the trial court's exclusion of Dr. Ofshe or Leo's testimony was reversible error. The only negative California authority at the relevant time, Son, was readily distinguishable as in that case, the defendant gave a specific reason as to why he falsely confessed. Thus there was no reason for Dr. Ofshe in that case to describe police tactics that result in false confessions. (Son, supra, 79 Cal.App.4th 224, 241.) That is not the case here. Both Dr. Ofshe and Dr. Leo had been found to be experts in the relevant subject area in other published decisions. (Hall, 974 F.Supp. 1198.) Dr. Leo has since implicitly been so found. (Scott v. Texas (Tex.App. 2005) 165 S. W.3d 27; Ramos, supra [no objection in either case that Dr. Leo was not an expert in the field about which the defense sought his testimony].) The scope of expert testimony Petitioner sought to have admitted was in line with what the Page court had approved some years earlier. The court's expressed reason for excluding the expert testimony in this case, that such testimony was not necessary to help the jury resolve the issue of witness credibility was not well taken inasmuch as, as more fully set forth in the preceding subsection, defense counsel specifically indicated he would not be asking his expert to render an opinion on

the credibility of the particular false statement by Michael Leon but rather would allow the jury to draw their own conclusion in that regard. Further, the trial court could have admitted the testimony then sustained individualized objections to any testimony that appeared to cross the line into improper opinion as to witness credibility. (State v. Miller, supra, 770 N.E.2d at p. 774.) Indeed, defense counsel was prepared to limit his expert in the manner approved by the court in United States v. Hall, supra, 974 F.Supp. at p. 1205 ["It is beyond Dr. Ofshe's knowledge as a social psychologist to assess the weight of the evidence and the credibility of witnesses."]. Further, appellate counsel could have argued that the fact that the court decided it did not need expert testimony to assist it in its determination that Michael Leon's statement was similarly not a principled basis to exclude the proffered expert testimony. As stated in Miller v. State, supra, "The trial court's threshold determination of sufficient voluntariness for admissibility of the videotape did not preclude the defendant's challenge to its weight and credibility at trial." (770 N.E.2d at p. 773.) Also see Hall, supra, 93 F.3d at p. 1344.)

Further, appellate counsel could have made an equally compelling argument that the refusal to allow the requested expert testimony was prejudicial error warranting reversal. Michael Leon's alleged statement that Petitioner essentially admitted the crime to him, stating it had been committed in self-defense was one of the centerpieces of the prosecution's case, right alongside Danette Edelberg's claim that Petitioner had not only admitted to her that he committed the murder but reenacted it as well to her. Indeed, the prosecutor argued the importance of Michael Leon's statement in the scheme of the case during his opening argument to the jury. [Exhibits Vol. 14:2214-2215 (22 RT 2563-2564).] Petitioner's defense depended upon his ability to demonstrate the unreliability of his father's highly incriminating statement to the police. Counsel's cross-examination of Mr. Leon was no substitute for the requested expert testimony, for if it were, such testimony would never be admitted on the theory that the defense could always elicit coercive factors on cross-examination. Cases allowing such expert testimony implicitly

demonstrate that cross-examination of the witness making the statement or the police officer taking it is not an adequate substitute.

Appellate counsel Lynda Romero has provided a declaration as to why she did not raise this issue.. In said declaration ([Exhibit D: Exhibits Vol. 1:44-45 (Exhibit D)], she states she had familiarity with the issue from two prior cases and had actually raised it on appeal in one case. In evaluating the issue, she reviewed several cases, which included People v. Son, supra, the case upon which the People relied in arguing against the admission of the expert testimony and two Evidence Code sections. She also listened to the tape of Michael Leon's interview with police which she opined did not show that any coercive tactics were used. She also felt that establishing prejudice from the exclusion of the requested testimony would be problematic and that the fact that the testimony in question was that of a witness as opposed to a defendant impacted the viability of the issue. She vaguely recalls discussing the issue with trial counsel.

Petitioner contends that Ms. Romero's explanation for her failure to raise this issue is unavailing. First, although she claims familiarity with the issue, it is clear that her research was inadequate as she failed to review the Page case from California that would have supported the admission of the expert testimony in this case as well as the numerous authorities from other jurisdictions cited above in existence at the time Petitioner's direct appeal was pending which would have supported it as well and which in some instances found reversible error in its exclusion. To analogize to IAC in the trial counsel context, Ms Romero made a tactical choice based on an inadequate investigation.

As such her choice is not entitled to the deference of this court:

> "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgements support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." (Wiggins v. Smith (2003) 559 U.S. 510, 123 S.Ct. 2527, 2535;

also see <u>Sanders v. Ratelle</u> (9th Cir. 1994) 21 F.3d 1446, 1456.)

Second, the case she had personally handled on appeal which involved an unfavorable and unpublished disposition of this same issue, <u>People v. Hall</u> (2000) 78 Cal.App.4th 232 was from the Fourth District. The Sixth District appellate court, which reviewed Petitioner's appeal, was not bound to follow <u>Hall</u> if the relevant portion of the case had been published. (<u>Nabors v. Worker's Compensation Appeals Board, supra,</u> 140 Cal.App. 4th at p. 226.)

Third, Ms. Romero's negative judgement of the issue based on her own review of the tape of Michael Leon's police interview does not warrant excluding the issue from Petitioner's direct appeal. She was not qualified to judge whether or not coercive tactics were used in extracting the statement from Mr. Leon. As more fully set forth above, the whole point of the proffered testimony, as argued by defense counsel, was that such techniques were subtle and not necessarily apparent to untrained eyes.

Fourth, Ms. Romero's conclusion that the issue was not worthy of arguing because the coerced statement testimony was that of a witness as opposed to a defendant is similarly not well taken. While it is true that the applicable cases happens to involve statements by defendants, nothing in those cases indicates they do not apply to witness statements as well.

Attached hereto as Exhibit E is the declaration of Sam Polverino (Exhibits Vol. 1:46-47), Petitioner's trial counsel, a veteran of many homicide trials and a certified specialist in criminal law. Mr. Polverino's assessment of the issue is that it was a critical one because of the importance of Michael Leon's testimony to the prosecution's case and that its exclusion deprived Petitioner of his right to a fair trial. Further, Mr. Polverino recalls discussing this issue with appellate counsel and so informing her of this opinion.

**b. Prejudice.**

Ms. Romero's assessment that the error in excluding the expert testimony was harmless is unavailing. She indicates in her declaration [Exhibits Vol. 1: 44-45

(Exhibit D)] that Petitioner's father's statements were not the most damaging evidence of guilt, and that even if his statements had been excluded, there was other more damaging evidence of guilt sufficient to sustain the conviction. She points to the testimony of Danette Edelberg and her brother, Shelby Arbuckle, as to Petitioner's admission of guilt and his reenactment of the crime which she characterizes as the strongest evidence of guilt. She also points to Bernard Wesley's testimony as to Petitioner's admissions concerning the crime and Danette Edelberg's testimony as to Petitioner's admission he was with Marlon Bass on the day of the murder. She also opines that Michael Leon's testimony that he had been drinking before the police interviewed him provided an alternative attack on his statements to the police and gave the jury a basis to reject said statements.

Appellate counsel's argument as to lack of prejudice is unpersuasive. Michael Leon's statement concerning Petitioner's alleged admission to him that he committed the crime in self-defense was a crucial piece of the prosecution's case. Edelberg's testimony regarding Petitioner's admissions/reenactment was not strong evidence of his guilt. Edelberg's testimony was rife with inconsistencies as to when the reenactment took place, how Petitioner reenacted the crime, and when Edelberg informed law enforcement of it. Further, she admitted lying to the police. Her testimony conflicted with that of her friend, Danielle Fournier as to how Petitioner reenacted the crime and whether or not Danielle picked Edelberg up or she left his house in her own car. Both Danette and her brother had a reason to be biased against Petitioner because of his alleged physical and emotional abuse of them. Danette and Shelby's testimony differed as to whether or not Danette told Shelby about the alleged reenactment. Further, Shelby never disclosed Petitioner's supposed admissions until shortly before his testimony. As for Bernard Wesley, his testimony was filled with contradictory statements and was inconsistent with other witnesses. In addition, he had been a suspect in the case as he was seen near the Bass residence on the day of the crime and thus had a bias toward

incriminating Petitioner. He gave the police inconsistent alibis and his girlfriend did not corroborate his story of giving her jewelry on the day in question. He admitted the crime to a co-worker although he claimed to be joking. Even the prosecution admitted that Wesley was not a good witness. [Exhibits Vol. 14:2133 (22 RT 2545).] The Smith brothers, who in 1984 told police that Petitioner had asked their help in collecting a drug debt were obvious liars. They claimed to have no relationship with Petitioner and claimed not to know Bernard Wesley despite the fact that Wesley identified them as possibly involved and they had backed Petitioner up when he collected a drug debt from Wesley.

Other evidence relied upon by the People to establish Petitioner's guilt was equivocal. No physical evidence connected him to the crime. No one saw him at the Bass house on the day of the crime. His former girlfriend Mary Keasling did not incriminate him. The case against him rested entirely on the statements of various witnesses made years after the fact. Although the prosecution pointed to the fact that Petitioner appeared to have money after the crime, there was evidence that he was employed at the time, plus had received funds from the sale of his car and an insurance settlement. Although there was evidence that he had been seen with a gun, as it turned out, this was not at the time of the killing and moreover was not shown to be the type of weapon used to kill Bass. The prosecution relied on the fact that Petitioner appeared to know facts about the killing that had not been released to the public. The defense presented evidence that such facts had not been kept secret. The prosecution argued that Petitioner's allegedly abrupt departure from the San Jose area was evidence of his guilt. Yet the defense presented evidence that said departure was planned as Petitioner had to obtain advance permission from the court to change the location of his then probation.

Defense trial counsel argued that Michael Leon had been drinking at the time he was interviewed by the police and that the statements were "a product of how police get the information they want when they want to build a case against somebody."

56

[Exhibits Vol. 14:2217-2218 (22 RT 2629-2630).] It will be recalled that Michael Leon testified that he felt pressured and threatened. [Exhibits Vol. 10:1481, 1500 (15 RT 1832, 1851).] Counsel continued:

> "And the way the police operate is that there is this, they provide inducements and they provide threats. You could be an accessory. All of these sorts of threats that are addressed to somebody. At the same time they are providing inducements; this could help your son, just tell us what was told to you. It was self-defense, just tell us. . . .
>
> What you have is their [sic] is a gradual inducements of threats and inducements. And inducements and threats. Sometimes it works with respect to Mr. Leon, sometimes it doesn't." [Exhibits Vol. 14:2218 (22 RT 2630).]

Defense counsel's argument rang hollow without any expert testimony to support it, leaving the jury free to reject it as lacking in evidentiary support. The absence of Dr. Leo or Ofshe thus cast a long shadow over this case. Without the necessary expert testimony, counsel's argument concerning the coerced nature of Michael Leon's statement to police was doomed to failure. As a previous case has observed, jurors tend to ascribe great importance to expert testimony by a qualified expert. (People v. Kelly (1976) 17 Cal.3d 24, 31.)

Based on the foregoing, Petitioner contends that he was deprived of the effective assistance of appellate counsel due to her failure to raise  on direct appeal the issue of the trial court's exclusion of expert testimony concerning police coerced statements. As demonstrated above, the issue had a reasonable potential for success. Not only did counsel have favorable authority on which to rely but she could have shown the prejudice to Petitioner's case of the exclusion of the requested testimony.

57

III

**THE SUPERIOR COURT ERRED IN CONCLUDING THAT THIS COURT WOULD HAVE FOUND ANY ERROR IN EXCLUDING THE EXPERT TESTIMONY IN QUESTION HARMLESS AND THUS DENYING THE PETITION ON THAT BASIS.**

As more fully stated in the Superior Court's order denying the Petition for Writ of Habeas Corpus, Exhibit I, the court determined that the issue was arguable, but that if there were any error in failing to raise it, the error was harmless. Petitioner submits this conclusion is erroneous.

The Superior Court points to this Court's summation of Michael Leon's statement including that Mr. Leon testified that he had lied to the police at face value, and thus a lack of prejudice as to the exclusion of the expert testimony. [Exhibits Vol. 15:2336 (Exhibit I, p. 3).] However, the jury would likely view such testimony as self-serving, given that it came out of the mouth of Petitioner's father, a man the jury was equally likely to view as having a strong motive to help his son. Obviously, an expert was required to provide a more impartial view as to why the jury should not take Mr. Leon's statements at face value. As previously observed, it is axiomatic that jurors give great importance to expert testimony by a qualified witness. (People v. Kelly, supra.)

The Superior Court also points to this Court's description of the alleged strength of the evidence against Petitioner, specifically that incriminating evidence came from Petitioner himself, that Daniel Barnett testified that Petitioner threatened Marlon, that Shelby Arbuckle testified that Petitioner knew many details about the crime and professed to have hired someone to commit the burglary, that Danette Edelberg testified that Petitioner admitted the crime to her, that defendant told his father he had acted in self-defense, that Bernard Wesley testified that Petitioner approached him to commit the burglary, and that various witnesses testified that Petitioner seemed to have money after the murder. [Exhibits Vol. 15:2336 (Exhibit I, p. 3).] As noted above, this evidence

breaks down on careful analysis and thus is not overwhelming in favor of Petitioner's guilt. For example, Shelby Arbuckle had good reason to be biased against Petitioner because of Petitioner's alleged abuse of him and kept quiet about Petitioner's admissions for years until shortly before his testimony. As for Daniel Barnett's trial testimony that Petitioner supposedly threatened to kill Marlon, he had testified differently at the Preliminary Hearing, i.e. that Petitioner threatened to kick his ass, which statement could have been made one to two years <u>before</u> the murder. [Exhibits Vol. 5:637, 639 (9 RT 989, 991).] In the preceding section, Petitioner has pointed out the numerous weaknesses, inconsistencies and lies by Danette which show that her testimony was not as strong as this Court stated in its earlier opinion in this case. The same holds true as to Bernard Wesley and Petitioner incorporates those comments rather than repeat them here. In terms of Petitioner appearing to have money after the crime, it bears repetition that he was employed at the time and had recently received an insurance settlement plus sold his car.

In sum, the reasons given by the Superior Court for denying Petitioner's Petition do not withstand reasoned analysis.

59

## CONCLUSION

Based on the foregoing, Petitioner respectfully submits that his present confinement in Santa Clara County CC093326 is illegal and a writ of habeas corpus should issue.

Dated:  May 9, 2007          Respectfully submitted,

_Julie Schumer_
JULIE SCHUMER, Attorney
For Petitioner DAVID M. LEON

### CERTIFICATE OF WORD COUNT

I, JULIE SCHUMER, declare:

I am Petitioner's counsel and prepared the foregoing Petition for Writ of Habeas corpus.  According to the word count feature of the software used to prepare the writ petition, it contains 16, 623 words.  I declare under penalty of perjury that the foregoing is true and correct.

Executed May 9, 2007 at Lamy, New Mexico.

_Julie Schumer_
JULIE SCHUMER

60

PROOF OF SERVICE

I declare that I am over the age of eighteen years and am not a party to the within action; my business address is PMB 120, 120 Village Square, Suite 120, Orinda, California, 94563.

On May 9, 2007, I served the foregoing PETITION FOR WRIT OF HABEAS CORPUS and EXHIBITS (related case Santa Clara Co. No. CC093326, People v David Leon) on the below named in said cause by placing a true copy thereof enclosed in a sealed envelope with postage fully prepaid, in the United States mail at Santa Fe, New Mexico addressed as follows:

David Leon
T-93769
PVSP A3-240
Box 8501
Coalinga, Ca.  93210

District Attorney
70 W. Hedding St.
San Jose, Ca. 95110

Attorney General's Office
455 Golden Gate Ave., Suite 11000
San Francisco, Ca. 94102

Clerk's Office
Superior Court
191 N. First St.
San Jose, Ca. 95113

I declare under penalty of perjury that the foregoing is true and correct. Executed May 9, 2007, at Lamy, New Mexico.

_Julie Schumer_
JULIE SCHUMER

1

## DECLARATION OF JULIE SCHUMER, Esq

2

3          I, JULIE SCHUMER, declare:

4          1. I am an attorney at law duly admitted to practice in the State of

5    California and before this Court.  I am Petitioner's counsel.

6          2. I have been handling criminal appeals for indigent defendants and

7    on a retained basis since 1978.  I have handled hundreds of appointed indigent

8    appeals through the appellate project system in place in the State of California and

9    am quite familiar with the compensation claim form which appointed counsel must

10   use to obtain payment.

11         3. In Exhibit F to the Petition, the Declaration of Lynda Romero,

12   Esq., Petitioner's appointed counsel on direct appeal, Ms. Romero states that at the

13   time she filed the opening brief in the direct appeal, she informed SDAP regarding

14   "unbriefed issues" that she had reviewed particular cases in connection with the

15   issue concerning the trial court's failure to allow defense counsel to present expert

16   testimony concerning coercive techniques by police in obtaining statements.

17         4. The required compensation claim form used by appointed counsel

18   in appointed cases has a section entitled "unbriefed issues" in which counsel is to

19   provide information concerning issues that were explored and rejected.  Further,

20   the compensation forms are signed under penalty of perjury.

21         I declare under penalty of perjury that the foregoing is true and

22   correct.  Executed August 11 , 2008 at Lamy, New Mexico.

23

24                    _Julie Schumer_____
                      JULIE SCHUMER

25

26

27                    EXHIBIT J

28