1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

DAVID MICHAEL LEON,

Petitioner,

v.

JAMES A YATES, et al.,

Respondent.

_____/

No. C 07-05719 CRB

**MEMORANDUM AND ORDER**

In 2001 petitioner David Michael Leon was charged with the 1983 shooting murder of Marlon Bass. The following year a jury found Petitioner guilty of first degree murder and he was sentenced to 25 years to life, plus an additional two years for using a firearm. He seeks a writ of habeas corpus under 28 U.S.C. section 2254 on the ground that he was denied his federal constitutional rights. After reviewing the record and the parties' arguments, the petition is DENIED.

**BACKGROUND[1]**

On November 30, 1983, Palmer and Annie Bass discovered the dead body of their 20-year-old son, Marlon Bass, in the hallway just outside his bedroom. Marlon, who sold marijuana, had a small bat in his hand and had been shot five times from at least three feet

---

[1]The Court will not repeat the lengthy statement of facts set forth in the Court of Appeals decision. Petition, Exh. A at 2-9.

United States District Court
For the Northern District of California

away.  Petitioner was charged with the murder 17 years later, in 2001, and convicted the following year.

The conviction was affirmed on appeal, but the case was remanded to determine the appropriate restitution and parole revocation fines.  See People v. Leon, 2006 WL 446082 *19-20 (Cal.App.6th Feb. 24, 2006).  The California Supreme Court subsequently denied review.  Petitioner then filed a habeas corpus petition with the California Superior Court, raising the additional issue of ineffective assistance of counsel.  After the California Supreme Court denied review, Petitioner filed the pending federal petition for habeas relief.

## STANDARD OF REVIEW

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or ( 2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  In general, a federal habeas court is "highly deferential" to the rulings of the state courts and grants them "the benefit of the doubt."  Woodford v. Visciotti, 537 U.S. 19, 24 (2002) (per curiam) (citation omitted).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  Williams v. Taylor, 529 U.S. 362, 412-13 (2000 ).  "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id.

United States District Court
For the Northern District of California

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision.  Id. at 412;  Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003). While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied.  Id.

If a federal court determines that a constitutional error has occurred, the court must also find that said error "had substantial and injurious effect or influence in determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).  Essentially, the petitioner must prove that any such error resulted in "actual prejudice."  Id.

## DISCUSSION

Petitioner makes four claims in challenging his conviction: (1) the 17-year delay between the murder and his prosecution violated his right to due process and a fair trial, (2) the trial court erred by excluding a portion of his third-party culpability evidence, (3) the trial court erroneously dismissed a juror during deliberations, violating his rights to a jury trial and due process, and (4) he was deprived of his right to the effective assistance of appellate counsel.

### A.      The 17-Year Delay

Petitioner claims that the 17-year pre-accusation delay violated his Fifth and Fourteenth Amendment rights to due process.  Determining whether pre-indictment delay

violates due process is a two-step inquiry.  First, "there must be some demonstration of actual prejudice resulting from the delay." United States v. Mays, 549 F.2d 670, 677 (9th Cir. 1977).  "Such prejudice will inevitably be either the loss of witnesses and/or physical evidence or the impairment of their use." Id.  The petitioner must show not only that a witness and/or evidence was lost, but also "demonstrate how that loss is prejudicial to him." Id.  This demonstration must be "definite and not speculative"; the mere "'assertion that a missing witness might have been useful'" will not suffice. Id. (quoting United States v. Galardi, 476 F.2d 1072, 1075 (9th Cir. 1973)).  "[T]he burden of showing actual prejudice is heavy and . . . is rarely met." United States v. Doe, 149 F.3d 945, 948 (9th Cir. 1998). Petitioner is not required, however, to show that he would not have been convicted but for the delay; rather, a criminal defendant suffers actual prejudice when the effect of a delay is to "unfairly impair [his] ability to defend himself." United States v. Pallan, 571 F.2d 497, 500 (9th Cir. 1978).

If a defendant can establish prejudice, the second step is to balance that prejudice against other factors such as the justification for and the length of the delay. See Mays, 549 F.2d at 678.  To amount to a due process violation, the prejudice balanced against these other factors must offend those "fundamental conceptions of justice which lie at the base of our civil and political institutions." United States v. Sherlock, 962 F.2d 1349, 1353-54 (9th Cir. 1989) (quoting United States v. Lovasco, 431 U.S. 783, 790 (1977)).

Petitioner asserts two theories of actual prejudice arising from the delay: first, he lost his right to a juvenile adjudication, and second critical physical evidence was lost and memories faded.

### 1.    Right to Juvenile Adjudication

The murder occurred one week before Petitioner's eighteenth birthday.[2]  Petitioner contends that the 17-year delay in prosecution caused him to lose the right to be tried as a

---

[2]Unless otherwise noted, the facts discussed are drawn from the California Court of Appeal Opinion. See 28 U.S.C. § 2254(e)(1) ("[A] determination of a factual issue made by a State court shall be presumed to be correct.")

4

United States District Court
For the Northern District of California

juvenile, where the sentence would be much less severe.  The California Appellate Court rejected this argument:

> [D]efendant did not have the <u>right</u> to an adjudication of the murder charge in Juvenile court.  Rather, he was entitled only to a fitness hearing.  (See former Welf. & Inst. Code, § 707, subds. (b) and (c)); stats. 1982, ch. 1282, §§ 4 & 4.5, ¶. 4747-4751.)

Petition, Exh. A, at 11.  When a minor is alleged to have committed murder, the minor has a right to move for a fitness hearing.  At such a hearing, a probation officer submits a report on the behavioral patterns and social history of the accused minor.  In murder cases the minor is presumed to be unfit for juvenile adjudication unless he can prove that he would be amenable to services provided by the juvenile court.  See <u>People v. Superior Court (Jones)</u>, 18 Cal.4th 667, 680-83 (1998).  The state court explained that notwithstanding the 17-year delay, "defendant had a fitness hearing and was found unfit" to be tried as a juvenile.  Petition, Exh. A, at 12.  The court concluded that "the record does not suggest that the court abused its discretion in finding defendant unfit or that pre-complaint delay caused the court to find him unfit."  <u>Id</u>.

Petitioner does not explain why his fitness hearing--the only proceeding required by law--was inadequate, or even how the 17-year delay prejudiced his fitness hearing.  He does not even show that had there not been a delay, he could have overcome the presumption that he was unfit to be tried as a juvenile.  Accordingly, the state court's finding of no prejudice was not contrary to nor an unreasonable application of federal law.

### 2. Lost Evidence and Fading Memories

Next, Petitioner contends the delay adversely affected eight areas of evidence: (a) the original 911 dispatch tape; (b) audiotapes of police interviews with the Smith brothers; (c) fingerprints from the baseball bat, glass shards, and the door latch; (d) a traffic ticket that Troy Tibbils claimed to have received on the day of a drug transaction between Petitioner and Marlon on the day of Marlon's murder; (e) documentation concerning Bernard Wesley's purchase of jewelry; (f) Petitioner's employment records; (g) tape recordings of interviews and conversations with witnesses; and (h) records concerning Petitioner's former girlfriend's 1984 domestic violence complaint against Petitioner.  Petitioner also complains that potential

witnesses Darryl Littlejohn, Ricky Ventimiglia, and Mitch Helms were dead or otherwise unavailable and that witnesses Sergeant Kenneth Pitts, Detective Brockman, Crystal Custodia, and Palmer Bass were unable to recall important events and circumstances. The state court found that no actual prejudice resulted from the loss of any evidence, nor from the death, loss of memory, and other unavailability of witnesses.

The Court will review each alleged source of prejudice individually to determine whether the state court's adjudication involved an unreasonable application of federal law or an unreasonable determination of the facts. Since, as is explained above, the Court concludes that it did not, the Court need not and will not address the State's argument that federal law does not recognize a constitutional violation for pre-indictment delay that is the result of police negligence.

### a.        The 911 Tape

By the time Petitioner was charged with Marlon's murder, the tape of the 911 call placed by Marlon's father ("Mr. Bass") when he discovered his murdered son had been lost. Petitioner argues that had the original 911 call and dispatch tapes been preserved, police investigators would have been able to pinpoint the time of the 911 call. He suggests that nailing down the time of the 911 call might confirm that Mr. Bass had removed drugs from Marlon's room the night before the murder, as Mr. Bass testified at trial. This fact, in turn, would negate the prosecution's argument that Petitioner's increased wealth directly after the murder suggests that he robbed Marlon.

The state court held that there was no actual prejudice from the loss of this evidence because other evidence established the time of the 911 call "with sufficient exactitude." Petition, Exh. A,  at 13.  In particular, evidence established that the 911 operator dispatches patrol officers within a few minutes of a call, and the officers received the dispatch call at 5:11 p.m.  Detective Brockman similarly testified that he received a dispatch shortly after 5:00 p.m.  "Moreover, evidence of Mr. Bass' interview with police immediately after the murder as well as his and Mrs. Bass' testimony similarly revealed that the call was made around 5:00 p.m."  Id.

Petitioner does not address these findings; instead, he contends that the evidence was in dispute as to when Mr. Bass removed the drugs from Marlon's room and therefore the loss of the 911 and dispatch tapes prejudiced him.  The state court found that Petitioner had not explained how the 911 tape "could have shed light on whether Mr. Bass removed Marlon's marijuana before *or after* the murder."  Id.  The state court also found that although Mr. Bass initially denied having found marijuana in Marlon's room the night before the murder, after having his memory refreshed he testified that he had in fact removed the marijuana the night before his son died and Petitioner's counsel emphasized that evidence during closing argument.  Id.

The Court cannot conclude that the state court's findings are unreasonable or involve any unreasonable application of federal law, especially given Petitioner's failure–after multiple opportunities–to explain how the existence of the tapes would have more definitively established when Mr. Bass removed the marijuana from Marlon's room.

### b.    The Smith Brothers' Interview Tapes

Petitioner next contends that the missing audiotapes of police interviews with the Smith brothers would have helped undermine the brothers' credibility as witnesses at trial and create questions about their involvement in the murder.  The state court found that "the tapes were cumulative, and their unavailability harmless" because "the defense had a police report of the 1984 interview with David Smith and a report and transcript of the 1984 interview with Marvin Smith."  Petition, Exh. A at 14.  Petitioner does not explain why the state court's reasoning is wrong; accordingly, the Court cannot conclude that it was.

### c.    Fingerprint Evidence

Petitioner briefly touches on the police's failure to fingerprint the baseball bat, glass shards, and front door latch.  The police did not originally fingerprint these items, and by the time of trial they were missing and unavailable for analysis.  Petitioner argues that if these pieces of physical evidence contained another person's fingerprints, they would have been persuasive exonerating evidence.

The state court noted that this argument is based on the testimony of Petitioner's expert witness, Doctor Thornton:

> This claim is based on Doctor Thornton's assumption that the objects were not tested for prints. Doctor Thornton based his assumption on the fact that there were no fingerprint cards for them. However, he conceded that he did not know and could not tell whether tests had been performed but yielded no prints. He did not consult with the officer who initially tested the crime scene. That person, Officer William Santos of the San Jose Police Department, testified that the lack of fingerprint cards does not mean that areas and objects were not processed. When prints are not found, documentation is not generated, and no record is kept of such negative results. Although Officer Santos had no recollection of testing the point of entry, he opined that it would have been something that he ordinarily would have done because it was "obviously involved in the crime scene scenario."

Id.

The court also noted that Petitioner's actual prejudice argument assumes that prints were left on the objects by a third person and further that those prints would have remained on the objects. As for the bat, the court noted that there was little evidence that suggested the burglar might have touched the bat; the bat belonged to Marlon and he was clutching it when he was found by his parents. Id. And Dr. Thornton testified that it was unlikely that there were any fingerprints on the glass shards. Finally, the state court noted that the record did not establish that the delay caused the lack of fingerprint evidence:

> As noted, the trial court found that there was insufficient evidence to charge defendant before Edelberg [Petitioner's former girlfriend] revealed his admission to her in 1986, two years after the murder. However, Doctor Thornton testified that fingerprints are not always left when one touches an object, and whether a print is left in the first place and how long it remains depends on a number of variables, including the nature of the surface, the oils on the skin, and other environmental factors.

Id. at 15. The state court concluded: "Under the circumstances, the alleged failure to test for the fingerprints that may or may not have been on the various objects and remained there until 1986 combined with the assumption that tests would have revealed the fingerprints of someone other than Marlon or defendant makes defendant's claim that he lost potentially material evidence too speculative to show that the delay caused actual prejudice." Id.

Petitioner has failed to cite any case that suggests that the state court's conclusion that Petitioner's argument is too speculative to support relief is contrary to or an unreasonable

United States District Court
For the Northern District of California

8

application of Federal law, especially since it appears so unlikely that fingerprints would have been left on these objects.

Respondent's Answer failed to address the lack of fingerprints issue and Petitioner argues in his Traverse that this omission means the Court must rule in Petitioner's favor. Upon realizing his error, Respondent submitted a Supplemental Answer which explains that the omission was an oversight and recites, verbatim, the state court's reasons for rejecting Petitioner's argument. Petitioner moves to strike the supplemental response.

The Court will strike the supplemental response since Respondent did not move for, and was not granted, permission to file a supplemental brief. That Respondent did not answer that argument, however, does not mean that Petitioner prevails. With or without assistance from Respondent the Court has an obligation to review the state court's decision and determine if it satisfies the AEDPA. For the reasons explained above, the Court concludes that it does.

### d.   Tibbils's Traffic Ticket

Troy Tibbils claimed he received a traffic ticket on the day of a marijuana drug transaction between he and Marlon. Tibbils also linked Petitioner to Marlon on that same day. Petitioner hoped to use evidence of the date of Troy Tibbils's traffic ticket to show that the drug transaction occurred on a day different from the day of Marlon's murder, thus negating the evidence linking Petitioner to Marlon on the day of the murder. Due to the 17-year pre-accusation delay, evidence of the traffic ticket was unavailable.

The state court determined that there was no actual prejudice because Tibbils was uncertain about (1) whether the marijuana transaction and murder occurred on the same day and (2) whether he received the traffic ticket on the day of the drug transaction. Petition, Exh. A at 16. In other words, even if evidence of the traffic ticket existed, and it showed Tibbils received the ticket on a day different from the murder, it would not tend to show that Petitioner was not connected to Marlon on the day of the murder, especially in light of evidence apart from Tiibbil's placing Petitioner at Marlon's house on the day of the murder.

Petitioner responds that the state court gave him too high a burden; given the delay in prosecution Petitioner never had the opportunity to prove the date of the ticket. What this argument ignores, however, is that the state court found no prejudice even assuming the ticket was issued on a date different from the murder. Petitioner also disagrees about the probative value of the other evidence placing Petitioner at Marlon's house on the day of the murder. This disagreement, however, does not rise to a showing that the state court's conclusion was contrary to or an unreasonable application of federal law.

### e.   Documentation of Wesley's Jewelry Purchase

One of Petitioner's theories is that Wesley, who had been a suspect in the case, was the actual murderer. Wesley's alibi for Marlon's murder was that he was purchasing jewelry for, and giving it to, his girlfriend on the day of the murder. Because of the delay in prosecution, however, any evidence of the purchase was lost, thus complicating Petitioner's efforts to challenge Wesley's alibi.

The state court concluded that this theory WS too speculative to demonstrate prejudice and that, in any event, Petitioner's

> claim of actual prejudice is further undermined by the fact that (1) Crystal Custodia corroborated Wesley's testimony that he stopped on Curtner near the 7-Eleven on his way to meet his girlfriend during her lunch break; (2) defendant said he saw Wesley near the 7-Eleven around that time; and (3) Wesley's former girlfriend testified at [sic] that he would meet her at lunchtime on occasion and might have given her a piece of jewelry during her lunch break. Under the circumstances, defendant fails to show that the loss of whatever documentation there might hav been was prejudicial as a matter of law.

Petition, Exh. A at 18. Again, Petitioner fails to show how the state court's conclusion involves an unreasonable application of federal law.

### f.   Petitioner's Employment Records

Petitioner briefly claims that his employment records could be used to establish his whereabouts on the day of the crime and that the pre-indictment delay resulted in the loss of those records. The state court found, however, that just one month after the murder Petitioner admitted to Sergeant Vizzusi that he did not work on the day of the murder. The court noted that Petitioner also spoke to police in 1984, 1989 and 2000 never indicated he

10

was working on the day of the murder.  The court thus concluded that he was not prejudiced by the loss of employment records.  Petition, Exh. A at 18.  The state court's no prejudice conclusion was reasonable.

### g.   Records of Edelberg's Domestic Violence Complaint

Next, Petitioner claims that the records of the domestic violence complaint to police of Danette Edelberg, Petitioner's high school girlfriend, could have impeached Edelberg's trial testimony that Petitioner admitted to killing Marlon and acted it out in front of her.  As Petitioner admits, however, it is equally likely that the records could have provided powerful corroborating evidence.  The state court found that (1) the police report of Edelberg's initial complaint to police--where she did not mention Petitioner's admission--was used to impeach Edelberg and suggest that she had fabricated his admission; (2) Petitioner failed to identify what records were lost or unavailable but instead merely assumed their existence; and (3) Petitioner did not demonstrate how any of the purported missing evidence impaired his ability to undermine Edelberg's recorded statements and testimony about Petitioner's admission or caused some other sort of actual prejudice.  Again, Petitioner fails to cite any authority that explains how the state court's conclusion was unreasonable.

### h.   Unavailability of Darryl Littlejohn and Ricky Ventimiglia

Another of Petitioner's theories is that Darryl Littlejohn could have murdered Marlon.  Petitioner asserts that because Darryl Littlejohn had died and Ricky Ventimiglia was unavailable by the time of the trial, Petitioner was unable to introduce evidence that Littlejohn had once said "let's go over and get the Black guy," referring to Marlon.  Petitioner also intended to prove that Ventimiglia had overheard the comment.  He further contends that Littlejohn owed Marlon $987 and talked about a .22 gun--the same caliber used to murder Marlon.

The state court found the death of Littlejohn and unavailability of Ventimiglia did not prejudice Petitioner because other witnesses were available to testify about the same issues.  Moreover:

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  the record does not suggest that Marlon owed [Darryl] money.  Rather, it
2  reveals that Darryl's brother Darren owed Marlon the money.  The record also
   reveals that it was Darren who talked about getting a gun for protection.

3  Petition, Exh. A at 19.  The court explained further that:

4      Daren and Geoff Caplan overheard Darryl make his comment, and Kevin
       Camara later overheard Ventimiglia and Caplan talking about Darryl's
5      comment.

6      Given the availability of other witnesses to testify about Darryl's comment,
       Darren's debt, and Darren's interest in a gun, we do not find that the
7      unavailability of Darryl and Ventimiglia caused actual prejudice.  This is
       especially so because the court ruled prior to trial and again during trial that
8      the evidence implicating Darryl was inadmissible for the purpose of showing
       possible third-party culpability.

9

10 Id. at 19-20.

11     The state court's finding was not contrary to nor an unreasonable application of

12 federal law.  Petitioner's reliance on Barker v. Wingo, 407 U.S. 514 (1972), is misplaced.

13 Barker held:

14     Prejudice, of course, should be assessed in the light of the interests of
       defendants which the speedy trial right was designed to protect. This Court
15     has identified three such interests: (I) to prevent oppressive pretrial
       incarceration; (ii) to minimize anxiety and concern of the accused; and (iii)
16     to limit the possibility that the defense will be impaired.  Of these, the most
       serious is the last, because the inability of a defendant adequately to prepare
17     his case skews the fairness of the entire system. If witnesses die or disappear
       during a delay, the prejudice is obvious. There is also prejudice if defense
18     witnesses are unable to recall accurately events of the distant past.  Loss of
       memory, however, is not always reflected in the record because what has
19     been forgotten can rarely be shown.

20 Id. at 532.  Barker does not stand for the proposition that the death of a witness creates

21 prejudice per se; rather, prejudice only occurs in so far as the death or loss of memory

22 impairs the defendant's ability to adequately prepare his case.  Because the state court found

23 that other witnesses were available to testify about the same events, the state court was not

24 unreasonable in concluding that Petitioner's defense was not impaired.

              **i.      Unavailability of Mitch Helms**

25

26     Mitch Helms, who had also sold drugs to Petitioner, was missing at the time of trial.

27 Petitioner argues that Helms's absence critically impaired Petitioner's ability to argue that

28 others might have committed the offense.  The state court rejected this claim: "other than

United States District Court

For the Northern District of California

1  noting Helms's unavailability, defendant does not explain what Helms' testimony could have
2  helped him prove."  Petition, Exh. A at 20.  Petitioner has still not explained what Helms'
3  testimony could have helped him prove; accordingly, the state court's determination of no
4  actual prejudice was not unreasonable.

### j.    Sergeant Pitts's Faded Memory

6       Petitioner alleges that Sergeant Pitts lost any recollection of the case by the time of the
7  trial, but he does not explain why that matters.  According to the state court, Pitts testified
8  about an interview of Geoff Caplan and that Sergeant Pitts' lost recollection did not prejudice
9  Petitioner because defense counsel had the police report that Sergeant Pitts prepared after the
10 interview.  "The report supported defendant's effort to show that Caplan, who had previously
11 burglarized Marlon's house, committed the murder."  Id. at 20.  In light of the content of the
12 report, the state court's decision was not contrary to nor an unreasonable application of
13 federal law.

### k.    Detective Brockman's Faded Memory

15      Petitioner also notes that Detective Brockman could not remember whether Danette -
16 Edelberg revealed Petitioner's re-enactment of the crime in a 1984 interview.  As the state
17 court explained:

> it is undisputed that Edelberg reported defendant's admission in 1986, and
> she testified about it at trial.  Defense counsel impeached her with the fact
> that although she immediately reported defendant's physical abuse, she did
> not mention his admission.  Under the circumstances, we fail to see how
> Detective Brockman's inability to remember for sure whether Edelberg told
> him about defendant's admission in 1984 caused actual prejudice.

21 Id.  Petitioner does not explain how a determination about whether Edelberg revealed the re-
22 enactment in 1984 would have aided the preparation of his defense.

### l.    Crystal Custodia's Faded Memory

24      Petitioner comments that "Crystal Custodia, who saw Wesley near the Bass residence
25 on the day of the offense, had a failure of recall."  Petition, 43:2-3.  As the state court noted,
26 "defendant does not explain what she could not recall, its significance, and the resulting
27 prejudice."  Petition, Exh. A at 21.  Furthermore, "the defense had a copy of the police report
28 containing her statement to police in 1983, which was used to refresh her recollection."  Id.

13

Lastly, "Wesley admitted that he pulled over to the curb to talk to some people that day, and defendant said that he had seen him in the area that day." Id.  Given the above findings, the state court was reasonable in determining that Petitioner suffered no actual prejudice from Custodia's failure of recall.

### m.    People v. Boyson

Petitioner cites People v. Boyson, 165 Cal.App.4th 761 (2007), for the proposition that prejudice can be found even without a showing that the lost evidence impacted the defense. In Boyson, the trial court found that the defendant was prejudiced by a 24-year delay between a murder and its prosecution.  After weighing the prejudice against the reasons for the lengthy delay, the trial court dismissed the criminal charges. Id. at 771.  The state court of appeals affirmed.  The court concluded that the trial court's finding of actual prejudice was supported by substantial evidence; namely, that the delay resulted in the loss of the most important alibi evidence. Id. at 778-80.  Boyson in no way suggests that the state court's finding of no actual prejudice here was contrary to or an unreasonable application of federal law.

## B.    Third-Party Culpability Evidence

Petitioner next contends that the trial court's exclusion of evidence that Blaine Buscher killed Marlon violated Petitioner's Sixth and Fourteenth Amendment rights to due process, a fair trial, and to present a defense.

The Ninth Circuit has explained the role of a habeas corpus court in reviewing the exclusion of evidence in a state proceeding as follows:

> [T]he Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense. The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations."  A person's right to reasonable notice of a charge against him, and an opportunity to be heard in his defense-a right to his day in court-are basic in our system of jurisprudence.

> In a habeas proceeding, we have traditionally applied a balancing test to determine whether the exclusion of evidence in the trial court violated petitioner's due process rights, weighing the importance of the evidence against the state's interest in exclusion.  In balancing these interests, we must, on the one hand, afford due weight to the substantial state interest in preserving orderly trials, in judicial efficiency, and in excluding unreliable . . . evidence. On the other hand, we must stand vigilant guard over the principle that [t]he

14

United States District Court
For the Northern District of California

1
2
3

right to present a defense is fundamental in our system of constitutional jurisprudence. In light of these competing interests, federal habeas courts must determine what weight the various interests will carry when placed on the scales, and ultimately determine whether the decision of the state court to exclude the evidence in question was reasonable or unreasonable.

4

Chia v. Cambra, 360 F.3d 997,1003 (9th Cir. 2004) (internal quotation marks and citation

5

omitted). In "assessing the interests at issue," the court balances the following five factors:

6

(1) the probative value of the excluded evidence on the central issue; (2) its reliability; (3)

7

whether it is capable of evaluation by the trier of fact; (4) whether it is the sole evidence on

8

the issue or merely cumulative; and (5) whether it constitutes a major part of the attempted

9

defense. Id. at 1004.

10

Petitioner sought to introduce William Wall's testimony that Buscher admitted killing

11

Marlon. He also sought to introduce the testimony of Kirk Hill, Laura Basolo, Shannon

12

Murphy and Mark Delaney as circumstantial evidence linking Buscher to the murder.

13

Petitioner's offer of proof was that in 1984 Wall had told police that at an all-night poker

14

party, Wall said to Buscher, "you killed that nigger," and Buscher slowly nodded once in

15

agreement.

16
17
18

Later, however, Wall denied knowing whether Buscher had known that his comment at the party referred to Marlon's murder. Wall also did not believe that Buscher had intended to accept responsibility for the murder. The police also questioned Buscher. He admitted being at the card party and said he knew Marlon from playing basketball together. However, he denied involvement in the murder.

19

Petition, Exh. A at 28.

20

Petitioner also offered evidence that Kirk Hill told police that around 7:30 p.m. on the

21

night before the murder, he, a friend, and Marlon were outside Marlon's house when an

22

unkempt white man, wearing a green army jacket, drove up in a Mustang, got out, walked up

23

to Hill and said, "you are not Buscher." Basolo and Murphy had revealed to police that on

24

the day of the murder they had seen a white man with a green army jacket around Marlon's

25

house. Furthermore, Delaney had reported that around the time of the murder, Buscher wore

26

a green army jacket. Petitioner argued that the man in the green army jacket could have been

27

Buscher, and thus the testimony of these witnesses would circumstantially connect Buscher

28

to Marlon's house around the time of the murder. "According to [Petitioner], this evidence

15

United States District Court
For the Northern District of California

plus Buscher's silent nod at the card party was strong evidence of third-party culpability." Petition, Exh. A at 28.

The trial court excluded Wall's proposed testimony on hearsay and reliability grounds. The testimony of the other witnesses was also excluded as too attenuated. Id. at 28-29.  The state court of appeals agreed that "given Wall's proposed testimony in the context it was made, no reasonable person could find that Buscher knowingly intended his one low nod to be an admission that be murdered Marlon." Id. at 29.  Similarly, "[g]iven the inconsistencies among the descriptions of the man in the green army jacket and Hill's indication that the man was not Buscher, the court reasonably could also conclude that the three observations and evidence that Buscher was known to wear an army jacket were insufficient to link him to the scene of the crime around the time it happened." Id.

The state court's decision was not contrary to nor an unreasonable application of federal law.  Wall's testimony was not sufficiently reliable in light of the ambiguity surrounding Buscher's nod even if the Court ignores that Wall later recanted any belief that Buscher had admitted perpetrating the murder.  Similarly, the state court's conclusion that the testimony of the three witnesses was too attenuated to connect Buscher to the murder was not unreasonable.

Petitioner's reliance on Chia for the proposition that evidence of Buscher's nod was reliable because reasonable people tend not to make self-inculpatory statements is misplaced. In Chia, the perpetrator unambiguously admitted to police on four separate occasions that he was involved in a conspiracy to commit robbery.  364 F.3d at 1004.  Conversely, Buscher once nodded ambiguously at a poker companion's suggestion that he had murdered an unnamed person.

Petitioner's reliance on  People v. Cudjo, 6 Cal.4th 585 (1983), is similarly misplaced. In Cudjo, the California Supreme Court reversed the exclusion of a third party admission of guilt on the grounds that doubts about the credibility of witnesses should be left to the jury, the evidence had substantial probative value, and the evidence need only be capable of raising a reasonable doubt of guilt. Id. at 610.  Here, the question of admissibility did not

turn on the credibility of witnesses; the state courts assumed that the proposed testifying witnesses could be believed. With respect to Wall, the issue was whether a reasonable trier of fact could find that Buscher intended his nod to be an admission of guilt to the murder of Marlon. And as to the other witnesses the issue was whether their testimony tended to connect Buscher to the murder.

In sum, the trial court could have admitted Petitioner's third-party culpability evidence; however, its refusal to do so in the particular circumstances of this case was not a violation of Petitioner's federal constitutional rights.

## C.    Dismissal of Juror No. 6

Petitioner also argues that his federal constitutional rights were violated when the trial judge removed a juror during deliberations.

During deliberations seven jurors sent the trial court a note:

Your Honor,

The undersigned jurors below are concerned with the unwillingness of one of the jurors, Juror #6, to participate in the process of evaluating and examining the evidence in this case. This juror has expressed negative bias based on his personal experience. This experience has caused him to disregard all police testimony. He has had personal experience with violence, guns and corrupt police and has informed us that we are naive about the police. In addition, he believes all of the witnesses were lying and has thus disregarded all testimony. Based on his comments and behavior, it appears to us that he does not understand, respect or accept our legal system.

We feel that he may have misrepresented himself . . . during jury selection. We would appreciate your advice or additional jury instructions in this matter.

(Clerk's Transcript on Appeal ("CT") 1631). The trial court then questioned Juror No. 6 who denied the jurors' accusations; he had merely expressed his belief that the investigators did not do a sufficient job to prove guilty beyond a reasonable doubt. The court then questioned the 11 other jurors individually. Juror No. 1 reported that Juror No. 6 had stated that the other jurors did not know the police as he did, and that he had seen a friend shot in the stomach when he was 13. Juror No. 2 confirmed that Juror No. 6 reported that he had seen his first shooting at 13 and, indeed, Juror No. 2 explained that he found that disturbing because he did not recall that Juror No. 6 had disclosed that information during voir dire. Other jurors also confirmed that Juror No. 6 stated that he had seen a friend get shot and

17

United States District Court
For the Northern District of California

expressed his belief that all police are liars.  Nearly all jurors reported that Juror No. 6 was hostile to the police.

The trial judge questioned Juror No. 6 again.  Juror No. 6 denied ever telling the other jurors that he had seen a friend shot in the stomach.  He also explained his belief that the other jurors were upset with him because the vote was 11 to one, and he was the one.  The judge then asked the Juror No. 6 about his criminal history, and the fact that he had been a defendant on several occasions; indeed, the record reflects that he had been booked 29 different times from 1978 through 2001.  Juror No. 6 explained that his experiences did not make him hostile to the police.

After considering the jurors' testimony, the voir dire questions, and briefing from the parties, the trial court found that Juror No. 6 had not been truthful during voir dire about whether he could be fair and impartial, and, in particular, that he was not truthful about his bias about police officers.  The judge also found that Juror No. 6 was not truthful when he denied ever disclosing to other jurors that he had witnessed a friend get shot.  The trial judge accordingly removed Juror No. 6 and replaced him with an alternate.  The jury subsequently convicted.

The removal of the juror was upheld on appeal.  The state court of appeal noted that "[a] finding that a juror harbors an actual bias and concealed it during voir dire constitutes good cause to remove that juror," and that substantial evidence supported the trial judge's "findings that Juror No. 6 lacked credibility, had lied during voir dire about not having negative experiences of the police and a bias that would prevent him from being fair and impartial, and later lied again to the court about not making certain statements during deliberations."  Petition, Exh. A at 34.

Petitioner does not challenge the law applied by the state courts; rather, he contests the trial judge's factual finding that Juror No. 6 was untruthful and demonstrated actual bias.  Under the AEDPA, the trial judge's factual findings "are entitled to a presumption of correctness, unless the petitioner can prove otherwise by clear and convincing evidence." Sanders v. Lamarque, 357 F.3d 943, 947 (9th Cir. 2004) (citing 28 U.S.C. § 2254(e)(1)).

This Court may grant the writ only if the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). In other words, Petitioner must show by clear and convincing evidence that the state trial judge "made an objectively unreasonable determination of the relevant facts." Sanders, 357 F.3d at 948.

In light of the other jurors' testimony, and the nature of the voir dire questions, Petitioner does not meet his heavy burden. While the trial judge could have made a different finding, this Court cannot conclude that Petitioner has shown by clear and convincing evidence that the state judge made an objectively unreasonable determination of the facts. The trial judge, who was present for voir dire and questioned each juror individually, did not err in disbelieving Juror No. 6 in light of the other jurors' testimony.

**4.    Ineffective Assistance of Appellate Counsel**

Finally, Petitioner argues that his conviction must be vacated because he was deprived of effective assistance of appellate counsel. To succeed on this claim Petitioner must show that his appellate counsel's conduct was objectively unreasonable and that he was prejudiced by that conduct, that is, he must show a reasonable probability that, but for his counsel's unreasonable conduct he would have prevailed on his appeal. Smith v. Robbins, 528 U.S. 259, 285 (2000).

Petitioner contends that his appellate counsel was ineffective for failing to challenge the trial court's refusal to allow the defense to present expert testimony on the subject of police coerced statements from witnesses. Petitioner sought to offer such expert testimony at trial to show that the statement his father gave to police, admitting that Petitioner had informed him the murder was committed in self-defense, was coerced. Petitioner proposed that the expert would testify as to police interrogation techniques, interview training, and why a person would make a false statement to police.

In connection with the state habeas petition, Petitioner's appellate counsel submitted a declaration in which she attests that she made a deliberate decision not to raise the issue on appeal. She had unsuccessfully raised the issue in another case, she had reviewed the tape of

United States District Court
For the Northern District of California

the father's statement to police and did not believe that it demonstrated coercive tactics, and she believed that, in any event, establishing prejudice would be difficult in light of the other evidence in the case. The state habeas court concluded that while the expert issue was

> arguable, it was not a winning argument for counsel to present on appeal.  Thus it appears that appellate counsel had to make strategic choices regarding this and the other potential issues to be brought on appeal. . . .  The risk that the appellate counsel would devote a substantial portion of their opinion to the weakest defense argument, and inadvertently give short shrift to the argument that should have prevailed, is why appellate counsel often foregoes their weakest, but still viable, points.

Petition, Exh. D at 2-3.  The court went on to deny the state habeas petition on the ground that if it was error to exclude the expert testimony, the error was harmless.  Id. at 3-4.

The state habeas court's conclusion was neither contrary to nor an unreasonable application of federal law.  First, even assuming, as Petitioner does, that the state habeas court's decision did not rest on the first Strickland prong, namely, whether appellate counsel's decision not to pursue the issue was constitutionally deficient, this Court has reviewed the record and concludes that it was a reasonable tactical decision.  Petitioner's assertion that appellate counsel's investigation of the issue was inadequate because she did not review the decision in People v. Page, 2 Cal.App. 4th 161 (1991), as well as authority from outside of California, is unpersuasive.  Page did not hold that such expert testimony must be admitted as the trial court had admitted the proffered testimony and the defendant was nonetheless convicted; instead, the Page court affirmed the exclusion of other expert testimony.  2 Cal.App.4th at 184-89.  And Petitioner does not cite any case that suggests that counsel's investigation of an issue is constitutionally deficient if she does not review authority from every jurisdiction, even if not controlling.  Moreover, appellate counsel's judgment that even if Petitioner prevailed in showing error, such error would be found harmless, was not unreasonable, especially in light of the state court of appeal's ultimate determination.

Second, the Court cannot conclude that the state habeas court's determination of harmless error was so unreasonable as to justify the granting of the writ.  While Petitioner's father's testimony was important, as the state courts have noted there was other evidence of

20

Petitioner's guilt of equal if not more probative value than the father's testimony. Moreover, the reliability of the father's statement to police, which he did not repeat at trial, was thoroughly challenged at trial even without the assistance of expert testimony.

In sum, while it would not have been unreasonable for appellate counsel to challenge the exclusion of the proffered testimony, on this record the Court cannot conclude that the state habeas court's denial of Petitioner's ineffective assistance of appellate counsel claim was contrary to or involved an unreasonable application of federal law.

## CONCLUSION

For the reasons stated above, the petition for habeas corpus is DENIED.

**IT IS SO ORDERED.**

Dated: March 24, 2009

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California